## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| Essex Insurance Company, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  3:15-cv-506-WHA |
| | ) | |
| J&J Cable Construction, LLC, *et al.* | ) | **OPPOSED** |
| Defendants. | ) | |
| | ) | |
| And Related Actions | ) | |

## MOTION FOR SUMMARY JUDGMENT

Essex Insurance Company moves this Honorable Court for entry of summary judgment in its favor as to all claims for coverage made by J&J Cable Construction, LLC,  and all related claims by Dixie Electric Cooperative, Marrell A. Crittenden, Jr., Individually and as Next Friend of M.C., a minor, and A.C., a minor, and Courtney Bynum Crittenden, Individually and as Next Friend of M.C., a minor, and A.C., a minor, and Caroline Torrence pursuant to FED. R. CIV. P. Rule 56 and applicable Alabama law.[1]

---

[1]  The insurance policies were issued to J&J Cable in Alabama.  *See,* Doc. 1, ¶¶ 2 & 16.  "In diversity cases, the choice-of-law rules of the forum state determine which state's substantive law applies. Alabama law holds that the law of the state where the insurance policy was delivered to the insured controls the interpretation of the insurance contract." *Travelers Indem. Co. v. Gen. Star Indem. Co*., 157 F. Supp. 2d 1273, 1285 (S.D. Ala. 2001).

Essex is entitled to summary judgment as a matter of law because:

1.   The Total Pollution Exclusion provides the insurance policy "does not apply to … '[b]odily injury' or 'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' [*i.e*., 'any solid, liquid, [or] gaseous … irritant or contaminant, including … waste'] at any time."   The underlying claims all arise from the overflow of raw sewage (including human waste and feces) which each claimant encountered in November 2013.

2. The insured, J&J Cable, lacks substantial evidence that Marrell Crittenden's bodily injury and property damage claims occurred before the insurance policy expired at 12:01 a.m. on November 12, 2013.

3. Courtney Crittenden's bodily injury and property damage claims occurred on November 16, 2013; clearly after the insurance policy expired at 12:01 a.m. on November 12, 2013.

4. The bodily injury claims of M.C., a minor, occurred on November 16, 2013; clearly after the insurance policy expired at 12:01 a.m. on November 12, 2013.

5.     The bodily injury claims of A.C., a minor, occurred on November 16, 2013; clearly after the insurance policy expired at 12:01 a.m. on November 12, 2013.

6.     The insured lacks substantial evidence that Caroline Torrence's bodily injury and property damage claims occurred before the insurance policy expired at 12:01 a.m. on November 12, 2013.

This motion is supported by all of the pleadings and other documents before the Court and the Evidentiary Materials in Support of Essex's Motion for Summary Judgment filed herewith.

## I.  Procedural Background

This Complaint for Declaratory Judgment (Doc. 1), as amended (Doc. 61), arises out of two lawsuits filed in the Circuit Court of Montgomery County, Alabama:

> *Marrell A. Crittenden, et al. v. Dixie Electric Cooperative and J&J Cable Construction, LLC*, Civil Action No. CV-2014-900103 (the "Crittenden Action").

> *Caroline Torrence v. Dixie Electric Cooperative, et al*., Civil Action No. CV-2015-901757 (the "Torrence Action").

*See,* Exhibit A, the complaints in the Crittenden Action; and Exhibit B, the complaint in the Torrence Action.

3

## A.  Crittenden Action

The Crittenden Action seeks recovery for bodily injury and property damage alleged by Marrell A. Crittenden, Jr. and by Courtney Bynum Crittenden, and bodily injury alleged by their two minor children, M.C. and A.C.  Those damages to each claimant allegedly occurred as a result of an overflow of sewage into the rental house the Crittendens were occupying in November 2013. However, as shown below in Section III.D.1-4, their injuries/damages did not all occur on the same day.

The Crittendens' original complaint alleged:

> a.    "***On or about November 15, 2013 until approximately November 24, 2013, raw sewage began to and continued to seep and invade [the Crittendens'] home*** through bathroom toilets, under various walls within their dwelling place, the family living room, and various closets within the household and in hallways. The seepage of raw sewage made the home uninhabitable causing them to move, destroyed their possessions within the household and caused mental anguish, mental distress and other illnesses for the household members."  Compl., Exhibit A, ¶ 9; emphasis added.

The Crittendens' First and Second Amended Complaints allege:

> a.    "On or about November 3, 2013 until approximately November 11, 2013, the sewage line was breached and ***thereafter*** raw sewage began to and continued to seep and invade their home...." Exhibit A, First Am. Compl. at ¶ 9; Second Am. Compl. at ¶ 10; emphasis added.

> b.    Count One is styled "negligent/wantonness" and alleges Dixie Electric and J&J Cable "negligently and/or wantonly

4

*caused raw sewage to seep into the home* of the plaintiffs." Exhibit A, First Am. Compl. at ¶ 12; Second Am. Compl. at ¶ 17; emphasis added.

c. Count Two is styled "nuisance" and alleges the defendants created a nuisance in the household of the plaintiffs at an unspecified time. Exhibit A, First Am. Compl. at ¶ 15; Second Am. Compl. at ¶ 20.

d. Count Three is styled "trespass" and alleges the defendants' activities constitute a trespass. Exhibit A, First Am. Compl. at ¶ 18; Second Am. Compl. at ¶ 23.

## B. Torrence Action

The Torrence Action seeks recovery for bodily injury and property damage alleged by Caroline Torrence. Her damages also allegedly occurred as a result of an overflow of sewage into the rental house she was occupying in November 2013.

The Torrence complaint copies the Crittenden Second Amended Complaint with substantially identical allegations:

a. "On or about or between November 3, 2013 until approximately November 11, 2013, the sewage line at Plaintiff's home was breached and *thereafter* raw sewage began to and continued to seep and invade Plaintiff's home...." Exhibit B, at ¶ 7; emphasis added.

b. Count One is styled "negligent/wantonness" and alleges Dixie Electric and J&J Cable "negligently and/or wantonly *caused raw sewage to seep into the home* of the Plaintiff." Exhibit B, at ¶ 14; emphasis added.

    c.    Count Two is styled "nuisance" and alleges the defendants created a nuisance at an unspecified time.  Exhibit B, at ¶ 17.

    d.    Count Three is styled "trespass" and alleges the defendants' activities constitute a trespass. Exhibit B, at ¶ 20.

## C.  Dixie Electric Cross-Claims

The Cross-claim filed by Dixie Electric against J&J Cable in the Crittenden Action seeks recovery from J&J Cable for breach of:

> [A] common law duty of indemnity and/or contribution to Dixie which has caused Dixie to incur damages, including but not limited to, the cost to investigate the broken sewer laterals; the cost to repair the broken and damaged sewer laterals; the cost associated with the loss of use of property resulting from the broken and damaged sewer laterals; the cost to clean up the houses at 8212 Ryan Ridge Loop and 8216 Ryan Ridge Loop; attorneys' fees, costs, and expenses incurred in defending this litigation; and any possible judgment in favor of the Crittendens and against Dixie in this action.

Exhibit T, Cross-claim – Crittenden Action at ¶ 14.

The Cross-claim filed by Dixie Electric against J&J Cable in the Torrence Action makes identical claims relative to Torrence.  Exhibit U, Cross-claim – Torrence Action at ¶ 14.

## II.  Summary of Issues

This declaratory action raises three principle issues:

1.    Does the Total Pollution Exclusion apply to bar coverage for any claims that occurred during the policy period? The burden is on the insurer to establish that the Total Pollution Exclusion applies. As shown below, at Section III.C, that is easily proven and the insured cannot offer substantial evidence that the damages were not caused by excluded pollutants.

2.    Did any of the various *separate* claims occur before the Essex CGL policy expired at 12:01 a.m. on November 12, 2013?  The burden to establish each of the claims arose during the policy period is on the insured.  As shown below, at Section III.D.1-4; there is not substantial evidence to enable the insured to meet that burden.

3.    Does Dixie Electric have standing to assert coverage under the Essex CGL policy? This is, in fact, a nonissue light of Dixie Electric's concession in its interrogatory answers that it does not claim to be an additional insured under the Essex policy, as discussed in Section III.E below.  As also demonstrated in Section III.E, Dixie Electric does not assert a covered claim against J&J Cable.

### III.  Undisputed Facts

**A.  Essex CGL Policy**

Essex issued the CGL Policy to J&J Cable on an occurrence basis for the period from 12:01 a.m. on November 12, 2012, to 12:01 a.m. on November 12, 2013.  See Essex CGL Policy, Exhibit V.  The Essex CGL Policy was incorporated into the complaint by reference.  [Doc. 1, ¶ 16.]   The terms pertinent to this motion are set forth below.

The Essex CGL Policy covers damages as a result of covered "property damage" and "bodily injury" caused by an "occurrence," subject to certain exclusions:[2]

> SECTION I -COVERAGES
> COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY
> 1.  Insuring Agreement
>> a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply....
>
>> ….

---

[2] *E.g.*, exclusion b, contractual liability, "This insurance does not apply to 'Bodily Injury' or 'Property Damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  Exhibit V, Form CG 00 01 12 07, p. 2.

b. This insurance applies to "bodily injury" and "property damage" only if:

....

(2) The "bodily injury" or "property damage" occurs during the policy period;

....

Exhibit V, Form CG 00 01 1207, p. 1.

The Essex CGL Policy contains a Total Pollution Exclusion Endorsement that states:

**TOTAL POLLUTION EXCLUSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

....

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**....**

Exhibit V, Form CG 21 49 09 99.

The term "pollutants" means "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." Exhibit V, Form CG 00 01 12 07, p. 5.

It is not apparent the insured seeks coverage under Coverage B of the Essex

CGL policy.  However, if such coverage is sought, the following policy terms are

pertinent:

> COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY
>
> 1 . Insuring Agreement
>
>> a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury"[3] to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. ….
>>
>> ….

Exhibit V, Form CG 00 01 12 07, p. 6.

The exclusions from Coverage B include:

>> e.  Contractual Liability
>>
>> "Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.
>>
>> f.  Breach Of Contract

---

[3] "Personal and advertising injury" means injury … arising out of … False arrest …; Malicious prosecution;  wrongful eviction …; Slander[] or libel[] …; [etc.] …."  Exhibit V, Form CG 00 01 12 07, p. 14.

> "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement"
>
> ….
>
> m. Pollution
>
> "Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

Exhibit V, Form CG 00 01 12 07, pp. 6-7.

## B.  Undetected Breach of Sewer Laterals

Dixie Electric was requested by Ryan Ridge LLC to provide underground residential electrical service to a new section of the Ryan Ridge Subdivision in Montgomery, Alabama.  Doc. 10, Cross-claim, at ¶ 2. To provide electrical service, Dixie Electric had to install underground electrical conduit along Ryan Ridge Loop, where there were some existing houses that were part of an older section of the subdivision.  *Id*. Dixie Electric hired J&J Cable to perform the underground electrical portion of this work and informed J&J Cable how much conduit to use and where to run the conduit.  *Id*.; *see also* March 6, 2015 Jerry Weir Affidavit, ¶¶ 6, 12, attached hereto as Exhibit C; 2014 Noblitt Depo., 76:13-76:15, 76:19-77:1, and 164:8-171:22, excerpts attached hereto as Exhibit D. J&J Cable performed its work sometime between November 8, 2013 and November 11, 2013.  Exhibit C, October 5, 2015 Affidavit of Jerry Weir ¶¶ 4-8; Exhibit D, 43:17-44:6, 146:21-147:9, 173:20-174:5, and 206:12-206:21.

11

At some time during J&J Cable's work, it breached the sewer laterals that connected 8212 and 8216 Ryan Ridge Loop to the main sewer line.  Exhibit D, 45:6-45:13 and 48:1-48:15.  The actual date of the breach of the sewer laterals is still in question as even J&J Cable's owner testified that he could not state definitively that the breach occurred before November 19, 2013, as indicated on certain documents.  Exhibit D, 74:6-74:17, 74:19-75:11.

There was no indication that anyone knew the sewer laterals were breached until sometime after the work was completed:

- Dixie Electric approved J&J Cable's work after it was completed. Exhibit C, March 6, 2015 Affidavit ¶ 14.

- The ***Crittendens did not notify anyone about the sewage issue in the home until November 25, 2013***.  2014 Courtney Crittenden Depo., 69:5-70:18, 107:22-108:8, 125:16-129:17, excerpts attached as Exhibit E; 2016 Courtney Crittenden Depo., 34:12-34:15, excerpts attached as Exhibit F; November 26, 2013 Letter from Dr. Anderson to Ms. Singleton, Exhibit G.

- ServPro was contacted to perform work on 8212 Ryan Ridge Loop on ***November 25, 2013***.  *See* ServPro First Notice of Loss, Exhibit H.

- Dixie did not learn about the damage to the sewer laterals or the sewage backup until ***November 22, 2013***. 2014 Brad Arrington Depo., 30:4-31:7, excerpts attached as Exhibit I; 2016 Brad Arrington Depo., 26:10-27:22, excerpts attached as Exhibit J.

- J&J Cable did not learn about the damage to the sewer laterals or sewage backup until ***November 25, 2013***, or later.  Exhibit C, October 5, 2015 Affidavit ¶ 9; Exhibit D, 42:12-43:16; 2016 Noblitt Depo., 22:10-22:19, attached hereto as Exhibit K.

## C.   Evidence of Pollutants

The testimony of the claimants makes quite clear that their damages were caused by exposure to raw sewage containing human waste.  For example, Marrell Crittenden repeatedly testified the sewer water contained feces.  *See, e.g.*, 2016 Marrell Crittenden Depo., 40:9-40:17, and 43:16-43:20, excerpts attached as Exhibit L.  Courtney Crittenden repeatedly testified there was "human waste" in the sewer water.  *See, e.g.*, Exhibit F, 28:10-28:22.  Bynum testified there was "human waste," "bowel movement," and "BM Pebbles" in the sewer water.  *See, e.g.*, 2016 Courtney Bynum Depo., 37:3-37:19, excepts attached hereto as Exhibit M.  Likewise, Caroline Torrence testified the "raw sewage" that overflowed into her house contained feces and "human waste."  2016 Caroline Torrence Depo., 18:4-18:11 and 19:3-19:13, excerpts attached at Exhibit N.

## D.   Evidence of Dates of Occurrence

The great weight of the evidence points to November 15-16, 2013, as the first day that sewage backed up into the Crittenden and Torrence houses. On December 9, 2013, claimants' counsel wrote a letter to Dixie Electric

Cooperative stating that "[t]he claim arises out of an incident wherein Dixie Electric and others negligently and/or wantonly caused or contributed to causing raw sewage to flood their home.   The events began as early as November 15, 2013." Letter from Tyrone Means to Dixie Electric, Exhibit O.   The Crittendens' original complaint asserted "on or about ***November 15, 2013*** … raw sewage began … to seep and invade their home…." Exhibit T, original Compl. at ¶9; emphasis added.   Courtney Crittenden and her sister, Courtney Bynum, repeatedly testified that the sewage overflow occurred on ***November 16, 2013***, as shown below.

### 1.   Earliest Date of Occurrence for Courtney Crittenden's Claim: November 16, 2013

Courtney Crittenden did not recall any sewage entering the house before ***November 16, 2013***.   Exhibit E, 63:8-63:16.   She testified that the overflow started on ***November 16, 2013***.   Exhibit E, 63:8-65:20, 70:23-73:23, and 81:12-82:18.   Courtney Crittenden does not recall when any sewage first came into contact with her personal property.   Exhibit F,  63:10-63:23.

Her sister, Courtney Bynum, testified she does not recall Courtney Crittenden or Marrell Crittenden telling her of a plumbing or sewage backup before ***November 16, 2013***.   Exhibit M, 32:17-33:15, 62:1-62:4, and 82:3-82:7.   According to Courtney Bynum, the sewage overflow occurred on

14

*November 16, 2013*.[4]  2014 Bynum Depo., 43:3-44:23, 46:8-46:23, and 59:3-60:16, excerpts attached as Exhibit P.

### 2.  Earliest Date of Occurrence for Minors' Claims: November 16, 2013

On *November 16, 2013*, A.C. and M.C. were taking a shower when A.C. got out of the shower and went to tell her mother that water was overflowing out of the toilet.   Exhibit F, 15:9-15:22.   Neither A.C. nor M.C. mentioned any sewage backup before *November 16, 2013*.  Exhibit F, 22:5-22:12.

Marrell Crittenden did not observe anything about his daughters, such as any symptoms or abnormalities, that he thought was related to the sewage backup prior to *November 16, 2013*.  Exhibit L, 69:2-69:15.

Bynum testified that her nieces (M.C. and A.C.) did not report any sewage backup to her before *November 16, 2013*.  Exhibit M, 61:20-61:23.

The Crittendens' expert in the Crittenden Action, Harry A. Milman, Ph. D., opined that:

> In my professional opinion within a reasonable degree of scientific certainty, it is more probable than not that baby [M.C.] was exposed in her home to raw sewage containing bacteria, viruses and other microorganisms as well as to toxic chemicals present in raw sewage *between November 16, 2013 and November 25, 2013.*

---

[4] In 2016 Bynum testified about plumbing backing up on or about November 2, 2013, which is patently unbelievable because there is no evidence J&J Cable performed any work at Ryan Ridge before November 8, 2013.

*See* Harry A. Milman, Ph. D. 2014 Report, Opinion 1, attached hereto as Exhibit Q.  As the basis for his opinion, Milman noted that "[b]eginning on or about **November 16, 2013 until November 25, 2013**, toilets in the Crittenden home overflowed with raw sewage onto the floor of the bathrooms and adjoining hallway and bedrooms."  *See* Exhibit Q, Opinion 1, Basis of Opinion 1.  Milman further noted that:

> On November 24, 2013, when baby [M.C.] was 26 months old and eight days after sewage backup began in the Crittenden home [*i.e., November 16*], [M.C.] had a noticeable rash with swollen areas. The onset of her symptoms is consistent with baby [M.C.]'s more probable than not dermal contamination with infectious agents and caustic chemicals present in raw sewage.

*See* Exhibit Q, Opinion 2, Basis of Opinion 3.

There is no evidence the minors suffered property damage.

### 3.  Earliest Date of Occurrence for Marrell Crittenden's Claim: November 12-16, 2013

There is no admissible evidence regarding when Marrell Crittenden first encountered any sewage overflow.  He simply does not know when he first noticed or experienced the sewage backup.  Exhibit L, 25:6-25:11 ("As far as dates, I don't quite remember."); 26:1-26:16 (I don't know the dates [when it began]….").

In 2014 he testified:

> Q.    Okay. ***When's the first time you noticed any problems with either smell or something coming out of the toilets or the tub?***
>
> A.    ***I don't know the exact date,*** but before that date, I remember having to clean our bathroom floor and toilet because of some issues with it over flooding and it also came up in the -- it would come up in the shower adjacent to that toilet.
>
> Q.    Was this the master bathroom?
>
> A.    Correct.
>
> Q.    ***Do you know how long in time it was before your wife had the problem on the 16th?***
>
> A.    ***No***.
>
> Q.    Did it happen again, or were you able to fix it?
>
> A.    I mean, I just cleaned it up. I didn't fix anything. And it just kept recurring. And it gradually got worse and worse, and I remember her mentioning to me about their situation.

2014 Marrell Crittenden Depo. at 46:4-47:2, excerpts attached as Exhibit R, emphasis added.

Courtney Crittenden also testified:

> Q.    You said your husband had mentioned something before [November 16]?
>
> A.    Prior, yes.
>
> Q.    When was that?
>
> A.    I would say like that Monday or Tuesday. ***I don't know the date***, but it was prior to the 16th.[5]

Exhibit E, 64:2-64:8, emphasis added.

---

[5] While hearsay, this testimony still does not establish that Marrell Crittenden, in fact, encountered any sewage by Monday, November 11, 2013.

Marrell Crittenden does not recall Courtney Crittenden reporting a sewage backup prior to *November 16, 2013*. Exhibit L, 58:3-58:4; 58:8-58:11. Neither of Marrell Crittenden's daughters reported a sewer backup to him prior to *November 16, 2013*. Exhibit L, 58:12-58:19. He has no reason to believe anyone else knew about the sewer backup prior to *November 16, 2013*. Exhibit L, 58:20-59:4. He did not tell anyone in the house to not use the toilets or tubs/showers prior to *November 16, 2013*. Exhibit L, 59:14-59:17.

None of his personal property came in contact with the sewage before *November 16, 2013*. Exhibit L, 59:18-60:2. When asked if he "sustain[ed] any injury while cleaning any time prior to *November 16*?", Marrell Crittenden testified "Not that I was aware of at the time, no." Exhibit L, 60:3-60:6.

In his 2016 deposition, Marrell Crittenden contradicted his 2014 testimony in an apparent attempt to put his first contact with the sewage at a date before the Essex policy expired.  However, his attempt yielded conflicting testimony and is insufficient to bar summary judgment. [6]  He testified that he noticed discoloration in the water as early as when J&J

---

[6] Alabama law is clear that "a party is not allowed to directly contradict prior sworn testimony to avoid the entry of summary judgment." *Continental Eagle Corp. v. Mokrzycki*, 611 So. 2d 313, 317 (Ala. 1992), citing *Doe v. Swift*, 570 So. 2d 1209, 1214 (Ala. 1990).

Cable was working in the subdivision and he had to clean the tub and shower when the men were working.  Exhibit L,  25:13-26:19, and 51:3-51:9.  The sewage did not come out of the toilet until later, but he could not specify a date. *See* Exhibit L, 51:3-51:22.  And again, he did not tell his family to not use the bathrooms.  Exhibit L, 59:14-17.

Marrell Crittenden's expert, Harry A. Milman, Ph. D., reported that the Crittendens' house became contaminated **between November 16, 2013 and November 25, 2013**.  Exhibit Q.  More specifically, he reported Marrell Crittenden experienced nausea and headaches from his exposure to raw sewage that contaminated his home **between November 16, 2013 and November 25, 2013**.  *See* Exhibit Q, Opinion 3, Basis of Opinion 1-2.

### 4.  Earliest Date of Occurrence for Caroline Torrence's Claim: November 12, 2013

The Torrence Action asserts: "[B]etween November 3, 2013 [and] … November 11, 2013, the sewage line at Plaintiff's home was breached…." That allegation continues "***thereafter*** [*i.e.*, after the November 3-11 timeframe] raw sewage began to and continued to seep and invade Plaintiff's home...."  Exhibit B ¶ 7.

Torrence could not offer any testimony as to when the sewage backup into her home first occurred.  Exhibit N, 18:16-19:2.  She does not know where the dates in paragraph 7 of the complaint come from, to wit "On or

19

about or between November 3, 2013, until approximately sometime after November 11, 2013, the sewage line at plaintiff's home was breached." Exhibit N, 55:11-55:21.  In fact, she could not testify that the sewage line was in fact breached during that time frame.  Exhibit N, 56:7-56:9, 56:13-56:18.  She testified her claim is based on:

> the pipe breaking, and it [feces; sewage with human waste in it] coming out of my toilet and my tub and my showers.  Because it's -- it's an incident.  I have not had any personal plumbing problems other than this incident as a result of this incident with them breaking the pipe.

Exhibit N, 17:8-17:14.

She simply does not recall the date of the sewage overflow.  Exhibit N, 18:4-18:21, 40:16-21, and 41:5-41:11. She does not recall when the pipe was broken.  Exhibit N, 18:12-18:15. Prior to the sewage overflow, Torrence had no problems with the plumbing system at all.  Exhibit N, 73:14-73:19.

## IV. Argument

Based on the undisputed facts recited above and the evidence contained in Essex's Evidentiary Materials in Support of Motion for Summary Judgment, Essex is entitled to summary judgment as a matter of law finding that all the claims are based on bodily injury or property damage that would not have occurred, in whole or in part, but for the seepage or discharge of pollutants (*i.e.*, raw sewage

containing human waste).   Therefore, those claims are barred by the Total Pollution Exclusion in the Essex CGL Policy.

Additionally, Essex is entitled to summary judgment as a matter of law because the separate, individual claims of Marrell Crittenden, occurred *after* the Essex CGL Policy expired; the separate, individual claims of Courtney Crittenden occurred *after* the Essex CGL Policy expired; the separate, individual claims of M.C., a minor, occurred *after* the Essex CGL Policy expired; the separate, individual claims of A.C., a minor, occurred *after* the Essex CGL Policy expired; and the separate, individual claims of Caroline Torrence occurred *after* the Essex CGL Policy expired.

## A.  Summary Judgment Standard

The usual standard of review applies to this summary judgment motion. *See, e.g.*, FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); and *Clarke v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (l1th Cir. 1991).

Thus, to defeat this summary judgment motion, each of the defendants separately must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to each non-moving party.  *Dominick v. Dixie Nat'l Life Ins. Co*., 809 F.2d 1559 (11th Cir. 1989).  If they cannot do so,

Essex is entitled to judgment on the claims asserted by each such defendant as a matter of law.

Under Alabama law, the insured bears the burden of establishing coverage by demonstrating that a claim falls within the policy. *Universal Underwriters Ins. Co. v. Stokes Chevrolet, Inc.*, 990 F.2d 598 (11th Cir. 1993). The insurer then bears the burden of proving the applicability of any policy exclusion. *Acceptance Ins. Co. v. Brown*, 832 So. 2d 1, 12 (Ala. 2001). "If an insurance policy is ambiguous in its terms, the policy must be construed liberally in favor of the insured, and exceptions to coverage must be interpreted as narrowly as possible in order to provide maximum coverage to the insured. However, if there is no ambiguity, an insurance contract must be enforced as written, and courts should not defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties." *Auto-Owners Ins. Co. v. Toole*, 947 F. Supp. 1557, 1561 (M.D. Ala. 1996), citing *Colonial Life & Accident Ins. Co. v. Collins*, 194 So. 2d 532, 535 (Ala. 1967), *U.S. Fidelity & Guar. Co. v. Armstrong*, 479 So. 2d 1164, 1168 (Ala. 1985), and *Altiere v. Blue Cross & Blue Shield*, 551 So. 2d 290, 292 (Ala. 1989).

## B.  Essex is Entitled to a Declaration There is No Duty to Defend J&J Cable for Bodily Injury or Property Damage Caused by Pollution

As stated in the prior section, the insured has the burden to prove coverage, while Essex has the burden to prove application of an exclusion.

22

Essex meets that burden here with contradicted testimony by all of the claimants that their damages were caused by the seepage or discharge of "pollutants" - sewage containing feces and other human waste - into their houses.

Before delving into case law discussing "pollution exclusions," Essex acknowledges that not all pollution exclusions are the same. "The first generation of pollution-exclusion clauses—the predecessor to the 'absolute' clause—has come to be known as the 'qualified' pollution-exclusion clause." *Porterfield v. Audubon Indem. Co*., 856 So. 2d 789, 793 (Ala. 2002). In *U.S. Fid. & Guar. Co. v. Armstrong*, 479 So. 2d 1164 (Ala. 1985), the Alabama Supreme Court "noted that such a clause was 'relatively new to the insurance industry [in 1985]' and that '[i]ts insertion in standard liability policies began in the past decade in an attempt to protect the environment by eliminating coverage for industry-related pollution damages.'" 479 So. 2d at 1168. The "total" or "absolute" pollution exclusion commonly found in CGL policies today is not as narrow in its application as was the "qualified" pollution exclusion.

There are no reported Alabama decisions addressing the applicability of the pollution exclusion (whether qualified or absolute) to a sewer backup *per se*. The 1985 *Armstrong* case*,* 479 So. 2d 1164, involved overflow of raw sewage onto plaintiff's land. That case interpreted a "qualified" pollution exclusion. In

23

contrast, the Essex CGL Policy has a "total" pollution exclusion.  The difference

between those two policies is important and stark:

Qualified Pollution Exclusion in <em>Armstrong</em>

> This insurance does not apply to bodily injury or property
> damage arising out of the discharge … of … waste materials or
> other irritants, contaminants or pollutants into or upon land, the
> atmosphere or any water course or body of water; but this
> exclusion does not apply if such discharge, dispersal, release or
> escape is sudden and accidental."

Total Pollution Exclusion in Essex CGL Policy

> This insurance does not apply to … "[b]odily Injury" or
> "property damage" which would not have occurred in whole or
> part but for the actual, alleged or threatened discharge,
> dispersal, seepage, migration, release or escape of "pollutants"
> at any time.

In *Shalimar Contractors, Inc. v. Am. States Ins. Co*., 975 F. Supp. 1450,

1456 (M.D. Ala. 1997) *aff'd sub nom. Shalimar Contractors v. Am*., 158 F.3d 588

(11th Cir. 1998), the court held the insured's alleged negligence in disposing of

lead-bearing waste and temporarily depositing lead contaminated work clothes

near plaintiff's apartment fell within the absolute pollution exclusion clause in the

general liability policy.   The court found "the [absolute or total] pollution

exclusion ... is markedly different from the [qualified] pollution exclusions at issue

in the cases cited by the Plaintiff [including *Armstrong*, 479 So. 2d 1164]." That

decision found the absolute pollution exclusion was not limited to pollution of a

broad natural environment resulting from industrial activity. 975 F. Supp. 1455.

24

In *Kruger Commodities, Inc. v. U.S. Fid. & Guar.*, an insured was sued over offensive odors emanating from the insured's rendering plant which processed used cooking oils and animal carcasses.  923 F. Supp. 1474, 1476-77 (M.D. Ala. 1996).  The insurer denied coverage because of the absolute pollution exclusion contained in that policy. The *Kruger Commodities* decision stated, without reference to Nebraska authority,[7] "this case involved an absolute pollution exclusion, which the overwhelming majority of courts have found to bar coverage for all types of pollution claims." *Id.*  Furthermore, the court found the absolute pollution exclusion was unambiguous. *Id.*  And, as noted earlier in that decision, "[i]n reviewing the extensive litigation on absolute pollution exclusions, one federal court stated that 'Courts faced with the absolute exclusion generally have concluded that it is unambiguous and excludes coverage for all claims alleging damage caused by pollutants.'" 923 F. Supp. at 1478, citing *City of Salina, Kansas v. Maryland Cas. Co.*, 856 F. Supp. 1467, 1476 (D. Kan. 1994).

Only one reported decision based on Alabama law found an absolute pollution exclusion was ambiguous, but the ambiguity in that case is not present here.  *See, Porterfield*, 856 So. 2d 789 (Ala. 2002) (terms "discharge," "dispersal," "release," or "escape" were ambiguous in the context of flaking and peeling lead

---

[7]  "Because there is no Nebraska case addressing the application of a pollution exclusion, the court must look to other jurisdictions for persuasive authority."  923 F. Supp. at 1478.

paint ingested or inhaled by tenants).  *Compare*, *Federated Mut. Ins. Co. v. Abston Petroleum, Inc*., 967 So. 2d 705, 713 (Ala. 2007) (absolute pollution exclusion not ambiguous as to whether gasoline was a pollutant) and *Shalimar Contractors*, 975 F. Supp. 1455-56 (absolute pollution exclusion was unambiguous as to scope).

While, there are no reported decisions applying Alabama law to a total or absolute pollution exclusion in the context of a sewage backup, that does not mean there is a shortage of decisions nationwide interpreting pollution exclusions. Looking to other states, the logic of the following cases is sound:

- Under Florida law, a claim for personal injuries caused by exposure to feces and raw sewage while cleaning premises "fell within scope of commercial general liability policy's pollution exclusion, and thus insurer had no duty to defend or indemnify ... even though there was no allegation of industrial pollution or environmental damage...." *Philadelphia Indem. Ins. Co. v. Yachtman's Inn Condo Ass'n, Inc*., 595 F. Supp. 2d 1319 (S.D. Fla. 2009).

- The Colorado Court of Appeals rejected the position that an absolute pollution exclusion should be limited to circumstances of "traditional" or "industrial" pollution. *Figuli v. State Farm Mut. Fire & Cas*., 304 P.3d 595 (Colo. App. 2012), citations omitted.  304 P.3d at 598, fn. 2.

- Under Michigan law, "backed up sewage was 'pollutant,' for purposes of total pollution exclusion ... and thus policies did not cover city residents' claims for damages caused by sewage backup...." *U.S. Fire Ins. Co. v. City of Warren*, 87 F. App'x 485 (6th Cir. 2003) (city's sewage system backed up and spilled into homes).

- Under Oklahoma law, sewage "constituted 'pollutants,' and thus, a total pollution exclusion in insurance policy applied as to bar coverage for liability and damages" based on disposal of sewage from wastewater treatment plant project.  Further, the court found the total pollution exclusion for "was susceptible to only one reasonable

construction [and] it could not be construed in favor of insured." *Certain Underwriters at Lloyds London v. B3, Inc*., 262 P.3d 397 (Okla. Civ. App. 2011) (wastewater discharged into creek; coverage barred by total pollution exclusion).

The Essex CGL Policy clearly states coverage does not apply to "bodily injury" or "property damage" caused, in whole or part, "but for the actual … discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time."[8]   The Crittenden and Torrence Claims each assert "raw sewage began to and continued to seep and invade their home."   They all testified the "sewage" contained feces and other human waste, clearly a "pollutant" (*i.e*., "any solid, liquid, [or] gaseous … irritant or contaminant, including … fumes … and waste.").  *See* Section III.C, above.

The Total Pollution Exclusion should be applied as written under Alabama law.  Therefore, any bodily injury/property damage caused by the sewage, clearly a pollutant, is excluded from coverage. The Court should enter judgment in favor of Essex finding that there is no duty to defend because the Total Pollution Exclusion bars all coverage here.

---

[8] Coverage B also excludes coverage for all injury "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time."

## C.   Essex is Entitled to a Declaration of No Coverage Because Each Separate Occurrence was After the Expiration of the CGL Policy

The Alabama Supreme Court established a bright-line rule that "the time of an 'occurrence' of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time ***the complaining party was actually damaged***." *U.S. Fid. & Guar. Co. v. Warwick Dev. Co.,* 446 So. 2d 1021, 1024 (Ala. 1984), emphasis added.

The insured (J&J Cable) and the claimants (the Crittendens and Torrence) assert the date of occurrence was when J&J Cable breached the sewer laterals leading to the two rental homes occupied by the claimants.  *They are incorrect as a matter of law.*  The "occurrence" was when each claimant encountered a sewage overflow; that date differs among the claimants, but was consistently after the policy expired at 12:01 a.m. on November 12, 2013.  Prior to that time, each of the claimants were using and enjoying their houses and were unaware of any problems.

Essex's position is supported by *Cincinnati Ins. Co. v. Amerisure Ins. Co.,* 2012 WL 4033724 (S.D. Ala. 2012). *Cincinnati Ins. Co.* involved a coverage dispute between two insurance companies as to when damage to balconies at the Dolphin Key condominium occurred.   2012 WL 4033724, *1.   In 2003, an inspector observed cracked stucco cladding at the edge of a balcony, which he

attributed to water intrusion, and sagging beams. *Id.* at *1.   Repairs were performed in 2004 and all parties appeared satisfied with the remediation.  *Id.*

In 2007, sagging balconies were observed and further investigation revealed horizontal beams supporting the balconies were severely damaged by water intrusion.  *Id.* at *2. The federal court sought to determine when the "occurrence" happened and held that, under Alabama law, the time of an occurrence under a liability insurance policy "is the time the property was actually injured." *Id.* at *9, citing *U.S. Fid. & Guar. Co. v. Warwick Dev. Co*., 446 So. 2d 1021, 1024 (Ala. 1984) ("as a general rule the time of an 'occurrence' of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time the complaining party was actually damaged.") and *Alabama Plating Co. v. U.S. Fid. & Guar. Co*., 690 So. 2d 331, 334 n. 1 (Ala. 1996) ("Under the rule of ... *Warwick* ..., the time of the 'occurrences' under the liability insurance policies at issue is the time the property was actually injured"); other citations, each repeating that "the time **the complaining party** was actually damaged" is when the "occurrence" happened, are omitted.

The "timing of the 'occurrence' is pegged to when Dolphin Key was actually damaged." 2012 WL 4033724 at *10. The undisputed evidence was the property damage claim at issue first manifested in spring 2007. "Significantly,

29

Dolphin Key consistently and unequivocally framed its claims as being for damage that was observed beginning in 2007." *Id.*

Alabama law makes clear, it is not the date of J&J Cable's negligence that marks the occurrence. **As in *Cincinnati Ins.*, the date of the occurrence is when each claimant was actually damaged.** The claimants here consistently and unequivocally framed their claim as being for bodily injury and property damage that began after November 11, 2013.  In fact, the claims of Courtney Crittenden, M.C, and A.C., clearly occurred on ***November 16, 2013***. Neither Marrell Crittenden nor Caroline Torrence testified with any reliability that their claims occurred on or before November 11, 2013.

*Cincinnati Ins.* relies on *Liberty Mut. Ins. Co. v. Wheelwright Trucking Co*., 851 So. 2d 466 (Ala. 2002). In *Wheelwright*, the Supreme Court addressed coverage for damage to trailers that began cracking as early as 1995; the trailers did not fail (and the trucking company did not suffer loss of use) until 1998-99. The Alabama Supreme Court reasoned:

> The "occurrence" ... was not the cracking, but rather the failure of the trailers upon being loaded with the steel coils. Only at that time, in July 1998, did Wheelwright begin to suffer the damage that led to its claims against Dorsey—the loss of the use of its tractors for the purpose of hauling the steel coils.

*Id*. at 483.

As in *Wheelwright*, the fact the sewer lateral was cracked as early as November 8, 2013, does not determine when each claimants' damages occurred. None of the claimants suffered property damage or bodily injury until after November 11, 2013. Again, claimants Courtney Crittenden, M.C., and A.C. did not experience any sewage or plumbing problems until ***November 16, 2013***. Exhibit E, 63:8-65:23, 71:9-73:23, and 81:6-82:18. Claimant Marrell Crittenden is unsure when he was first exposed to sewage and cannot say it was, in fact, before 12:01 a.m. on November 12, 2013. Exhibit O, 25:21-26:16; Exhibit Q, 46:4-46:20. Claimant Torrence simply does not recall when she first experienced any plumbing problems or was exposed to the sewage. Exhibit R, 18:16-19:2. Stated another way, she has no evidence her damages occurred prior to expiration of the Essex policy at 12:01 a.m. on November 12, 2013.

In *Cincinnati Ins.*, the Court rejected the view that because water penetration continued from 2003 to 2007, the damage upon which the claim was based necessarily occurred beginning in 2003:

> Alabama courts have never construed the manifestation trigger so broadly as to be satisfied by incremental, imperceptible property deterioration that the complaining party cannot see, does not observe, and does not even know is happening, especially where the complaining party had full use and enjoyment of the property during that period and did not bring claims for damages during that period.

2012 WL 4033724 at *12, footnote omitted.

That authority requires a finding here that none of the claimants' damages manifested while the sewer lateral leaked incrementally, imperceptibly towards their house, unobserved and unknown to them, especially since each claimant had full use and enjoyment of their house during that period and they do not assert a claim for damages during the period before the sewage backed up into their house. *In fact, there is no evidence that a single claimant suffered personal injury or property damage until after November 11, 2013, and, most likely, not until November 16, 2013.*

Here, the burden is on J&J Cable to show it is entitled to coverage.  It cannot do so because there is simply no admissible evidence that the claimants actually suffered damage prior to 12:01 a.m. on November 12, 2013.

Therefore, Essex is not obligated to defend J&J Cable in the Crittenden or Torrence Actions and Essex has no obligations to the claimants or to Dixie Electric.

## D. Dixie Electric is Not an Insured and There is No Coverage for Its Claims

Essex owes no duty to defend Dixie Electric, as it was not a named insured under the CGL Policy.  It also does not qualify as an "insured" under Section II – Who Is An Insured of the CGL Policy.  Dixie admits that.  *See* Defendant Dixie Electric Cooperative's Responses to Plaintiff's Request for

Admissions, Interrogatories, and Request For Production, Resp. to Request for Admission no. 1, attached hereto as Exhibit S.

Dixie Electric's cross-claim against J&J Cable for a "common law duty of indemnity and/or contribution" is not a claim for "bodily injury" or "property damage" nor one for "personal and advertising injury." Dixie Electric's alleged damages are excluded by the Total Pollution Exclusion and, under Coverage B, by the pollution exclusion, exclusion m. If Dixie Electric's claim were based on contractual liability or breach of contract, which it is not, that claim would be excluded under Coverage A by exclusion b and excluded under Coverage B by exclusions e and f.

Furthermore, neither J&J Cable nor Dixie Electric can offer admissible evidence that Dixie Electric's claims occurred during the policy period.

Therefore, Essex is not obligated to defend or indemnify Dixie Electric in the Underlying Actions.  Nor is Essex required to defend J&J Cable against Dixie Electric's Cross-Claims in the Underlying Actions.

## V.  Conclusion

Essex demonstrated that it is entitled to a judgment finding it owes no duty to defend J&J Cable against the claims of Marrell Crittenden, Courtney Crittenden, M.C., A.C., or Caroline Torrence based on uncontroverted proof that each claim was caused by exposure to raw sewage containing human waste that seeped from

their toilets and drains.  The Essex CGL Policy does not apply to such claims because of the Total Pollution Exclusion.

Essex Insurance also demonstrated that the claims of Marrell Crittenden, Courtney Crittenden, M.C., A.C. and Caroline Torrence each separately arose after the Essex CGL Policy expired.  Essex is entitled to a judgment as a matter of law for that reason as well.  Alternatively, Essex demonstrated one or more of those five separate claims did not arise during the policy period.  In which case, Essex is entitled to summary judgment as to each such claim.

WHEREFORE, Essex respectfully requests that this Honorable Court declare and adjudge Essex does not owe a duty to defend J&J Cable with respect to the Underlying Actions and declare that there is no coverage under the CGL Policy for the Crittendens' or Torrence's claims or Dixie Electric's cross-claims against J&J Cable; and grant any other relief that the Court deems just and equitable under the circumstances.

RESPECTFULLY SUBMITTED,

DATED:  March 1, 2016          */s/  Lane Finch*
                              F. LANE FINCH, JR.
                              (ASB-0027-I58F)
                              BRIAN C. RICHARDSON
                              (ASB-5241-H14U)
                              Attorneys for Essex Insurance Co.

**OF COUNSEL:**
SWIFT, CURRIE, McGHEE & HIERS, LLP
2 North 20th Street, Suite 1405
Birmingham, AL 35203
(205) 314-2401
lane.finch@swiftcurrie.com
brian.richardson@swiftcurrie.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 1, 2016, I have served the foregoing by electronic filing through the Court's CM/ECF system the following attorneys of record:

John G. Smith
Louis M. Calligas
BALCH & BINGHAM, LLP
P. O. Box 78
Montgomery, AL 36101-0078

Tyrone C. Means
H. Lewis Gillis
MEANS GILLIS LAW, LLC
P. O. Box 5058
Montgomery, AL 36103

Robert Simms Thompson
Tiffany N. Johnson
THE LAW OFFICES OF ROBERT
SIMMS THOMPSON, PC
P. O. Box 830780
Tuskegee, AL 36083

David E. Allred
D. Craig Allred
ALLRED & ALLRED, PC
7030 Fain Park Drive, Suite 9
Montgomery, AL 36117

*/s/ Lane Finch*
Of Counsel