# EXHIBIT A

ELECTRONICALLY FILED
1/15/2014 6:00 PM
03-CV-2014-900103.00
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
TIFFANY B. MCCORD, CLERK

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

Marrell A. Crittenden, Jr., Courtney Bynum Crittenden,          a minor child who sues by and through her custodial parents and next friend Marrell A. Crittenden, Jr. and Courtney Bynum Crittenden, and          a minor child who sues by and through his custodial parents and next friend Marrell A. Crittenden, Jr. and Courtney Bynum Crittenden,

         Plaintiffs,

vs.

Dixie Electric Cooperative, a non-profit, membership corporation and J and J Cable. Construction, LLC, a foreign limited liability company, and fictitious parties A through Z whose identities are unknown to plaintiffs at this time, but will be named by amendment when ascertained being those persons, corporations or other legal entities whose wrongful acts caused or contributed to cause damages and injuries to the plaintiffs at times relevant to this lawsuit,

         Defendants.

---

Civil Action No. **[Blank]**

---

## COMPLAINT FOR DAMAGES

### A.    PARTIES

1.    Marrell A. Crittenden, Jr. is an adult citizen resident of Montgomery County, Alabama.

2.    Courtney Bynum Crittenden is an adult citizen resident of Montgomery County, Alabama.

3.             is a minor child who sues by her custodial parents and next friend Marrell A. Crittenden, Jr. and Courtney Bynum Crittenden.

4.             is a minor child who sues by and through his custodial parents and next friend Marrell A. Crittenden, Jr. and Courtney Bynum Crittenden.

5.    Dixie Electric Cooperative (hereinafter sometimes referred to as "Dixie") is a non-profit membership corporation organized under the laws of the State of Alabama. Dixie was

organized for the purpose of supply electrical energy and such uses as permitted under Code of Alabama §37-6-1 et. seq. Dixie's chief executive officer and general manager is Garry Harrison. The principle place of business of Dixie is located at 9100 Atlanta Highway, Montgomery, Alabama 36117.

6.      J and J Cable. Construction, LLC (hereinafter sometimes referred to as "J and J") is a foreign limited liability company believed to be organized under the laws of the State of Georgia. J and J is believed to be authorized to do business as an Alabama company. Its registered agent for service of process if Richard Daugherty, 1241 OG Skinner Drive, Westpoint, Georgia 31833. J and J's principle place of business in Alabama is believed to be 500 North 26th Street, Suite 302, Opelika, Alabama 36801.

7.      Fictitious parties A through Z whose identities are unknown to plaintiffs at this time, but will be named by amendment when ascertained being those persons, corporations or other legal entities whose wrongful acts caused or contributed to cause damages and injuries to the plaintiffs at times relevant to this lawsuit

## B.      ALLEGED FACTS

8..      At times material to this lawsuit, the Crittenden family, to wit: Marrell A. Crittenden, Jr., Courtney Bynum Crittenden and their minor children Milan and Amari Crittenden were tenant residents of 8212 Ryan Ridge Loop, Montgomery, Alabama 36117.

9.      On or about November 15, 2013 until approximately November 24, 2013, raw sewage began to and continued to seep and invade their home through bathroom toilets, under various walls within their dwelling place, the family living room, and various closets within the household and in hallways. The seepage of raw sewage made the home uninhabitable causing

them to move, destroyed their possessions within the household and caused mental anguish, mental distress and other illnesses for the household members.

10.     At times material to this lawsuit new homes were being built in and around their neighborhood and their home.  Both Dixie and J and J were engaged in activities that were related to new home construction and negligently and/or wantonly caused damage to sewer lines that resulted in raw sewage seeping into the dwelling place of the plaintiffs.

C.     CAUSES OF ACTION

COUNT ONE:

NEGLIGENCE/WANTONNESS

11.     The plaintiffs reallege all of the previous allegations in the subject Complaint as if fully set out herein.

12.     That the defendants Dixie, J and J and fictitious parties A through Z whose identities are unknown to plaintiffs at this time, but will be named by amendment when ascertained being those persons, corporations or other legal entities whose wrongful acts caused or contributed to cause damages and injuries to the plaintiffs at times relevant to this lawsuit negligently and/or wantonly caused raw sewage to seep into the home of the plaintiffs.

13.     As a proximate result of the negligence and/or wantonness of said defendants, the plaintiffs suffered both personal injury and personal property damages for which they seek compensation.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that a jury enter a judgment in favor of each of the plaintiffs and against the said defendants for compensatory and punitive damages plus interests and costs in an amount commensurate with their claim for damages.

COUNT TWO:

NUISANCE

14. The plaintiffs reallege all of the previous allegations in the subject Complaint as if fully set out herein.

15. The activities of the defendants Dixie, J and J and fictitious parties A through Z whose identities are unknown to plaintiffs at this time, but will be named by amendment when ascertained being those persons, corporations or other legal entities whose wrongful acts caused or contributed to cause damages and injuries to the plaintiffs at times relevant to this lawsuit, created a nuisance as defined in Code of Alabama §6-5-120, et. seq. in the household of the plaintiffs.

16. As a proximate result of the nuisance created by the defendants, the plaintiffs suffered both personal injury and personal property damages for which they seek compensation.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that a jury enter a judgment in favor of each of the plaintiffs and against the said defendants for compensatory and punitive damages plus interests and costs in an amount commensurate with their claim for damages.

COUNT THREE:

TRESPASS

17. The plaintiffs reallege all of the previous allegations in the subject Complaint as if fully set out herein.

18. The activities of defendants Dixie, J and J fictitious parties A through Z whose identities are unknown to plaintiffs at this time, but will be named by amendment when ascertained being those persons, corporations or other legal entities whose wrongful acts caused

or contributed to cause damages and injuries to the plaintiffs at times relevant to this lawsuit constitutes a trespass against the plaintiffs.

19.     As a proximate result of the trespass of the defendants, the plaintiffs suffered both personal injury and personal property damages for which they seek compensation.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that a jury enter a judgment in favor of each of the plaintiffs and against the said defendants for compensatory and punitive damages plus interests and costs in an amount commensurate with their claim for damages.

RESPECTFULLY SUBMITTED

BY:/s/Tyrone C. Means
Tyrone C. Means (MEA003)
tcmeans@meansgillislaw.com
H.Lewis Gillis (GIL011)
hlgillis@meansgillislaw.com

**OF COUNSEL:**
Means Gillis Law, LLC
60 Commerce Street, Suite 200
P. O. Box 5058
Montgomery, Alabama 36103-5058
Phone 334-270-1033;
Fax 334-260-9396

PLAINTIFFS DEMAND TRIAL BY STRUCK JURY.

/s Tyrone C. Means

ELECTRONICALLY FILED
10/10/2014 3:15 PM
03-CV-2014-900103.00
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
TIFFANY B. MCCORD, CLERK

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

| | |
|---|---|
| Marrell A. Crittenden, Jr., Courtney Bynum Crittenden, █████████████, a minor child who sues by and through her custodial parents and next friend Marrell A. Crittenden, Jr. and Courtney Bynum Crittenden, and █████ a minor child who sues by and through his custodial parents and next friend Marrell A. Crittenden, Jr. and Courtney Bynum Crittenden, | ) ) ) ) ) ) ) ) ) |
| **Plaintiffs,** | )Civil Action Number: CV-2014-900103.00 |
| **vs.** | ) ) ) |
| Dixie Electric Cooperative, a non-profit, membership corporation and J and J Cable. Construction, LLC, a foreign limited liability company, and fictitious parties A through Z whose identities are unknown to plaintiffs at this time, but will be named by amendment when ascertained being those persons, corporations or other legal entities whose wrongful acts caused or contributed to cause damages and injuries to the plaintiffs at times relevant to this lawsuit, | ) ) ) ) ) ) ) ) ) ) ) ) |
| **Defendants.** | ) |

## FIRST AMENDED COMPLAINT

### THE PARTIES

1. Marrell A. Crittenden, Jr. is an adult citizen resident of Montgomery County, Alabama.

2. Courtney Bynum Crittenden is an adult citizen resident of Montgomery County, Alabama.

3. ████████████ is a minor child who sues by her custodial parents and next friend Marrell A. Crittenden, Jr. and Courtney Bynum Crittenden.

4. ████████████ is a minor child who sues by and through his custodial parents and next

friend Marrell A. Crittenden, Jr. and Courtney Bynum Crittenden.

5.  Dixie Electric Cooperative (hereinafter sometimes referred to as "Dixie") is a non-  profit

    membership corporation organized under the laws of the State of Alabama.  Dixie was

    organized for the purpose of supply electrical energy and such uses as permitted under

    Code of  Alabama §37-6-1 et. seq.  Dixie's chief executive officer and general manager is

    Garry Harrison.  The principle place of business of Dixie is located at 9100 Atlanta

    Highway, Montgomery,  Alabama 36117.

6.  J and J Cable. Construction, LLC (hereinafter sometimes referred to as "J and J")  is a

    foreign limited liability company believed to be organized under the laws of the State of

    Georgia.  J and J is believed to be authorized to do business as an Alabama company.  Its

    registered agent for service of process if Richard Daugherty, 1241 OG Skinner Drive,

    Westpoint,  Georgia 31833.  J and J's principle place of business in Alabama is believed

    to be 500 North 26th  Street, Suite 302, Opelika, Alabama 36801.

7.  Fictitious parties A through Z whose identities are unknown to plaintiffs at this  time, but

    will be named by amendment when ascertained being those persons, corporations or

    other legal entities whose wrongful acts caused or contributed to cause damages and

    injuries to  the plaintiffs at times relevant to this lawsuit.

## STATEMENT OF FACTS

8.    At times material to this lawsuit, the Crittenden family, to wit:  Marrell A.

Crittenden, Jr., Courtney Bynum Crittenden and their minor children Milan and Amari

Crittenden were tenant residents of 8212 Ryan Ridge Loop, Montgomery, Alabama

36117.

9.      On or about November 3, 2013 until approximately November 11, 2013, the sewage line was breached and thereafter raw sewage began to and continued to seep and invade their home through bathroom toilets, under various walls within their dwelling place, the family living room, and various closets within the household and in hallways. The seepage of raw sewage made the home uninhabitable causing them to move, destroyed their possessions within the household and caused mental anguish, mental distress and other illnesses for the household members.

10.     At times material to this lawsuit new homes were being built in and around their neighborhood and their home. Both Dixie and J and J were engaged in activities that were related to new home construction and negligently and/or wantonly caused damage to sewer lines that resulted in raw sewage seeping into the dwelling place of the plaintiffs.

## COUNT ONE

## NEGLIGENCE/WANTONNESS

11.     The Plaintiffs incorporate by reference all of the allegations of preceding paragraphs of this Complaint as if the same were set out fully herein.

12.     That the defendants Dixie, J and J and fictitious parties A through Z whose identities are unknown to plaintiffs at this time, but will be named by amendment when ascertained being those persons, corporations or other legal entities whose wrongful acts caused or contributed to cause damages and injuries to the plaintiffs at times relevant to this lawsuit negligently and/or wantonly caused raw sewage to seep into the home of the plaintiffs.

13.     As a proximate result of the negligence and/or wantonness of said defendants, the plaintiffs suffered both personal injury and personal property damages for which they seek

compensation.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray that a jury enter a judgment in favor of each of the plaintiffs and against the said defendants for compensatory and punitive damages plus interests and costs in an amount commensurate with their claim for damages.

## COUNT TWO

### NUISANCE

14.     The plaintiffs incorporate by reference all of the allegations of preceding paragraphs of this Complaint as if the same were set out fully herein.

15.     The activities of the defendants Dixie, J and J and fictitious parties A through Z whose identities are unknown to plaintiffs at this time, but will be named by amendment when ascertained being those persons, corporations or other legal entities whose wrongful acts caused or contributed to cause damages and injuries to the plaintiffs at times relevant to this lawsuit, created a nuisance as defined in Code of Alabama §6-5-120, et. seq. in the household of the plaintiffs.

16.     As a proximate result of the nuisance created by the defendants, the plaintiffs suffered both personal injury and personal property damages for which they seek compensation.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs pray that a jury enter a judgment in favor of each of the plaintiffs and against the said defendants for compensatory and punitive damages plus interests and costs in an amount commensurate with their claim for damages.

## COUNT THREE

## TRESPASS

17.     The plaintiffs incorporate by reference all of the allegations of preceding

paragraphs of this Complaint as if the same were set out fully herein.

18.     The activities of defendants Dixie, J and J fictitious parties A through Z whose

identities are unknown to plaintiffs at this time, but will be named by amendment when

ascertained being those persons, corporations or other legal entities whose wrongful acts

caused

or contributed to cause damages and injuries to the plaintiffs at times relevant to this lawsuit

constitutes a trespass against the plaintiffs.

19.     As a proximate result of the trespass of the defendants, the plaintiffs suffered

both  personal injury and personal property damages for which they seek compensation.


        **WHEREFORE, PREMISES CONSIDERED,** Plaintiffs pray that a jury enter a

judgment  in favor of each of the plaintiffs and against the said defendants for compensatory and

punitive  damages plus interests and costs in an amount commensurate with their claim for

damages.


                        **RESPECTFULLY SUBMITTED**

                        _/s/ H. Lewis Gillis_
                        H. Lewis Gillis (GIL 011)
                        Tyrone C. Means (MEA003)
                        Attorneys for Plaintiffs

**OF COUNSEL:**
Means Gillis Law, LLC
60 Commerce Street, Suite 200
P. O. Box 5058
Montgomery, Alabama 36103-5058
Phone 334-270-1033
Fax 334-260-9396
hlgillis@meansgillislaw.com
tcmeans@meansgillislaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been filed electronically under the court's efiling system where copies are forwarded to Defendants, has been sent by U.S. Mail, properly addressed postage prepaid and/or via e-mail this 10th day of October, 2014, to the following:

Louis M. Calligas
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101
lcalligas@balch.com

Teresa G. Minor
Balch & Bingham, LLP
P.O. Box 306
Birmingham, Alabama 35201
tminor@balch.com

J & J Cable Construction, LLC
c/o Jerry Noblitt
1307 India Road
Opelika, Alabama 36801
jerryenoblitt@gmail.com

*/s/ H. Lewis Gillis*
OF COUNSEL

ELECTRONICALLY FILED
2/24/2015 1:56 PM
03-CV-2014-900103.00
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
TIFFANY B. MCCORD, CLERK

## IN THE CIRCUIT COURT OF
## MONTGOMERY COUNTY, ALABAMA

MARRELL A. CRITTENDEN, JR., et al. )

       Plaintiffs,           )

v.                          ) CIVIL ACTION: CV-2014-900103

DIXIE ELECTRIC COOPERATIVE,  )
et al.,                         )
       Defendants.        )

## SECOND AMENDED COMPLAINT

On leave of Court, first had and obtained, the Plaintiffs by and through their

Attorneys of record, Amend the Complaint as follows:

## THE PARTIES

1. Marrell A. Crittenden, Jr. is an adult citizen resident of Montgomery County,

   Alabama.

2. Courtney Bynum Crittenden is an adult citizen resident of Montgomery County,

   Alabama.

3.                is a minor child who sues by her custodial parents and next

   friend Marrell A. Crittenden, Jr. and Courtney Bynum Crittenden.

4.                is a minor child who sues by and through his custodial parents

   and next friend Marrell A. Crittenden, Jr. and Courtney Bynum Crittenden.

5. Defendant Dixie Electric Cooperative (hereinafter sometimes referred to as

   "Dixie" or "Dixie Electric") is a non- profit Membership Corporation organized

   under the laws of the State of Alabama. Dixie was organized for the purpose of

   supplying electrical energy and such uses as permitted under Code of Alabama

§37-6-1 ct. seq. Dixie's Chief Executive Officer and General Manager is Garry
Harrison. The principle place of business of Dixie is located at 9100 Atlanta
Highway, Montgomery, Alabama 36117. As a public utility Dixie Electric
Cooperative is liable to the Plaintiffs for their own corporate failure to discharge
legal duties to the Plaintiffs including the non-delegable duty to cause no harm to
Plaintiffs; or cause to be safely install electrical conduit through which Dixie will
provide electrical services to the public; or the Defendants are vicariously liable
for the wrongful acts of individual Defendants; or the corporate Defendants
acquiesced in the wrongful acts complained of. The Defendants each individually
negligently and/or wantonly failed to make Plaintiffs aware of and/or safe from
back up of sewage after learning of the sewage line breach caused by the
Defendants. As a proximate result, Plaintiffs were subjected to unreasonable
damages both property and personal injury.

6. Defendant J and J Cable Construction, LLC (hereinafter sometimes referred to as
"J and J" or "J&J Cable") is a foreign limited liability company believed to be
organized under the laws of the State of Georgia. J and J is believed to be
authorized to do business as an Alabama company. Its registered agent for
service of process if Richard Daugherty, 1241 OG Skinner Drive, Westpoint,
Georgia 31833. J and J's principle place of business in Alabama is believed to be
500 North 26th Street, Suite 302, Opelika, Alabama 36801. As the agent or
employee or independent contractor of Dixie Electric Cooperative, J & J is liable
to the Plaintiffs for their own corporate failure to discharge legal duties to the
Plaintiffs including the non-delegable duty to cause no harm to Plaintiffs; or cause

to be safely install electrical conduit through which Dixie will provide electrical services to the public; or the Defendants are vicariously liable for the wrongful acts of individual Defendants; or the corporate Defendants acquiesced in the wrongful acts complained of. The Defendants each individually negligently and/or wantonly failed to make Plaintiffs aware of and/or safe from the sewage after learning of the sewage line breach caused by the Defendants. As a proximate result, Plaintiffs were subjected to unreasonable damages both property and personal injury.

7. Fictitious parties A through Z whose identities are unknown to plaintiffs at this time, but will be named by amendment when ascertained being those persons, corporations or other legal entities whose wrongful acts caused or contributed to cause damages and injuries to the plaintiffs at times relevant to this lawsuit.

## STATEMENT OF FACTS

8. Plaintiffs incorporate by reference all of the allegations of preceding paragraphs of this complaint as if the same were set out fully herein.

9. At times material to this lawsuit, the Crittenden family, to wit: Marrell A. Crittenden, Jr., Courtney Bynum Crittenden and their minor children Milan and Amari Crittenden were tenant residents of 8212 Ryan Ridge Loop, Montgomery, Alabama 36117.

10. On or about November 3, 2013 until approximately November 11, 2013, the sewage line was breached and thereafter raw sewage began to and continued to

seep and invade their home through bathroom toilets, under various walls within their dwelling place, the family living room, and various closets within the household and in hallways until approximately November 25, 2013. The seepage of raw sewage made the home uninhabitable causing them to move, destroyed their possessions within the household and caused mental anguish, mental distress and other illnesses for the household members.

11. At times material to this lawsuit new homes were being built in and around their neighborhood and their home. Both Dixie and J and J were engaged in activities that were related to new home construction and negligently and/or wantonly caused damage to sewer lines that resulted in raw sewage seeping into the dwelling place of the Plaintiffs.

12. As a public utility and/or manager and/or master and/or principal, Dixie and J & J were charged with a non-delegable duty to bring no harm to the Plaintiffs; or to safely install underground conduit safely without causing harm or damage to Plaintiffs person and/or property; and/or these Defendants voluntarily assumed the non-delegable duty to provide safe conditions and safely install underground conduit and thereafter, due to negligence or wantonness or inadvertence, failed to act with due care.

13. The Defendants also had a non-delegable duty to warn of defects in the premises of which they were aware and to warn of those defects which could have been discovered through reasonable inspection and/or these Defendants assumed the non-delegable duty to reasonably inspect and warn of such defects.

14. The Defendants, separately and severally, either negligently or wantonly, failed
    to fulfill these non-delegable duties resulting in harm to the Plaintiffs. The
    Defendants, separately and severally, failed to discharge these duties by
    negligently and untimely notifying the plaintiffs of the sewage line breach or to
    maintain or timely repair the sewage line or to untimely notify the Plaintiffs of
    the breached sewage line all of which resulted in the flooding of Plaintiffs home
    with raw sewage and raw sewage leaking from the commode, the shower, the
    bathtub into the bedrooms and hallway of the house. The Defendants also
    negligently failed to inspect, repair or otherwise maintain in a safe condition the
    underground boring resulting in the back up of raw sewage into Plaintiffs home.

15. The Defendants, separately and severally, either negligently or wantonly, failed to
    fulfill these non-delegable duties resulting in harm to the Plaintiffs. The
    Defendants, separately and severally, failed to discharge these duties by
    negligently and untimely notifying the plaintiffs of the sewage line breach or to
    maintain or timely repair the sewage line or to untimely notify the Plaintiffs of the
    breached sewage line all of which resulted in the flooding of Plaintiffs home with
    raw sewage and raw sewage leaking from the commode, the shower, the bathtub
    into the bedrooms and hallway of the house. The Defendants also negligently
    failed to inspect, repair or otherwise maintain in a safe condition the underground
    boring resulting in the back up of raw sewage into Plaintiffs home.

## COUNT ONE

### NEGLIGENCE/WANTONNESS

16. The Plaintiffs incorporate by reference all of the allegations of preceding
    paragraphs of this Complaint as if the same were set out fully herein.

17. That the Defendants Dixie, J and J and fictitious parties A through Z whose
    identities are unknown to Plaintiffs at this time, but will be named by amendment
    when ascertained being those persons, corporations or other legal entities whose
    wrongful acts caused or contributed to cause damages and injuries to the
    Plaintiffs at times relevant to this lawsuit negligently and/or wantonly caused raw
    sewage to seep into the home of the Plaintiffs.

18. As a proximate result of the negligence and/or wantonness of said Defendants, the
    P laintiffs suffered both personal injury and personal property damages for which
    they seek compensation.

   **WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray that a jury enter
a judgment in favor of each of the Plaintiffs and against the said Defendants for
compensatory and punitive damages plus interests and costs in an amount
commensurate with their claim for damages.

## COUNT TWO

### NUISANCE

19. The Plaintiffs incorporate by reference all of the allegations of preceding
    paragraphs of this Complaint as if the same were set out fully herein.

20. The activities of the Defendants Dixie, J and J and fictitious parties A through Z
    whose identities are unknown to Plaintiffs at this time, but will be named by

amendment when ascertained being those persons, corporations or other legal

entities whose wrongful acts caused or contributed to cause damages and injuries

to the Plaintiffs at times relevant to this lawsuit, created a nuisance as defined in

Code of Alabama §6-5-120, et. seq. in the household of the P l a i n t i f f s .

21. As a proximate result of the nuisance created by the Defendants, the plaintiffs

suffered both personal injury and personal property damages for which they seek

compensation.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs pray that a jury enter

a judgment in favor of each of the Plaintiffs and against the said Defendants for

compensatory and punitive damages plus interests and costs in an amount

commensurate with their claim for damages.

## COUNT THREE

### TRESPASS

22. The Plaintiffs incorporate by reference all of the allegations of preceding

paragraphs of this Complaint as if the same were set out fully herein.

23. The activities of Defendants Dixie, J and J fictitious parties A through Z whose

identities are unknown to Plaintiffs at this time, but will be named by amendment

when ascertained being those persons, corporations or other legal entities whose

wrongful acts caused or contributed to cause damages and injuries to the Plaintiffs

at times relevant to this lawsuit constitutes a trespass against the Plaintiffs.

24. As a proximate result of the trespass of the Defendants, the plaintiffs suffered both

personal injury and personal property damages for which they seek compensation.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs pray that a jury enter

a judgment in favor of each of the Plaintiffs and against the said Defendants for

compensatory and punitive damages plus interests and costs in an amount

commensurate with their claim for damages.

### RESPECTFULLY SUBMITTED

*/s/ H. Lewis Gillis*
H. Lewis Gillis (GIL 011)
Tyrone C. Means (MEA003)
Robert S. Thompson (THO 039)
Attorneys for Plaintiffs

**OF COUNSEL:**
Means Gillis Law, LLC
60 Commerce Street, Suite 200
P. O. Box 5058
Montgomery, Alabama 36103-5058
Phone 334-270-1033
Fax 334-260-9396
hlgillis@meansgillislaw.com
tcmeans@meansgillislaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been filed electronically under the court's efiling system where copies are forwarded to Defendants, has been sent by U.S. Mail, properly addressed postage prepaid and/or via e-mail this 24TH day of February, 2015, to the following:


Louis M. Calligas
Balch & Bingham, LLP
P.O. Box 78
Montgomery, Alabama 36101
lcalligas@balch.com

Teresa G. Minor
Balch & Bingham, LLP
P.O. Box 306
Birmingham, Alabama 35201
tminor@balch.com

M. Andrew Donaldson
Ryals, Donaldson & Agricola, P.C.
60 Commerce Street, Suite 1400
Montgomery, Alabama 36104
adonaldson@rdafirm.com


                              /s/ H. Lewis Gillis
                              OF COUNSEL

# EXHIBIT B

ELECTRONICALLY FILED
11/1/2015 11:51 PM
03-CV-2015-901757.00
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
TIFFANY B. MCCORD, CLERK

## IN THE CIRCUIT COURT OF
## MONTGOMERY COUNTY, ALABAMA

| | |
|---|---|
| **CAROLINE TORRENCE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION:  CV-2015-_____** |
| | ) |
| **DIXIE ELECTRIC COOPERATIVE, a** | ) |
| **Non-profit, membership corporation, and** | ) **Jury Trial Demanded** |
| **J&J CABLE CONSTRUCTION, LLC, a** | ) |
| **foreign limited liability company, and** | ) |
| **FICTITIOUS DEFENDANTS "A"** | ) |
| **Through "Z" whose identities are unknown** | ) |
| **To Plaintiffs at this time, but will be named** | ) |
| **by amendment when ascertained being** | ) |
| **those persons, corporations or entities** | ) |
| **whose wrongful acts caused or contributed** | ) |
| **to cause damages and injuries to the** | ) |
| **Plaintiff at times relevant to this lawsuit,** | ) |
| **Defendants.** | ) |

## COMPLAINT FOR DAMAGES

## THE PARTIES

1. Caroline Torrence is an adult citizen resident of Montgomery County,  Alabama and she is over the age of nineteen (19) years old.

2. Defendant Dixie Electric Cooperative (hereinafter sometimes referred to as "Dixie" or "Dixie Electric") is a non-  profit Membership Corporation organized under the laws of the State of Alabama.  Dixie was organized for the purpose of supplying electrical energy and such uses as permitted under Code of  Alabama §37-6-1 et. seq.  Dixie's Chief Executive Officer and General Manager is Garry Harrison.  The principle place of business of Dixie is located at 9100 Atlanta Highway, Montgomery,  Alabama 36117.  As a public utility Dixie Electric Cooperative is liable to the Plaintiff for their own corporate failure to discharge

1

legal duties to the Plaintiff including the non-delegable duty to cause no harm to Plaintiff; or cause to be safely install electrical conduit through which Dixie will provide electrical services to the public; or the Defendants are vicariously liable for the wrongful acts of individual Defendants; or the corporate Defendants acquiesced in the wrongful acts complained of. The Defendants each individually negligently and/or wantonly failed to make Plaintiff aware of and/or safe from back up of sewage after learning of the sewage line breach caused by the Defendants. As a proximate result, Plaintiff was subjected to unreasonable damages both property and personal injury.

3. Defendant J and J Cable Construction, LLC (hereinafter sometimes referred to as "J and J" or "J&J Cable") is a foreign limited liability company believed to be organized under the laws of the State of Georgia. J and J is believed to be authorized to do business as an Alabama company. Its registered agent for service of process if Richard Daugherty, 1241 OG Skinner Drive, Westpoint, Georgia 31833. J and J's principle place of business in Alabama is believed to be 500 North 26th Street, Suite 302, Opelika, Alabama 36801. As the agent or employee or independent contractor of Dixie Electric Cooperative, J & J is liable to the Plaintiff for their own corporate failure to discharge legal duties to the Plaintiff including the non-delegable duty to cause no harm to Plaintiff; or cause to be safely install electrical conduit through which Dixie will provide electrical services to the public; or the Defendants are vicariously liable for the wrongful acts of individual Defendants; or the corporate Defendants acquiesced in the wrongful acts complained of. The Defendants each individually negligently

2

and/or wantonly failed to make Plaintiff aware of and/or safe from the sewage
after learning of the sewage line breach caused by the Defendants. As a
proximate result, Plaintiff were subjected to unreasonable damages both property
and personal injury.

4. Fictitious parties A through Z whose identities are unknown to Plaintiff at this
time, but will be named by amendment when ascertained being those persons,
corporations or other legal entities whose wrongful acts caused or contributed to
cause damages and injuries to the Plaintiff at times relevant to this lawsuit.

## STATEMENT OF FACTS

5. Plaintiff incorporates by reference all of the allegations of preceding paragraphs
of this complaint as if the same were set out fully herein.

6. At times material to this lawsuit, Caroline Torrence was a tenant resident of 8216
Ryan Ridge Loop, Montgomery, Alabama 36117.

7. On or about or between November 3, 2013 until approximately sometime after
November 11, 2013, the sewage line at Plaintiff's home was breached and
thereafter raw sewage began to and continued to seep and invade Plaintiff's
home through bathroom toilets, under various walls within her dwelling place, the
family living room, and various closets within the household and in hallways
until approximately middle to late November 2013. The seepage of raw sewage
made the home uninhabitable causing Plaintiff to temporarily move out,
destroyed her personal property within the household and caused mental anguish,
mental distress and other personal injuries and personal illnesses.

3

8. At all times material to this lawsuit new homes were being built in and around the Plaintiff's neighborhood and her home. Both Dixie and J and J were engaged in activities that were related to new home construction and negligently and/or wantonly caused damage to sewer lines that resulted in raw sewage seeping into the dwelling place of the Plaintiff.

9. As a public utility and/or manager and/or master and/or principal, Dixie and J & J were charged with a non-delegable duty to bring no harm to the Plaintiff; or to safely install underground conduit safely without causing harm or damage to Plaintiff's person and/or property; and/or these Defendants voluntarily assumed the non-delegable duty to provide safe conditions and safely install underground conduit and thereafter, due to negligence or wantonness or inadvertence, failed to act with due care.

10. The Defendants also had a non-delegable duty to warn of defects in the premises of which they were aware and to warn of those defects which could have been discovered through reasonable inspection and/or these Defendants assumed the non-delegable duty to reasonably inspect and warn of such defects.

11. The Defendants, separately and severally, either negligently or wantonly, failed to fulfill these non-delegable duties resulting in harm to the Plaintiff. The Defendants, separately and severally, failed to discharge these duties by negligently and untimely notifying the Plaintiff of the sewage line breach or to maintain or timely repair the sewage line or to untimely notify the Plaintiff of the breached sewage line all of which resulted in the flooding of Plaintiff home with raw sewage and raw sewage leaking from the commode, the shower, the

4

bathtub into the bedrooms and hallway of the house.   The Defendants also negligently failed to inspect, repair or otherwise maintain in a safe condition the underground boring resulting in the back up of raw sewage into Plaintiff's home.

12. The Defendants, separately and severally, either negligently or wantonly, failed to fulfill these non-delegable duties resulting in harm to the Plaintiff.  The Defendants, separately and severally, failed to discharge these duties by negligently and untimely notifying the Plaintiff of the sewage line breach or to maintain or timely repair the sewage line or to untimely notify the Plaintiff of the breached sewage line all of which resulted in the flooding of Plaintiff home with raw sewage and raw sewage leaking from the commode, the shower, the bathtub into the bedrooms and hallway of the house.   The Defendants also negligently failed to inspect, repair or otherwise maintain in a safe condition the underground boring resulting in the back up of raw sewage into Plaintiff's home.

## COUNT ONE

## NEGLIGENCE/WANTONNESS

13. The Plaintiff incorporates by reference all of the allegations of preceding paragraphs of this Complaint as if the same were set out fully herein.

14. That the Defendants Dixie, J and J and fictitious parties A through Z whose identities are unknown to Plaintiff at this time, but will be named by amendment when  ascertained being those persons, corporations or other legal entities whose wrongful acts caused  or contributed to cause damages and injuries to the Plaintiff

at times relevant to this lawsuit  negligently and/or wantonly caused raw sewage to seep into the home of the Plaintiff.

15. As a proximate result of the negligence and/or wantonness of said Defendants, the P laintiff suffered both personal injury and personal property damages for which she seeks  compensation.

   **WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays that a jury enter a judgment in favor of the Plaintiff and against the said Defendants for compensatory and punitive  damages plus interests and costs in an amount commensurate with her claim for damages.

## COUNT TWO

## NUISANCE

16. The Plaintiff incorporates by reference all of the allegations of preceding paragraphs of this Complaint as if the same were set out fully herein.

17. The activities of the Defendants Dixie, J and J and fictitious parties A through Z whose identities are unknown to Plaintiff at this time, but will be named by amendment when  ascertained being those persons, corporations or other legal entities whose wrongful acts caused  or contributed to cause damages and injuries to the Plaintiff at times relevant to this lawsuit,  created a nuisance as defined in Code of Alabama §6-5-120, et. seq. in the household of the  P l a i n t i f f .

18. As a proximate result of the nuisance created by the Defendants, the Plaintiff suffered both personal injury and personal property damages for which she seeks compensation.

   **WHEREFORE, PREMISES CONSIDERED,** Plaintiff pray that a jury enter

6

a judgment in favor of the Plaintiff and against the said Defendants for compensatory and punitive damages plus interests and costs in an amount commensurate with her claim for damages.

## COUNT THREE

### TRESPASS

19. The Plaintiff incorporates by reference all of the allegations of preceding paragraphs of this Complaint as if the same were set out fully herein.

20. The activities of Defendants Dixie, J and J fictitious parties A through Z whose identities are unknown to Plaintiff at this time, but will be named by amendment when ascertained being those persons, corporations or other legal entities whose wrongful acts caused or contributed to cause damages and injuries to the Plaintiff at times relevant to this lawsuit constitutes a trespass against the Plaintiff.

21. As a proximate result of the trespass of the Defendants, the Plaintiff suffered both personal injury and personal property damages for which she seeks compensation.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays that a jury enter a judgment in favor of the Plaintiff and against the said Defendants for compensatory and punitive damages plus interests and costs in an amount commensurate with her claim for damages.

**Respectfully submitted this 1st day of November, 2015.**

*/s/ H. Lewis Gillis*
**H. LEWIS GILLIS (GIL 011)**
**TYRONE C. MEANS (MEA 003)**
**KRISTEN J. GILLIS (GIL 078)**
**Attorneys for Plaintiff**

<u>OF COUNSEL:</u>
**Means Gillis Law, LLC**
**60 Commerce Street, Suite 200**
**P. O. Box 5058**
**Montgomery, Alabama 36103-5058**
**Phone 334-270-1033**
**Fax 334-260-9396**
hlgillis@meansgillislaw.com
tcmeans@meansgillislaw.com
kjgillis@meansgillislaw.com


**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY**


        */s/H. Lewis Gillis*
        **OF COUNSEL**


**FOR SERVICE OF PROCESS THE DEFENDANTS CAN BE SERVED AS FOLLOWS:**

**Dixie Electric Cooperative**
**9100 Atlanta Highway**
**Montgomery, AL 36117**


**J & J Cable Construction LLC**
**c/o Jerry Noblitt**
**193 Lee Road 261**
**Opelika, AL 36801**
jerrynoblitt@gmail.com

# EXHIBIT C

## AFFIDAVIT OF JERRY WEIR

STATE OF ALABAMA          )

LEE COUNTY                )

Before me, the undersigned authority in and for said County and State, personally appeared Jerry Weir, who, after first being duly sworn by me, says as follows:

My name is Jerry Weir. I am of sound mind, capable of making this affidavit and am personally acquainted with the facts herein stated:

1.      In November, 2013, I was employed by J and J Cable Construction, LLC ("J and J"). At that time, J and J's primary business was underground boring for cable and/or other utility services.

2.      I was the foreman of the J and J job to bore underground in order to extend electrical utilities to a new phase of construction in the Ryan Ridge neighborhood in Montgomery, Alabama. I contacted Alabama Locate or 811 so that the applicable utilities in the underground easement would be marked prior to J and J beginning work. I also contacted Montgomery County Water Works to have water and sewer lines marked.

3.      On Tuesday, November 5, 2013, I obtained conduit from Dixie Electric Cooperative ("Dixie") for the job.

4.      All of the boring for the Ryan Ridge subdivision project was done on Friday, November 8, 2013. We began at the corner of 8220 Ryan Ridge Loop and bore underneath the ground of the sixth existing homes on Ryan Ridge Loop until we reached the existing padmount transformer at the corner of 8200 Ryan Ridge Loop. The ground at the location had river gravel that caused the hole to collapse before the job could be completed that Friday.

5.      I notified the management at J and J of the issue with the river gravel by sending an email on Saturday, November 9, 2013. Attachment A hereto is a true and correct copy of the November 9, 2013 email that I sent.

1403176.1

6.     Because of the issue with the river gravel, we returned to the project on Monday, November 11, 2013 to re-install the conduit in the same bore with Tru-Bore, a drilling compound used to maintain hole integrity during pullback.  All the work done on Monday, November 11, 2013 was in the same bore that had been dug on Friday, November 8, 2013.  No additional boring was done on Monday, November 11, 2013.

7.     J and J followed the depth requirements for installing underground utilities on this project. All boring for the assignment from Dixie Electric for the Ryan Ridge subdivision project occurred on Friday November 8, 2013 and any re-boring through on November 11, 2013 proceeded through the same underground path that was established on Friday, November 8, 2013.

8.     I did not know when I was at the job on either Friday, November 8, 2013 or Monday, November 11, 2013 that J and J had struck or punctured the sewer lateral to 8212 Ryan Ridge Loop. I do not recall going back to the site after the job was completed.

9.     I did not learn that anyone who resided at 8212 Ryan Ridge Loop was claiming that he or she had become ill, had suffered a sewage backup in their home, or had suffered any mental anguish until after the lawsuit, *Marrell A. Crittenden, Jr., et al. v. Dixie Electric Cooperative, et al.*, In the Circuit Court of Montgomery County, Alabama, CV-2014-900103 was filed in January, 2014.

FURTHER AFFIANT SAYETH NOT.

_____

Jerry Weir

Sworn to and subscribed before me this _5_ day of ~~August~~ October, 2015.

1403176.1                                   2



Notary Public

My commission Expires: My Commission Expires June 4, 2017

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

| | |
|---|---|
| MARRELL A. CRITTENDEN, JR., ET AL., | ) ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )    Civil Action No.: CV-2014-900103 |
| | ) |
| DIXIE ELECTRIC COOPERATIVE, J AND J CABLE CONSTRUCTION, LLC, ET AL., | ) ) ) |
| | ) |
|     Defendants. | ) |

## AFFIDAVIT OF JERRY WEIR

| | |
|---|---|
| STATE OF ALABAMA | ) |
| COUNTY OF LEE | ) |

Personally appeared before me, the undersigned Notary Public, in and for said County and State, Jerry Weir, who, after being duly sworn, did depose and state on oath as follows:

1.    My name is Jerry Weir, and I have personal knowledge of the facts contained herein.

2.    I am over the age of nineteen (19) years of age.

3.    I am competent to testify to the facts set out below, and if called as a witness I could competently testify to the facts contained herein.

4.    At all relevant times I was an employee of J and J Cable Construction, LLC, a Defendant in the above-referenced lawsuit.

5.    J and J Cable is no longer in business but in November 2014 its primary purpose was underground boring for cable and/or other utility services.

6.    Dixie Electric hired J and J Cable to bore underground in order to extend electrical utilities to a new phase of construction in the Ryan Ridge neighborhood.

7.    I was in charge of that assignment from Dixie Electric. Before work began we walked

DOCUMENT 361

the project with representatives of Dixie Electric. Dixie Electric informed us where the conduit that would be installed in the bore sights would go, how much conduit would be needed as well as how much conduit to leave out of the ground.

8.      Since the Ryan Ridge was an existing neighborhood I contacted Alabama Locate or 811 so the City of Montgomery would mark the utilities.

9.      The City of Montgomery marked the utilities but will not mark lateral sewage lines that run from a residence to the main sewage line.

10.     The only way to determine the location of the lateral sewage lines in that circumstance would be to dig up the grass and dirt.

11.     I have worked with Dixie Electric on several other projects as an employee of J and J Cable that are similar and I was told previously that if this situation arises and we cannot determine the exact location of the lateral sewage lines or other utilities that the City of Montgomery will not mark then to always dig deeper.

12.     J and J Cable went to Dixie Electric's office and was given the amount of conduit that was needed to extend the utility services at the Ryan Ridge project. After we completed boring the lines where we were told to run them and installed the conduit all remaining conduit must be turned back in to Dixie Electric.

13.     J and J Cable followed the depth requirements for installing underground utilities and complied with all industry standard at this project.

14.     After the services were provided for the Ryan Ridge project the work was approved by Dixie Electric and J and J Cable's invoice was paid by Dixie Electric.

15.     At no time during this project did anyone from J and J Cable know or suspect that any utility had been punctured and/or struck during the boring process.

DOCUMENT 361

16.     J and J Cable complied with all industry standards in having the utilities marked by the City of Montgomery, boring the utility lines to extend the electrical services to a new construction phase in the Ryan Ridge neighborhood and also making sure those lines were run through the utility easements.

17.     I hereby state and affirm that all the above statements are true and correct, to the best of my knowledge and belief.

**Further affiant sayeth not.**

Jerry Weir

STATE OF ALABAMA    )
COUNTY OF LEE        )

I, the undersigned, a Notary Public in and for said State and County, hereby certify that JERRY WEIR, whose name is signed to the foregoing Affidavit and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same voluntarily.

Given under my hand and official seal on this the 6th day of March, 2015.

[SEAL]

NOTARY PUBLIC
My Commission Expires: MAY 20, 2016.



DOCUMENT 361

# EXHIBIT D

1

```
                IN THE CIRCUIT COURT

                       FOR

              MONTGOMERY COUNTY, ALABAMA


MARRELL A. CRITTENDEN,
JR., et al.,

      Plaintiffs,

vs.                          CIVIL ACTION NO.
                              CV-2014-900103
DIXIE ELECTRIC COOPERATIVE,
et al.,

      Defendants.


            * * * * * * * * * * * *


      DEPOSITION OF JERRY NOBLITT, taken pursuant
to stipulation and agreement before Gayle F. Watson,
CCR, ACCR #573, and Commissioner for the State of
Alabama at Large, in the Law Offices of Means Gillis
Law, LLC, 60 Commerce Street, Suite 200, Montgomery,
Alabama, on Thursday, October 9, 2014, commencing at
approximately 1:05 p.m.


            * * * * * * * * * * * *
```

2

```
                   APPEARANCES


FOR THE PLAINTIFFS:

H. Lewis Gillis, Esquire
MEANS GILLIS LAW
Attorneys at Law
60 Commerce Street
Suite 200
Montgomery, Alabama


FOR THE DEFENDANTS:

Teresa G. Minor, Esquire
BALCH & BINGHAM
Attorneys at Law
1901 Sixth Avenue North
Suite 1500
Birmingham, Alabama  35203-4642


PRO-SE:

Mr. Jerry Noblitt
193 Lee Road 261
Opelika, Alabama  36804


ALSO PRESENT:

Mrs. Crittenden
Mr. Brad Arrington


            * * * * * * * * * * * * *
```

3

EXAMINATION INDEX

JERRY NOBLITT
     BY MR. GILLIS . . . . . . . . . . .     6
     BY MS. MINOR . . . . . . . . . . . . 109
     BY MR. GILLIS . . . . . . . . . . . . 200
     BY MS. MINOR . . . . . . . . . . . . 210
     BY MR. GILLIS . . . . . . . . . . . . 212
     BY MS. MINOR . . . . . . . . . . . . 212


                EXHIBIT INDEX

                                              MAR
Plaintiffs'
 1     Order issued by Judge William Shashy dated    8
       10/3/2014

 2     Check written to ServPro for sewage damage    69
       repair at 8212 Ryan Ridge in the amount of
       $7,851.46

 3     ServPro document entitled, First Notice of    71
       Loss, dated 11/25/2013, for 8212 Ryan Ridge
       Loop

 4     Document entitled, Release of All Claims,     73
       dated April 3, 2014, 8212 Ryan Ridge Loop
       Montgomery, Alabama

 5     Document entitled, Release of All Claims,     78
       April 3, 2014, 8216 Ryan Ridge Loop
       Montgomery, Alabama

 6     Cook Claims Services, Inc., Breakdown of      80
       Settlement for 8216 Ryan Ridge Loop
       Montgomery, Alabama and 8212 Ryan Ridge
       Loop, Montgomery, Alabama

 7     Same as Plaintiffs' Exhibit Number 6         93


            (Exhibit index continued on next page.)

4

            EXHIBIT INDEX (continued)

                                              MAR
Plaintiffs'
 8     Document with customer name, Anderson,       81
       Jack; Phone no:  220-8984; Job/Invoice no:
       9569

 9     Letter, Teresa G. Minor to Timothy C.        84
       Halstrom, 9/26/2014, in re:  8216 Ryan
       Ridge Loop, Montgomery, Alabama

10     Letter, Jack Anderson to Martha Singleton,   89
       1/2/2014, in re:  8212 and 8216 Ryan Ridge
       Loop

11     Handwritten document by Jack Anderson,       91
       12/9/2013, in re:  Claim for lost rental
       income

12     Answer to complaint provided by J&J Cable   102
       Construction, LLC


Defendants'
 1     Articles of Organization for J&J Cable       136
       Construction

 2     Email, Jessica Love to Brad Arrington with   145
       attached insurance certificates for J&J
       Cable Construction

 3     Work order ticket number 133031287          175

 4     J&J material check out and check in for Ryan 181
       Ridge Loop

 5     J&J invoice for the job at Ryan Ridge,       182
       dated November 15, 2013


            (Exhibit index continued on next page.)

41

```
1    Q.  Tell me who from J&J was on site when the
2        sewage line was broken into, breached.
3    A.  The sewer line wasn't established as being
4        broke until there was a service call that
5        there was a problem with a residence.  So if
6        you're asking who was on site, we didn't know
7        there was a problem to have someone on site.
8    Q.  Who all did you have working for you on that
9        project?  Give me their names.
10   A.  David Weir and Jerry Weir, and that would be
11       it.
12   Q.  And David and Jerry are the ones who operated
13       the machinery --
14   A.  Correct.
15   Q.  -- that you used in -- in doing this bore?
16   A.  Correct.
17   Q.  And then who was on site when it was
18       discovered that the sewage line had been
19       breached?
20   A.  Dixie had a representative out there very
21       quick.  I can't -- I can't answer the time
22       frame.  But on the initial phone call that
23       there was a problem, Dixie had someone out
```

42

```
1        there immediately.
2    Q.  Who did Dixie have out there?
3              MS. MINOR:  Object to the form.
4              He's already said he doesn't
5              know.
6              MR. GILLIS:  Come on, Teresa.
7    A.  I don't know the guy's name.
8    Q.  Well, describe him for me.
9              MS. MINOR:  Now, you come on.  He
10             wasn't even there.  How is he
11             supposed to know?
12   A.  I don't know.  I can't answer that.  I had
13       a -- I received a phone call that there had
14       been a sewer damage.
15   Q.  Who called you?
16   A.  Dixie called me.
17   Q.  Who from Dixie?
18   A.  I believe it was Brad.
19   Q.  Brad?  Brad who?
20   A.  Arrington.
21   Q.  And what did Brad tell you?
22   A.  There had been a problem.  There was a sewer
23       damage at that address.
```

43

```
1    Q.  And when Brad told you that, what did you do?
2    A.  Tried to find out what was going on there.  I
3        called my brother-in-law and them to find out
4        did they know anything about it.
5    Q.  You called Jerry?
6    A.  Correct.
7    Q.  Did you talk to Jerry?
8    A.  I did.
9    Q.  What did Jerry tell you?
10   A.  He didn't know there was a problem.
11   Q.  Was David still there?
12   A.  At the job site?
13   Q.  Yes, sir.
14   A.  No.  This was -- This is -- It had been a few
15       days after the bore that the phone call was
16       notified of damage.
17   Q.  When was the bore?
18   A.  The bore was done on the 11th -- or completed
19       on the 11th.  My locates expired after the
20       12th.  I believe my locate ticket, which I
21       will make sure I provide you with that
22       information from Alabama One Call -- I believe
23       my locate cleared around the 3rd.
```

44

```
1    Q.  And so sometime between the 3rd and the 11th
2        you-all bored out there?
3    A.  Correct.
4    Q.  And sometime between the 3rd and did you say
5        the 19th?
6    A.  No, sir.  No, sir.
7    Q.  What day did Brad Arrington call you?
8    A.  I don't recall the exact date.  I apologize,
9        sir.
10   Q.  Well, let me ask you this:  Did you -- When
11       they told you that this breach had occurred,
12       did you conduct -- did J&J conduct an
13       investigation to see what happened.
14   A.  I called my brother-in-law to find out, if he
15       was in the area, could he go by and see.  At
16       that point the sewer line was already being
17       fixed and taken care of.  I asked him what
18       happened on the job.
19   Q.  And what did he tell you?
20   A.  He didn't even know there was a problem, as
21       far as sewer line.  So, I mean, it wasn't
22       something where we just said, oh, yeah.  This
23       was something -- Didn't even know a problem
```

45

1  had occurred, as far as a broken sewer pipe.

2  Q. Well, did J&J cause this problem?

3  A. If you're asking who caused it, we hit it. I

4     believe, in a nutshell, the City of Montgomery

5     is responsible.

6  Q. Well, I understand that you believe the City

7     of Montgomery is responsible. Everybody --

8     J&J is not responsible, though; is that

9     correct?

10 A. What I'm saying is I hit the pipe, obviously.

11 Q. Is J&J responsible for this breach of this

12    sewage line?

13 A. Yes.

14 Q. But in addition to J&J, you're saying that the

15    City of Montgomery is responsible?

16 A. The City of Montgomery will not mark from the

17    main to the residence; therefore, we cannot

18    determine the sewer at a residence. You

19    absolutely have no way because they will

20    not -- they refuse to put paint on the ground.

21 Q. So the City of Montgomery is negligent for not

22    determining the mark to the residence, you're

23    saying?

46

1  A. I believe so.

2  Q. I believe you said that when you found out

3     about it --

4  A. Yes, sir.

5  Q. -- that the repair had already started?

6  A. Correct.

7  Q. You told me that you were responsible for this

8     breach?

9  A. Obviously, when I got the phone call. We were

10    out -- We were out there working. So I would

11    say if it was determined when I received a

12    phone call, yes. I mean, we were the one

13    boring.

14 Q. Well, if you were the one responsible for this

15    breach, who took responsibility for sending

16    somebody out there to do the repair?

17 A. Dixie.

18 Q. Even though you were an independent

19    contractor?

20    MS. MINOR: Object to the form.

21 A. Dixie at that point's concern was for the

22    customer, not who was -- who was involved.

23 Q. Even though you were an independent

47

1  contractor, Dixie took over and sent somebody

2  out there, as far as you know?

3     MS. MINOR: Object to the form.

4  A. As far as I know, I mean.

5  Q. Who went out there to do the repair?

6  A. I can't answer that. I was not there.

7  Q. Whoever went out there, you certainly did not

8     get them and go out there?

9  A. I did not, no.

10 Q. Not only did you not get them to go out there,

11    you certainly didn't pay them for the work

12    that was done out there, did you?

13 A. No, sir.

14 Q. Do you know who paid them?

15 A. I don't.

16 Q. You did go out there and look, though, didn't

17    you?

18 A. I sent my brother-in-law, correct.

19 Q. You sent your brother-in-law?

20 A. Correct. He was in Montgomery working. I

21    asked him, as soon as we received the phone

22    call, to go by and make sure that, first of

23    all, we even did it.

48

1  Q. But you satisfied yourself that you-all did

2     it?

3  A. I satisfied that was -- there was --

4     Obviously, we were the ones out there boring.

5     I'll say that.

6  Q. Is it your testimony to this jury that you-all

7     did not cause the damage out there the 8612

8     (sic.) and 8616 (sic.)?

9  A. That's not what I said. I said we were the

10    ones out there boring; therefore, obviously we

11    had to be the ones that caused the problem.

12    We did not know there was a problem until we

13    even received a phone call. I didn't know

14    there was damage to anybody's property until

15    we received a phone call.

16 Q. Do you accept responsibility for the damage

17    that was done in breaching the sewer?

18    MS. MINOR: Object to the form,

19        asked and answered.

20 A. I don't accept responsibility. As I said

21    before, I believe Montgomery is responsible.

22 Q. In addition to not accepting responsibility,

23    you didn't even go out there to see what

73

1  Q. Do you know if Dixie Electric got a release of
2     claims from the Andersons for the damage that
3     we are talking about?
4  A. No, sir.
5  Q. Did Dixie tell you, as the independent
6     contractor, that they had gotten a release of
7     claims concerning this matter?
8  A. No, sir.
9  Q. They didn't discuss that with you?
10  A. No, sir.  I believe if you're talking about
11     when all this process would have started, it
12     may have been within the lawsuit.  And at that
13     point Dixie would have been instructed to not
14     talk about the case.  So, no, I --
15  Q. Even though you're the one who caused the
16     damage?
17  A. Yeah.  I mean --
18  Q. And so we know that you did not authorize
19     Dixie to pay the Andersons $8,322.24, did you?
20  A. No, sir.
21         (Plaintiffs' Exhibit 4 was marked for
22         identification.)
23  Q. Let me just show you, for identification

74

1     purposes, Plaintiffs' Exhibit Number 4, ask
2     you to look at it and see -- and tell me
3     whether or not you've ever seen that document
4     before.
5  A. No, sir, I've never seen this document.
6  Q. In looking at Plaintiffs' Exhibit Number 4, it
7     appears to deal with a release of all claims
8     as a heading on that document; is that
9     correct?
10  A. Yes, sir.
11  Q. If you look at the last two lines in the first
12     paragraph, it appears that it's a release of
13     claims regarding an accident -- the events
14     that occurred on or about the 19th of November
15     of 2013 at 8212 Ryan Ridge Loop, Montgomery,
16     Alabama; is that correct?
17  A. Correct.
18        MS. MINOR:  Object to the form.
19  Q. And that is one of the addresses that was
20     involved in the breach that occurred?
21  A. Yes, sir.
22  Q. And, again, with regard to the money that was
23     paid, you didn't authorize Dixie to pay that?

75

1  A. No, sir.
2  Q. Have they asked you to come -- collect it from
3     you?
4  A. No, sir.
5  Q. They haven't sent you an invoice for it?
6  A. No, sir.
7  Q. This document, if it's accurate, seems to say
8     that the breach occurred on the 19th of
9     November.  Do you know whether or not that's
10     accurate or not?
11  A. I can't answer that definitively, no, sir.
12  Q. If the homeowner said that the backup had
13     started a week or so earlier, you wouldn't
14     have any evidence to disprove that, would you?
15  A. I wouldn't have any evidence because I didn't
16     know about the damage until there was a claim.
17  Q. Do you have any idea why Dixie was out there
18     trying to get release of claims for damage
19     that you, as an independent contractor,
20     caused?
21        MS. MINOR:  Object to the form.
22  A. I can't answer that.  I don't speak for
23     Dixie.

76

1  Q. But it's your testimony that you didn't work
2     for Dixie, did you?
3  A. What do you mean "work for Dixie?"  As an
4     employee?
5  Q. Yeah.
6  A. No, sir.
7  Q. And is it your testimony that you were not
8     under the supervision or control of Dixie?
9  A. No.  No one stood out there supervising us
10     while we did the work, if that's what
11     you're -- if I think I understand what you're
12     asking me.
13  Q. Well, do you agree that you were under Dixie's
14     control even though they were not out there
15     standing over you?
16        MS. MINOR:  Mine object to the
17        form.  Calls for a legal
18        conclusion.
19  A. I would say that the only time Dixie would
20     have control is if I didn't put the product in
21     as what was agreeable --
22  Q. And so somebody had to --
23  A. -- because I wouldn't get paid if it wasn't

77

```
1    agreeable.
2  Q.  So somebody has to be out there to kind of see
3    if you're doing it right?
4  A.  No.
5         MS. MINOR:  Object to the form.
6  A.  They don't come out until after -- after I
7    turn in, and then they would go out to make
8    sure that it's agreeable.
9  Q.  And do you know whether or not Dixie got a
10   release for J&J?
11 A.  I don't know.
12 Q.  Only for itself?
13 A.  I can't --
14        MS. MINOR:  Object to the form.
15 A.  -- answer that, no, sir.
16 Q.  At least that Exhibit Number 4 which seems to
17   say that Dixie got the release just for
18   itself; is that correct?
19        MS. MINOR:  He's not a lawyer and he
20            doesn't know the answer to that
21            question and it's unfair.
22            Objection.
23 Q.  Are you not able to read and understand that?
```

78

```
1         MS. MINOR:  He's not a lawyer.
2  A.  I mean, I don't see where I'm on here, no.
3  Q.  Mr. Norbitt --
4  A.  Noblitt.
5  Q.  -- Noblitt -- I'm sorry, I apologize --
6  A.  That's okay.
7  Q.  -- do you not understand -- can you understand
8    that document?
9  A.  I understand it's a release, correct.  I'm not
10   on there, no.
11 Q.  And it appears to release Dixie?
12 A.  Yes.
13        MS. MINOR:  Object to the form.
14            It's a legal document.  He's not
15            a lawyer and it's an unfair
16            question.
17        (Brief interruption.)
18        MR. GILLIS:  Let's take a break,
19            please.
20        (Brief recess.)
21        (Plaintiffs' Exhibit 5 was marked for
22            identification.)
23 BY MR. GILLIS:
```

79

```
1  Q.  Sir, I promise you I don't think we'll be that
2    much longer.
3  A.  Yes, sir.
4  Q.  I want to show you Plaintiffs' Exhibit Number
5    5, and I'll represent to you that Exhibit
6    Number 5 is the same as Exhibit Number 4,
7    except that it is a release with regard to
8    8216 Ryan Ridge Loop, if you see down there at
9    the end of that first paragraph.
10 A.  I do.
11 Q.  Okay.  The responses that you gave with regard
12   to 8212 Ryan Ridge Loop and the release of
13   payment would be the same as to -- would be
14   the same testimony that you would give to 8216
15   Ryan Ridge Loop?
16 A.  As far as --
17 Q.  Payment of monies.  Dixie did that, not you?
18 A.  Okay.
19 Q.  You didn't authorize Dixie, did you?
20 A.  No.
21 Q.  And you didn't authorize Dixie to get a
22   release?
23 A.  No, sir.
```

80

```
1  Q.  And Dixie did not discuss the acquisition of
2    the release with you?
3  A.  No, sir.
4         (Plaintiffs' Exhibit 6 was marked for
5            identification.)
6  Q.  I want to show you Plaintiffs' Exhibit Number
7    6.  Across the top of it it has Cook Claims
8    Service.  Are you familiar with Cook Claims
9    Services, Inc.?
10 A.  No, sir.
11 Q.  Do you know anybody named Tracy at that
12   location?
13 A.  No, sir.
14 Q.  Looking at the first typed line below the
15   addresses -- correct me if I'm wrong -- it
16   reads, breakdown of settlement for 8216 Ryan
17   Ridge Loop, Montgomery, Alabama; is that
18   correct?
19 A.  Yes, sir.
20 Q.  And then down below it with part of it circled
21   does it say, breakdown of settlement for 8212
22   Ryan Ridge Loop?
23 A.  Yes, sir.
```

145

1  Q.  Were any of these employees paid directly by
2      Dixie Electric?
3  A.  No, ma'am.
4  Q.  Did all of those employees receive their
5      paycheck from J&J?
6  A.  Yes, ma'am.
7  Q.  You indicated as well that J&J maintained
8      insurance; am I right?
9  A.  Correct.
10 Q.  And that was required for the work that you
11     were doing with Knology?
12 A.  Correct.
13 Q.  Did Dixie also require you to maintain
14     insurance?
15 A.  Correct.
16 Q.  And did you provide a copy of J&J's insurance
17     certificate to Dixie?
18 A.  Yes.
19         (Defendants' Exhibit 2 was marked for
20          identification.)
21 Q.  Let me show you what I've marked as
22     Defendants' Exhibit 2. Can you tell me what
23     that is, please, sir.

146

1  A.  That's my insurance.
2  Q.  And when you say your, you mean J&J?
3  A.  Correct.
4  Q.  And on the first page of Defendants' Exhibit
5      2, does that appear to be an email
6      communication where Jessica Love is sending
7      that -- transmitting that to Brad Arrington?
8  A.  Correct.
9  Q.  And Brad Arrington is with Dixie?
10 A.  Correct.
11 Q.  Now, on the second page, which has the actual
12     certificate --
13 A.  Yes.
14 Q.  -- do you see in the first column where it's
15     got policy expiration date?
16 A.  Yes.
17 Q.  And what's that date, sir?
18 A.  I believe it would be 11-12.
19 Q.  Of '13?
20 A.  Of '13.
21 Q.  Is it your testimony that the work that was
22     done at Ryan Ridge was done before 11-12-13?
23 A.  Yes, it was.

147

1  Q.  And are you certain of that?
2  A.  I'm positive.
3  Q.  And how are you so positive?
4  A.  I received an email from Jerry Weir that the
5      project would need to go until Monday and this
6      was on the 9th of November. That Monday,
7      being the 11th, the work would have been
8      completed and, thereafter, the material was
9      returned to Dixie and the invoice followed.
10 Q.  Do you still have a copy of that email --
11 A.  I do.
12 Q.  -- from Jerry Weir?
13 A.  I do.
14 Q.  And you have my email address --
15 A.  Yes, ma'am.
16 Q.  -- sir?
17         Will you please provide that to me?
18 A.  Yes, ma'am.
19 Q.  And you also have a -- the email address for
20     Mr. Gillis?
21 A.  I have Tyrone's. Obviously, Mr. Gillis' won't
22     go through or didn't go through. I can send
23     it to Tyrone.

148

1  Q.  I will state for the record, if you will send
2      that to me I will get it to Crittendens'
3      counsel.
4  A.  Yes, ma'am.
5  Q.  Okay?
6  A.  Yes, ma'am.
7  Q.  And, according to this, the insurance carriers
8      for this time period was Essex Insurance
9      Company, Scottsdale Insurance Company, and
10     Evanston Insurance; is that right?
11 A.  Correct.
12 Q.  Did you have -- Or did J&J have any other
13     insurance other than those carriers?
14 A.  We had workers' compensation insurance through
15     Alabama Home Builders. That's why I was
16     confused on the other articles we were
17     talking. But I had Alabama Home Builders.
18 Q.  Did J&J obtain any insurance after November
19     12th, 2013?
20 A.  No, ma'am.
21 Q.  Did y'all deal with the particular insurance
22     company or an insurance agent in getting your
23     insurance?

157

1   A.   It would be Jerry Weir.
2   Q.   And why do you say it would be him?
3   A.   Because he was the only one that did my work
4        at that time, him and David.  And Brad -- Brad
5        would either usually call me or Jerry Weir.
6   Q.   And did you, yourself, ever physically go do
7        the work?
8   A.   No, ma'am.  I was in Huntsville at the time,
9        so I wasn't in town when this work was done.
10  Q.   Did you ever physically do the work for Dixie?
11  A.   Oh, yes.  I'm sorry, I apologize.  I thought
12       you meant on this job.
13  Q.   But on this job, you didn't?
14  A.   No, ma'am.
15  Q.   It was Mr. Weir and David Weir?
16  A.   Correct.  Correct.
17  Q.   Were there ever any jobs that J&J was called
18       about that y'all didn't do?
19  A.   J&J was called for Dixie that I personally
20       didn't do?
21  Q.   No.  That J&J.  Maybe you had too much
22       workload, you didn't have a crew and you
23       couldn't get to it in time.

158

1   A.   Yeah.  There's times I've had to ask another
2        company or another friend of mine could he do
3        the work.
4   Q.   Because y'all couldn't get to it?
5   A.   I couldn't get to it.
6   Q.   So you had the discretion to turn down any
7        assignment from Dixie if you wanted to?
8   A.   I wouldn't say turn down.  I would say I had
9        to get it done somehow, and I had friends that
10       were in the business.  I never told anybody,
11       nope, I can't do it.  I always either did it
12       myself or found someone, even at Knology.
13  Q.   But you had the right to turn it down if you
14       wanted to?
15  A.   I guess I could have.  I wouldn't have gotten
16       much work, I'm sure.  But ...
17  Q.   I recognize you wouldn't have gotten paid.
18  A.   I mean, well, I probably wouldn't have
19       received too much more work beyond that if I
20       would have turned it down, I mean, is what I'm
21       getting at.
22  Q.   But it was the prerogative of J&J whether to
23       do the work or not?

159

1   A.   There's always a prerogative to turn down,
2        sure.
3   Q.   And the relationship that J&J had with Dixie
4        was as an independent contractor?
5   A.   Yes, ma'am.
6   Q.   And why do you say that?
7   A.   I wasn't an employee.  I was in business for
8        myself.
9   Q.   And J&J was a completely separate business
10       from Dixie Electric?
11  A.   Correct.
12  Q.   And the employees that did the work, Jerry
13       Weir and David Weir, who supervised them?
14  A.   Jerry Weir was the supervisor and he reported
15       to me.  And that's been that way for years.
16  Q.   And on this job he was not supervised by any
17       employees of Dixie, was he?
18  A.   No.
19  Q.   He was supervised by employees of J&J?
20  A.   Correct.
21  Q.   And as for David Weir, he was supervised by
22       Jerry Weir --
23  A.   Correct.

160

1   Q.   -- who worked for J&J?
2   A.   Correct.
3   Q.   Now, as far as the tools that the gentlemen
4        used to do the boring, whose tools were they?
5   A.   Mine.
6   Q.   When you say mine, do you mean --
7   A.   J&J's?
8   Q.   -- J&J?
9   A.   Correct.
10  Q.   And what kind of tools were being used?
11  A.   We had a directional drill that would go in
12       the ground and bore from one point to
13       another.
14  Q.   Any other tools that would be used?
15  A.   Shovels and pieces that hooked up to the
16       conduit to pull the conduit back.
17  Q.   Was that a particular piece of equipment?  Did
18       it have a name?
19  A.   It would be called a carrot.
20  Q.   Carrot?
21  A.   Yeah.
22  Q.   Anything else y'all would be using?
23  A.   No, ma'am.  I mean, different jobs we'd use a

161

1  excavator -- a mini excavator.  But I'm not
2  sure that it was used on this job.
3  Q.  Anything else?
4  A.  No, ma'am.
5  Q.  Now, for all of those pieces of equipment --
6  the directional drill, the shovels, the
7  carrot, the mini excavator -- who owned those?
8  A.  It was J&J.
9  Q.  Who maintained that equipment?
10  A.  Me, J&J.
11  Q.  Dixie ever maintain y'all's directional
12  drills, shovels, carrots or excavators?
13  A.  No, ma'am.
14  Q.  And did Dixie ever provide that equipment to
15  J&J to use?
16  A.  No, ma'am.
17  Q.  Now, how would Jerry Weir and David Weir get
18  to a job site?
19  A.  J&J's vehicles.
20  Q.  What kind of vehicle did J&J have?
21  A.  One-ton service trucks.
22  Q.  And did they have any markings or indications
23  on side about what business they were

162

1  affiliated with?
2  A.  No, ma'am.  We had magnets that would say J&J
3  Construction.
4  Q.  And would those be on the truck?
5  A.  Yes, ma'am.
6  Q.  Did they have any kind of logo or anything to
7  identify them with Dixie?
8  A.  No, ma'am.
9  Q.  And the truck that they used to get to work,
10  the one-ton service truck, who owned that?
11  A.  J&J.
12  Q.  And who maintained that?
13  A.  J&J.
14  Q.  Did Dixie ever provide trucks to Jerry Weir
15  and David Weir to get to and from work?
16  A.  No, ma'am.
17  Q.  Who set the hours that your employees would
18  work?
19  A.  There was really no set hours.  We would try
20  and get there as early as possible.
21  Typically, you wouldn't start at a house
22  before eight -- eight o'clock out of being --
23  you know, just being courteous.  And depending

163

1  on the job, we'd try and work until it got
2  done.  I mean, there was no, like, normal job
3  where you go in and work for eight hours or --
4  Q.  Was that determined by the J&J employees?
5  A.  Yes, ma'am.
6  Q.  It was not determined by Dixie, was it?
7  A.  No, ma'am.
8  Q.  And even though the employees might be doing a
9  project that was for Knology or Dixie, they
10  were paid by J&J; am I correct?
11  A.  Correct.
12  Q.  And J&J would be the company that would hire
13  the employees; am I right?
14  A.  Correct.
15  Q.  And they would be the ones that would decide
16  whether or not they should be terminated or
17  retained?
18  A.  Correct.
19  Q.  And Dixie did not make any of those
20  determinations?
21  A.  No.
22  Q.  Dixie did not give instructions to the J&J
23  employees on how to do the work?

164

1  A.  When you say instructions, I mean --
2  Q.  I believe -- let me give you your words
3  back --
4  A.  Okay.
5  Q.  -- you were paid to get it from point A to
6  point B?
7  A.  Correct?
8  Q.  Other than that, it was your discretion --
9  J&J's discretion how to do the work; am I
10  right?
11  A.  We had to bore it.  That was what we were
12  called to do.  And as far as I couldn't just
13  go out and determine I want to put it here.  I
14  mean, it went where I was told, from this
15  point to that point.
16  Q.  Other than giving you the instructions from
17  this point to this point, did you get any
18  other instructions from Dixie?
19  A.  Just as far as where they needed the -- the
20  service to be, you know, and we had minimum
21  requirements of depth.  But other than that,
22  no.
23  Q.  So that's it?

165

1   A.   Yes, ma'am.

2   Q.   And when you say minimum requirements of

3        depth, what were they?

4   A.   On primary cable it was four feet, and on

5        secondary it was three feet.

6   Q.   To your knowledge, was that set by the

7        National Electric Safety Code?

8   A.   Yes, ma'am, it is.

9   Q.   And is that adopted in the state of Alabama as

10       the standard of good engineering practice in

11       Alabama by the Alabama Public Service

12       Commission?

13  A.   Yes, ma'am.

14  Q.   And that is who determines the depth the cable

15       will be; am I right?

16  A.   Yes, ma'am.

17  Q.   And that would apply not just to Dixie

18       Electric, but to any other electric utility in

19       the state of Alabama?

20  A.   Yes, ma'am.

21  Q.   Am I right?

22  A.   Yes, ma'am.

23  Q.   So when you say you have minimal standards,

166

1        you're really talking about minimal standards

2        that are set by the National Electric Safety

3        Code?

4   A.   Yes, ma'am.

5   Q.   Now, keeping in mind that you told me that you

6        get paid to get it from point A to point B --

7   A.   Yes, ma'am.

8   Q.   -- as far as how far to go below that minimal

9        standard, who determines that?

10  A.   Really, the project.  It's a project

11       variable.  It's case by case.

12  Q.   And would J&J be making that determination?

13  A.   Depend on how utilities were set up, yes.

14  Q.   And in this instance was that determination --

15  A.   Yes.

16  Q.   -- made by J&J?

17  A.   Yes.

18  Q.   As far as how far to go below the minimal

19       requirement of the National Electric Safety

20       Code --

21  A.   Right.

22  Q.   -- J&J made that determination?

23  A.   Correct.

167

1   Q.   Not Dixie?

2   A.   Right.

3   Q.   And I believe you also said "Dixie didn't

4        stand there and tell me what to do"; am I

5        right?

6   A.   Yeah.  They didn't stand -- They didn't stand

7        there on the job site with us while we were

8        performing the work.  They just checked the

9        quality of work or that it was done to

10       standards, you know, in order to get paid.

11  Q.   So before you would get paid, they would

12       verify the work had been done according to

13       your agreement with Dixie?

14  A.   Correct.

15  Q.   They didn't do anything else?

16  A.   Not to my knowledge.

17  Q.   And as far as the safety of the employees that

18       were doing the work, who was responsible for

19       that?

20  A.   J&J.

21  Q.   Did Dixie have any responsibility for the

22       safety of the J&J employees?

23  A.   No, ma'am.

168

1   Q.   To your knowledge, were the Dixie employees

2        even present when this work was done at Ryan

3        Ridge?

4   A.   I don't know.

5   Q.   You don't know of them being there?

6   A.   I don't know because I wasn't there.

7   Q.   You just don't know one way or the other?

8   A.   Yeah.  I don't know one way or the other, yes,

9        ma'am.

10  Q.   In your conversations with Mr. Weir about this

11       job, has he ever indicated that anyone from

12       Dixie was even present when the work was done?

13  A.   No, ma'am.

14  Q.   No, he hasn't; or, no, they weren't?

15  A.   No, he hasn't indicated to me.  It never came

16       up in our conversation that somebody was

17       there.

18  Q.   Sure.  And it was a bad question.  My

19       apologies.

20  A.   No.  That's okay.

21  Q.   When Mr. Weir -- Jerry Weir and David Weir

22       would be doing their work, would they be

23       wearing any articles of clothing or hard hats

169

1    from Dixie Electric?
2  A.  No.
3  Q.  What would they be wearing?
4  A.  Green safety vest and a hard hat.  You know,
5      standard equipment.
6  Q.  And who provided that to them?
7  A.  J&J.
8  Q.  Were they ever provided any safety equipment
9      or other equipment by Dixie?
10 A.  Beyond the conduit, no.
11 Q.  Let's talk about that conduit.  Is that
12     conduit required, as part of the National
13     Electric Safety Code, as far what can be used
14     by an electric utility?
15 A.  As far as I know, yes.
16 Q.  And so it's specified under the rules of the
17     National Electric Safety Code?
18         MR. GILLIS:  Object to the form.
19 A.  I guess.  I guess.  I mean, I don't know.  I
20     haven't --
21 Q.  When you did similar work for other utilities
22     such as Knology, did they, likewise, provide
23     the conduit or materials that were to be used?

170

1  A.  All companies provided the material.  They
2      just paid me for the labor.
3  Q.  And when you say provided the materials, what
4      type of materials are you talking about?
5  A.  In Knology's case it would be cable or fiber.
6      In Dixie's case it would be conduit.
7  Q.  And you weren't provided anything else by
8      Dixie other than the conduit?
9  A.  Correct.
10 Q.  How did you -- Who determined how much conduit
11     you needed?
12 A.  The supervisor at Dixie would meet us at the
13     job.  And as we walked out the premises to see
14     the -- you know, where we needed to go --
15 Q.  Point A to point B?
16 A.  -- we would determine we need a hundred feet
17     or two hundred feet or -- And then at that
18     point he would make notations and take it back
19     and create a job order, I would assume.
20 Q.  So, based on what you're telling me, when you
21     say we, J&J would decide how much was needed
22     and then --
23 A.  No.

171

1  Q.  -- you would ask Dixie for it?
2  A.  No.
3  Q.  I misunderstood, then.
4  A.  No.  Dixie would meet us out there together.
5      And then together, Dixie and a J&J
6      representative, would look at the job, wheel
7      it off and say it's this many feet and we're
8      going to need this amount of conduit.  We
9      didn't just go out and determine that by
10     ourselves.
11 Q.  Okay.  I thought I understood that.  You
12     would, then, request Dixie for a certain
13     amount of conduit?
14 A.  No.  Dixie would already have it predetermined
15     that this was -- They had a work order, and we
16     would go in and they would give us a work
17     order number with a specific footage of
18     conduit.  And it was always a little more in
19     case something foreseen -- unforeseen, you had
20     to use more.  But if I had to use that more, I
21     had to answer for it when I returned because I
22     had to return it with a job number.
23 Q.  Did you get the conduit before y'all met them

172

1      out there?
2  A.  No.
3  Q.  That would be after you met them out there?
4  A.  After I met Dixie, yeah, I would -- I would
5      come back and then I would check the conduit
6      out.
7  Q.  And is the point of the meeting out there for
8      them to tell you where point A and point B is?
9  A.  Yeah.  We looked at it together.  We'd walk it
10     out so I could understand what they were
11     wanting.  And then I would call in locates
12     based on, you know, where we were going to
13     bore.
14 Q.  And then for the actual boring and the depth
15     and things, that would be done by J&J?
16 A.  The boring and all that, yeah, correct.
17 Q.  And within the confines of the easement that
18     was held, would J&J make the determination
19     about where the conduit would be within that
20     easement?
21 A.  No.  Power always usually goes to the rear of
22     the easement.  It wasn't like we just had free
23     reign to go front or -- You know, I mean, we

173

1     had to be -- we just couldn't recklessly put

2     it in.  I mean, I had a specific area we tried

3     to stick by and put it in.

4  Q.  And is that area also set by the National

5     Electric Safety Code?

6  A.  I guess.  I don't know.

7  Q.  And within that area, as far as the depth

8     below the minimum, that's determined by J&J?

9  A.  Yes.

10  Q.  Am I right?

11  A.  Yes, ma'am.

12  Q.  Not by Dixie?

13  A.  No, ma'am.

14  Q.  Have you told us about all the discussions

15     that you remember having with anybody from

16     Dixie about this job?

17  A.  I believe so, yes, ma'am.

18  Q.  Do you know how long it took to actually bore

19     in this cable?

20  A.  Are you talking about on their specific

21     project?

22  Q.  Yes, sir.

23  A.  As I said, I believe on the 9th is -- is when

174

1     the email was -- was written that it was going

2     to have to be finished on Monday, and I -- and

3     I know it was finished on the 11th.

4  Q.  But the 11th was a Monday; am I right?

5  A.  It was Monday, yes, ma'am.

6  Q.  And the email that you're talking about saying

7     that it had to go over to Monday, that's one

8     you got from Jerry Weir?

9  A.  Correct.

10  Q.  That wasn't being sent to Dixie, was it?

11  A.  No, ma'am.  He would send us letting us know

12     kind of what their day was and for billing

13     purposes.  So if I did get a phone call asking

14     were we done, I could confidently, you know,

15     answer it.

16  Q.  Do you know if this took an entire eight-hour

17     day to get it done?

18  A.  I'm going to say, yes, only because they had

19     to carry over into Monday.  I don't know what

20     obstacles on this specific they ran into.  But

21     I'm going to say, yes.

22  Q.  Did he work on any other jobs on that Friday

23     other than this job?

175

1  A.  No, ma'am.

2  Q.  So it took all of Friday and some of Monday?

3  A.  Yes, ma'am.

4  Q.  Is that right?

5  A.  Yes, ma'am.

6  Q.  And during that time period, to your

7     knowledge, no one from Dixie was present

8     supervising the work?

9  A.  Yes, ma'am.

10  Q.  Now, when would the locates have been called

11     in before the work was actually done?

12  A.  I believe we received the work order on the

13     28th, and I believe the work order was called

14     in -- the ticket called in on the 1st and I

15     believe it cleared on the 3rd.  I don't have

16     the ticket in front of me.

17         (Defendants' Exhibit 3 was marked for

18     identification.)

19  Q.  Let me see if I can help you.  Let me show you

20     what's been marked as Defendants' Exhibit 3.

21     Take a minute and look at that.

22  A.  Okay.

23  Q.  Do you recognize that, sir?

176

1  A.  I recognize the ticket.  I'm sitting here

2     looking it over.  It looks like it was called

3     in on the 30th and it was due to update on the

4     13th.

5  Q.  What does that mean?

6  A.  What does what mean?

7  Q.  Due to update on the 13th?

8  A.  What it means is they give you so many days

9     before you need to refresh that ticket.  It's

10     good through the 15th, but they ask that you

11     update a few days prior to it expiring.  It

12     gives them a little time to kind of schedule

13     other -- other areas they may have to mark

14     out, I'm assuming, throughout their -- their

15     day.

16  Q.  So the fact that the update was due on the

17     13th, is that why you're confident that the

18     work was done by the 13th?

19  A.  I know it was, correct.

20  Q.  Who called this in?

21  A.  It looks like Jerry Weir called this one in.

22  Q.  And it indicates under the second heading

23     there, work information, it says, work date,

177

1    November 1, 2013, 1 p.m.  Do you think that's
2    right or is that just when it started?
3  A.  In Alabama they -- it's a 48-hour turnaround,
4    I believe, and in Georgia it's 72.  After 48
5    hours from when you call in, they give you a
6    date and a time when it's clear.  If they put
7    on the -- November the 1st, then that would be
8    the date that it cleared.
9  Q.  So you're free to begin working as of November
10    1 up through November 13?
11  A.  Correct.
12  Q.  And when I say you, that means Dixie
13    Electric --
14  A.  Yes, ma'am.
15  Q.  -- or -- excuse me -- it means J&J?
16  A.  Yes, ma'am.
17  Q.  And who actually called in this locate?
18  A.  It would be -- It says -- It says, Jerry Weir,
19    it looks like, and Gary is the email.
20  Q.  That's your father?
21  A.  No.  Gary.
22  Q.  Gary is your uncle?
23  A.  Yes.

178

1  Q.  But it was called in by J&J; am I right?
2  A.  Correct.
3  Q.  It was not called in by Dixie?
4  A.  Yes, ma'am.  Yes, ma'am.
5  Q.  And is that standard in this type of industry
6    for the independent contractor to call in the
7    locate request?
8  A.  For -- Yes, absolutely.
9  Q.  Is there anything else, other than calling in
10    this locate request, that a company like J&J
11    can do to determine what is buried in the
12    ground?
13  A.  No, ma'am.  You would call the One Call, and
14    then you have to call the water and sewer
15    separate -- I don't think they're on One Call
16    anymore -- and at which point they follow the
17    same guidelines when they come out.
18  Q.  And was that done in this case with Ryan
19    Ridge?
20  A.  Yes, ma'am.
21  Q.  And so, to your knowledge, did J&J meet the
22    standard in the industry about attempting to
23    locate anything that was in the ground there

179

1    at Ryan Ridge?
2  A.  Yes, ma'am.
3  Q.  Who was in charge of this job for J&J?
4  A.  Jerry Weir.
5  Q.  And would Jerry have decided what equipment
6    needed to be used?
7  A.  No.  At that point, because Knology was
8    selling -- had sold out to WOW, we had shrunk
9    down equipment considerably, so there wasn't
10    much option.  I mean, we had one drill.  So he
11    had no choice as far as what equipment to use.
12  Q.  But that equipment was J&J equipment; am I
13    right?
14  A.  Correct.  It was sufficient for the job.
15  Q.  Did Dixie provide any documents or information
16    to J&J about this job --
17  A.  No.
18  Q.  -- or any standards, guidelines or procedures
19    about how to do this job?
20  A.  No, ma'am.
21  Q.  And I believe you stated at the time this work
22    was done and completed J&J had no idea that
23    they had contacted the sewer lateral for 8212?

180

1  A.  Yes, ma'am.
2  Q.  Why didn't you know?
3  A.  I didn't know that there was damage.  I mean,
4    sewer is not a -- a utility when you hit that
5    you -- You know what I mean?  If you hit
6    water, it's evident right away; if you hit
7    power, it's evident right away.
8  Q.  How?
9  A.  Somebody is going to walk outside and tell you
10    their power is off.  If you hit water, it's
11    coming out of the ground.
12  Q.  And you can see it?
13  A.  Yes, ma'am.  Sewer is a gravity-fed utility.
14    You're not going to know.  It's not like any
15    other utility.
16  Q.  Was there any way for Mr. Weir and David Weir
17    to know that they had struck that sewer
18    lateral on the day the work was done?
19  A.  No, ma'am.
20  Q.  So the only way to know is when you have a
21    call or a report --
22  A.  Correct.
23  Q.  -- from the homeowner; am I right?

181

1  A.  Yes, ma'am.
2  Q.  And you're dependent on when the homeowner
3      decides to notify you?
4  A.  Yes, ma'am.
5  Q.  Am I right?
6  A.  Yes, ma'am.
7          (Defendants' Exhibit 4 was marked for
8          identification.)
9  Q.  Let me show you what I have marked as
10     Defendants' Exhibit Number 4.  Can you tell me
11     what that is, please, sir?
12 A.  That would be our material check out and check
13     in for that job from Dixie.
14 Q.  And this would be the conduit that was
15     actually used?
16 A.  Yes, ma'am.
17 Q.  And so by this time, as of November 16, 2013,
18     the material -- the unused portion of the
19     material has already been returned; am I
20     right?
21 A.  Yes, ma'am.  Well, it was -- Yes, ma'am.
22 Q.  Well, it says, returned 70.
23 A.  Return, yes, ma'am.

182

1  Q.  So by this point in time it's already back?
2  A.  Yes, ma'am.
3          (Defendants' Exhibit 5 was marked for
4          identification.)
5  Q.  Let me show you what I've marked as
6      Defendants' Exhibit Number 5.
7  A.  Okay.
8  Q.  Tell me what that is, please, sir.
9  A.  That's our invoice for the job at Ryan Ridge.
10 Q.  And the date of the invoice is November 15th;
11     am I right?
12 A.  Yes, ma'am.
13 Q.  It doesn't indicate on here, I don't think,
14     when the work was completed?
15 A.  In order to invoice, the work would have to
16     have been completed prior to the 15th.
17 Q.  And did you only invoice once a week?
18 A.  Yes, ma'am.
19 Q.  So when you say week ending November 15th,
20     that just happens to the Friday that it fell
21     or --
22 A.  Yeah.  Well, when you put work ending -- Even
23     for Knology what we did is -- There were

183

1      cut-off dates.  And if we didn't get our
2      invoicing in before a cut-off date, then it
3      would go to the following week.  So, I
4      believe, that would be the week ending where
5      we sent it in showing two dates.
6  Q.  So that's not the date the work was actually
7      done?
8  A.  No.  The work was done -- completed on the
9      11th.
10 Q.  All right.  And then this is the bill that was
11     sent to Dixie for the work at Ryan Ridge; am I
12     right?
13 A.  Correct.
14 Q.  And where it says J&J Cable Construction,
15     whose signature is that?
16 A.  My father's.
17 Q.  And did Dixie pay this bill?
18 A.  Yes.
19 Q.  And the work that was being done was as an
20     independent contractor for Dixie; am I right?
21 A.  Correct.
22        MR. GILLIS:  Objection.
23 Q.  Did J&J knowingly and willfully dig into the

184

1      sewer lateral at 8212 Ryan Ridge?
2  A.  No.
3  Q.  Did J&J take all steps that it knew to take to
4      avoid hitting any utility at Ryan Ridge?
5  A.  Yes, ma'am.
6  Q.  Now, I believe you told Mr. Gillis that you
7      found out that there was an issue when you
8      were contacted by Dixie; is that right?
9  A.  Yes, ma'am.
10 Q.  And refresh my memory.  Who did you say
11     contacted you?
12 A.  I believe it was Brad, that there had been a
13     problem.  A customer called and there was a
14     sewer damage.  And I called Jerry Weir to run
15     by out there and I asked him did he know what
16     was going on out there, and he didn't.  And I
17     asked him could he run by and, you know, see
18     what was going on.
19 Q.  And did he go by that same day that he was
20     called?
21 A.  Yes, ma'am.
22 Q.  Did Dixie say how long they had known about
23     this issue?

185

```
1    A.   I believe, if I understand -- and, again, I'm
2         trying to go back to the conversation -- I
3         want to say that within the hour of the
4         customer calling somebody was out there with
5         Dixie on the site.
6    Q.   Trying to be responsive?
7    A.   Trying to fix the problem.
8    Q.   And did J&J show up that day as well?
9    A.   Yes, ma'am.
10   Q.   And what did Jerry Weir do out at the Ryan
11        Ridge location that day?
12   A.   I don't know.
13   Q.   Did you ever ask him what was going on?
14   A.   I asked him what had happened.  He said that
15        the sewer line had been broke and steps were
16        already being taken to try and reestablish
17        service for the customer.  So, yeah, I mean, I
18        did ask.
19   Q.   And when did you learn that a lawsuit was
20        going to be filed by the Crittendens?
21   A.   Been a while -- It's been a while back.
22   Q.   Was it shortly after the time that you were
23        notified of the --
```

186

```
1    A.   Sewer damage?
2    Q.   -- sewer damage?
3    A.   Yes, ma'am.
4    Q.   Have you told me about all the conversations
5         you've had with Dixie, -- or that J&J had with
6         Dixie related to this project?
7    A.   I believe I have.
8    Q.   And you were asked repeatedly by Mr. Gillis
9         about why you didn't contact the Crittendens.
10   A.   Right.
11   Q.   Why didn't you contact the Crittendens,
12        Mr. Noblitt?
13   A.   Well, sewer is a very rare incidence, but
14        usually it's not an issue.  When -- When the
15        sewer gets busted, it's a matter of fixing a
16        pipe.  It's not -- I had no idea that this had
17        happened to the extent.
18             Typically, being honest, the more
19        dangerous utility would be gas or something
20        because that can blow up.  And so, if I'm
21        honest with it, I didn't know the extent was
22        so -- because it's never -- I mean in 10 years
23        I've been doing this I've never seen something
```

187

```
1         like this.
2    Q.   Did the Crittendens ever try and call J&J?
3    A.   No, ma'am.
4    Q.   Did they ever ask you to come in and see the
5         extent of the damage that was done at their
6         house --
7    A.   No, ma'am.
8    Q.   -- or provide you any medical records related
9         to the illness of their daughter?
10   A.   No, ma'am.
11   Q.   You were asked as well about the repairs that
12        were done at 8212?
13   A.   Um-hum (positive response).
14   Q.   Do you know, Mr. Noblitt, who actually
15        contacted ServPro to come in and do that work.
16   A.   I don't.
17   Q.   If I told you that it was the Andersons, the
18        property owners, would you have any reason to
19        dispute that?
20   A.   No, because I wasn't there.
21   Q.   And you also indicated you heard that there
22        was damage to the floor and there was feces in
23        the shower and tub; am I right?
```

188

```
1    A.   Yes, ma'am.
2    Q.   Did you, yourself, ever see any of that
3         damage?
4    A.   No, ma'am.
5    Q.   Did anyone ever ask J&J to come in and see the
6         extent of that damage?
7    A.   No, ma'am.
8    Q.   Let me ask you about something I wrote in my
9         notes -- and I may have not gotten this
10        right -- from when you were testifying for
11        Mr. Gillis.  You said that there was markings
12        that were made when you initially went out on
13        a job.  What were you talking about?
14   A.   The -- The ticket that you gave me a while
15        ago, the One Call ticket, what they do is they
16        go out and mark the gas -- private gas
17        service, water service, sewer, cable TV,
18        telephone, those -- those things.  So the
19        markings on the ground, that's what we're
20        going back to.  That's what it would be.
21   Q.   Were there any markings that were made by
22        Dixie?
23   A.   Yeah.  Dixie would mark any existing power in
```

205

A.  Yes, sir.  Yes, sir.

Q.  At any time that -- The locate document that
    you identified for counsel earlier, you will
    agree with me that the locate identification
    number, or ticket number, at the top of that
    page is not this number that I'm about to read
    for you -- you can follow with me and look at
    that Defendants' Exhibit 3, I believe --
    133010803.  That's not the number shown on the
    Defendants' Exhibit 3, is it?

A.  No.

Q.  And do you know if the number I read to you is
    the locate number that Dixie called in?

A.  I don't know.  I don't know.

Q.  But you said that Dixie doesn't call in those
    locate numbers, you do?

A.  Not for me.

Q.  And do you know if they call that locate
    number in days in front of you and -- and
    provided that information to you?

A.  Sir, I wouldn't know.  That would be a
    question really for Jerry Weir.

Q.  We're going to try to give Jerry a chance to

206

    answer a few questions.
        Your earlier testimony indicated that
    somebody told you that you had to start on the
    9th of November?

A.  No, I don't think I said that.

Q.  What is it about the 9th that you --

A.  No.  The 9th was where Jerry Weir emailed me
    and said he was going to have to finish on
    that Monday.  If I'm -- If I'm correct, the
    9th would have been a Friday and the 11th
    would have been a Monday.

Q.  Okay.  So he emailed you on the 9th that we
    have to finish by Monday?

A.  No.  We have to finish Monday.  We're not done
    yet.  They weren't done yet with the -- with
    the bore.

Q.  And Monday would have been the 11th, as you
    understood?

A.  Yes, sir.

Q.  And they did not work the weekend?

A.  No, sir.  No, sir.

Q.  Is there any particular reason why you were
    told you had to be finished by the 11th, that

207

Monday?

A.  No one told me to.  That's just when we
    finished.  We were trying to get the job done
    in a timely fashion for Dixie so I could
    actually get paid.  No one specified that it
    had to be done on the 11th.  That's just when
    it fell.

Q.  You indicated or stated that you thought that
    the City of Montgomery was responsible for the
    damage and injury that the Crittendens
    suffered in this case?

A.  No.  I said the City of Montgomery should be
    responsible to mark a utility that's going
    into their system.  And if I said that
    incorrectly, I apologize.

Q.  Well, is there anything that the Crittendens
    did to cause their damage or injury that
    you're aware of?

A.  No, sir.

Q.  Is there anything that Dixie did to cause the
    injury to the Crittendens?

A.  No, sir.

Q.  But Dixie is the one that -- In terms of all

208

    the dollars and cents that's been paid either
    to the Andersons or whomever was injured --

A.  Yes, sir?

Q.  -- property-wise, Dixie has paid it?

A.  Yes, sir.

Q.  Not J&J?

A.  No, sir.

Q.  Mr. Noblitt, how long is it going to take you
    to see if you can find any of the documents
    associated with this lawsuit?

A.  On the insurance?

Q.  On every aspect of it.

A.  Well, now, every aspect, there's -- I mean, I
    don't know.  But I know on the insurance, what
    we talked about, I can have that to you in the
    next day.  It's a matter of probably going
    through emails and just seeing what all
    Stephanie Doyle sent.  I don't know what else
    you would need that I haven't answered.

Q.  And then I think the last that I want to ask
    you is this:  Not one of the documents,
    whether from Louis, from Tyrone, from the
    Court -- none of those documents have arrived

# EXHIBIT E

## FREEDOM COURT REPORTING

1

```
 1    IN THE CIRCUIT COURT OF MONTGOMERY COUNTY,
 2         ALABAMA
 3
 4    CIVIL ACTION NO.: CV-2014-900103
 5
 6    MARRELL A. CRITTENDEN, JR., et al.,
 7         Plaintiffs,
 8    vs.
 9    DIXIE ELECTRIC COOPERATIVE, et al.,
10         Defendants.
11
12
13
14              DEPOSITION
15                 OF
16         COURTNEY BYNUM CRITTENDEN
17         27TH DAY OF JUNE, 2014
18
19
20
21    TAKEN BEFORE:  Gary N. Morgan
22         Registered Professional
23         Reporter and Notary Public
```

2

```
 1         APPEARANCES
 2
 3    FOR THE PLAINTIFFS:
 4         Messrs. Tyrone C. Means and
 5              H. Lewis Gillis
 6         Attorneys at Law
 7         Means Gillis Law, LLC
 8         Post Office Box 5058
 9         Montgomery, Alabama 36103
10         tcmeans@meansgillislaw.com
11         hlgillis@meansgillislaw.com
12
13    FOR THE DEFENDANT, DIXIE ELECTRIC:
14         Ms. Teresa G. Minor
15         Attorney at Law
16         Balch & Bingham LLP
17         Post Office Box 306
18         Birmingham, Alabama 35201-0306
19         tminor@balch.com
20
21    ALSO PRESENT:
22         Mr. Marrell A. Crittenden
23         Mr. Brad Arrington
```

3

```
 1              STIPULATION
 2         IT IS STIPULATED AND AGREED,
 3    by and between the parties, through their
 4    respective counsel, that the deposition of
 5    COURTNEY BYNUM CRITTENDEN may be taken before
 6    Gary N. Morgan, Commissioner, Registered
 7    Professional Reporter and Notary Public, State
 8    at Large;
 9         That the signature to and reading
10    of the deposition by the witness is waived, the
11    deposition to have the same force and effect as
12    if full compliance had been had with all laws
13    and rules of Court relating to the taking of
14    depositions;
15         That it shall not be necessary for
16    any objections to be made by counsel to any
17    questions, except as to form or leading
18    questions, and that counsel for the parties may
19    make objections and assign grounds at the time
20    of trial, or at the time said deposition is
21    offered in evidence, or prior thereto.
22
23
```

4

```
 1         INDEX OF EXHIBITS
 2         DESCRIPTION                          PAGE
 3    DX-1  Notice of Deposition                 36
 4    DX-2  Discovery responses                  37
 5    DX-3  Discovery responses                  37
 6    DX-4  Lease                            49
 7    DX-5  Diagram                         57
 8    DX-6  Diagram                         58
 9    DX-7  Text message                    127
10    DX-8  Complaint                       141
11    DX-9  Medical bills                       153
12    DX-10 Record of doctor visits             154
13    DX-11 List of meds                        155
14    DX-12 Hotel bill                          156
15    DX-13 Receipt from Rug Doctor             157
16    DX-14 Receipt from Rooms to Go            158
17    DX-15 Receipt from Sandman               159
18    DX-16 Receipt for recliner and bed        160
19    DX-17 Photo                              162
20    DX-18 Photo                              162
21    DX-19 Photo                              163
22    DX-20 Photo                              164
23    DX-21 Photo                              164
```

1 (Pages 1 to 4)

## FREEDOM COURT REPORTING

61

1    A.  It just depends on if they were
2  playing. I mean, used it.
3    Q.  But they slept in the master
4  bedroom?
5    A.  Yeah, we slept in the master
6  bedroom.
7    Q.  And just so we're clear, that's
8  ████████ you and then your husband, when
9  he wasn't working nights?
10    A.  Correct.
11    Q.  How many bedrooms -- or how many
12  beds were in the master bedroom?
13    A.  One.
14    Q.  What size?
15    A.  From my recollection, a queen.
16    Q.  What other furniture was in the
17  master bedroom?
18    A.  A recliner, a television, a stand
19  and a desk.
20    Q.  Anything else?
21    A.  Furniturewise?
22    Q.  Yes, ma'am.
23    A.  You mean mattresses and things

62

1  like that?
2    Q.  Yes, ma'am, any other --
3    A.  Oh, yeah.
4    Q.  -- furniture that was in there.
5    A.  Mattress.
6    Q.  What size mattress?
7    A.  Queen.
8    Q.  Are you talking about for your
9  bed?
10    A.  For the master, yes.
11    Q.  Okay. Were there any other
12  mattresses or beds, other than your bed in the
13  master bedroom?
14    A.  No.
15    Q.  Was there any other furniture,
16  other than what you told me about?
17    A.  Not that I can recall.
18    Q.  And the house had two bathrooms,
19  am I right?
20    A.  Yes.
21    Q.  Who used which bathroom?
22    A.  Milan was a toddler, so she used
23  both. I used master. Amari used this one.

63

1    Q.  The other bathroom?
2    A.  Yes.
3    Q.  And what bathroom did your sister
4  use when she was there?
5    A.  This one.
6    Q.  The other bathroom?
7    A.  Yes.
8    Q.  When did you first believe there
9  was a problem with the sewage getting into the
10  house?
11    A.  It was a major issue on the 16th
12  of November. My husband and I discussed that
13  he noticed before then, but I had the -- I had
14  a major issue to clean up on the 16th, I
15  remember, because I had to go rent a Roto --
16  the -- the Rug Doctor.
17    Q.  What was the major issue?
18    A.  It overflooded from the hall bath
19  to the carpet, all the way up to the hall; not
20  only in the hall bath but, also, in the -- this
21  bath, it came up.
22    Q.  When you're saying "this bath,"
23  you're pointing to the master bathroom?

64

1    A.  The master bath -- bathroom.
2    Q.  You said your husband had
3  mentioned something before then?
4    A.  Prior, yes.
5    Q.  When was that?
6    A.  I would say like that Monday or
7  Tuesday. I don't know the date, but it was
8  prior to the 16th.
9    Q.  Do you remember what day of the
10  week the 16th was?
11    A.  I can't remember.
12    Q.  What had he said?
13    A.  Well, he -- he just told -- told
14  me he noticed it before I did.
15    Q.  What did he notice?
16    A.  The overflowing -- well, not the
17  overflowing, the -- the -- the overflowing,
18  yeah.
19    Q.  Would it not flush properly or
20  what?
21    A.  Yes, it wasn't flushing.
22    Q.  Anything else that he said he
23  noticed?

## FREEDOM COURT REPORTING

| | 65 |
|---|---|
| 1 | A.   I can't recall. |
| 2 | Q.   Did he indicate he had called |
| 3 | anybody or -- |
| 4 | A.   No. |
| 5 | Q.   -- tried to do anything about it? |
| 6 | A.   No. |
| 7 | Q.   Anything else he said? |
| 8 | A.   No.  I can't remember. |
| 9 | Q.   Now, who was home on November 16th |
| 10 | when you had this major issue? |
| 11 | A.   My sister, me, ███████ |
| 12 | Marrell. |
| 13 | Q.   Everybody was home? |
| 14 | A.   Yes. |
| 15 | Q.   What time was it? |
| 16 | A.   It was early.  11 a.m. |
| 17 | Q.   Do you remember why everybody was |
| 18 | at home that day? |
| 19 | A.   It was -- it may have been a |
| 20 | Saturday.  I'm not sure. |
| 21 | Q.   And where was everyone when y'all |
| 22 | noticed this problem? |
| 23 | A.   ███████ was in the bathroom. |

| | 66 |
|---|---|
| 1 | Q.   Which bathroom? |
| 2 | A.   This, the -- (indicating). |
| 3 | Q.   The extra bathroom? |
| 4 | A.   Right.  The hall bath, taking a |
| 5 | bath -- taking a shower that day and I remember |
| 6 | Amari running, telling -- telling me the toilet |
| 7 | came up.  And, so, when I went in there -- you |
| 8 | know, I looked at the toilet, and it had like |
| 9 | stuff coming back up, and I just assumed that |
| 10 | maybe it was a plumbing issue, you know.  And I |
| 11 | told Marrell about it, and he went to get the |
| 12 | plunger, and he was trying to plunger the |
| 13 | toilet.  We thought we fixed it.  But it |
| 14 | over -- it was overflowing at the same time, |
| 15 | and it got on the carpet. |
| 16 | Q.   What was the floor in the hall |
| 17 | bath? |
| 18 | A.   It was tile, but it went to the |
| 19 | carpet as well. |
| 20 | Q.   You mean in the hall there? |
| 21 | A.   The hall (indicating). |
| 22 | Q.   You said that ███████ ame and told |
| 23 | you -- |

| | 67 |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   -- there was something wrong? |
| 3 | A.   Yes. |
| 4 | Q.   Was she in the bathroom the same |
| 5 | time as Milan? |
| 6 | A.   Yes.  They were taking a shower. |
| 7 | Q.   And where were you? |
| 8 | A.   Maybe, in the living area.  I |
| 9 | can't recall. |
| 10 | Q.   Did you immediately go in there? |
| 11 | A.   Yes. |
| 12 | Q.   And where was ███████ when you got |
| 13 | in there? |
| 14 | A.   She was standing over -- she was |
| 15 | standing in-between the toilet and the shower. |
| 16 | Q.   She was out of the shower? |
| 17 | A.   Yes.  They -- she had gotten out |
| 18 | of the shower. |
| 19 | Q.   Did she have any clothes on? |
| 20 | A.   No. |
| 21 | Q.   Any shoes? |
| 22 | A.   No.  She very rarely wears shoes |
| 23 | and clothes, while she's in the house, anyway. |

| | 68 |
|---|---|
| 1 | Q.   Do you have any idea how long she |
| 2 | had been standing there? |
| 3 | A.   I have no idea.  I can't recall. |
| 4 | Q.   Did you move her out of the |
| 5 | bathroom? |
| 6 | A.   Yes. |
| 7 | Q.   And you indicated your husband |
| 8 | then took a plunger and worked on it? |
| 9 | A.   Right. |
| 10 | Q.   How long did he -- did it take for |
| 11 | him to do that? |
| 12 | A.   He -- he tried to flush it.  We |
| 13 | thought it flushed.  Like, ten minutes, he |
| 14 | tried the plunger, and we thought it flushed, |
| 15 | and we thought it was okay, but it came back |
| 16 | up. |
| 17 | Q.   When did it come back up again? |
| 18 | A.   Like, 15 minutes later, it came |
| 19 | back up, and it just sat there. |
| 20 | Q.   What did you do then? |
| 21 | A.   We just let it -- we went into |
| 22 | Wal-Mart, and I have a receipt for that as |
| 23 | well.  We bought the Drano stuff.  We were just |

## FREEDOM COURT REPORTING

69

1  trying to pour the Drano and let it sit. We
2  thought maybe it would eventually go down.
3      Q.  Did you contact the landlord?
4      A.  I did not.
5      Q.  When's the first contact you made
6  with the landlord?
7      A.  It was the 25th of November.
8      Q.  Why did you wait from the 16th to
9  the 25th to contact the landlord?
10     A.  It was progressive.  It wasn't
11 where I thought that it was something going on
12 with the house.  I thought it was something
13 that maybe the kids put in the toilet.  So, I
14 was trying to fix -- fix the situation before
15 we contacted him.  But that Saturday prior to
16 the 25th, it got to the point where both
17 bathrooms were flooding up, like on the floor
18 and in the closet, and there was actual sewage
19 sitting up in the toilet and in the tub, in
20 both bathrooms by that Friday, prior to the
21 25th, and --
22         I remember going to my mom's
23 house, and I told her, I said, I can't take

70

1  this anymore.  And, so, ▮▮▮ was sick.  She
2  was -- sorry.  ▮▮▮ had a rash -- she had a
3  rash under her here, but I -- I didn't relate
4  the two at the time, but she was sick the whole
5  time, and I didn't know it was because of all
6  of this going on.  I thought that it was just
7  plumbing issues.  I would never left her in the
8  house like that.  But -- I contacted him on the
9  25th, and that's when he told me, you know, it
10 was something going on with Dixie and a
11 pipeline.
12     Q.  Had you contacted anyone before
13 the 25th about the problems?
14     A.  No.
15     Q.  Had y'all called SERVPRO?
16     A.  Nobody.
17     Q.  No one?
18     A.  Nobody.
19     Q.  You tried to address it yourself?
20     A.  Yes.
21     Q.  Were the problems in both
22 bathrooms the entire time?
23     A.  My assumption was that it was just

71

1  in that bathroom on the 16th, but when I went
2  to the other bathroom, not on that particular
3  day, but during that week, it started doing the
4  same thing, but it would -- it would go down.
5  So, we was thinking, oh, it's just plumbing.
6  So, we was able to use it, but it would come
7  back up, but I had no idea it was coming up in
8  my bathtub.
9      Q.  All right.  I want to make sure
10 our record is clear.  You said you went to
11 "that bathroom."  You mean the hall bathroom?
12     A.  The hall bathroom, yes.
13     Q.  And then when you went to the
14 other bathroom, that was the master bathroom?
15     A.  Yes.
16     Q.  All right.  And if I understand
17 what you just told me, and correct me if I'm
18 wrong, on the first day you noticed this, on
19 November 16th --
20     A.  Yes.
21     Q.  -- you thought it was limited to
22 the hall bath?
23     A.  That's what I assumed it to be,

72

1  limited.
2      Q.  And when did you realize that it
3  was also affecting the master bath?
4      A.  By that same night, the night of.
5      Q.  The 16th?
6      A.  Yes.
7      Q.  Did y'all take any steps to try to
8  fix the problem in the master bath?
9      A.  Yes, we did the same thing for
10 that bathroom.
11     Q.  And what was that?
12     A.  We poured the -- the liquid stuff
13 down in the toilet.
14     Q.  That's what you got at Wal-Mart?
15     A.  Yes.
16     Q.  Anything else?
17     A.  Plungered the toilet.  We cleaned
18 the carpet; bought cleaning supplies to clean
19 the bathrooms.  You know, it was just a
20 constant thing that we were doing, like a
21 ritual.  Every time it overflowed, we were
22 trying to clean it.
23     Q.  I want to focus just on that first

18  (Pages 69 to 72)

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

## FREEDOM COURT REPORTING

73

1   day on November 16th --
2       A.   Yes.
3       Q.   -- that you told me was the first
4   time you noticed it?
5       A.   Right.
6       Q.   Did you notice any problems in the
7   tubs, in either the hall bath or the master
8   bath?
9       A.   I noticed with my eyes in this
10  bathroom, the hall bathroom, sewage sitting up,
11  not only in the toilet but in the tub.
12      Q.   When did you notice that?
13      A.   The 16th.
14      Q.   When, after y'all had cleaned,
15  before you had cleaned?
16      A.   It was sometime after we had
17  plungered, it came back up.
18      Q.   In the tub?
19      A.   In the tub.
20      Q.   Do you know if there was any
21  sewage in the tub before then?
22      A.   No, ma'am.  I can't recall before
23  then.

74

1       Q.   Did either of your daughters say
2   anything to you about any sewage being in the
3   tub when they were taking their shower?
4       A.   ████ just ran and told me about
5   the toilet.  I immediately got them out of the
6   bathroom.
7       Q.   But did they ever say anything
8   about anything being in the bathtub with them?
9       A.   I can't recall.
10      Q.   Did you ever ask them?
11      A.   I -- no, I didn't know to ask.
12      Q.   And from the 16th until the 25th,
13  y'all just addressed the problem yourself?
14      A.   Yes, ma'am.
15      Q.   You didn't call anyone?
16      A.   No.
17      Q.   What facilities, bathroom
18  facilities, did y'all use in the house during
19  those nine days?
20      A.   We used -- we used the master
21  bathroom.
22      Q.   Did you use the hall bathroom at
23  all?

75

1       A.   We used both.  The girls would use
2   this one, and we would use the master.
3       Q.   Did anything get on the carpet
4   again after the 16th, to the extent that y'all
5   had to clean it?
6       A.   Yes.
7       Q.   How many times?
8       A.   Constant.
9       Q.   Can you give me an idea how many
10  times that is?
11      A.   I could -- I can't recall exactly
12  how many times we had to clean the bathroom or
13  clean the carpet because it was a constant
14  ritual.  In order to use the restroom, you had
15  to plunger the toilet for it to flush.  So, if
16  you count as many times that you used the
17  restroom -- I -- I can't recall the number.
18      Q.   I'm just trying to get an idea,
19  please, Ms. Crittenden.  You know, is it one,
20  two, three, a dozen times a day?
21      A.   Maybe, a dozen.
22      Q.   For that entire nine days?
23      A.   I can't recall the number for the

76

1   entire nine days.  I would say within a day we
2   would do it, plunger maybe six times a day.
3       Q.   Were you doing anything else,
4   other than plungering six times a day?
5       A.   To the toilet?
6       Q.   Yes, ma'am.
7       A.   Pouring the --
8       Q.   Liquid?
9       A.   Yes.
10      Q.   Did you have to go buy more
11  liquid?
12      A.   We -- we bought liquid.  We bought
13  Clorox.  I don't recall buying any more.
14      Q.   Anything else that y'all did
15  during those nine days?
16      A.   Not that I recall.
17      Q.   During that nine days, who all was
18  in the house?
19      A.   My daughter, ████████
20  Marrell, Courtney Renea and me.
21      Q.   How frequently was Courtney there
22  during that nine days?
23      A.   Oh, this was during the

## FREEDOM COURT REPORTING

81

1  trunk area (indicating), and by Saturday, she
2  was -- it was like, reddish rashes -- a reddish
3  rash on -- on her chest area, on her back,
4  around her mouth. And Sunday, we took her to
5  the ER.
6      Q.   You said you noticed -- first
7  noticed a rash on a Thursday?
8      A.   Well, it started developing -- I
9  saw redness like that Thursday. By Friday, it
10  was like a -- it was like a rash, like bumps,
11  like under her neck area and back.
12      Q.   How long had you been having
13  issues with the toilets in the two bathrooms
14  when you saw the redness on your daughter?
15      A.   Like I say, I remember cleaning up
16  on the 16th. So, by the end of that particular
17  week, I would say I noticed between what --
18  four days, four or five days.
19      Q.   Four or five days? November 16th
20  of 2013 was on a Saturday.
21      A.   Yes.
22      Q.   Does that help you?
23      A.   November 16th was on a Saturday?

82

1      Q.   Yes, ma'am.
2      A.   Yes.
3      Q.   And you noticed the rash on your
4  daughter the next Thursday?
5      A.   Not the -- on the 16th is when the
6  overflooding started. She -- I didn't notice
7  the redness. She didn't start getting red
8  until sometime within that week, but I really
9  noticed it by that Thursday or Friday.
10      Q.   Yes, ma'am. I just want to make
11  sure I've got my days right. You first noticed
12  a problem with the toilets on Saturday the
13  16th --
14      A.   Uh-huh.
15      Q.   -- am I right?
16      A.   Uh-huh.
17      Q.   You need a yes or no for him.
18      A.   Yes.
19      Q.   And then you started noticing
20  issues with your daughter, then, the following
21  Thursday?
22      A.   I'm not going to pin it to that
23  Thursday. I don't know for sure when. You

83

1  know, the rashes started -- with my eye, I saw
2  it on her body by that Thursday.
3      Q.   All right. Fair enough. Had
4  anybody else commented on any rash that she was
5  having before then?
6      A.   Not that I recall.
7      Q.   And when is the first time you
8  took her to the doctor?
9      A.   That Sunday morning, the 24th.
10      Q.   Why didn't you take her to the
11  doctor before Sunday morning?
12      A.   I wasn't sure what was wrong. I
13  was trying to just wait it out. She didn't
14  have any fevers. She wasn't coughing. I
15  wasn't sure, you know, if it was severe
16  enough -- enough to go to the doctor, but by
17  that Sunday morning, she literally had flesh
18  falling from her face.
19      Q.   What ER did you take her to?
20      A.   East Montgomery.
21      Q.   Had you given her any medicine, or
22  were you treating her at all yourself?
23      A.   No.

84

1      Q.   No Benadryl or cream, anything
2  like that?
3      A.   No.
4          MR. MEANS: Just to clarify. When
5  she said "East Montgomery," she was talking
6  about Baptist East.
7      A.   Oh, I'm sorry.
8          MS. MINOR: Thank you.
9      A.   Baptist East. Yes.
10      Q.   And what time of day did you go to
11  Baptist East on that Sunday?
12      A.   8:30, 9:00.
13      Q.   And who all went?
14      A.   Marrell. Marrell.
15      Q.   Anyone else?
16      A.   No.
17      Q.   Other than your daughter,
18  obviously?
19      A.   Right.
20      Q.   And what happened during that
21  visit?
22      A.   She was suffering from swelling
23  around the eyes. She had green circular

## FREEDOM COURT REPORTING

105

1  she's had with the pediatrician from the time
2  of the sewage incident until today?
3      A.   No.
4      Q.   Have you told me about all of
5  those?
6      A.   That I can recall at this time.
7      Q.   Have you told me about all the
8  other doctors' visits she's had with Dr.
9  Mackey?
10     A.   Yes.
11     Q.   Any other doctors that she's seen?
12     A.   No.
13     Q.   Any other hospitalization?
14     A.   No.
15     Q.   Are there any current plans for
16 any more procedures, with respect to her?
17     A.   Yes.
18     Q.   What plans?
19     A.   She's going to stay on at the
20 dermatologist for further -- discoloration, and
21 I want to make sure her -- whatever that
22 cellulitis stuff, I don't know the extent of
23 that.

106

1      Q.   Yes, ma'am.  Do they have any
2  hospital procedures, anything like that,
3  surgery plans?
4      A.   No, not that I can recall, no.
5      Q.   Any other treatments that you
6  expect for your daughter, as you sit here
7  today?
8      A.   We're still watching her.  As to
9  today, I can't recall, no.
10          MS. MINOR:  Why don't we take a
11 just a quick break?
12     A.   All right.
13          (Said deposition was in recess
14          at 11:53 a.m. until 12:21 p.m.,
15          after which the following
16          occurred:)
17     Q.   (BY MS. MINOR:)  Ms. Crittenden,
18 before we broke, we finished talking about your
19 daughter's ▇▇▇▇ treatment that she got
20 after this accident.  Do you remember that?
21     A.   Yes.
22     Q.   Were there any other doctors that
23 you thought of since we broke?

107

1      A.   No.
2      Q.   Did ▇▇▇ ever have any type of
3  rash or skin issues before the sewage incident?
4      A.   No skin issues that I can recall
5  of or -- none -- none that I can recall of.
6      Q.   Had she ever had any rashes?
7      A.   No.
8      Q.   Had she ever been to the doctor
9  for any type of skin issues before the sewage
10 incident?
11     A.   She was born, she had eczema in
12 her creases, but it wasn't -- very minute.
13     Q.   And did they treat her for that
14 after she was born?
15     A.   No.
16     Q.   Did you ever see a doctor for her
17 eczema?
18     A.   No.
19     Q.   Did y'all have any type of
20 renter's insurance there at Ryan Ridge?
21     A.   No.
22     Q.   You indicated that during that
23 nine days, from the time you first saw the

108

1  issue with the toilet until y'all left on the
2  25th, that you didn't call anyone to repair it,
3  am I right?
4      A.   Correct.
5      Q.   Do you know if your husband did?
6      A.   He did not.
7      Q.   Do you know if your sister did?
8      A.   He did -- she did not.
9      Q.   Was there any type of smell
10 associated with the sewage issue?
11     A.   Yes.
12     Q.   Can you tell me about that,
13 please?
14     A.   It was very, very foul, loud,
15 like -- like really, really heavy smelling
16 sewage, rotten egg smell.
17     Q.   The entire time?
18     A.   Mostly, that weekend between -- I
19 don't have the dates, but that Friday up until
20 the 25th.
21     Q.   Did the smell get better or worse
22 during the day?
23     A.   It was just worse.  It was just

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

## FREEDOM COURT REPORTING

125

1      A.   Prior to that -- that sewage -- I
2   can't -- I can't recall.  I can't remember the
3   date.
4      Q.   Was it done on more than one
5   occasion?
6      A.   I can't recall.  I don't know.
7      Q.   Did you see them doing it?
8      A.   I just seen the marking.
9      Q.   Did you just come home and the
10  markings were there?
11     A.   Right.
12     Q.   Did you know what they were?
13     A.   No.
14     Q.   Did you ask anybody?
15     A.   No.
16     Q.   Now, you indicated that Mr. Fuquay
17  came to the house on the 25th?
18     A.   Yes.
19     Q.   Is that the first time you had
20  talked to somebody from Dixie?
21     A.   Other than the phone call --
22     Q.   Okay.
23     A.   -- that my husband made.

126

1      Q.   I want to focus on you.  I promise
2   I'll ask your husband what he did, okay?
3      A.   Okay.
4      Q.   So, focus on what you did.
5      A.   Yes.
6      Q.   Was your conversation with Mr.
7   Fuquay when he came to the house, the only time
8   you ever talked to anybody from Dixie?
9      A.   Yes.
10     Q.   How did he come to the house?
11     A.   I assumed he came in a work truck.
12  I didn't --
13     Q.   What brought him there?  Did y'all
14  call, and he came in response or --
15     A.   Correct.  My husband called in
16  regards to Dr. Anderson telling us that Dixie
17  Electric was working -- doing some work on the
18  houses -- his houses, in particular, in the
19  area.  And you all had something about a pipe,
20  something about a subcontractor hit a pipe or
21  something, and he told us that you all -- Dixie
22  Electric, was responsible.  He was supposed to
23  contact someone for us, but he was taking too

127

1   long.  So, we decided to call Dixie ourselves.
2   We called Dixie.  They sent someone out.
3      Q.   When you say "we" called Dixie --
4      A.   My husband and I.
5      Q.   -- you mean you and your husband
6   did?
7      A.   Yes.
8      Q.   And was Mr. Fuquay the person that
9   was sent out?
10     A.   Correct.
11          (Whereupon, Defendant's
12          Exhibit 7 was marked for
13          identification.)
14     Q.   All right.  Let me go ahead and
15  show you Defendant's Exhibit 7, the text
16  message that was produced to us by your
17  lawyers.  It appears to be a message from Mr.
18  Anderson on --
19     A.   Yes.
20     Q.   -- November 25th at 8:43 a.m.?
21     A.   Yes.  Correct.
22     Q.   Is that the first time y'all
23  contacted Mr. Anderson about the sewage backup?

128

1      A.   Yes.
2      Q.   Did you call him, or did you just
3   text him?
4      A.   I text him.
5      Q.   Did you ever talk to him on the
6   phone?
7      A.   He called me shortly after I sent
8   the text.
9      Q.   And what number did he call you
10  on?
11     A.   My cell.
12     Q.   And this text message, whose phone
13  is this on?
14     A.   My -- this is my phone.
15     Q.   Is this the only text message you
16  ever had with Mr. Anderson --
17     A.   No.
18     Q.   -- about this?
19     A.   Well, after -- after this
20  incident, we would -- he would text me about
21  the progress being made in the house.
22     Q.   Do you still have those messages?
23     A.   I don't.

**2015 3RD AVENUE NORTH - BIRMINGHAM, AL 35203 - 205-397-2397**

## FREEDOM COURT REPORTING

129

1    Q.   How did you come to keep this
2    message?
3    A.   I actually saved it before I got
4    rid of my phone.
5    Q.   Why did you save it?
6    A.   Because it was in regard to the
7    damages done in the house.
8    Q.   But you didn't save the other
9    messages?
10   A.   I didn't, no, ma'am.
11   Q.   When did you get rid of that
12   phone?
13   A.   Oh, wow.  It's been a couple of
14   months -- six months ago.
15   Q.   So, is it your testimony that Mr.
16   Fuquay was out there after this, the same day,
17   November 25th?
18   A.   Correct.
19   Q.   Okay.  Did you know him?
20   A.   No.
21   Q.   All right.  Tell me about his
22   visit.
23   A.   He came in.  He introduced

130

1    himself.  He said my name is Houston Fuquay.  I
2    work for Dixie Electric.  He -- he let us know
3    that he knew we called, someone told him to
4    come in reference to the sewage -- well, backup
5    in our home.  So, we went on to explain to him
6    that we've been having issues with both
7    bathrooms, stuff been coming up in the bathtub
8    and bathroom.
9         He said, yes, I'm aware of this.
10   Dixie responsible for -- Dixie is responsible
11   for whatever subcontractor working out there,
12   and they hit a pipeline.  He said, it's very
13   unsanitary for you all to be in the house.  You
14   all need to get out.  We told him, what do we
15   need to do, as far as like getting a hotel?  He
16   said, call Dixie Electric, and they'll get you
17   all a check, and you can go and pick up the
18   check, and you all get you a room.  And he
19   said, you need to get rid of every and any
20   thing that was contaminated that you think or
21   touched by that sewage.
22        He also -- we stood there, you
23   know, chitchatting some more, and we made

131

1    mention of Milan; she was on the couch.  She
2    was sitting there.  We was like we even think
3    that my baby -- we don't know what's wrong with
4    her.  She just went to the doctor Sunday
5    morning, and we still don't know what's wrong
6    with her.  And he looked as if, you know, in
7    disbelief at her and kind of shook his head and
8    was -- and he told us we just need to get out
9    because it's very unsanitary.
10   Q.   Anything else that was said?
11   A.   No, not in regards to the home,
12   just basically -- that's all I can remember at
13   this time.
14   Q.   How long was he there?
15   A.   I would say like 15 minutes,
16   10 minutes.
17   Q.   And who all was present?
18   A.   Marrell, Milan and I.
19   Q.   Was your sister there?
20   A.   No.
21   Q.   Were y'all inside the house?
22   A.   Correct.  Oh, yeah, he also made
23   mention of the loud smell.  I asked him, I

132

1    said, do you want to take a look at the
2    bathrooms to assess the damages?  He said, I
3    don't need to.  I can smell it from the door.
4    Q.   Anything else that was said?
5    A.   Not that I can recall right now.
6    Q.   Did you talk to anybody else from
7    Dixie?
8    A.   No.
9    Q.   Did you ever talk to Mr. Fuquay
10   again?
11   A.   No.
12   Q.   Did you attempt to contact Dixie
13   again?
14   A.   Oh, yeah, we did.  My husband did.
15   Q.   Did you, yourself, do that?
16   A.   No.  (Shaking head negatively.)
17   Q.   Did you ever attempt to go to
18   Dixie to get the check for the hotel room?
19   A.   No.
20   Q.   Why not?
21   A.   Because my husband called and they
22   referred us to someone called Martha, and
23   Martha -- I mean, it was just like contact Mr.

# EXHIBIT F

```
1        IN THE UNITED STATES DISTRICT COURT

2           MIDDLE DISTRICT OF ALABAMA

3               EASTERN DIVISION

4

5

6

7    CIVIL ACTION NO.:  3:15-CV-506

8

9    ESSEX INSURANCE COMPANY,

10         Plaintiff,

11

12   v.

13

14   J&J CABLE CONSTRUCTION, et al.,

15         Defendants.

16

17

18           DEPOSITION TESTIMONY OF:

19           COURTNEY ALREA CRITTENDEN

20                January 7, 2016

21

22

23
```

1    house, did you have any problems with the

2    plumbing or the toilets or the sewage

3    system, so to speak, between April of

4    2013 and November of 2013?

5       A.   No.

6       Q.   So everything seemed to you to

7    be working fine?

8       A.   Yeah.

9       Q.   Okay.  What was the very first

10   problem you observed with the plumbing

11   system or the sewage system or the

12   toilets or tubs or showers?

13      A.   I remember November the 16th.

14   Basically because that's when my

15   daughters were taking a shower together.

16      Q.   Okay.

17      A.   ▮▮▮▮▮▮▮▮▮▮▮▮  And ▮▮▮▮▮, she

18   saw the toilet rise, and she said that it

19   looked like stuff was coming over the

20   toilet.  And so she left ▮▮▮▮▮ in the

21   shower, and she ran and told me to come

22   in the bathroom.

23      Q.   Where were you when ▮▮▮▮▮ came

```
 1      A.    I'm thinking -- I can't remember
 2   what he told me.
 3      Q.    All right.
 4      A.    I'll put it that way.
 5      Q.    And Courtney hadn't reported
 6   anything to you.  Had your daughters
 7   reported anything to you prior to when
 8   ███████ came out of the shower and said,
 9   "Hey, Mommy" --
10      A.    No.
11      Q.    -- "the toilet's overflowing"?
12      A.    No.
13      Q.    When ███████ told you that, tell
14   me in as much detail as you can exactly
15   what you did in reaction.
16      A.    I went into the bathroom, the
17   hall bathroom.  And ███████ was still in
18   the bathroom.  At that time she had
19   gotten out of the shower and she had
20   stepped over into the water.  The water
21   had already come over from the toilet.
22   So she was standing there.  So I got her,
23   because she was --
```

```
1       A.    Yeah.   It was that Saturday
2   night we got home.
3       Q.    Was that the date when the
4   overflow was the greatest or was the most
5   amount?
6       A.    No.   That -- no.   That was the
7   next Saturday, like the -- no, that had
8   to have been like the 23rd.
9       Q.    Okay.   Either I confused you or
10  you confused me.
11      A.    Okay.
12      Q.    The way I thought you were
13  saying was on November 25th you contacted
14  the landlord.
15      A.    Yes.
16      Q.    And one of the reasons was the
17  Saturday before November 25 you had this
18  big overflow which got out into the
19  master bedroom and the master closet.
20      A.    Right.   The 23rd.
21      Q.    Okay.   Was that event on the
22  23rd the greatest extent or greatest
23  amount of overflow that happened since
```

1    allow me to ask her what items of

2    personal property were damaged by contact

3    with raw sewage, yes or no?

4           MR. MEANS:  No.

5           MR. FINCH:  Are you going to

6    allow me to ask her when her personal

7    property came into contact with raw

8    sewage?

9           MR. MEANS:  Sure.

10    Q.    (By Mr. Finch) When did your

11    personal property come into contact with

12    raw sewage, ma'am?

13    A.    I can't recall the date.

14    Q.    Do you have any documentation

15    that would pinpoint the date when your

16    personal property came into contact with

17    raw sewage?

18    A.    No.

19    Q.    Do you claim that your personal

20    property was damaged by any other means

21    other than coming into contact with raw

22    sewage?

23    A.    No.

# EXHIBIT G

11-26-2013

Dear Ms. Singleton,

Per your request, this letter is to inform you of the situation that has occurred at my rental home located at 8216 Ryan Ridge Loop.

I was notified by my tenant on Nov. 25 of a plumbing issue that had resulted in the back-up of sewage water into her bathroom drains resulting in overflow of contaminated water onto her bathroom floor and out of the bathroom and into the adjacent room(s) affecting the carpet and possibly some items in her bathroom closet. I am not aware of what the cause of this problem was but was informed by a plumber that it was related to a damaged sewage pipe by workers somewhere off of my property. It was reported to me by the builder of the home that a Dixie Electric employee had acknowledged responsibility in this issue. I, of course, cannot confirm that. I am proceeding with cleaning and replacing carpet, as I have a tenant living in the house and this must be done as quickly as possible. I am hoping that this can be sorted out as soon as possible as to who the responsible party is so that the repairs can be covered.

Thank you,

Jack Anderson

# EXHIBIT H

## SERVPRO — First Notice of Loss

Page 1

### Caller Details

| | | | |
|---|---|---|---|
| Call Received By (employee initials): KP | Date: 11/25/2013 | Time: 01:43 PM | |

Initial call received By Call Center?  O Y  O N    Timestamp: _____    Dispatched By: _____

| | | |
|---|---|---|
| Caller Name: Marrell Crittendon | Company: | |
| Caller Phone: ▇▇▇▇ ( C W H ) | Email: | |
| The Caller Is the Customer?  O Y  O N | Caller Type (if no): | |
| How did you hear about SERVPRO®?  O Individual  O Advertisement | Referral Name/Source: | |

### Customer Details

Customer Contacted By (employee initials): _____   Date: _____   Time: _____

| | | |
|---|---|---|
| Customer Name: Jack Anderson | Company: | |
| Customer Phone: ▇▇▇▇ ( C W H ) | Phone 2: ▇▇▇▇ ( C W H ) | |
| Email: | Customer Type: | |
| Loss Address: 8212 Ryan Ridge Lp | | |
| City: Montgomery | State: AL   Zip: 36117 | |
| The Customer Is the On-Site Contact?  O Y  O N | On-Site Contact Name (if no): | |
| Relationship to Customer: | Authorized to sign paperwork?  O Y  O N | |

### Loss Details

| | |
|---|---|
| Type of Loss: Water | Cause of Loss: Other |
| When did the loss occur:  Date: 11/25/2013 | Time: 02:27 PM  am | pm  O Unknown |
| Structure Type (circle):  Residential  Multi-Unit Resid. | Property Type: Residential |
| Commercial  Multi-Unit Comm. | Year structure built: 2012 |
| # of rooms affected: 3 | # of floors affected: 1 |
| Is water available?  O Y  O N | Is electricity available?  O Y  O N |
| Is there standing water?  O Y  O N | Is hardwood affected?  O Y  O N |
| Is a crawlspace or attic affected?  O Y  O N | Is there visible mold?  O Y  O N |
| Sizeable amount of contents affected?  O Y  O N | Emergency board-up/tarping required?  O Y  O N |

| | |
|---|---|
| Insurance / Client: _____ | Is this job self-pay?  O Y  O N |
| Claims Professional: _____ | Phone: _____ ( C W H ) |

Emergency Services Scheduled?  O Y  O N   Time (if yes): _____   Assigned to: _____

FNOL Notes: Sewage has backed up into at least 3 rooms. Customer is concerned about cleanliness. Some contents are affected. This will show as a self pay, there is a discrepancy about whether the Electric Co or the homeowner will be paying for this.



PLAINTIFF'S EXHIBIT 3

28570   11/10

Each SERVPRO® Franchise is Independently Owned and Operated

SERVPRO 000032

Essex00108

# EXHIBIT I

**1**

IN THE CIRCUIT COURT

FOR

MONTGOMERY COUNTY, ALABAMA

MARRELL A. CRITTENDEN,
JR., et al.,

    Plaintiffs,

vs.              CIVIL ACTION NO.
                   CV-2014-900103
DIXIE ELECTRIC COOPERATIVE,
et al.,

    Defendants.

* * * * * * * * * * * *

DEPOSITION OF **BRAD ARRINGTON**, taken pursuant

to stipulation and agreement before Gayle F. Watson,

CCR, ACCR #573, and Commissioner for the State of

Alabama at Large, in the Law Offices of Balch &

Bingham, 105 Tallapoosa Street, Suite 200, Montgomery,

Alabama, on Friday, October 17, 2014, commencing at

approximately 9:40 a.m.

* * * * * * * * * * * * *

**2**

APPEARANCES

FOR THE PLAINTIFFS:

H. Lewis Gillis, Esquire
MEANS GILLIS LAW
Attorneys at Law
60 Commerce Street
Suite 200
Montgomery, Alabama

FOR THE DEFENDANTS:

Teresa G. Minor, Esquire
BALCH & BINGHAM
Attorneys at Law
1901 Sixth Avenue North
Suite 1500
Birmingham, Alabama  35203-4642

* * * * * * * * * * * *

EXAMINATION INDEX

BRAD ARRINGTON
  BY MR. GILLIS . . . . . . . . . . . . .   7
  BY MS. MINOR . . . . . . . . . . . . .   99

EXHIBIT INDEX

                                  MAR
Plaintiffs'
1   Plaintiffs' notice of depositions    7

2   Dixie Electric Cooperative's response to   7
    Rule 30(b)(6) deposition notice

3   Dixie Electric Cooperative's response to   52
    Plaintiffs' request for production of
    documents number 7

(Exhibit index continued on next page)

**3**

EXHIBIT INDEX (continued)

                                    MAR
Plaintiffs'
4   Copies of locate request 133010803 and   58
    133031287

5   Reports, Tierce Industrial Service d/b/a   61
    Roto-Rooter, pages four through six

6A-K A) Copy of check from J. Anderson to   64
    ServPro in the amount of $7,851.49; B)
    First notice of loss, 11/25/2013, 8212 Ryan
    Ridge Loop; C) Release of all claims for
    8212 Ryan Ridge Loop; D) Release of all
    claims for 8216 Ryan Ridge Loop; E and F)
    Cook Claims Service, Inc., breakdown of
    settlement for 8216 and 8212 Ryan Ridge
    Loop; F) Federated Insurance document
    regarding 8212 Ryan Ridge Loop; G and H)
    Letter, T. Minor to T. Halstrom, 9/26/2014
    in re: 8216 Ryan Ridge Road; I) Letter, J.
    Anderson to M. Singleton, 1/2/2014; J)
    Statement of J. Anderson, 12/9/2013, in re:
    8212 Ryan Ridge Loop; K) Statement of K.
    Anderson, undated, in re: 8212 Ryan Ridge
    Loop

7   Email, B. Arrington to M. Singleton,   74
    11/25/2013; subject: Sewer Damage

8   Email, B. Arrington to Brandon Johnson,   76
    Martha Singleton, 11/26/2013; subject: FW:
    Sewer Claims: WARNING WILL ROBINSON!!!

9   Letter, J. Anderson to M. Singleton,   78
    11/26/2013, in re: 8216 Ryan Ridge Loop

10   Letter, J. Anderson to M. Singleton,   78
    1/2/2014, in re: 8216 and 8212 Ryan Ridge
    Loop

(Exhibit index continued on next page)

**4**

EXHIBIT INDEX

                                    MAR
Plaintiffs'
11   Damage report for 8212, 8216 Ryan Ridge   81
    Loop

12   Email, B. Arrington to M. Singleton,   87
    11/26/2013 in re: FW:  J&J Cable
    Construction -- Certificate of Insurance

13   Pricing for directional boring from J&J   91
    Cable Construction

14   Invoice from J&J Cable Company to Dixie   92
    Electric for the bore

15   Document entitled, Trunk activity detail   94
    report

16   Dixie Electric Cooperative's response to   95
    Plaintiffs' interrogatories

* * * * * * * * * * * *

STIPULATION

It is hereby stipulated and agreed by and

between counsel representing the parties that the

deposition of **BRAD ARRINGTON** is taken pursuant to the

Alabama Rules of Civil Procedure and that said

deposition may be taken before Gayle F. Watson,

Certified Court Reporter, that objections to questions

other than objections as to the form of the question

need not be made at this time but may be reserved for

29

1      pricing by email.
2    Q.  Well, did J&J Cable give you pricing by email
3      with regard to this Ryan Ridge Loop
4      subdivision?
5    A.  They gave us pricing for the entire year.
6    Q.  So you-all would have this email or this
7      evidence of pricing for the entire year?
8    A.  Yes.  I believe they gave us that pricing in
9      2012.  And prior to that, the pricing was
10     probably several years before that.  They
11     didn't update it every year.
12    Q.  And what's the purpose of them giving you this
13     pricing?
14    A.  To know what it costs to go per foot with
15     conduit and how many.
16    Q.  I'm going to direct your attention to
17     Plaintiffs' Exhibit Number 2 and item number
18     four.  I believe you're here to offer
19     testimony regarding any of the allegations
20     made in Plaintiffs' complaint, and it appears
21     that you are able to offer testimony with
22     regard to the alleged facts in Plaintiffs'
23     complaint in paragraphs eight through 10; is

30

1      that correct?  Page 3, item four.
2          MS. MINOR:  It's right here.
3    A.  Yes.
4    Q.  If you would, tell me how Dixie became aware
5     that there was a problem with a backup of
6     sewage in this Ryan Ridge Loop subdivision
7     specifically at the addresses 8212 and 8216.
8    A.  I received a phone call about the first one.
9     I can't remember which one -- address it is,
10     not the Crittendens but the other one.
11    Q.  Who did you get the phone call from?
12    A.  Phillip Goodwyn.
13    Q.  And who is Phillip Goodwyn?
14    A.  He was the builder.
15    Q.  And what did Phillip Goodwyn tell you?
16    A.  He told me that the resident had called in to
17     I can't remember if he said Jim or
18     Dr. Anderson.  The resident had called and
19     said they were having sewage problems.
20    Q.  Did he tell you anything else?
21    A.  Told me that he had contacted Roto-Rooter and
22     that they had run a camera and had found a red
23     conduit going through the sewer lateral.

31

1    Q.  And was red conduit the color of conduit that
2     J&J was installing out there?
3    A.  Correct.
4    Q.  Approximately, when was it that Phillip
5     Goodwyn called you and told you these things?
6    A.  He called me on Friday, I believe it was the
7     22nd.
8    Q.  Did he tell you anything else other than the
9     resident is having a problem with sewage, we
10     installed a camera that showed red conduit
11     going through the sewage line?  Did he tell
12     you anything else or say anything else to
13     you?
14    A.  He wanted to know if that would be power, and
15     I told him, yes.  And he wanted to know if --
16     what he needed to do.  I instructed him to go
17     ahead and -- He said Roto-Rooter was going to
18     fix it.  But I instructed him that we would
19     have someone come over and assist them in
20     getting the conduit out of their pipe and that
21     he would need to submit a claim to
22     Ms. Martha.
23    Q.  Now, with regard to assisting him -- I think

32

1      you said you would assist him in getting
2      someone to get the conduit out -- what -- what
3      actions did you take to assist him in doing
4      this?
5    A.  The crews would either lower or raise the
6     conduit.  They would have to expose it, pull
7     it up or push it down.
8    Q.  Did you call someone and direct them to take
9     those actions, or are you saying that
10     Mr. Goodwyn called someone and directed those
11     actions?
12    A.  He called Roto-Rooter.  I contacted Houston
13     Fuqua with Dixie, he's the foreman of the
14     crews, and he sent someone up there.
15    Q.  Am I correct in saying, then, that Roto-Rooter
16     repaired the sewage line.  And then the taking
17     the sewage line out of -- taking of the
18     conduit out of the sewage line by pushing it
19     up or down, that is a function that Mr. Fuqua
20     took care of?
21    A.  That's correct.
22    Q.  Did he take care of this by calling somebody
23     from J&J Cable back out to do it, or who did

# EXHIBIT J

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE MIDDLE DISTRICT OF ALABAMA

3                  EASTERN DIVISION

4

5    ESSEX INSURANCE COMPANY,

6        Plaintiffs,

7

8    vs.             CIVIL ACTION NO.  CV-3:15-CV-506

9

10   J&J CABLE CONSTRUCTION, LLC, et al.,

11       Defendants.

12

13

                * * * * * * * * * * * *

14

         DEPOSITION OF BRAD ARRINGTON, taken

15

     pursuant to stipulation and agreement before

16

     Kristie Pearson, Certified Court Reporter and

17

     Commissioner for the State of Alabama at

18

     Large, in the Law Offices of Balch & Bingham,

19

     105 Tallapoosa Street, Suite 200, Montgomery,

20

     Alabama, on Wednesday, January 13, 2016,

21

     commencing at approximately 11:45 a.m.

22

23               * * * * * * * * * * * *

```
 1    Q.   Did anyone at Dixie supervise any of J & J

 2         Cable's work performed in the area we've

 3         identified as J & J Cable performed bore?

 4              MR. CALLIGAS:   Object to the form.

 5    A.   No.

 6    Q.   Do you know when J & J completed its scope

 7         of work on the area we've identified as J &

 8         J Cable performed bore?

 9    A.   No.

10    Q.   How did you learn about the damage to the

11         sewer laterals at Ryan Ridge Loop?

12    A.   Which sewer lateral?

13    Q.   Which sewer lateral did you learn about

14         first?

15    A.   The 8216, I believe, was the Torrence.  That

16         was the one that came in first.

17    Q.   Do you remember when you would have learned

18         about this?

19    A.   It was on Friday the 22nd.  I received a

20         call from Phillip Goodwyn.

21    Q.   What did he tell you in that phone call?

22    A.   He told me that the residence was backing

23         up, sewage was backing up, and they had
```

1        called Roto Rooter and they had run a light

2        and the camera down the pipe and found there

3        was a red conduit in the pipe.

4    Q.  Did he indicate to you when he heard from

5        the owner of 8216 Ryan Ridge Loop?

6    A.  The owner being --

7    Q.  The person who contacted him about the

8        sewage backing up.

9    A.  He did not.  I don't know if it was that

10       same day.  I don't know.

11   Q.  Did he indicate to you that it could have

12       been going on for several days?

13   A.  I can't recall if he told me they had been

14       having problems for a period or not.

15   Q.  Did he indicate to you if he had learned

16       about the sewage backing up before

17       11/22/2013?

18   A.  I can't recall.

19   Q.  When did you learn about the damage to the

20       sewer lateral at 8212?

21   A.  That was the second one?  That was on

22       Monday.  That would be Monday the 25th.

23   Q.  How did you learn about this one?

| | | |
|---|---|---|
| 1 | | up at 8212? |
| 2 | A. | Same answer, yes. |
| 3 | Q. | Did you speak to anyone else about the |
| 4 | | damage to the sewer lateral or sewage backup |
| 5 | | at 8216 -- |
| 6 | | MR. CALLIGAS:  Object to the form. |
| 7 | Q. | -- following your conversation with Phillip |
| 8 | | Goodwyn? |
| 9 | A. | On 8216?  Other than talking to Houston, no. |
| 10 | Q. | What did you tell Houston? |
| 11 | A. | When Phillip contacted me, I called Houston |
| 12 | | to tell him that we had a problem in that |
| 13 | | area, possible that we could have damaged |
| 14 | | lines or damage could have been caused to a |
| 15 | | line, so he sent a crew over there. |
| 16 | Q. | Did you contact anyone else at Dixie related |
| 17 | | to the damage to the sewer lateral or sewage |
| 18 | | backup at 8216? |
| 19 | A. | Contacted Ms. Martha. |
| 20 | Q. | What did you discuss with Ms. Martha? |
| 21 | A. | I let her know that the contractor possibly |
| 22 | | had bored into a line and that there |
| 23 | | probably would be a claim filed on it or |

1   what they file is a report that damage or

2   something has taken place at a residence.

3   Q.  Did you speak to anybody else?

4   A.  I don't recall.  I don't think so.

5   Q.  After you learned about the damage at 8212,

6       did you speak to anybody at Dixie about the

7       damage to the sewer lateral or the sewage

8       backup?

9   A.  It would have been Ms. Martha again.

10  Q.  Anyone else that you recall?

11  A.  Well, back on the other one.  I contacted J

12      & J Cable to let them know they had hit one.

13  Q.  When did you contact J & J Cable?

14  A.  I don't recall.

15  Q.  Would it have been the same day?

16  A.  More than likely, yes, but I don't recall.

17  Q.  On the 8212 Ryan Ridge Loop, did you speak

18      to anyone else at Dixie other than

19      Ms. Martha and Houston Fuqua?

20  A.  I don't recall.

21  Q.  As far as 8216 Ryan Ridge Loop, do you know

22      how long the sewage backup and damage to the

23      sewer lateral had occurred before it was

# EXHIBIT K

1         IN THE UNITED STATES DISTRICT COURT MIDDLE

2           DISTRICT OF ALABAMA, EASTERN DIVISION

3

4     CIVIL ACTION NO. 3:15-CV-506

5

6     ESSEX INSURANCE COMPANY,

7               Plaintiff,

8     vs.

9     J&J CABLE CONSTRUCTION, LLC, et al.,

10              Defendants.

11

12

13          DEPOSITION OF JERRY E. NOBLITT

14             Allred & Allred, PC

15          7020 Fain Park Drive, Suite 9

16           Montgomery, Alabama 36117

17             January 12, 2016

18

19    REPORTED BY:

20          Gail B. Pritchett

21          Certified Realtime Reporter,

22          Registered Professional

23          Reporter and Notary Public

1      Crittenden address, 8216?

2                  MR. RICHARDSON:   I think 12 is the

3      Torrence address, I believe.

4                  MR. ALLRED:   Is your question

5      Torrence or Crittenden?

6                  MR. RICHARDSON:   Mine -- let's

7      see, 8212, so Crittenden.

8                  MR. ALLRED:   Okay.

9           A.    Can you ask the question again?

10          Q.    (BY MR. RICHARDSON:)  Yes, sir.

11     How did you learn about the damage to the sewer

12     lateral at around 8212?

13          A.    I received a phone call from

14     Dixie.

15          Q.    Do you know who you spoke with at

16     Dixie?

17          A.    Brad Arrington.

18          Q.    Do you know when he called you?

19          A.    I don't know dates, no.

20          Q.    What did you discuss on the phone

21     with Mr. Arrington?

22          A.    That there had been a sewer damage

23     and that it had been repaired and they wanted