IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| ESSEX INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 3:15-cv-0506-WHA |
| | ) | |
| J&J CABLE CONSTRUCTION, LLC, DIXIE | ) | |
| ELECTRIC COOPERATIVE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM BRIEF IN SUPPORT OF DEFENDANT DIXIE ELECTRIC
COOPERATIVE'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to *Fed.R.Civ.P.* 56, Defendant-Counterclaim Plaintiff Dixie Electric
Cooperative ("Dixie Electric") submits this memorandum brief in support of its Motion for
Summary Judgment.[1]

## INTRODUCTION

This is an insurance coverage dispute arising from Essex's denial of coverage to its
insured, J&J Cable Construction, LLC ("J&J") under a Commercial General Liability Policy (the
"Policy"). Essex has raised only two coverage questions: (1) whether "bodily injury"[2] or

---

[1] In the underlying state court litigation, Dixie Electric disputes any liability to the Crittendens and
Caroline Torrence and further disputes the damages and injuries they claim to have suffered. As such, all
facts stated in this brief are presented as undisputed solely for purposes of Dixie Electric's Motion for
Summary Judgment. Further, all arguments in this brief are made solely for purposes of Dixie Electric's
Motion for Summary Judgment. By referring to facts, testimony, and evidence as undisputed and making
corresponding arguments in this brief, Dixie does not mean to state, suggest, or imply that such facts,
testimony, and evidence are undisputed in the underlying state court litigation. Dixie Electric reserves the
right to contest, dispute, challenge, withdraw, and/or change any and all facts and arguments stated herein
in this litigation, in the pending underlying state court litigation, and in any other litigation or proceeding.

[2] Quotations throughout the brief represent defined terms in the Policy or quoted language from
the Policy.

"property damage" occurred during the Policy period, and (2) whether the Policy's pollution exclusion applies.

In November 2013, J&J was performing underground boring work to install electrical conduit for Dixie Electric, an electric utility company.  During this work, J&J struck and broke the sewer laterals (sewer pipes that run from a house to the city sewer main) of two homes. As a result of that property damage, the tenants of the two homes lost the use of their respective sewer laterals and sewage backed up into their homes, resulting in additional claimed property damage and personal injuries. In two underlying state court actions, the tenants of the homes have sued J&J and Dixie Electric alleging claims of negligence/wantonness, nuisance, and trespass relating to the broken sewer laterals. Dixie Electric filed cross-claims against J&J in those underlying state court actions seeking indemnity for the litigation and related claims. J&J sought coverage under the Policy with Essex, but Essex denied the claim, contending the damage occurred outside of the Policy period and that a pollution exclusion applied.

The underlying claims and undisputed evidence demonstrate that Dixie Electric is due summary judgment on its counterclaim for coverage and against Essex's claim for no coverage as a matter of law. The Policy covered "bodily injury" or "property damage" that occurred during the Policy period that was not, prior to the Policy period, known to have occurred. Significantly, the Policy also covers "any continuation, change or resumption" of that "bodily injury" or "property damage" after the end of the Policy period.

The Policy period continued through November 12, 2013 at 12:01 a.m. It is undisputed that the sewer laterals were broken no later than November 8, 2013. It is also undisputed that all of the "property damage" and "bodily injuries" claimed in this matter resulted from the broken

2

sewer laterals. The "property damage" to the sewer laterals resulted in the tenants' loss of use of their sewer system and caused them to leave their homes due to their inhabitability.

Under the Policy's definition of "property damage," the tenants' loss of use of their sewer lines and, ultimately, their homes, is "deemed to occur at the time of the physical injury that caused it" (*i.e.*, at the same time as when the damage to their sewer laterals occurred, which was undisputedly during the Policy period). In addition, there is undisputed evidence that the tenants' "property damage" and "bodily injures" started to occur before the Policy's expiration.  And while it is true some of the tenants' damages continued and arguably changed or worsened after the Policy's expiration on November 12, 2013, Essex is not relieved of its coverage obligations for those damages. The Policy expressly extends coverage to "any continuation, change or resumption of that 'bodily injury' or 'property damage' after the end of the policy period."

In sum, all of the collective, undisputed evidence demonstrates that "property damage" and "bodily injury" occurred during the Policy and *continued, changed, or resumed* after the Policy as well.  All of the "property damage" and "bodily injury" is, therefore, covered by the Policy. Finally, the Alabama Supreme Court has held that sewage is not a "pollutant" subject to the pollution exclusion clause in the Policy, and, further, that the environmental terms of art used in the pollution exclusion are not meant to apply to personal injury claims like those presented here.

In conclusion, as established herein, coverage clearly exists in this matter for J&J under the Policy.

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

NARRATIVE SUMMARY OF UNDISPUTED MATERIAL FACTS ......................................... 5

   I.   The Incidents ............................................................................................. 5

   II.  The Underlying Claims.............................................................................. 10

   III. The Insurance Policy at Issue ................................................................... 12

   IV. J&J's Claim for Coverage and Essex's Denial ......................................... 14

PROCEDURAL HISTORY OF THIS CASE ....................................................................... 14

LEGAL ANALYSIS AND ARGUMENT ............................................................................. 15

   I.   The Rules for Construing Insurance Policies Favor Coverage for J&J ............................ 15

   II.  The Crittendens' Second Amended Complaint Alleges "Property Damage" and "Bodily Injury" That Occurred During, and is Covered by, the Policy. ......................................... 17

       A.   The Allegations in the Underlying Lawsuits Trigger Essex's Duty to Defend J&J Against those Claims. ................................................................... 18

       B.   All of the Damages in the Crittenden Matter Relate Back to the Undisputed Damage to the Sewer Lateral which Occurred within the Policy Period no Later than November 8, 2013 .......................................................................... 19

       C.   Essex's Coverage Position Contravenes the Policy's Language and Leads to Absurd Results. ......................................................................................... 27

   III. Caroline Torrence's Complaint Alleges "Property Damage" and "Bodily Injury" That Occurred During, and is Covered by, the Essex Policy.................................................. 29

   IV. Dixie Electric's Cross-Claims Against J&J in the Underlying Lawsuits Allege Common Law Indemnity for the "Property Damage" and "Bodily Injuries" that Occurred During, and are Covered by, the Essex Policy.......................................................................... 30

   V.  Essex Cannot Meet Its Burden of Proving Applicability of the Total Pollution Exclusion ............................................................................................................... 32

CONCLUSION............................................................................................................. 35

## NARRATIVE SUMMARY OF UNDISPUTED MATERIAL FACTS

I.      **The Incidents**

Dixie Electric, an electric utility company, hired J&J, an independent contractor, to bore and install underground electrical conduit along Ryan Ridge Loop in front of existing homes in the Ryan Ridge subdivision in Montgomery, Alabama. Exhibit A – Deposition of Brad Arrington ("Arrington Depo.") at 23-24. J&J's primary business was underground boring for cable and other utility services. *See* Exhibit B – Affidavit of Jerry Weir ("Weir Aff.") at 1. Dixie required that J&J maintain and provide proof of commercial general liability ("CGL") insurance coverage for the work it would be performing. Arrington Depo. at 44, 90. J&J provided Dixie Electric a certificate that it had CGL insurance with Essex Insurance Company. Arrington Depo. at 87-91, PX 12 (Email and Certificate of Insurance).

On Tuesday, November 5, 2013, J&J obtained electrical conduit from Dixie Electric for use in the job. Weir Aff. at 1. J&J completed all of its boring work on Ryan Ridge Loop by Friday, November 8, 2013. *Id.*; *See* Exhibit C - 2014 Deposition of Jerry Noblitt ("Noblitt Depo.") at 43-44. J&J completed all of its work on Ryan Ridge Loop for the job on that Monday, November 11, 2013. *Id.* No additional boring was performed on November 11. Weir Aff. at 1.

While performing the boring, J&J unknowingly and unintentionally struck and broke the underground sewer laterals of two homes on Ryan Ridge Loop owned by Dr. and Mrs. Jack Anderson, 8212 and 8216 Ryan Ridge Loop ("the Properties"). *See* Noblitt Depo. at 44-45; Arrington Depo. at 36; Exhibit D – Deposition of Kem Anderson ("Anderson Depo.") at 10. A sewer lateral is a privately-owned sewer pipe connecting a residence to the publicly-owned main sewer line. *See What is a Sewer Lateral Line?*, http://www.savrbay.com/cgl/whatis (last accessed February 9, 2016). J&J admitted that it accidently damaged the sewer laterals and admitted that it

is not aware of anything that Dixie did to cause injury to the owners or tenants of the Properties. Noblitt Depo. at 45-46, 207.

In November 2013, Marrell and Courtney Alrea Crittenden, along with their minor children, M.C. and A.C., (collectively "the Crittendens") were leasing from the Andersons and residing at property and the home at 8212 Ryan Ridge Loop. Exhibit E – 2014 Deposition of Courtney Crittenden ("C. Crittenden Depo.") at 49. Caroline Torrence resided at the property and home at 8216 Ryan Ridge Loop. Exhibit F – Deposition of Caroline Torrence ("Torrence Depo.") at 15-16.[3] The Crittendens and Torrence are hereinafter collectively, "the Tenants." The Crittenden and Torrence Residential Rental Agreements with the Andersons covered the full properties, including the sewer laterals, which were required for the homes to be habitable. *See* Anderson Depo., DX 1 and DX 2; Torrence Depo. at 15-16.

As a result of the broken sewer laterals, sewage seeped up into the Properties and overflowed from the toilets, showers, and tubs, on an ongoing, periodic basis beginning no later than November 11, 2013, based on testimony from the Crittendens.  Exhibit G - 2016 Deposition of Marrell Crittenden ("M. Crittenden 2016 Depo.") at 43-45, 53.  The Tenants were forced to leave their homes. The Tenants and the Andersons have claimed that the sewage caused significant "property damage" to the Properties, personal "property damage" to their belongings, and "bodily injuries" to themselves, including physical injuries, emotional distress, and mental anguish. *See* Crittenden Second Amended Complaint (Doc. 50-1 at 17-26 - Exhibit E to Dixie Electric's Counterclaim); Torrence Complaint (Doc. 50-1 at 90-98 - Exhibit I to Dixie Electric's Counterclaim); Exhibit O - Dr. Jack Anderson Depo. ("Dr. Anderson Depo.") at 42-53.

---

[3] The Andersons leased the property and home at 8216 Ryan Ridge Loop to Torrence's father, Tim Halstrom. Anderson Depo. at 13-14.

**The Crittendens**

The Crittendens first experienced "water irregularities and discoloration [in the toilets, shower, and tub] starting around when the [J&J] men were outside working." M. Crittenden 2016 Depo. at 25. The water was discolored and had feces particles floating in it, and the water would rise and drain in the toilet on its own. *Id*. at 26. Marrell Crittenden had to clean up feces from the toilet and shower overflowing on Monday, November 11, 2013, while his daughter, M.C., was present at the home with him. *Id*. at 46-47, 51, 61. Thereafter, the Crittendens continued to experience sewage backup issues including a major overflow that occurred on Saturday, November 16, 2013. *Id*.; Exhibit H- 2016 Deposition of Courtney Alrea Crittenden ("C. Crittenden 2016 Depo.") at 20-21.

From November 11, 2013, on a "pretty constant" basis, Marrell noticed particles in the water, feces, smelled a bad odor, and the toilets were backing up and sometimes flooding in both bathrooms. M. Crittenden 2016 Depo. at 43-45, 53. He also started feeling ill at some time while all of the sewage problems were ongoing and it progressively became worse until the time when they went to the hospital for his daughter M.C. and he was able to see a doctor. *Id*. at 60, 71.

On Saturday, November 16, 2013, while A.C. and M.C. were bathing, A.C. reported to her mother (Courtney Crittenden) that feces was coming out of the toilet and overflowing onto the floor and carpet. C. Crittenden 2016 Depo. at 15, 22-23. M.C. was standing in the sewage water. *Id*. The overflowing sewage was so substantial, Courtney and her sister went to get a rug doctor to clean the carpet. *Id*. at 26. Courtney Crittenden testified that sewage was coming up on an ongoing basis, every day, from the toilets and bathtubs, she recalls, at least from that Saturday, November 16 until the end of that week when they left the home. *Id*. at 30-31. Courtney stated that "by the end of the week, it was just so bad because we couldn't take a

shower … It was like you couldn't even walk in the shower at that point." *Id*. at 32. There was a foul smell in the home, which caused Courtney Crittenden to have a headache. C. Crittenden 2014 Depo. at 32, 108-109.

Courtney Crittenden's sister, Courtney Renee Bynum, also stayed with the Crittendens regularly during the month of November 2013. Exhibit I – Deposition of Courtney Bynum ("Bynum Depo.") at 21-22. According to Ms. Bynum, the overflowing sewage issues occurred for first the time approximately two weeks prior to the major incident on November 16, and she testified she cleaned it up with towels and Clorox. *Id*. at 32-34.

Around Thursday, November 21, 2013, Courtney Crittenden noticed that her daughter M.C. had a rash on her body and that her face was swollen. C. Crittenden 2014 Depo. at 80-83. Days later, M.C.'s skin also began to peel. *Id*. at 79. Courtney and Marrell Crittenden took her to the Emergency Room. *Id*. at 83. M.C. stayed in the hospital from November 26, 2013 to November 29, 2013. *Id*. at 95. The Crittendens claim that M.C.'s skin condition in November 2013 was caused by exposure to sewage in the house. *See generally id*.; Crittenden Second Amended Complaint. The Crittendens also claim that M.C. was still, as of June 27, 2014, experiencing social delays, emotional attachment, and physical blemishes as a result of her interaction with the sewage water. C. Crittenden 2014 Depo. at 17-28. M.C. was also taking oral medication and applying a cream for her rash daily. *Id*. at 18-20.

After contacting the Andersons, the Crittendens left the 8212 Ryan Ridge Loop home on November 25, 2015. Exhibit J – 2014 Deposition of Marrell Crittenden ("M. Crittenden 2014 Depo.") at 8. As a result of the sewage overflowing, the Crittendens claim that their personal property came into contact with the sewage water, including their furniture, clothing, shoes, etc. C. Crittenden 2014 Depo. at 60-61.

Courtney Crittenden testified that A.C. has had emotional issues caused by the sewage incident. C. Crittenden 2014 Depo. at 26-28. Ms. Crittenden stated regarding A.C., "She's very sensitive to anyone that goes into the hospital. She's very sensitive to her sister, M.C.. She cries a lot. She doesn't want – she doesn't want anything to happen to M.C.. She always tell[s] me that she's worried about her because she saw her in that condition." *Id*. at 28.

Courtney Crittenden testified that she has had emotional issues as a result of the sewage incident. C. Crittenden 2014 Depo. at 29. Ms. Crittenden also testified that she experienced nausea and headaches during the time of the sewage issues. *Id*. at 31-32.

In sum, the Crittendens lost the use of the sewer lateral that serviced the Anderson's rental home at 8212 Ryan Ridge Loop by November 8, 2013. *See supra*. The Crittendens testified that they first suffered damage to their plumbing and water on or before November 11, 2013, including the toilet flow irregularities, over flowing toilets, showers, and tubs and a foul smell in the home. *Id*. Courtney Bynum testified that she experienced overflow sewage issues approximately two weeks prior to the major incident on November 16. *Id*. This damage allegedly caused the Crittendens to have headaches, feel ill, and suffer mental anguish. *Id*. The Crittendens also alleged that the loss of use of the sewer lateral ultimately caused them to move out of their home because it was uninhabitable. *Id*.

## Caroline Torrence

While Torrence could not recall the exact date when she experienced the overflowing sewage, she recalled that it was in the beginning of November. Torrence Depo. at 40-41. Torrence testified that after the sewer pipe broke, sewage overflowed from her toilet, tub, and showers in both her master bedroom and her hall bathroom. *Id*. at 17-20. The sewage flowed out of the bathrooms onto the carpet, into her bedroom, in the closet, and in the hall. *Id*. at 27-28.

9

The sewage problems forced her to leave her home that same day. *Id*. at 59-60. She claims that she was emotionally affected immediately and that she was "totally freaking out." *Id*. at 25.  She also testified that "the smell and the appearance… was very traumatic." *Id*.

### Dixie Electric

In response to a claim made by the Andersons, Dixie Electric reimbursed the Andersons for damages sustained to the houses at 8212 and 8216 Ryan Ridge Loop, which included property damage, remediation/repair costs, and lost rent for December 2013. Arrington Depo. at 34-36; Exhibit K – Deposition of Martha Singleton at 32; Dr. Anderson Depo. at 42-53. Dixie Electric also paid Roto Rooter for the repairs to the two broken sewer laterals. Arrington Depo. at 64-66; Dr. Anderson Depo. at 42-53.

### II.    The Underlying Claims

As a result of the sewer lateral incidents, on January 15, 2014, the Crittendens filed a lawsuit in state court against Dixie Electric and J&J: *Marrell Crittenden, Jr. et al, v. Dixie Electric Cooperative, et al.*, in the Circuit Court of Montgomery County, Alabama, Case No. CV-2014-900103 (the "Crittendens lawsuit") alleging claims for negligence/wantonness, nuisance, and trespass. *See* Crittenden Second Amended Complaint (Doc. 50-1 at 17-26 - Exhibit E to Dixie Electric's Counterclaim). The Crittendens allege that:

> On or about November 3, 2013 until approximately November 11, 2013, the sewage line was breached and thereafter raw sewage began to and continued to seep and invade their home through bathroom toilets, under various walls within their dwelling place, the family living room, and various closets within the household and in hallways until approximately November 25, 2013. The seepage of raw sewage made the home uninhabitable causing them to move, destroyed their possessions within the household and caused mental anguish, mental distress and other illnesses for the household members.
>
> …

10

1401360.12

> Both Dixie and J and J were engaged in activities that were related to new home construction and negligently and/or wantonly caused damage to sewer lines that resulted in raw sewage seeping into the dwelling place of the Plaintiffs.

Crittenden Second Amended Complaint at ¶¶ 10, 11. Moreover, the Crittendens allege their daughter M.C. suffered medical problems including a staph infection, cellulitis, and Dermatitis due to the sewage backup at the 8212 Ryan Ridge Loop home. C. Crittenden 2014 Depo. at 96-98.

In addition, on November 18, 2015, Torrence filed a lawsuit in state court against Dixie Electric and J&J: *Caroline Torrence v. Dixie Electric Cooperative, et al.*, in the Circuit Court of Montgomery County, Alabama, Case No. CV-2015-901757 (the "Torrence lawsuit") alleging claims for negligence/wantonness, nuisance, and trespass. *See* Torrence Complaint (Doc. 50-1 at 90-98 - Exhibit I to Dixie Electric's Counterclaim). Torrence alleges that:

> On or about or between November 3, 2013 until approximately sometime after November 11, 2013, the sewage line at Plaintiff's home was breached and thereafter raw sewage began to and continued to seep and invade Plaintiff's home through bathroom toilets, under various walls within her dwelling place, the family living room, and various closets within the household and in hallways until approximately middle to late November 2013. The seepage of the raw sewage made the home uninhabitable causing Plaintiff to temporarily move out, destroyed her personal property within the household and caused mental anguish, mental distress and other personal injuries and personal illnesses.

Doc. 50-1 at 93 (Torrence Complaint at 3). Collectively, the Crittendens suit and Torrence suit are referred to as the "Underlying Lawsuits." The Underlying Lawsuits remain pending.

In the Underlying Lawsuits, Dixie Electric filed cross-claims against J&J for indemnity from J&J. *See* Doc. 50-1 at 30 (Dixie Electric Cross-Claim). Dixie Electric seeks indemnity from J&J for the losses incurred as a result of J&J's negligence, including, but not limited to, the cost to investigate the broken sewer laterals, the cost to repair the broken sewer laterals, the cost to clean up the houses at 8212 Ryan Ridge Loop and 8216 Ryan Ridge loop, the costs associated

11

with the loss of use of property resulting from the broken sewer laterals, and the cost of defending the Underlying Lawsuits and any possible judgment that may be entered in the Underlying Lawsuits against Dixie. *Id.*

### III.    The Insurance Policy at Issue

Essex issued a commercial general liability insurance policy to J&J, Policy number 3DM2159, with a policy period from November 12, 2012 to November 12, 2013 at 12:01 AM (hereinafter "the Policy").[4]  *See* Exhibit L- Certified Copy of the 2012-2013 Policy.  Under the Policy, Essex agreed to pay damages for which J&J becomes legally obligated to pay because of "bodily injury" or "property damage" that occurs during the Policy period.

The Policy states:

SECTION I-COVERAGES
COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY
1. Insuring Agreement
    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this Insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

    b. This insurance applies to "bodily injury" and "property damage" only if:
        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
        (2) The "bodily injury" or "property damage" occurs during the policy period; and
        (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II -- Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a

---

[4] Essex also issued a commercial general liability insurance policy to J&J, Policy number 3DR9159, for the policy period commencing on December 4, 2013. Exhibit M – Certified Copy of the 2013-2104 Essex Policy. This 2013-2014 policy ultimately was cancelled effective February 17, 2014. Conveniently, Essex seeks to avoid coverage to J&J altogether by arguing all of the alleged damage occurred during the three week period when J&J was not insured from November 12, 2013 to December 3, 2013.

listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c. "bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured** listed under Paragraph 1. of Section II -- Who Is An insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, **includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.**

*See* Exhibit L – Form CG 00 01 12 07, pg. 1 (emphasis added).

The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id*. at pg. 14 - Policy Section V – Definitions ¶ 13.

"Property damage" is defined in pertinent part as:

    a.  Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or.

    b.  Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*Id*. at pg. 15 ¶ 17a and b.

The Policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." *Id*. at pg. 13,  ¶ 3.

## The Pollution Exclusion

The Policy includes an exclusion for "'bodily injury' or 'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." *See* Exhibit L - Essex Policy,

Form CG 214909 99 - "Total Pollution Exclusion Endorsement." The term "pollutants" is defined in the Policy as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." Exhibit L – Form CG 00 01 12 07, pg. 15, ¶ 15.

### IV.    J&J's Claim for Coverage and Essex's Denial

J&J has sought coverage for the Underlying Lawsuits with Essex. *See* Noblitt Depo. at 53-54. Essex initially denied coverage, but later agreed to defend J&J in the Underlying Lawsuits under a reservation of rights. In its correspondence to the parties, as well as in its Complaint, as amended, in the instant case, Essex has raised two grounds for denying coverage: (1) the damages did not occur within the Policy period, and (2) the pollution exclusion. *See* Exhibit N - Markel Letter dated October 29, 2014 at 2; Essex's First Amended Complaint for Declaratory Judgment (Doc. 61).

### PROCEDURAL HISTORY OF THIS CASE

On July 15, 2015, Essex filed this declaratory judgment action against J&J, Dixie Electric, and the Crittendens seeking a declaration of no coverage as to the Policy. *See* Complaint (Doc. 1). Essex later added Torrence as a defendant. *See* Essex's First Amended Complaint (Doc. 61). Dixie Electric has counterclaimed for a declaration of rights and obligations of Essex under the Policy and seeking coverage under the Policy for its cross-claims against J&J in the Underlying Lawsuits. *See* Dixie Electric's First Amended and Supplemented Counterclaim. (Doc. 50).

## LEGAL ANALYSIS AND ARGUMENT

**I.    The Rules for Construing Insurance Policies Favor Coverage for J&J**

Under Alabama law,[5] an insurer's duties of defense and indemnity are related, but distinct and thus require separate analysis. *Porterfield v. Audubon Indem. Co.,* 856 So. 2d 789, 792 (Ala. 2002) (citation omitted). Specifically, an insurer's duty to defend is more extensive than its duty to indemnify. *U.S. Fid. & Guar. Co. v. Armstrong,* 479 So. 2d 1164, 1168 (Ala. 1985) (citations omitted). "The general rule is that, in deciding whether a duty to defend exists, the courts look to the issue pleadings alleging the claim being made against the insured." *Am. Safety Indem. Co. v. T.H. Taylor, Inc*., 513 Fed. App'x. 807, 811 (11th Cir. 2013) (*citing Hartford Cas. Ins. Co. v. Merchants & Farmers Bank*, 928 So. 2d 1006, 1010 (Ala. 2005); *United States Fid. & Guar. Co. v. Armstrong*, 479 So. 2d 1164, 1168 (Ala. 1985)). In making that examination the court is not bound by the formal or legalistic characterization of the claim in the pleadings; the court should focus instead upon the facts alleged in support of the claim. *Id*. (citing *Hartford Cas. Ins. Co.*, 928 So. 2d at 1012). If the facts alleged could reasonably support a legal theory of recovery that is an insured risk under the policy, the insurer has a duty to defend the claim. *Id*. When a complaint alleges both acts covered under a policy and acts not covered, the insurer must at least defend the covered allegations. *Blackburn v. Fid. & Deposit Co. of Md.,* 667 So.2d 661, 670 (Ala.1995) (citation omitted).

The insured bears the burden of establishing that a claim is covered by the policy. *See Colonial Life & Acc. Ins. Co. v. Collins,* 194 So. 2d 532, 535 (Ala. 1967). The insurer has the

---

[5] Because this is a diversity action, state substantive law will determine whether Essex has a duty to defend and/or indemnify J&J or Dixie Electric. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938); *see also Manuel v. Convergys Corp.,* 430 F.3d 1132, 1139 (11th Cir. 2005) ("[A] federal court sitting in diversity will apply the choice of law rules for the state in which it sits."). Alabama law will apply to the policy's interpretation.  *See Colonial Life & Accident Ins. Co. v. Hartford Fire Ins. Co.*, 358 F.3d 1306, 1308 (11th Cir. 2004).

burden to prove the applicability of any policy exclusion. *See Bankers Fire and Marine Ins. Co. v. Contractors Equip. Rental Co.*, 159 So. 2d 198, 201 (Ala. 1963).  Moreover, "[e]xclusions are to be interpreted as narrowly as possible, so as to provide maximum coverage for the insured, and are to be construed most strongly against the insurance company that drafted and issued the policy." *Am. States Ins. Co. v. Martin*, 662 So. 2d 245, 247 (Ala. 1995) (citations omitted); *see also Altiere v. Blue Cross and Blue Shield of Alabama*, 551 So. 2d 290, 292 (Ala. 1989) (exceptions to coverage must be interpreted as narrowly as possible in order to provide maximum coverage to the insured).

General rules of contract law govern an insurance contract. *Lambert v. Coregis Ins. Co., Inc.*, 950 So. 2d 1156, 1161 (Ala. 2006). Thus, the court must enforce the policy as written if the terms are unambiguous. Whether a provision is ambiguous is a question of law. *Id.* "A term in a contract is ambiguous only if, when given the context, the term can reasonably be open to different interpretations by people of ordinary intelligence." *Id.* at 1162. Consequently, courts must first look to the terms of the insurance contract. The interpretation of a provision in an insurance contract is a question of law. *Pa. Nat'l Mut. Cas. Ins. Co. v. Snider*, 607 Fed. App'x. 879, 882 (11th Cir. Ala. 2015).

Significantly, any ambiguity in an insurance policy should be interpreted in favor of the insured and against the insurer. *Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.*, 817 So. 2d 687, 695 (Ala. 2001) (interpreting ambiguity in insurance policy against drafter/insurer and holding home health aide was insured); *Blackburn v. Fid. & Deposit Co.*, 667 So.2d 661, 670 (Ala. 1995) ("[W]here the court concludes that an insurance contract is ambiguous as to a condition of, an exclusion from, or a limitation on, coverage or liability, it must construe the ambiguity against the insurer that drafted the policy"); *Ala. Ins. Guar. Assoc. v. Kinder-Care, Inc.*, 551 So.2d 286,

287 (Ala. 1989); *Ho Brothers Restaurant, Inc. v. Aetna Cas. & Surety Co.*, 492 So.2d 603, 605 (Ala. 1986) ("an insurance contract containing ambiguous language will be construed liberally in favor of the insured and strictly against the insurance company").

For the reasons that follow, the claims and allegations in the Underlying Lawsuits triggered the provisions of Coverage A under the Policy. This brief will address: first, coverage under the Policy for the Crittenden lawsuit; second, coverage for the Torrence lawsuit; then, coverage for Dixie Electric's cross-claims; and finally, that the pollution exclusion does not apply to the facts of this matter.

## II.     The Crittendens' Second Amended Complaint Alleges "Property Damage" and "Bodily Injury" That Occurred During, and is Covered by, the Policy.

The Policy covers "property damage" and "bodily injury" caused by an "occurrence" that takes place during the Policy period from November 12, 2012 to November 12, 2013 and that was not, prior to the Policy period, known to have occurred…*as well as* any "continuation, change, or resumption of that 'bodily injury' or 'property damage' *after the end of the policy period*." *See* Exhibit L - Form CG 00 01 12 07, pg. 1 - Policy Section I, Coverage A, 1.c. (emphasis added). In its First Amended Complaint for Declaratory Judgment, Essex appears to concede that the Policy's definitions of "occurrence," "property damage," and "bodily injury" are satisfied.[6]  Doc. 61, at ¶¶ 28-29.

---

[6] The Policy's definitions of "bodily injury" and "property damage" are discussed extensively below.  The Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Exhibit L – Form CG 00 01 12 07, Policy Section V – Definitions.  The Tenants allege that J&J mistakenly broke the sewer lateral by November 8, 2013.  *Id.*; Noblitt 2014 Depo. at 24, 45; *see generally* Weir Aff.  Because this unforeseen accident could not have reasonably been anticipated, the policy's definition of "occurrence" is easily met. *See Pa. Nat'l Mut. Cas. Ins. Co. v. St. Catherine of Siena Parish*, 790 F.3d 1173, 1179 (11th Cir. Ala. 2015); *United States Fidelity & Guaranty Co. v. Bonitz Insulation Co.*, 424 So. 2d 569 (Ala. 1982).

Thus, Essex owes coverage under its Policy if the Tenants allege "bodily injury" or "property damage" that occurred during its Policy period. *See U.S.F.&G. v. Warwick Dev. Co., Inc.*, 446 So. 2d 1021, 1024 (Ala. 1984). The Alabama Supreme Court has stated that "as a general rule the time of an 'occurrence' of an accident within the meaning of an indemnity policy is not the time the wrongful act is committed but the time the complaining party was actually damaged." *See American States Ins. Co. v. Martin*, 662 So. 2d 245, 247 (Ala. 1995).

Here, the Crittendens undisputedly have alleged "property damage" and "bodily injuries" that occurred during the Policy period from November 12, 2012 to November 12, 2013. Moreover, because the damage here began during the Policy period, Essex owes coverage for any *continuation, change or resumption* of that injury or damage after the end of the Policy. *See* Exhibit L – Policy Form CG 00 01 12 07, pg. 1.

### A.   The Allegations in the Underlying Lawsuits Trigger Essex's Duty to Defend J&J Against those Claims.

As an initial matter, Essex's duty to defend is determined by the allegations in the complaints in the Underlying Lawsuits. The allegations in the Underlying Lawsuits allege damage to the sewer lateral, to the Crittendens' residence, and to the Crittendens personally within the Policy period. *See* Section II, *supra*; Crittenden Second Amended Complaint at ¶¶ 10, 11 (alleging injuries and damage from November 3, 2013 until approximately November 11, 2013, and thereafter). These allegations alone are sufficient to trigger Essex's defense obligations under the Policy. *See Am. Safety Indem. Co.*, 513 Fed. App'x. at 811; *Hartford Cas. Ins. Co.*, 928 So. 2d at 1010; *Armstrong*, 479 So. 2d at 1168. Taking these allegations as true and construing all reasonable inferences in favor of coverage, Essex owes a duty to defend J&J against all claims in the Underlying Lawsuits as a matter of law.

**B.      All of the Damages in the Crittenden Matter Relate Back to the Undisputed Damage to the Sewer Lateral which Occurred within the Policy Period no Later than November 8, 2013.**

Every single claim for damage by the Crittendens is a direct result of the damage to the sewer lateral that occurred on or before November 8, 2013, within the Policy period. When the sewer lateral was broken, the Crittendens immediately lost the use of their sewer system. The Crittendens claim that the broken sewer lateral and loss of the use of the sewer system caused continuing and changing damages after expiration of the Policy, and culminated in them moving out of their home by late November. The damages related to the Crittendens' claims are outlined below including the damage to the sewer lateral and its resulting loss of use, the Crittendens' injuries and damage prior to the Policy ending, and the Crittendens' injuries and damage after the Policy ended.  All of these damages are covered either because they took place during the Policy period, or by virtue of the Policy's language expressly extending coverage for damages occurring after the Policy's expiration, but that flow from damage that occurred during the Policy period.

> ### i.      *Damage to the sewer lateral and all resulting loss of use undisputedly occurred on or before November 8, 2013.*

"Property damage" to the sewer lateral undisputedly occurred during the Policy period – on November 8, 2013.  *See* Weir Aff. at 1-2.  "Property damage" is defined in pertinent part as: "Physical Injury to tangible property, including all resulting loss of use of that property." *See* Exhibit L – Policy Form CG 00 01 12 07, pg. 15– Section V - Definitions ¶ 17a. J&J undisputedly caused physical injury to the Tenants' sewer lateral by November 8, 2013 and before the Policy's expiration on November 12, 2012. In addition to the damage to the sewer lateral, the Policy covers "all resulting loss of use of that property."  *See id.*  Importantly, under the definition of "property damage", this loss of use is "deemed to occur at the time of the physical injury that caused it." *Id.*  The Crittendens lost the use of their sewage system as a result

of the damage to the sewer lateral on or before November 8, 2013.  Further, the Crittendens ultimately lost the use of their home when they were forced to move out due to the damage.  This loss of use is "property damage" that is deemed to have occurred when at the time of the physical injury that caused it (*i.e.*, when the sewer lateral was damaged).  Consequently, the Crittendens' alleged injuries and damages (as well as the Anderson's property damage) began as soon as J&J struck and broke the sewer lateral because it was part of the leased property.

Moreover, while the Crittendens did not have the ability to see through the ground inside their sewer pipes to know the exact moment when the sewage backup first reached their home, their knowledge of the broken sewer lateral is immaterial. In any event, they have presented evidence that they experienced toilet water irregularities, toilet and shower backups, and flooding with sewage water within the Policy period (before November 12, 2013). This is evidence of property damage and demonstrates that the Crittendens lost the full functional use of their sewer system as a result of the sewer lateral fracture within the Policy period.

ii.     ***After J&J fractured the sewer laterals, subsequent toilet backup occurred on or before November 11, 2013, resulting in alleged mental anguish and other "bodily injuries" as well as personal property damage in connection with the Crittenden home.***

The Crittendens claim both "property damage" and related and resulting "bodily injury" that occurred during the Policy period. Both Marrell and Courtney Crittenden as well as Courtney Bynum have testified that sewage backup began at the Crittenden residence during the Policy period. Marrell Crittenden testified he recalled sewage backup overflowing onto the bathroom floor on Monday, November 11, 2013 that he had to clean up.  M. Crittenden 2016 Depo. at 56-61; M. Crittenden 2014 Depo. at 46.   Courtney Bynum described overflowing sewage issues occurring for the first time approximately two weeks prior to the major incident on November 16, and cleaning up the sewage with towels and Clorox. *Id*. at 32-34.  Further, the

Crittendens' Second Amended Complaint specifically states that "[t]he seepage of raw sewage made the home uninhabitable causing them to move, destroyed their possessions within the household and ***caused mental anguish, mental distress and other illnesses for the household members***." Crittenden Second Amended Complaint at ¶ 10 (emphasis added). The Crittendens claim "property damage" to their personal possessions and "bodily injuries" in the form of mental anguish and other medical illness.

The Policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." Exhibit L, p. 26 - Section V - Definitions ¶ 3.  While the Policy does not specifically list mental anguish as a type of "bodily injury," under Alabama law, "[m]ental anguish is held to be "bodily injury." *Am. States Ins. Co. v. Cooper*, 518 So. 2d 708, 710 (Ala. 1987) (quoting *Allen's Alabama Liability Insurance Handbook*, § 8-12 (2d Ed. 2008)); *see also Am. Econ. Ins. Co. v. Fort Deposit Bank,* 890 F. Supp. 1011, 1017 (M.D. Ala. 1995) ("Because the Alabama Supreme Court has held that mental anguish constitutes "bodily injury" within the meaning of policy provisions strikingly similar to the policy in this case, the court finds that such injury falls within the definition of "bodily injury" as defined in the Policy."). Therefore, a "plaintiff's allegation that he has suffered mental anguish and emotional distress as a result of the defendants' acts and omissions satisfies the policy's '"bodily injury"' definition under Alabama law." *Id*. For example, in *Morrison Assurance Company v. North American Reinsurance Corporation,* 588 F. Supp. 1324, 1327 (N.D. Ala. 1984), the district court, applying Alabama law, found that although mental anguish was not articulated specifically in the subject policy, the terms "sickness" or "disease" necessarily encompassed mental anguish. *See also Cooper,* 518 So. 2d at 711.

Under Alabama law, plaintiffs may recover mental anguish for damage to their home. The presence of sewage backup in the Crittendens' homes alone gives rise to their claims of mental anguish damage. *See Keck v. Dryvit Sys.*, 830 So. 2d 1, 15 (Ala. 2002) (Johnstone, J., concurring in part, dissenting in part) (citing *Southern Energy Homes, Inc. v. Washington*, 774 So. 2d 505 (Ala. 2000) ("Mental anguish resulting from damage to a home is a legally recognizable and compensable form of personal injury.").  Thus, the plaintiffs' mental anguish began at least as early as the Crittendens were required to clean up sewage entering their home, before the Policy's expiration.  M. Crittenden 2016 Depo. at 56-61; M. Crittenden 2014 Depo. at 46. In addition to the allegations in their state court complaint, the Crittendens described experiencing their alleged mental anguish from as early as when the sewer lateral was damaged or at least by Monday, November 11, 2013, when they began experiencing plumbing irregularities and toilet overflows. Each of the Crittendens claim mental anguish damage, including M.C., who witnessed and experienced the sewage her father had to clean up on November 11, 2013. Crittenden Second Amended Complaint at ¶ 10; *see* M. Crittenden 2014 Depo. at 47.

There is also evidence of other claimed "bodily injuries" allegedly associated with the sewage water that backed-up into the Crittenden home in the form of illness, rashes, skin problems, nausea, and headaches. For example, Courtney Crittenden claims that she suffered nausea and headaches from the smell of the sewage. C. Crittenden 2014 Depo. at 32, 108-109. Marrell Crittenden claims that he felt ill and testified to the terrible smell. M. Crittenden 2016 Depo. *Id.* at 60, 71. M.C. allegedly developed a rash, had to be hospitalized, and had other skin problems. C. Crittenden 2014 Depo. at 79-83.

1401360.12

Because the Crittendens have alleged both "property damage" and "bodily injuries," including mental anguish, within the Policy period, these alleged damages are covered by the Policy.

        **iii.**     ***The Crittendens' injuries and damages that changed and continued after the Policy's expiration are covered.***

Because the sewer lateral damage undisputedly occurred on November 8, 2013, the additional sewage backup and associated damage that continued *after* that Policy period ended is also covered regardless of whether it took place during the Policy period. Under the Policy, Essex agreed to pay damages for which J&J becomes legally obligated to pay because of "bodily injury" or "property damage" that occurs during the Policy period. While it is true some "property damage" must occur during the Policy period for the Policy to apply, it is not true that *all of it* must occur during the Policy period. Importantly, the Policy provides as follows with respect to injury or damage that takes place during the Policy period and continues after its expiration:

> "bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred . . . . ***includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.***

*See* Exhibit L – Policy Form CG 00 01 12 07, pg. 1 - Essex Policy -Section I, Coverage A, 1.c. (emphasis added). Based on this Policy language, the additional sewage backup and damage is covered because it is attributable to the initial "property damage" to the sewer lateral that undisputedly occurred during the Policy period. Here, the damage that resulted from the broken sewer lateral began and then continued, or resumed soon thereafter, thus this provision is applicable and ties in any *continuing, changing or resuming* "property damage" or "bodily injuries" that occurred even after the end of the Policy period, which includes claimed damage

inside the home, associated mental anguish, and personal injuries from coming into contact with the sewage.

Courts from around the country addressing policy language like that in the Policy have found coverage when presented with facts similar to those here. *E.g., Grange Mut. Cas. Col v. West Bend Mut. Ins. Co.*, 946 N.E.2d 593 (Ind. Ct. App. 2011); *Parr v. Gonzalez*, 669 N.W.2d 401, 406-07 (Minn. Ct. App. 2003) (holding coverage existed for mold damage that did not develop until after policy expired, but was attributable to property damage to a vent cap that took place during the policy period).

In *Grange Mut. Cas. Col.,* a subcontractor, McCurdy, hired to install pipes and drains fractured a storm drain pipe during its work and later, as a result, a school experienced significant water damage. The subcontractor had two insurance policies, and the issue was which policy was applicable. *Id*. One policy was in effect during the construction and during the damage to the pipe but not at the time of the resulting flooding. 946 N.E.2d at 594. The policies included language stating that any "property damage" is covered "which occurs during the policy period and was not, prior to the policy period, known to have occurred ..., includes *any continuation, change or resumption* of that ... 'property damage' after the end of the policy period." *Id*. at 595 (emphasis added).

Consistent with Alabama law, the Indiana court noted that "[a]n occurrence takes place not when the policyholder engages in the wrongful act, but the time the complaining party was actually damaged." *Id*. at 596 (internal citations omitted); *see Warwick*, 446 So. 2d at 1024. The Indiana court further stated:

> As expressed above, we agree that the time of the damage, as opposed to the time of the alleged negligent conduct that caused the damage, is the triggering event. We do not agree, however, that no damage occurred during West Bend's policy period to trigger coverage under its policy with McCurdy. Although the damages

> resulting from McCurdy's negligence became apparent only after they evolved over time, some damage clearly resulted when the drain pipe was fractured, which was within West Bend's policy period.

*Id*. The Indiana court determined that "the undisputed facts show that the storm drain pipe was damaged by McCurdy [the subcontractor] during the West Bend policy period." *Id*. at 597. The court noted that the West Bend policy provided that this initial property damage "includes any continuation, change or resumption of that ... 'property damage' after the end of the policy period." *Id*. The Indiana court held that pursuant to this provision, because "***the West Bend policy was triggered at the time McCurdy negligently fractured the drain pipe, the policy covers all damages that flowed from the original damage***, including the extensive flood damage." *Id*. (emphasis added).

Similarly here, the Policy includes the same language as in the *Grange* case -- coverage for any "continuation, change or resumption of that ... 'property damage' after the end of the policy period," and, thus, instructs a similar result as in *Grange*, covering all damages that "flowed from the original damage." *See id*. Every single claim for damage in the Crittenden lawsuit (and Dixie Electric's cross-claim) flows directly from the original damage to the sewer lateral and thus, all such claims are covered under the Policy.

Likewise, in *Parr*, subcontractor Gonzalez performed work on the Parr's roof on behalf of Midwest. 669 N.W.2d at 403. After the roof work was completed, Midwest replaced a damaged vent cap. *Id*. Because the replacement vent cap was the wrong size, it resulted in blockage of the vent pipe that led to mold in the home. *Id*. at 403-404. Gonzales had a CGL policy with Zurich American Insurance Company that was in place when the vent cap was replaced but not when the resulting mold developed. *Id*. Consistent with the Policy here, the Zurich policy in *Parr* defined "property damage" as "physical injury to tangible property,

25

including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it." *Id*. at 406. The Zurich policy also defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id*.

In *Parr*, under Minnesota case law (identical to Alabama's law), "to establish or trigger coverage under an occurrence-based policy, 'an insured must demonstrate that damage 'occurred' while the policy was in effect." *Id*. (citing *N. States Power Co. v. Fid. & Cas. Co*., 523 N.W. 2d 657, 659-60 n. 3 (Minn. 1994) (quotation omitted)). The *Parr* court noted that "[a]n occurrence takes place not when the policyholder engages in the wrongful act, 'but the time the complaining party was actually damaged.'" *Id*. (citing *Singsaas v. Diederich*, 238 N.W. 2d 878, 880 (Minn. 1976)). "Consequently, if the damage occurs outside of the policy period, the policy does not provide coverage." *Id*.

The Court of Appeals of Minnesota determined that the undisputed facts showed that the vent cap was damaged by the insured while the insured's policy was in effect, resulting in an "occurrence" that triggered the policy. *Parr*, 669 N.W.2d at 406. Moreover, while Zurich argued the mold may not have developed until after the policy had expired, the court noted that "when damages arise from discrete and identifiable events that occur within the policy period, the actual-injury trigger theory allows those policies on the risk at the point of initial damage to pay for all the damages that follow." *Id*. at 406-407 (citation omitted). Consequently, the Minnesota court held that coverage existed for mold damage that did not develop until after policy expired, but was attributable to property damage to a vent cap that took place during the policy period. *Id*.

### C.   Essex's Coverage Position Contravenes the Policy's Language and Leads to Absurd Results.

Putting aside for the moment the Crittendens' testimony that their "property damage" and "bodily injury" began to occur before the Policy's expiration, the Policy's coverage is triggered because all of the alleged injuries are the result of "property damage" that undisputedly took place during the Policy period.  Any other interpretation would ignore the Policy's clear intent to cover damage that begins during the Policy and *continues, changes,* or *resumes* after the end of the Policy period. Furthermore, it would be absurd if the Policy covers the "property damage" that drove the Crittendens out of their home, but not the associated mental anguish or the resulting personal injuries. Likewise, it would be non-sensical for some damage from the sewage backup to be covered as within the Policy, but not other damage from the same backup.  Courts are instructed to read contract provisions, including insurance contracts, so as to avoid reaching absurd results. *See e.g. Tarrant Reg'l Water Dist. v. Herrmann*, 133 S. Ct. 2120, 2131 (2013) (reading two contract provisions together "to avoid absurd results").

At best for Essex, the general coverage provisions are ambiguous when applied to the facts presented by the Underlying Claims. First, Coverage A of the Policy states it applies to "'bodily injury' *and* 'property damage' only if . . . (2) [t]he 'bodily injury' *or* 'property damage' occurs during the policy period; . . . ."  *See* Exhibit L – Policy Form CG 00 01 12 07, pg. 1. (emphasis added).  In other words, *both* are covered when one *or* the other occurs during the policy period.  *See id.*  Further, while the Policy expressly covers injuries that *continue, change*, or *resume* after the end of the Policy, these terms are undefined.  *Id.*  Alabama case law is clear that undefined words and provisions will be given "the same meaning that a person of ordinary intelligence would reasonably conclude." *St. Paul v. Edge Memorial Hospital*, 584 So. 2d 1316, 1322 (Ala. 1991). Alabama also applies the "reasonable expectation" rule, which states that an

27

insured is entitled to the protection it can reasonably expect from the terms of the insurance policy. *Aetna Cas. & Sur. Co. v. Chapman*, 200 So. 425, 427 (1941). To the extent there is any confusion or ambiguity over the meaning of this Policy language, the Court is charged to construe this language in favor of coverage for J&J and against Essex. *See Leeds*, 530 So. 2d at 207. "When doubt exists as to whether coverage is provided under an insurance policy, the language used by the insurer must be construed for the benefit of the insured." *Porterfield*, 856 So. 2d at 799-800.

In determining the common meaning of the terms of an insurance policy, the Alabama Supreme Court has looked to dictionary definitions. *See State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 309 (Ala. 1999) (citing *Emergency Aid Ins. Co. v. Dobbs*, 263 Ala. 594, 83 So. 2d 335 (Ala. 1955)). In the Merriam-Webster online dictionary, resumption is defined as "an act of starting something again after it has stopped: an act of resuming something." Merriam-Webster.com. "Resumption." http://www.merriam-webster.com/dictionary/resumption (accessed February 16, 2016). Change is defined as "to make the form, nature, content, future course, etc., of (something) different from what it is or from what it would be if left alone." Dictionary.com "Change." Dictionary.com Unabridged. Random House, Inc. http://dictionary.reference.com/browse/change (accessed: February 26, 2016). Continuation is defined as "something that continues some preceding thing by being of the same kind or having a similar content." Dictionary.com Continuation. Dictionary.com Unabridged. Random House, Inc. http://dictionary.reference.com/browse/continuation (accessed: February 26, 2016).

Here, looking to the dictionary definitions of the ambiguous Policy terms, the "property damage" and "bodily injuries" claimed by the Crittendens are a *continuation, change,* or *resumption* of the sewer lateral damage and resulting sewage backup and personal injuries. After

the sewer lateral damage, additional damage "continued" "of the same kind or having a similar content" and some damage may have "changed" making the "form, nature, content …different from what [was]." Other damage may have stopped and then "resumed."  The Policy recognizes that a plaintiffs' claimed injuries may change in form, nature and content, and is written to cover those changes so long as they are the result of covered injury or damage.

Applying the liberal rules of policy construction to the language of the Policy, including construing any ambiguities in the Policy in favor of J&J, the only reasonable interpretation of the Policy provides coverage for J&J for the claims in the Underlying Lawsuits and corresponding cross-claims asserted by Dixie Electric against J&J.

For all these reasons, the Policy covers the "property damages" and "bodily injuries" claimed by the Crittendens in the Crittenden lawsuit.

### III.    Caroline Torrence's Complaint Alleges "Property Damage" and "Bodily Injury" That Occurred During, and is Covered by, the Essex Policy.

Many of the arguments outlined *supra* related to the Crittenden lawsuit also apply to the Torrence lawsuit. Torrence has alleged "property damage" – damage to her personal property as a result of the backup of sewage. Doc. 50-1 at 93 (Torrence Complaint at 3). Torrence also alleges "bodily injury" in the form of mental anguish damages and personal injuries. *Id*. Torrence's Complaint states "[t]he seepage of the raw sewage made the home uninhabitable causing Plaintiff to temporarily move out, destroyed her personal property within the household and caused mental anguish, mental distress and other personal injuries and personal illnesses." Torrence Complaint at ¶ 7.

While Torrence could not testify to a specific date when the sewage overflow occurred at her home, she remembered it was in early November. Torrence Depo. at 40-41. Because the

Policy ended on November 12, 2013, Torrence's sewage overflow arguably occurred during the Policy period and is also covered on that basis.

Because "property damage" to the sewer lateral undisputedly occurred during the Policy period – on November 8, 2013, *see* Weir Aff. at 1-2, all resulting "property damage" and "bodily injuries" that flowed from that original damage is also covered. *See Grange Mut. Cas. Col*, 946 N.E.2d at 597. The damage to the sewer lateral initiated a chain of events that resulted in Torrence immediately losing the use of her sewer system and no longer having the ability to use her toilets, shower, and tub, making her home uninhabitable. Moreover, because the damage to the sewer lateral began during the Policy, Essex owes coverage for any "continuation, change or resumption of that 'bodily injury' or 'property damage'" after the end of the Policy period. Moreover, the same ambiguous Policy language argument as outlined above applies in the context of the Torrence lawsuit. *See supra*. Any ambiguity is to be construed in favor of the insured, J&J. *See id.*

In sum, the Policy covers the damages and injuries claimed by Torrence in the Torrence lawsuit.

## IV.    Dixie Electric's Cross-Claims Against J&J in the Underlying Lawsuits Allege Common Law Indemnity for the "Property Damage" and "Bodily Injuries" that Occurred During, and are Covered by, the Essex Policy.

In the Underlying Lawsuits, Dixie Electric has asserted cross-claims for indemnity against J&J. *See* Dixie Electric Crittenden Cross-Claims (Doc. 50-1 at 27-32, 99-104). Dixie Electric has been forced to defend itself against the Underlying Lawsuits, notwithstanding J&J's actions in causing the broken sewer laterals. *See* Noblitt Depo. at 113-114. Dixie Electric has paid claims to the Andersons related to repair of the sewer lateral, repair of damage to the homes,

and lost rent. Dr. Anderson Depo. at 42-53. Through its cross-claims, Dixie Electric also seeks reimbursement for any damages that may be awarded to the Crittendens or Torrence.

Specifically, Dixie Electric is seeking a money judgment for all monies paid on any claims against Dixie for the cost to investigate the broken sewer laterals, the cost to repair the broken and damaged sewer laterals, the loss of use of property resulting from the broken and damaged sewer laterals and continuing damage, and the cost to clean up the houses at 8212 Ryan Ridge Loop and 8216 Ryan Ridge Loop, and a money judgment for all sums that may be adjudicated against Dixie in favor of the Crittendens and Torrence in the Underlying Lawsuits, as well as Dixie's attorneys' fees, costs, and expenses incurred in connection with the underlying state court litigation, including its cross-claim. *See* Dixie Electric First Amended Counterclaim; Dixie Electric Crittenden Cross-Claim.

Dixie Electric cross-claims for indemnity are covered under the Policy. The Policy covers any "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage.'" *See* Exhibit L – Policy Form CG 00 01 12 07, pg. 1. As is outlined *supra* and *infra*, the Crittendens and Torrence have alleged claims for "bodily injury" and "property damage" in the Underlying Lawsuits against Dixie Electric and J&J. Through its cross-claims, Dixie Electric seeks indemnity from J&J for that same claimed "bodily injury" and "property damage".

Moreover, the property damages of the Andersons, which have been paid and reimbursed by Dixie, are covered by the Policy. As owners of the houses at 8212 and 8216 Ryan Ridge Loop, the Andersons suffered physical property damage to their sewer laterals on November 8, 2013, within the Policy period. The Andersons also suffered damage to the interior of their rental homes caused by the sewer backup, which they paid to repair. Dixie reimbursed the Andersons

for those costs, as well as lost rent for the month of December 2013 for 8212 Ryan Ridge Loop (Crittendens' home). All of these damages are a direct result of the damage to the sewer laterals caused by J&J and thus are covered by the Policy as "property damage."

As such, any judgment on Dixie Electric's cross-claims in the Underlying Lawsuits would qualify as a "sum that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage.'" Thus, Dixie Electric's cross-claims for indemnity are covered under Coverage A of the Policy. Exhibit L - Essex Policy, Form CG 214909 99. p. 1.

## V.   Essex Cannot Meet Its Burden of Proving Applicability of the Total Pollution Exclusion

Essex bears the burden of proving the applicability of any Policy exclusion. *See Bankers Fire and Marine Ins. Co. v. Contractors Equip. Rental Co*., 276 Ala. 80, 159 So. 2d 198, 201 (Ala. 1963). Its burden is high. It is well established that exclusions "must be interpreted as narrowly as possible in order to provide maximum coverage for the insured, and must be construed most strongly against the company that drew the policy and issued it."  *See Porterfield,* 856 So. 2d at 806.

Under Alabama law, raw sewage is plainly not subject to the total pollution policy exclusion in the Policy. In *U.S. Fidelity & Guaranty Co. v. Armstrong*, 479 So. 2d 1164, 1168 (Ala. 1985), the Alabama Supreme Court found that damage caused by raw sewage was not excluded by a pollution exclusion. In *Armstrong*, during a construction project that entailed replacing the existing sanitary sewage system with new lines, the existing lines were crushed and removed and new lines were installed in the same place. *Id*. at 1166. During the construction, raw sewage flowed onto adjacent land owned by Armstrong, causing damage. *Id*.   The construction company's insurer contended that Armstrong's claim for damage was excluded by the pollution exclusion. *Id*. at 1168. The Court reiterated that the pollution exclusions was

32

"intended to cover only industrial pollution and contamination." *Id*. at 1168 (additional citation omitted). Holding that the pollution exclusion did not eliminate coverage, the Court emphasized that "[t]o deny coverage here under this clause would be to distort the plain purpose of the pollution exclusion." *Id*.

The facts of *Armstrong* are extraordinarily similar to the facts at hand. While performing construction-related work, J&J broke the sewer laterals, causing raw sewage to flow into the homes of the Crittendens and Torrence. The Crittendens and Torrence do not claim damages for "industrial pollution and contamination." Thus, similar to in *Armstrong*, "[t]o deny coverage here under this clause would be to distort the plain purpose of the pollution exclusion." *Id*.

While *Armstrong* dealt with a qualified pollution exclusion, more recent Alabama case law has also held that the rationale behind *Armstrong* applies equally to an absolute or total pollution exclusion, as contained in the Policy. In *Porterfield v. Audubon Indemnity Co.,* 856 So. 2d 789, 806 (Ala. 2002), the Alabama Supreme Court found the absolute pollution exclusion to be ambiguous and ineffective to exclude personal injury claims arising from lead paint chips in a household. The *Porterfield* Court noted the holdings of earlier cases, including *Armstrong* and *Essex v. Avondale Mills*, 639 So. 2d 1339 (Ala. 1994), which found the terms "discharge," "dispersal," "release," and "escape" to be environmental terms of art aimed at traditional environmental liabilities. *Porterfield,* 856 So. 2d at 798. The *Porterfield* Court concluded that because the insurers chose to use these same terms in its absolute pollution exclusion that had been interpreted by the Court in addressing the qualified pollution exclusion, it must be presumed to have intended the same construction given them by the Alabama Supreme Court in its earlier decisions. *Id.* at 806 (citing *Essex v. Avondale Mills*, 639 So. 2d 1339 (Ala. 1994)). The Court stated:

> Given this Court's characterization in *Essex v. Avondale Mills*, supra, of "discharge" and "dispersal" as terms commonly associated with environmental law, an insurer subsequently employing those terms can be presumed to have intended the same construction as used by the Court.

*Id.* The court in *Porterfield* went on to hold these terms were ambiguous under the policy and did not exclude coverage for personal injuries arising from flaking and pealing lead paint in a residential apartment. *Id.*

The *pertinent* language of the absolute/total pollution exclusion in the Policy is no different from the qualified pollution exclusion interpreted in *Armstrong*. The only difference in the qualified pollution exclusion here and the total pollution exclusion in the Policy is bolded below:

> 2. Exclusions
> This insurance does not apply to:
> …
> f. Pollution
>
> > 1. "bodily injury" or "property damage" **which would not have occurred in whole or part but for** the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

Exhibit L - Essex Policy, Form CG 214909 99 – "Total Pollution Exclusion Endorsement."

That language is not substantially different from the qualified pollution exclusion and, *significantly*, it does not change the fact that raw sewage is not included and does not apply to the definition of "pollutants." Raw sewage in this context, which is the same as in *Armstrong*, is not a pollutant, and thus no pollution exclusion applies. In short, the Total Pollution Exclusion does not warrant a finding of no coverage under the Policy. Accordingly, Dixie Electric is entitled to a summary judgment finding that the Total Pollution Exclusion does not apply here.

## **CONCLUSION**

There is no genuine issue of material fact and Dixie Electric is entitled to a judgment as a matter of law. Accordingly, and pursuant to *Federal Rule of Civil Procedure* 56, Dixie Electric respectfully requests that the Court grant summary judgment in its favor on its counterclaim (Doc. 50) against Essex and summary judgment in its favor as to all of Essex's claims in the complaint (Doc. 61).

Respectfully submitted this the 1st day of March, 2016.

/s/Louis M. Calligas
One of the Attorneys for Defendant
Dixie Electric Cooperative

**OF COUNSEL:**

John G. Smith (ASB-8146-T68J)
jgsmith@balch.com
Louis M. Calligas (ASB-4907-O73C)
lcalligas@balch.com
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115

1401360.12

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and service will be perfected upon any CM/ECF participants electronically on this the 1st day of March, 2016:

F. Lane Finch, Jr.
Lane.Finch@swiftcurrie.com
Brian C. Richardson
brian.richardson@swiftcurrie.com
Swift Currie McGhee and Hiers, LLP
2 North 20th Street, Suite 1405
Birmingham, AL 35203
*Attorneys for Essex Insurance Company*

Robert Simms Thompson
rstpc@aol.com
Tiffany Nichelle Johnson-Cole
tnijohnson@aol.com
Robert Simms Thompson, PC
P.O. Box 830780
Tuskegee, AL 36083
*Attorneys for the Crittendens and
Caroline Torrence*

Tyrone C. Means
tcmeans@meansgillislaw.com
H. Lewis Gillis
hlgillis@meansgillislaw.com
Kristen J. Gillis
kjgillis@meansgillislaw.com
Means Gillis Law, LLC
P.O. Box 5058
Montgomery, AL 36103
*Attorneys for the Crittendens and
Caroline Torrence*

David E. Allred
dallred@allredpclaw.com
D. Craig Allred
callred@allredpclaw.com
Allred & Allred, P.C.
7030 Fain Park Drive, Suite 9
Montgomery, Alabama 36117
*Attorneys for J&J Cable Construction, LLC*

/s/Louis M. Calligas
Of Counsel

36

1401360.12