**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| Essex Insurance Company, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 3:15-cv-506-WHA |
| | ) | |
| J&J Cable Construction, LLC, *et al*. | ) | **OPPOSED** |
|     Defendants. | ) | |
| | ) | |
| And Related Actions | ) | |

## ESSEX INSURANCE COMPANY'S OPPOSITION TO DIXIE ELECTRIC COOPERATIVE'S MOTION FOR SUMMARY JUDGMENT

Essex Insurance Company opposes Defendant/Counterclaim-Plaintiff Dixie Electric Cooperative's Motion for Summary Judgment (Docs. 83 and 92) for the following reasons and based on the evidence cited in Essex's Motion for Summary Judgment, which is incorporated by this reference. Docs. 81 and 82. More specifically:

1. Dixie Electric fails to show the Court significant legal authority to not apply the Total Pollution Exclusion.

2. Dixie Electric is not a party to the insurance agreement and lacks any standing to attempt to enforce any duties that Essex may owe the actual insured, J&J Cable Construction Company, LLC.

3. Dixie Electric fails to present substantial evidence that the bodily injury and property damages asserted separately by any of the underlying plaintiffs occurred before the policy expired.

1

# I. <u>Introduction</u>

**A.**   <u>**Questions of Law**</u>

Before the Court are two pure questions of law:

1. Does a Total Pollution Exclusion apply to bar coverage for damages caused exclusively by exposure to raw sewage containing human waste? If the Court applies the Total Pollution Exclusion to coverage here, the Court need not reach second question.

2. If reached, the second question is whether the date of occurrence is, in essence, personal to each claimant or, conversely, a date shareable among unrelated parties who suffer distinct and different bodily injury and property damage?

**B.**   <u>**Undisputed Facts**</u>

The parties are largely in agreement as to the following facts:

1.      J&J Cable broke a sewer lateral, or two, that lead to two rental homes owned by Dr. Jack and Kem Anderson.

2.      One home was rented to the Crittenden family: Marrell Crittenden, Courtney Crittenden, their two children. Each family member claims he or she was injured in separate encounters with raw sewage containing human waste. Mrs. Crittenden and her two daughters were first exposed to raw waste on November 16, 2013. They experienced no prior plumbing or sewer problems at the house. Marrell Crittenden allegedly experienced a plumbing problem sooner, but he repeatedly testified that he is just not sure when that was.

2

3.     The other home was rented to Caroline Torrence.  She simply does not know when she was first exposed to the raw sewage. However, we know her occurrence had to be after November 18, 2013; otherwise, her underlying action would be barred by the two-year statute of limitations because she filed her lawsuit on November 18, 2015.

## II. <u>Dixie Electric Has No Standing to Raise Coverage</u>

The most expedient solution to Dixie Electric's Motion for Summary Judgment is to deny it for lack of a justiciable controversy.  Dixie Electric admits it is not an insured under the Essex policy.  "Dixie admits that Essex Insurance Company ("Essex") is not obligated to defend Dixie as an additional insured under the insurance policies issued by Essex to J&J Cable …, but denies this Request for Admission to the extent that Essex is obligated to reimburse Dixie's attorneys' fees, expenses, and costs in defending the underlying Crittenden Litigation and the Torrence Litigation based on Essex's coverage obligations to J&J under the insurance policies."  Dixie Electric's Response to Request for Admission No. 1, attached to Doc. 82 as Exhibit S.  That being the case, Dixie Electric needs some other basis for its cross-claim against Essex, but it has none.

Dixie Electric simply lacks any standing to enforce any duties that Essex may owe the actual insured, J&J Cable Construction Company, LLC.  If Dixie Electric intends its claim as a direct action, it is premature:

3

> This Court has interpreted § 27–23–1 and § 27–23–2 to preclude an injured party from bringing an action against an insurer before the injured party has recovered a final judgment against the insured. Specifically, this Court in *Maness v. Alabama Farm Bureau Mutual Casualty Insurance Co.*, 416 So. 2d at 981–82, held that "the injured party ... can bring an action against the insurer only after he has recovered a judgment against the insured and only if the insured was covered against the loss or damage at the time the injured party's right of action arose against the insured tort-feasor." While the Knoxes contend they are asserting their right to a declaratory-judgment action under the Declaratory Judgment Act and the Alabama Motor Vehicle Safety–Responsibility Act, those statutes do not undermine the clear wording of § 27–23–1 and § 27–23–2, which precludes the Knoxes from asserting a direct action against Western World before a final judgment is rendered against Youngblood Trucking.

*Knox v. W. World Ins. Co*., 893 So. 2d 321, 324-25 (Ala. 2004).

Dixie Electric does not have standing to assert claims on behalf of the insured, yet it attempts to do so. The Court should deny Dixie Electric's motion and dismiss its claims against Essex.

### III.  Dixie Electric Fails to Present Evidence or Legal Authority to Defeat the Application of the Total Pollution Exclusion

There is no doubt the claims by each Crittenden and Torrence all arose from their individual exposure to human waste that initially backed up in to their rental houses on or about November 16, 2013.

As stated in Essex's Motion For Summary Judgment, the Total Pollution Exclusion provides the insurance policy "does not apply to … '[b]odily injury' or

4

'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' [i.e., 'any solid, liquid, [or] gaseous … irritant or contaminant, including … waste'] at any time."   The underlying claims all arise from the overflow of raw sewage (including human waste and feces) which each claimant encountered in November 2013. *See also* Essex's discussion in Doc. 81, pp. 9, 11, 13, and 22-27.

To avoid application of the Total Pollution Exclusion, Dixie Electric misrepresents that *U.S. Fidelity & Guaranty Co. v. Armstrong*, 479 So. 2d 1164 (Ala. 1985), holds "raw sewage is plainly not subject to the total pollution policy exclusion in the Policy."   *See* Dixie Electric's Motion for Summary Judgment, doc. 92, p. 32. What the Alabama Supreme Court really said was "We should not be understood to hold that raw sewage could never be such a 'pollutant,' or that the insurance company could not write an exclusion clause which would cover the activity here involved." *Armstrong*, 479 So. 2d at 1168.  As discussed at length in Essex's Motion for Summary Judgment, the qualified pollution exclusion in *Armstrong* is much narrower than the absolute pollution exclusion in the Essex policy.   Thus, *Armstrong*, which interpreted an entirely different pollution exclusion, does not support Dixie Electric's position.

5

Dixie Electric's reliance on *Porterfield v. Audubon Indemnity Company*, 856 So. 2d 789 (Ala. 2002), is also misplaced.  First, *Porterfield* dealt with lead paint, not sewage.  The Court determined that the pollutant exclusion did not include lead paint because "the presence of lead-paint flakes, chips, and/or dust in a residential apartment would not qualify as discharge, dispersal, release, or escape of a pollutant." *Id.* at 805 citing *Sphere Drake Ins. Co. v. Y. L. Realty Co.*, 990 F. Supp. 240 (S.D.N.Y. 1997) ("These terms do not ordinarily encompass the type of 'movement' associated with lead paint poisoning").  In other words they concluded that "'discharge,' 'dispersal,' 'release,' or 'escape' are ambiguous ***in the context of flaking and peeling lead paint*** in a residential apartment." *Id.* at 806; emphasis added.  Unlike in *Porterfield*, the sewage and human waste in the instant case undeniably "moved" by discharge and seepage; the underlying complaints even claim that "raw sewage began to and continued to seep...." *See* Crittenden Compl., ¶ 9. *See also*,  Crittenden First Am. Compl., ¶ 9, Crittenden Second Am. Compl., ¶ 10; Torrence Compl. ¶ 7.

Therefore, Dixie Electric's reliance on *Porterfield* and *Armstrong* to show that Essex's Total Pollution Exclusion is inapplicable to the instant case fails.  Raw sewage and waste is covered by the Total Pollution Exclusion and, as such, the damages arising from the raw sewage and human waste are not covered by the Essex Policy.

Furthermore, Dixie Electric fails to offer authority or even a sound rationale for why the Court should not follow the many other states which have applied total or absolute pollution exclusions to bar coverage for sewer back up damages. *See* Doc. 81, pp. 24-27.

### IV.  Individual Claims Did Not Accrue During The Policy Period

As shown in Essex's Motion for Summary Judgment at pages 13-20, each individual claim must occur during the policy period and they simply did not.

### A.    Individual Claims Must Be Considered Separately

A proper understanding of the insurance agreement is essential to enforcement of the policy. The insuring agreement provides: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  Provided, however,

> b. This insurance applies to "bodily injury" and "property damage" only if:
> ….
> (2) The "bodily injury" or "property damage" occurs during the policy period;
> ….

Exhibit V of Doc. 82, p. 1.

The insuring agreement does not create coverage, as Dixie Electric contends, for loss of use which occurs after expiration of the policy. Doc 92, p. 3 ("'property

damage' [in the form of loss of use] is 'deemed to occur' at the time the physical injury that caused it.") That is simply incorrect.

The only causes of action at issue here are the negligence/wantonness and nuisance claims. The Circuit Court granted judgment to Dixie Electric on the trespass claim in the underlying Crittenden action. It is anticipated same result will be obtained as to Torrence's trespass claim as it is a legal and factual copy of the Crittendens' trespass claim.

It is necessary to look at each individual claim of damage separately because Alabama law has long held that the date of occurrence is not when the wrongful act is committed (here, breach of the sewer lateral out in the street), "[b]ut the time when the complaining party was actually damaged." Doc. 92, p. 18, citing *Am. States Ins. Co. v. Martin*, 662 So. 2d 245, 247 (Ala. 1995). However, Dixie Electric lumps the claimants, Marrell Crittenden, Courtney Crittenden, M.C., A.C., and Caroline Torrence together and calls them "the Tenants." That tempts imprecise application of the acknowledged law that the date of occurrence is "when the complaining party was actually damaged."   That statement of law is quite important to properly apply coverage in this case.  The Court must look at when Courtney Crittenden was actually damaged, when M.C. was actually damaged, when A.C. was actually damaged, when Marrell Crittenden was actually damaged,

and when Caroline Torrence was actually damaged.  That required analysis shows each claimant's individual damages occurred after the policy expired.

Dixie Electric states "the Tenants" (referring both to the Crittendens and Torrence) "lost the use of their respective sewer laterals and sewage backed up into their homes, resulting in additional claimed property damage and personal injuries."  Doc. 92, p. 2.  That sentence structure is an attempt to assert damages not experienced by each Crittenden or by Torrence and to subtly mischaracterize how and when each of the Crittendens and Torrence were actually damaged.

Dixie Electric cites evidence that J&J Cable performed its work between November 5 and 11, 2013, but cites no evidence that between November 5 and 11 J&J Cable actually struck a sewer lateral.  In fact, it appears no one knows when the laterals were hit.  More importantly to this case, there is no evidence that anyone-not the Crittendens and not Torrence-lost use their plumbing before November 12, 2013.  Dixie Electric offers no admissible evidence that prior the expiration of the policy, any of the Crittendens experienced a plumbing problem or was exposed to raw sewage and human waste. Without that evidence, the insured fails to meet its burden of establishing that each of the five claims is covered by the policy. *See Colonial Life & Acc. Ins. Co. v. Collins*, 194 So. 2d 532, 535 (Ala. 1967).

In the end, the Court has a lot of evidence that the Crittendens were exposed to raw waste on November 16, 2013. The Court has some evidence, which is a combination of speculation, contradictory testimony, and hearsay evidence, as to when Marrell Crittenden was exposed to raw waste before November 16th. That type of "evidence" does not satisfy the insured's burden of establishing that each of the four Crittendens' claims is covered. Therefore, Dixie Electric's motion for summary judgment must be denied.

Further, coverage must be denied as to Torrence's claim because she cannot say her exposure to raw sewage was before expiration of the policy. If it was, then her underlying action is clearly barred by the statute limitations.

It is also critical to note "the Tenants" did not sue J&J Cable or Dixie Electric for damage to the sewer laterals. That damage claim belonged exclusively to the landlord, the Andersons, and those claims were settled in April 2014.  *See* Exhibit A, Release of All Claims for 8216 Ryan Ridge Loop, and Exhibit B, Release of All Claims for 8212 Ryan Ridge Loop.  In fact, the Tenants were not responsible for maintenance of the sewer laterals.  For example, on April 25, 2013, the Crittendens and Andersons entered into a Residential Rental Agreement for the property located at 8212 Ryan Ridge Loop.  *See* April 25, 2013 Residential Rental Agreement, attached hereto as Exhibit C.   According to the agreement, the Landlord, in this case the Andersons, "agrees to maintain in reasonably good and

safe working condition, all electrical, gas, plumbing, sanitary, HVAC, smoke detectors and other facilities supplied by him." Exhibit C, ¶ 11.

Faced with the reality that the Tenants were not damaged the day the sewer laterals were breached, Dixie Electric tries to piggyback the Crittendens' claims onto the property damage claim of the Andersons. However, the Crittendens' claims are legally separated and Dixie Electric offers no case law from Alabama or any other jurisdiction to justify using the date of Andersons' damage as the date of each of the Crittendens' damages. The Court should summarily reject that unsound logic.

**B.**     **Estoppel Argument Relative to Anderson and Torrence Claims**

Dixie Electric and Anderson settled the Andersons' claims for an accident which Dixie Electric and Anderson determined occurred on ***November 19, 2013***. *See* Settlement Agreements, attached as Exhibits A and B.  Dixie Electric is now estopped to unilaterally revise the settlement to select a date when insurance coverage might be available.

Torrence is estopped to claim a date of occurrence for coverage purposes which bars her underlying action. She is estopped and Dixie Electric's request for coverage for a time-barred claim is a waste of this Court's limited time and resources.

C.   **Dixie Electric's Reliance on** *Grange Mutual Casualty Company v. West Bend Mutual Insurance Company***, 946 N.E. 2d 593 (Ind. Ct. App. 2011), is misplaced**

Dixie Electric's reliance on *Grange Mutual Casualty Co. v. West Bend Mutual Insurance Co.,* 946 N.E. 2d 593 (Ind. Ct. App. 2011), is misplaced. That case is not controlling authority in Alabama; it is a decision from Indiana's intermediate appellate court based on Indiana law. It relied on a Minnesota case, *Parr v. Gonzalez*, 669 N.W. 2d 401 (Minn. Ct. App. 2003), which found that the policy was triggered because the claimant sustained property damage during the policy period, even though the damage was discovered after the policy expired. Likewise, in *Grange* the claimant suffered damage when the drain was initially fractured and ***the same claimant*** suffered further damage when the claimant's school flooded months later.

A significant distinction between *Grange* and *Parr* and this case is one claimant, the Andersons, suffered property damage, *i.e.*, a broken sewer lateral, on or about November 11, 2013.  ***Different claimants,*** Torrence and the Crittendens, suffered ***different property damage and bodily injury*** and M.C. suffered still ***different damage/injury*** (dermatitis) on or about November 16, 2013, or later.

Alabama law is clear that an occurrence takes place not when the policyholder engages in the wrongful act, but the time ***the complaining party*** was actually damaged. Here, the Crittendens and Torrence were not damaged until the

sewage overflowed into their home. The damage to the sewer laterals are not damage to Torrence's and the Crittendens' property. Thus, the subject "occurrence" began, at its earliest, when Torrence and the Crittendens themselves were damaged (*i.e.,* after sewage overflowed into their house).[1]

## D.   Objection to Dixie Electric's Narrative Statement of Undisputed Material Facts

Dixie Electric cited to Jack Anderson's deposition and Caroline Torrence's deposition as support that the rental agreements between the Andersons and Torrence, and the Andersons and the Crittendens covered the full properties, including the sewer laterals.  *See* Doc. 92, p. 6.  This statement is misleading in that it suggests that the sewer laterals were maintained and/or the responsibility of the Tenants, which is incorrect.

The rental agreements explicitly state that the "Landlord agrees to maintain in a reasonably good and safe working condition, all electrical, gas, plumbing, sanitary, HVAC, smoke detectors and other facilities supplied by him."  *See* Torrence Residential Rent Agreement, p. 3, ¶ 13, attached hereto as Exhibit D; Exhibit C, ¶ 11. There is nothing in either rental agreement which suggest that the Tenants had any ownership interest in the Andersons' real property, including the

---

[1]   See Essex's Motion for Summary Judgment for further argument and analysis on this issue. Doc. 81.

sewer laterals.  Moreover, Torrence is not qualified to testify as to the terms and conditions of the Crittenden lease.

Essex objects to Dixie Electric's reference to Marrell Crittenden's January 2016 contradictory testimony and Dixie Electric's misrepresentation that "the Crittendens" testified that sewage seepage and overflows began "no later than November 11, 2013." *See* Doc. 92, p. 6.  That assertion misrepresents the evidence.  Courtney Crittenden never testified that the sewage backup occurred before November 16, 2013.  Moreover, her only reference to any possible sewage backup before November 16th was some unspecified time earlier in the week based entirely on something Marrell told her, which is hearsay and inadmissible.

Additionally, Marrell's 2016 deposition testimony directly contradicts his prior testimony where he testified that he was unsure when he was first exposed to the sewage backup and when it first occurred.  *See* Exhibit O (Doc. 82), 25:21-25:16; Exhibit Q (Doc. 82), 46:4-46:20 of Doc. 81.  Under Alabama law, an issue of fact cannot be created by a party who testifies in a way that directly contradicts that party's prior testimony.  *Hines v. Trinity Contractors, Inc.*, 154 So. 3d 1014, 1021 (Ala. Civ. App. 2014), citing *McGough v. G & A, Inc.*, 999 So. 2d 898, 904 (Ala. Civ. App. 2007).  As such, Marrell Crittenden's contradictory January 2016 testimony, that sewage backup started on November 11, 2013, cannot create an

14

issue of material fact and should not be relied on as support for Dixie Electric's motion for summary judgment.

Essex objects to the reference to Courtney Bynum's January 2016 testimony where she testified that the overflowing first occurred approximately two weeks before the November 16, 2013 incident.  As a practical matter, assuming her 2016 testimony was not in direct contradiction to her previous testimony, it would place the sewage backup on November 2, 2013, at least six days *before* J&J Cable performed any work in the Ryan Ridge subdivision.  Thus, Courtney Bynum's testimony does not constitute substantial evidence which can support –or refute— summary judgment.

In 2014, she testified:

> Q.   And tell me what you remember happened.
> A.   That it was sewage coming up in the tub.
> Q.   Which tub?
> A.   It was in both tubs.
> Q.   On the 16th?
> A.   Yes ma'am....
> Q.   ***Now, was this the first time anything happened, on the 16th?***
> A.   ***Yes, ma'am.***

2014 Deposition of Courtney R. Bynum, pp. 42:8-43:5, attached as Exhibit E.

Essex objects to Dixie Electric's contention, which is without evidentiary support, that the Crittendens lost use of the sewer lateral that serviced their house on November 11, 2013. *See* Doc. 92, p. 9.  The Crittendens testified that they used

the showers, sinks, and tubs through November 16, 2013.  *See* Courtney

Crittenden's January 2016 Deposition, pp. 15:9-15:15, 30:3-31:15, excerpts

attached as Exhibit F; Exhibit E to this Brief, pp. 42:8-43:5.

**E.**    **The Torrence and Crittenden Complaints in the Underlying Action Do Not Allege "Bodily Injury" and "Property Damage" That Occurred during the Policy Period**

    **(1)**    **The Crittendens' Amended Complaints Do Not Allege "Property Damage" and "Bodily Injury" that Occurred During the Policy Period**

The Crittendens' original Complaint asserted that:

> ***On or about November 15, 2013 until approximately November 24, 2013, raw sewage began to and continued to seep and invade [the Crittendens'] home*** through bathroom toilets, under various walls within their dwelling place, the family living room, and various closets within the household and in hallways. The seepage of raw sewage made the home uninhabitable causing them to move, destroyed their possessions within the household and caused mental anguish, mental distress and other illnesses for the household members.

Compl., Exhibit A (Doc. 82), ¶ 9;  emphasis added.

Their Amended Complaints added the sewage line was breached on or about

November 3, 2013 until approximately November 11, 2013, and ***thereafter*** raw

sewage began to seep into their house.  Taken together, the Crittendens allege the

sewer lateral was broken between November 3 and 11 and then on or about

November 15 to about November 24, 2013, raw sewage backed into their home.

16

**(2)     The Allegations in the Torrence Complaint Does Not Trigger Essex's Duty to Defend J&J Against These Claims**

Torrence could not offer any testimony as to when the sewage backup into her home first occurred.  Exhibit N (Doc. 82), 18:16-19:2.  She does not know where the dates in paragraph 7 of her complaint come from, to wit "On or about or between November 3, 2013, until approximately sometime after November 11, 2013, the sewage line at plaintiff's home was breached."  Exhibit N (Doc. 82), 55:11-55:21.  In fact, she could not testify that the sewage line was in fact breached during that time frame.  Exhibit N (Doc. 82), 56:7-56:9, 56:13-56:18.  She testified her claim is based on:

> the pipe breaking, and it [feces; sewage with human waste in it] coming out of my toilet and my tub and my showers.  Because it's -- it's an incident.  I have not had any personal plumbing problems other than this incident as a result of this incident with them breaking the pipe.

Exhibit N (Doc. 82), 17:8-17:14.

She simply does not recall the date of the sewage overflow.  Exhibit N (Doc. 82),  18:4-18:21, 40:16-21, and 41:5-41:11. She does not recall when the pipe was broken.  Exhibit N (Doc. 82), 18:12-18:15. Prior to the sewage overflow, Torrence had no problems with the plumbing system at all.  Exhibit N (Doc. 82), 73:14-73:19.

Furthermore, any negligence or nuisance claims asserted by Torrence for damage occurring before November 18, 2013, are barred by the two-year statute of limitations.  *See* ALA. CODE § 6-2-38 (1975).

**F.      Mental Anguish Damages are Not Available for a Tenant Arising from Damage to the Tenant's Leased Property**

The Crittendens and Torrence are not entitled to mental anguish damages for property damage to the Andersons' real property.  They are tenants, not homeowners.  Dixie Electric cites *Keck v. Dryvit Sys.*, 830 So. 2d 1 (Ala. 2002), to suggest that the Crittendens and Torrence are entitled to mental anguish damages arising from damages to the Andersons' home.  However, this is not the case.  In *Keck*, the plaintiffs owned the home that was damaged.[2]  They were not tenants as in this case.      Under Alabama law, mental anguish damages are simply not available for a tenant arising from damage to its landlord's real property.

**G.      Applying the Unambiguous Essex Policy Language as Written Does Not Lead to Absurd Results**

Dixie Electric cites *Tarrant Regional Water Dist. v. Herrmann*, 133 S. Ct. 2120 (2013), as support for its argument that interpreting Essex's policy as written would lead to absurd results.  It is unclear how *Herrmann* is even slightly applicable to the instant case.  *Herrmann* involves the Red River Compact which allocates water rights within the Red River Basin and impacts Oklahoma, Texas,

---

[2] Moreover, Dixie Electric cited to the dissenting opinion in a completely inapplicable case dealing with construction defects and warranty issues.

Arkansas, and Louisiana. 133  S. Ct. at 2125-26.[3]  This case does not involve Alabama or anything related to the interpretation of an insurance policy.

Dixie Electric argues the policy is ambiguous, but did not articulate the ambiguity. The relevant policy language has been addressed in decisions under Alabama law without a finding the language is ambiguous (except in the case of flaking lead paint).

Dixie Electric asserts that because the sewer lateral was damaged by J&J Cable while the policy was in effect, any subsequent damage is covered -- even if it (*i.e*., Torrence's and the Crittendens' damage) occurred after the policy expired. The insuring agreement covers bodily injury/property damage "which occurs during the policy period ..., includ[ing] any continuation, change or resumption of ***that*** 'bodily injury' or 'property damage' after the end of the policy period." Emphasis added.

Dixie Electric ignores the role of the word "that" in paragraph c.  "That" is used as a demonstrative adjective to indicate which continuing bodily injury/property damage is covered.  Use of the adjective "that" indicates only bodily injury/property damage "which [first] occurs during the policy" is covered.  Thus, bodily injury/property damage beginning during the policy period is covered

---

[3] Tarrant filed a federal lawsuit, at the same time it filed the permit application, seeking to enjoin the Oklahoma Water Resources Board's enforcement of the state statute on the grounds that it was pre-empted by federal law in the form of the Compact and violated the commerce clause by discriminating against the interstate commerce of water.  *Id.* at 2128-29.

even if "that" bodily injury/property damage continues, changes, or resumes post-expiration.  Implicit is the bodily injury/property damage for which coverage is sought must commence during the policy period.

Here, the Crittendens' and Torrence's bodily injury/property damage did not commence during the policy period.  The only property damage that occurred during the policy period was the broken sewer lateral.  The Crittendens and Torrence did not make a claim for that property damage.  Their claim is for separate and distinct bodily injury/property damage they claim first occurred on November 16, 2013.

## CONCLUSION

WHEREFORE, Essex respectfully requests that this Honorable Court deny Dixie Electric Cooperative's Motion for Partial Summary Judgment; and grant Essex any other relief that the Court deems just and equitable on the grounds that Dixie Electric failed to show significant legal authority not to apply the pollution exclusion; Dixie Electric lacks standing to enforce any duties Essex may owe to J&J Cable Construction, LLC; and Dixie Electric lacks substantial evidence that any plaintiff in the underlying state court actions (Marrell Crittenden, Courtney Crittenden, their minor children, and Caroline Torrence) suffered any property damage or bodily injury during the policy period.

RESPECTFULLY SUBMITTED,

DATED:  March 23, 2016      /s/  Lane Finch
                                            F. LANE FINCH, JR.
                                            (ASB-0027-I58F)
                                            BRIAN C. RICHARDSON
                                            (ASB-5241-H14U)
                                            Attorneys for Essex Insurance Co.

**OF COUNSEL:**
SWIFT, CURRIE, McGHEE & HIERS, LLP
2 North 20th Street, Suite 1405
Birmingham, AL 35203
(205) 314-2401
lane.finch@swiftcurrie.com
brian.richardson@swiftcurrie.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 23, 2016, I have served the foregoing by electronic filing through the Court's CM/ECF system the following attorneys of record:

John G. Smith
Louis M. Calligas
BALCH & BINGHAM, LLP
P. O. Box 78
Montgomery, AL 36101-0078

Tyrone C. Means
H. Lewis Gillis
MEANS GILLIS LAW, LLC
P. O. Box 5058
Montgomery, AL 36103

Robert Simms Thompson
Tiffany N. Johnson
THE LAW OFFICES OF ROBERT
SIMMS THOMPSON, PC
P. O. Box 830780
Tuskegee, AL 36083

David E. Allred
D. Craig Allred
ALLRED & ALLRED, PC
7030 Fain Park Drive, Suite 9
Montgomery, AL 36117


*/s/  Lane Finch*_____
Of Counsel

# EXHIBIT A

Claim Number 01GC104536

## RELEASE OF ALL CLAIMS

### KNOW ALL MEN BY THESE PRESENTS:

That the undersigned, being of lawful age and authority, for sole consideration of Four Thousand Two Hundred Fifteen Dollars 74/100 ($4,215.74) to be paid to Jack Anderson do/does hereby and for my/our its heirs, executors, administrators, successors and assigns release, acquit and forever discharge Dixie Electric Cooperative, Federated Rural Electric Insurance Exchange and his, her, their or its agents servants, successors, heirs, executors, administrators and all other persons, firms, corporations, associations or partnerships of and from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever, which the undersigned now has/have or which may hereafter accrue on account of or in any way growing out of any and all known and unknown foreseen and unforeseen bodily and personal injuries and property damage and the consequences thereof resulting or to result from the accident, casualty or event which occurred on or about the 19th day of November, 2013 at, or near #216 Ryan Ridge Loop, Montgomery, AL.

It is understood and agreed that this settlement is the compromise of a doubtful and disputed claim, and the payment made is not to be construed as an admission of liability on the part of the party or parties hereby released, and that said releases deny liability therefore and intend merely to avoid litigation and buy their peace.
The undersigned hereby declares and represents that the injuries sustained are or may be permanent and progressive and that recovery therefore is uncertain and indefinite and in making this Release it is understood and agreed that the undersigned relies wholly upon the undersigned's judgment, belief and knowledge of the nature, extent, effect and duration of said injuries and liability therefore and is made without reliance upon any statement or representation of the party or parties hereby released or their representatives or by any physician or surgeon by them employed.
The undersigned further declares and represents that no promise, inducement or agreement not herein expressed has been made to the undersigned, and that this Release contains the entire agreement between the parties hereto, and that the terms of this Release are contractual and not a mere recital.

THE UNDERSIGNED HAS READ THE FOREGOING RELEASE AND FULLY UNDERSTANDS IT.

Signed, sealed and delivered this ___ day of _____, 2014

CAUTION: READ BEFORE SIGNING BELOW

x _____
Claimant Jack Anderson

State of Alabama

County of Montgomery

On this 3rd day of April 5, 2014, before me personally appeared

Jack Anderson known to be the person (s) named herein and who executed the foregoing Release and he/she/they acknowledges to me that he/she/they voluntarily executed the same.

_____
Notary Public

My term expires 05/27/2015

PLAINTIFF'S EXHIBIT 5

# EXHIBIT B

Claim Number 01GC104536

## RELEASE OF ALL CLAIMS

PLAINTIFF'S
EXHIBIT

### KNOW ALL MEN BY THESE PRESENTS:

That the undersigned, being of lawful age and authority, for sole consideration of Eight Thousand Three Hundred Twenty Two Dollars 24/100 ($8,322.24) to be paid to Jack Anderson do/does hereby and for my/our its heirs, executors, administrators, successors and assigns release, acquit and forever discharge Dixie Electric Cooperative, Federated Rural Electric Insurance Exchange and his, her, their or its agents servants, successors, heirs, executors, administrators and all other persons, firms, corporations, associations or partnerships of and from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever, which the undersigned now has/have or which may hereafter accrue on account of or in any way growing out of any and all known and unknown foreseen and unforeseen bodily and personal injuries and property damage and the consequences thereof resulting or to result from the accident, casualty or event which occurred on or about the 19th day of November, 2013 at, or near 8212 Ryan Ridge Loop, Montgomery, AL.

It is understood and agreed that this settlement is the compromise of a doubtful and disputed claim, and the payment made is not to be construed as an admission of liability on the part of the party or parties hereby released, and that said releases deny liability therefore and intend merely to avoid litigation and buy their peace.
The undersigned hereby declares and represents that the injuries sustained are or may be permanent and progressive and that recovery therefore is uncertain and indefinite and in making this Release it is understood and agreed that the undersigned relies wholly upon the undersigned's judgment, belief and knowledge of the nature, extent, effect and duration of said injuries and liability therefore and is made without reliance upon any statement or representation of the party or parties hereby released or their representatives or by any physician or surgeon by them employed.
The undersigned further declares and represents that no promise, inducement or agreement not herein expressed has been made to the undersigned, and that this Release contains the entire agreement between the parties hereto, and that the terms of this Release are contractual and not a mere recital.

THE UNDERSIGNED HAS READ THE FOREGOING RELEASE AND FULLY UNDERSTANDS IT.

Signed, sealed and delivered this ___3rd___ day of __April__ , 2014

CAUTION: READ BEFORE SIGNING BELOW

x _____
            Claimant Jack Anderson

State of __Alabama__

County of __Montgomery__

On this __3d__ day of __April__ , 2014, before me personally appeared

__Jack Anderson__ known to be the person (s) named herein and who executed the foregoing Release and he/she/they acknowledges to me that he/she/they voluntarily executed the same.

_____
Notary Public

My term expires __05/27/2015__

Anderson 000003

# EXHIBIT C

**RESIDENTIAL RENTAL AGREEMENT**

State of ALABAMA
County of Montgomery
Property Address: _8212 Ryan Ridge Loop, Montg. AL 36117_
Tenant: _Courtney Bynum /cosigned with mother: Marie Bynum_

This rental agreement made within Montgomery, ALABAMA, on this _25th_ day
of _April_____, _2013_, by and between Tenant(s) (hereinafter called
"TENANT"), and Owner (hereinafter called "Landlord"), shall provide as follows:

1. LOCATION: The Landlord hereby rents to the Tenant and the Tenant hereby rents
from the Landlord a parcel of property located in the county of Montgomery, State
of ALABAMA which parcel of land with improvements will constitute the premises.
Said parcel of land is more particularly described as follows:

2. TERMS: This Rental Agreement shall commence on the _25th_ day of
_April, 2013_, and end on the _25th_ day of _April, 2014_. Tenant
covenants that upon the termination of this Rental Agreement, or any extension
thereof that Tenant will quietly and peaceably deliver up possession of the premises
in good order and condition, reasonable wear and tear expected, free of Tenant's
personal property, garbage and other waste, and return all keys to the Landlord.

3. RENTAL APPLICATION: The Tenant acknowledges that the Landlord has relied
upon the rental application, a copy of which is attached hereto, as an inducement for
entering into this agreement, and the Tenant warrants to the Landlord that the facts
stated in the application are true to the best of Tenant's knowledge. If any facts
stated in the rental application prove to be untrue, the Landlord shall have the right
to terminate the residency immediately and to collect from the Tenant any damages
resulting therefrom.

4. RENT: Tenant agrees to pay Landlord a rent of $ _975.00_ per month, payable in
advance on or before the first day of every month during said term for a total rent of
$ _11,700.00_. The rent is payable to : _Jack (or Ken) Anderson_. Tenant agrees
that failure to pay rent pursuant to the terms hereof is a wilful violation of this
Rental Agreement.
Tenant further agrees to pay a late fee of $ _10_ per day if rent is paid after the
5th day of the month. This fee accrues daily and is retroactive to the 1st day of the
month. So, for example, if the rent is paid on the 6th of the month a minimum late
charge of $60 would be due. Where the term of the Rental Agreement commences or
terminates on a day of the month other than the first, the amount paid to Landlord
by Tenant for the portion of the month where rent is due shall be figured based on a
daily rate which is calculated based on the monthly rate.

5. OCCUPANTS: Only persons designated in the rental agreement or as further
modified or agreed to in writing by Landlord shall reside in the rented premises. For
purposes of this rental agreement, the designated occupants are:
✱ ▓▓▓▓▓▓▓▓▓

6. SUBLEASE: Tenant shall not assign or sublet said premises, or any part thereof
without the written consent of the Landlord. Tenant must have written permission
from Landlord for guests to occupy the premises for more than 14 days.

✱ There are some DARK spots on carpet
and clorox in the front bedroom

DEFENDANT'S
EXHIBIT
7

Essex01020

7. RENEWAL TERMS: With thirty days written notice, either party may terminate this agreement at the end of the initial term, but if no notice is given, the agreement will be extended on a month to month basis on the same terms and conditions contained in this agreement. Thirty days written notice by either party is required prior to termination during such month to month term.

8. RETURNED CHECKS:  Tenant agrees to pay $50 for each dishonored check for bookkeeping costs and handling charges, plus late charges if the check is not made good before the sixth day after the due date. All future rent and charges, if more than one check is returned, shall be paid in the form of cash, cashier's check or money order. If any check for the security deposit or the first month's rent is returned for insufficient funds, Landlord may declare this rental agreement void and immediately terminated.

9. UTILITIES AND SERVICE:  Tenant agrees to pay for utilities and services. In the event of Tenant default on payment of utilities, Landlord may pay and charge Tenant as additional rent together with any penalties, charges and interest. Tenant shall be liable for any inspections required by local authorities/utility companies due to Tenant's failure to obtain service at time of occupancy or to maintain said service during the term of this agreement. Tenant shall pay all cost of hook-ups and connection fees and security deposits in connection with providing utilities to premises during the term of the Lease.

10. TENANT OBLIGATIONS: Tenant agrees to comply with the provisions of  35-9A-301, Code of Alabama 1975, and to keep the dwelling unit and all parts of the premises that he leases safe and clean. In the case of a single-family house or duplex, Tenant shall keep the yard mowed, watered and free of fire ants, keep the roof and gutters free of debris, the shrubs neatly trimmed, and landscaping maintained. Tenant agrees to comply with the lease and rules and regulations the Landlord may adopt concerning the Tenants' use and occupancy of the premises.
        Tenant or any member of Tenant's family, guest or other person under the Tenant's control, shall conduct themselves in a manner that will not disturb other Tenants' and neighbors' peaceful enjoyment of the premises. Tenant, or any member of Tenant's family, guest or other person under the Tenant's control, shall not engage in or facilitate criminal or drug related activities. Any such violation constitutes substantial violation of the Lease and a material noncompliance with the Lease and is grounds for termination of tenancy and eviction from the premises.
        It is specifically understood that Tenant will, at Tenant's expense keep sinks, lavatories, and commodes open reporting any initial problem within five (5) days of occupancy, repair any and all damages caused by tenancy and replace any burned out light bulbs. Tenant agrees to report to Landlord any malfunction of or damage to electrical, plumbing, HVAC systems, smoke detectors, and any occurrence that may cause damage to the property. Tenant also agrees to pay for the cost to all repairs made necessary by negligence or careless use of the premises and pay for repairs and loss resulting from theft, malicious mischief or vandalism by Tenant and their guests. Tenant agrees to provide copies to Landlord of any inspection report or repair estimates the Tenant may obtain.
        Tenant agrees to be responsible for and to make at Tenant's expense all routine maintenance including but not limited to stoppage of sewer because of misuse or broken water pipes/fixtures due to neglect or carelessness of Tenant. No repairs, alterations or changes in or to said premises or the fixtures or appliances contained therein, shall be made except after written consent of Landlord, and shall be the responsibility of the Tenant for the cost of restoring said premises to their

Essex01021

original condition if Tenant makes any such unauthorized modifications. NO REPAIR COSTS SHALL BE DEDUCTED FROM RENT BY TENANT. All improvements made by Tenant to the said premises shall become the property of the Landlord. Locks/deadbolts shall not be changed without the expressed permission of the Landlord.

Tenant is directly responsible for any damage caused by Tenant's appliances and/or furniture. Tenant is responsible for changing HVAC filters, reporting any water leaks, lighting pilot lights, checking for tripped breakers, changing smoke detector batteries and minor housekeeping repairs. Tenants will be held liable for damage to HVAC systems caused by dirty or missing filters and damages resulting from unreported problems. Tenant acknowledges that Tenant has inspected the premises and agrees that the premises and any common area are in safe and habitable condition. Tenant acknowledges receipt of instructions of smoke detector operation.

**11. MAINTENANCE OF PREMISES:** Landlord agree to make repairs and do what is necessary to keep the premises in a fit and habitable condition as specified in ht e Alabama Uniform Residential Landlord and Tenant Act. The Landlord further agrees to maintain in reasonably good and safe working condition, all electrical, gas, plumbing, sanitary, HVAC, smoke detectors and other facilities supplied by him. Landlord is not responsible for changing batteries in smoke detectors.

**12. INSURANCE:** Tenant shall be responsible for insuring his/her own possessions against fire and other catastrophes.

**13. RIGHT TO ACCESS:** The Tenant shall not unreasonably withhold consent to the Landlord to enter into the dwelling unit in order to inspect the premises; make necessary or agreed repairs, decorations, alterations, or improvements; supply necessary or agreed services; or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workmen, or contractors. The Landlord or Landlord's agent may enter the dwelling unit without consent of the Tenant in case of emergency.

The Landlord shall not abuse the right of access or use it to harass the Tenant. Except in cases of emergency or unless it is impracticable to do so, Landlord shall give Tenant at least 2 days notice of the Landlord's intent to enter and may enter only at reasonable times. Posting on the primary door of entry to the residence of the Tenant stating the intended time and purpose of the entry shall be a permitted method of notice for the purpose of the Landlord's right of access to the premises.

The Landlord has not other right of access except: pursuant to court order, as permitted by the Alabama Uniform Residential Landlord and Tenant Act when accompanied by a law enforcement officer at reasonable times for the purpose of service of precess in eviction proceedings, or unless the Tenant has abandoned or surrendered the premises, or as otherwise allowed by law.

**14. DESTRUCTION OR DAMAGE TO PREMISES:** If the dwelling unit or premises are damaged or destroyed by fire or casualty to the extent that normal use and occupancy of the dwelling unit is substantially impaired, the Tenant may:

(a) immediately vacate the premises and notify the Landlord in writing within fourteen days thereafter of Tenant's intention to terminate the rental agreement, in which case the rental agreement terminates as of the date of vacating; or
(b) if continued occupancy is lawful, vacate any part of the dwelling unit rendered unusable by the fire or casualty, in which case the Tenant's liability for rent is reduced in proportion to the diminution in the fair-marked rental value of the dwelling unit.

Essex01022

a damaged item, or cleaning and the Tenant fails to comply as promptly as conditions require in case of emergency, or within fourteen (14) days after written notice by the Landlord specifying the breach and requesting that the Tenant remedy it within that period of time, the Landlord may enter the dwelling unit and cause the work to be done in a workmanlike manner and shall in addition have the remedies available under the Alabama Uniform Residential Landlord Tenant Act.

If there is noncompliance by the Tenant with Paragraph 10 above materially affecting health and safety other than as set forth in the preceding paragraph, and the Tenant fails to comply as promptly as conditions require in the case of emergency, or within (14) days after written notice by the Landlord if it is not an emergency, specifying the breach and requesting that the Tenant remedy within that period of time, the Landlord may terminate the rental agreement. If the rental agreement is terminated, the Landlord has a right to possession and for rent and a separate claim for actual damages for breach of the rental agreement. Any claim not satisfied by Tenant may be turned in to the credit bureau or collection agency. Except as prohibited by applicable law, a Landlord may recover actual damages and obtain injunctive relief for noncompliance by the Tenant with rental agreement of the obligations of the Tenant under §35-9A-301 Code of Alabama.

18. REMEDY AFTER TERMINATION: If the rental agreement is terminated, the Landlord has a right to possession, for rent, and a separate claim for actual damages for breach of the rental agreement and court cost

19. NOTICE: A Landlord receives notice when it is delivered at the place of business of the Landlord through which the rental agreement was made (see paragraph 28) or at any place held out by Landlord as the place of receipt of the communication.

20. PROHIBITIVE EQUIPMENT/FURNITURE: Tenant agrees not to place antennas, satellite dishes, waterbeds, and auxiliary heaters without written permission form Landlord.

21. PETS: Tenant shall not keep domestic or other animals on or about the premises without the PRIOR WRITTEN CONSENT of the Landlord. Landlord, and Landlord's sole discretion, may consent if Tenant makes the following payments:
(a) a non-refundable fee of $__500__ and
(b) a refundable deposit for the pet(s) in the total amount of $_____ , for the term of
this agreement.  Tenant shall be responsible for the animal, its behavior, and any damage done by the animal. The Landlord shall have the right to withdraw consent and demand removal of any previously permitted animal upon the first complaint registered against such animal or upon evidence of injury or damage to person or property caused by the animal.

22. WAIVER: A Tenant is considered to have waived violation of a Landlord's duty to maintain the premises as set forth by the Rental Agreement or violation of the Landlord's duties under the Alabama Residential Landlord and Tenant Act, as defense in an action for possession based upon nonpayment of rent, or in an action for rent concerning a period where Landlord has no notice of the violation of the duties, fourteen (14) days before rent is due for violations involving services other than essential services, or the Landlord has no notice before rent is due which provides a reasonable opportunity to make emergency repairs necessary for the provision of essential services. No modification, change, or cancellation hereof shall be valid unless in writing and executed by all parties hereto. No representation or promise has been made by either party hereto except as herein stated.

Essex01023

# EXHIBIT D

*8216 Ryan Ridge*

**Residential Rental Agreement**

State of ALABAMA

County of *Montgomery*

*Tim Halstrom for Caroline Torrence*

This rental agreement made at *Montgomery*, ALABAMA, on this 5th day of *August*, *2011*, by and between Tenant(s) (hereinafter called "TENANT"), and Owner (hereinafter called "LANDLORD"), shall provide as follows:

1. This Rental Agreement is governed by the provisions of the Alabama Uniform Residential Landlord and Tenant Act of 2006.

2. LOCATION: The Landlord hereby rents to the Tenant and the Tenant hereby rents from the Landlord a parcel of property located in the county of *Montg.*, State of ALABAMA which parcel of land with improvements will constitute the premises. Said parcel of land is more particularly described as follows: *8216 Ryan Ridge Loop, Montgomery, AL 36117*

3. TERMS: This Rental Agreement shall commence on the 5th day of *Aug. 2011*, and end on the 5th day of *Aug. 2012*. Tenant covenants that upon the termination of this Rental Agreement, or any extension thereof that Tenant will quietly and peaceably deliver up possession of the premises in good order and condition, reasonable wear and tear expected, free of Tenant's personal property, garbage and other waste, and return all keys to the Landlord.

4. LEAD-BASED PAINT DISCLOSURE FOR MOST RESIDENTIAL PROPERTIES BUILT BEFORE 1978: See Lead-based Paint Disclosure Addendum attached (only applies to most rental properties built before 1978.)

5. RENTAL APPLICATION: The Tenant acknowledges that the Landlord has relied upon the rental application, a copy of which is attached hereto, as an inducement for entering into this agreement, and the Tenant warrants to the Landlord that the facts stated in the application are true to the best of Tenant's knowledge. If any facts stated in the rental application prove to be untrue, the Landlord shall have the right to terminate the residency immediately and to collect from the Tenant any damages resulting therefrom.

6. RENT: Tenant agrees to pay Landlord a rent of $ *975.00* per month, payable in advance, on or before the first day of every month during said term for a total rent of $ *11,700*. The rent is payable to: *Jack Anderson* or as Tenant may be advised from time to time in writing. Tenant agrees that failure to pay rent pursuant to the terms hereof is a willful violation of this Rental Agreement.

Tenant further agrees to pay a late fee of $ *5* per day if rent is paid after the 5th day of the month, and an additional fee of $———after the———day of the month, Where the term of the Rental

*see item #41 for full explanation of late fee agreement.* (jtn)

00106681

Agreement commences or terminates on a day other than the first day of the month, Tenant shall pay rent unto the Landlord in the amount of $31.50 per day for each day of the month of commencement or termination of the Rental Agreement, payable prior to the Tenant taking possession upon commencement of the Rental Agreement, and payable on the first day of the final month of the Rental Agreement upon termination.

7. OCCUPANTS: Only persons designated in the rental agreement or as further modified or agreed to in writing by Landlord shall reside in the rented premises. For purposes of this rental agreement the designated occupants are:

In no event shall more than ___4___ persons be allowed to occupy said premises.

8. RETURNED CHECKS: Tenant agrees to pay $ 50.00 for each dishonored check for bookkeeping costs and handling charges, plus late charges if the check is not made good before the sixth day after the due date. All future rent and charges, if more than one check is returned, shall be paid in the form of cash, cashier's checks, certified check or money order. If any check for the security deposit or the first month's rent is returned for insufficient funds, Landlord may declare this rental agreement void and immediately terminated.

9. RENEWAL TERMS: With thirty (30) days written notice, either party may terminate this agreement at the end of the initial term, but if no notice is given, the agreement will be extended on a month-to-month basis on the same terms and conditions contained in this agreement. Thirty (30) days written notice by either party is required prior to termination during such month-to-month term.

10. SUBLEASE: Tenant shall not assign or sublet said premises, or any part thereof without the written consent of Landlord. Tenant must have written permission from Landlord for guest to occupy the premises for more than _30_ days.

11. UTILITIES AND SERVICES: Tenant agrees to pay for utilities and services except: _____ which will be paid by Landlord. In the event of Tenant default on payment of utilities Landlord may pay and charge Tenant as additional rent together with any penalties, charges and interest. Tenant shall be liable for any inspections required by local authorities/utility companies due to Tenant's failure to obtain service at time of occupancy or to maintain said service during the term of this agreement. Tenant shall pay all cost of hook-ups and connection fees and security deposits in connection with providing utilities to premises during the term of the Lease.

12. TENANT OBLIGATIONS: Tenant agrees to comply with the provisions of §35-9A-301, Code of Alabama 1975, and to keep the dwelling unit and all parts of the premises that he leases safe and clean. In the case of a single-family house or duplex, Tenant shall keep the yard mowed, watered

00106681

and free of fire ants, keep the roof and gutters free of debris, the shrubs neatly trimmed, and landscaping maintained. Tenant agrees to be responsible for removal of Tenant's contagious and other hazardous materials. Tenant agrees to comply with the lease and rules and regulations the Landlord may adopt concerning the Tenants' use and occupancy of the premises;

Tenant, or any member of Tenant's family, guest or other person under the Tenant's control, shall conduct themselves in a manner that will not disturb other Tenants' and neighbors' peaceful enjoyment of the premises. Tenant, or any member of Tenant's family, guest or other person under the Tenant's control, shall not engage in or facilitate criminal or drug related activities. Any such violation constitutes a substantial violation of the Lease and a material noncompliance with the Lease and is grounds for termination of tenancy and eviction from the premises.

It is specifically understood that Tenant will, at Tenant's expense, keep sinks, lavatories, and commodes open, reporting any initial problem within five (5) days of occupancy, repair any and all damages caused by tenancy and replace any burned out light bulbs. Tenant agrees to report to Landlord any malfunction of or damage to electrical, plumbing, HVAC systems, smoke detectors, and any occurrence that may cause damage to the property. Tenant also agrees to pay for the cost of all repairs made necessary by negligence or careless use of the premises and pay for repairs and loss resulting from theft, malicious mischief or vandalism by Tenant and their guests. Tenant agrees to provide copies to Landlord of any inspection reports or repair estimates the Tenant may obtain.

Tenant agrees to be responsible for and to make at Tenant's expense all routine maintenance, including but not limited to, stoppage of sewer because of misuse or broken water pipes/fixtures due to neglect or carelessness of Tenant. No repairs, alterations or changes in or to said premises or the fixtures or appliances contained therein, shall be made except after written consent of Landlord, and shall be the responsibility of the Tenant for the cost of restoring said premises to their original condition if Tenant makes any such unauthorized modifications. NO REPAIR COSTS SHALL BE DEDUCTED FROM RENT BY TENANT. All improvements made by Tenant to the said premises shall become the property of the Landlord. locks/deadbolts shall not be changed without the expressed permission of the Landlord.

Tenant is directly responsible for any damage caused by Tenant's appliances and/or furniture. Tenant is responsible for changing HVAC filters, reporting any water leaks, lighting pilot lights, checking for tripped breakers, changing smoke detector batteries and minor housekeeping repairs. Tenants will be held liable for damage to HVAC systems caused by dirty or missing filters and damages resulting from unreported problems. Tenant acknowledges that Tenant has inspected the premises and agrees that the premises and any common areas are in safe and habitable condition. Tenant acknowledges receipt of instructions of smoke detector operation.

13. MAINTENANCE OF PREMISES: Landlord agrees to make repairs and do what is necessary to keep the premises in a fit and habitable condition as specified in the Alabama Uniform Residential Landlord and Tenant Act. The Landlord further agrees to maintain in reasonably good and safe working condition, all electrical, gas, plumbing, sanitary, HVAC, smoke detectors and other facilities supplied by him. Landlord is not responsible for changing batteries in smoke detectors.

00106681

14. ESSENTIAL SERVICES AND APPLIANCES: The Landlord is required to provide essential services; meaning sanitary plumbing or sewer services; electricity; gas, where it is used for heat, hot water, or cooking, running water, and reasonable amounts of hot water and heat. except where the building that includes the dwelling unit is not required by law to be equipped for that purpose, or the dwelling unit is so constructed that heat or hot water is generated by an installation within the exclusive control of the Tenant and supplied by a direct public utility connection. The following appliances present in the dwelling unit are specifically included by this rental agreement as being deemed to be supplied by the Landlord: Ø stove, Ø refrigerator, Ø dishwasher, Ø disposal, O washer, O dryer, Ø microwave, O trash compactor, O other:

15. INSURANCE: Tenant shall be responsible for insuring his/her own possessions against fire and other catastrophes.

16. RIGHT TO ACCESS: The Tenant shall not unreasonably withhold consent to the Landlord to enter into the dwelling unit in order to inspect the premises; make necessary or agreed repairs, decorations, alterations, or improvements; supply necessary or agreed services; or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workmen, or contractors. The Landlord or Landlord's agent may enter the dwelling unit without consent of the Tenant in case of emergency.

The Landlord shall not abuse the right of access or use it to harass the Tenant. Except in cases of emergency or unless it is impracticable to do so, Landlord shall give Tenant at least 2 days notice of the Landlord's intent to enter and may enter only at reasonable times. Posting on the primary door of entry to the residence of the Tenant stating the intended time and purpose of the entry shall be a permitted method of notice for the purpose of the Landlord's right of access to the premises.

The Landlord has no other right of access except: pursuant to court order, as permitted by the Alabama Uniform Residential Landlord and Tenant Act when accompanied by a law enforcement officer at reasonable times for the purpose of service of process in eviction proceedings, or unless the Tenant has abandoned or surrendered the premises, or as otherwise allowed by law.

17. MILITARY CLAUSE: If the Tenant is a member of the Armed Forces of the United States, stationed in the _____ area, and shall receive permanent change of station orders out of the _____ area, Tenant may, upon presentation of a copy of said orders of transfer to the Landlord, along with thirty (30) days written notice of intent to vacate and payment of all rent to the expiration date of such written notice, and any miscellaneous charges in arrears, terminate that Rental Agreement. Normal enlistment termination or other type discharge from Armed Forces, unless due to conditions beyond the service member's control, or acceptance of government quarters is not a permanent change of station and is not justification for lease termination. Withholding knowledge of pending transfer or discharge at time of entry into this Rental Agreement voids any consideration or protection offered by this section.

18. DESTRUCTION OR DAMAGE TO PREMISES: If the dwelling unit or premises are damaged or destroyed by fire or casualty to the extent that normal use and occupancy of the dwelling

00106681

unit is substantially impaired, the Tenant may:

(a) immediately vacate the premises and notify the Landlord in writing within fourteen days thereafter of Tenant's intention to terminate the rental agreement, in which case the rental agreement terminates as of the date of vacating; or

(b) if continued occupancy is lawful, vacate any part of the dwelling unit rendered unusable by the fire or casualty, in which case the Tenant's liability for rent is reduced in proportion to the diminution in the fair-marked rental value of the dwelling unit.

Unless the fire or casualty was due to the Tenant's negligence or otherwise caused by the Tenant, if the rental agreement is terminated, the Landlord shall return security deposit to the Tenant with proper accounting as required by law. Accounting for rent in the event of termination or apportionment must be made as of the date of the fire or casualty. The Landlord shall withhold the Tenant's security deposit if the fire or casualty was due to the Tenant's negligence or otherwise caused by the Tenant, with proper accounting as required by law.

19. CONDEMNATION: Tenant hereby waives any injury, loss or damage, or claim therefore against Landlord resulting from any exercise of a power of eminent domain of all or any part of the rented premises or surrounding grounds of which they are a part. All awards of the condemning authority for the taking of land, parking areas, or buildings shall belong exclusively to the Landlord. In the event substantially all of the rented premises shall be taken, this Rental Agreement shall terminate as of the date the right to possession vested in the condemning authority and rent shall be apportioned as of that date. In the event any part of the property and/or buildings of which the rented premises are a part (whether or not the rented premises shall be affected) shall be taken as a result of the exercise of a power of eminent domain, and the remainder shall not, in the opinion of the Landlord, constitute an economically feasible operating unit, Landlord may, by written notice to Tenant given within sixty (60) days after the date of taking, terminate this Rental Agreement as of a date set out in the notice not earlier than thirty (30) days after the date of the notice; rent shall be apportioned as of termination date.

20. ABSENCE, NON-USE AND ABANDONMENT: The unexplained absence of a Tenant from a dwelling unit for a period of 15 days after default in the payment of rent must be construed as abandonment of the dwelling unit. If the Tenant abandons the dwelling unit for a term beginning before the expiration of the rental agreement, it terminates as of the date of the new tenancy, subject to the other Landlord's remedies. If the Landlord fails to use reasonable efforts to rent the dwelling unit at a fair rental or if the Landlord accepts the abandonment as a surrender, the rental agreement is considered to be terminated by the Landlord as of the date the Landlord has notice of the abandonment. When a dwelling unit has been abandoned or the rental agreement has come to an end and the Tenant has removed a substantial portion of personal property or voluntarily and permanently terminated the utilities and has left personal property in the dwelling unit or on the premises, the Landlord may enter the dwelling unit, using forcible entry if required, and dispose of the property.

21. SECURITY DEPOSIT: Tenant agrees to deposit with Landlord a security deposit of $ 975⁰⁰

00106681

*(to be paid over the 1st 3 months.)* to be held as security for the full and faithful performance by the Tenant of all terms and conditions herein, it being understood and agreed to that no part of this deposit is to be applied to any rent which may become due under this rental agreement. Upon termination of the tenancy, property or money held by the Landlord as security may be applied to the payment of accrued rent and the amount of loss of rents or damages which the Landlord has suffered by reason of the Tenant's noncompliance with this lease and the Alabama Uniform Residential Landlord and Tenant Act. Any deduction from the security deposit must be itemized by the Landlord in a written notice of the Tenant together with the amount due, if any, within 35 days after termination of the tenancy and delivery of possession and demand by the Tenant, whichever is later. This obligation is met when the Landlord mails the portion of the deposit owed and/or the written notice within 35 days by first class mail or better. The Tenant shall provide the Landlord in writing with a forwarding address or now address to which the written notice and the amount due from the Landlord may be sent.

22. NONCOMPLIANCE WITH RENTAL AGREEMENT OR FAILURE TO PAY RENT: If there is a noncompliance by the Tenant with the rental agreement other than nonpayment of rent or a noncompliance with Paragraph 12 above, the Landlord may deliver a written notice to the Tenant specifying the acts and omissions constituting the breach and that the rental agreement will terminate upon a date not less than 14 days after receipt of the notice, if the breach is not remedied in 14 days.

The rental agreement shall terminate as provided in the notice except that: If the breach is remediable by repairs or otherwise and the Tenant adequately remedies the breach before the date specified in the notice, or if such remedy cannot be completed within 14 days, but is commenced within the 14-day period and is pursued in good faith to completion within a reasonable time, the rental agreement shall not terminate by reason of the breach.

If rent is unpaid when due and the Tenant fails to pay rent within five days from the date due, the Landlord may terminate the rental agreement provided the Landlord has given the Tenant written notice of nonpayment and Landlord's intention to terminate the rental agreement. If the rent is not paid within that period, said notice is contained herein Paragraph 5.

The Landlord may recover actual damages and obtain injunctive relief in District or Circuit Court without posting bond for any noncompliance by the Tenant with the rental agreement or Paragraph 12 above.

If there is noncompliance by the Tenant with Paragraph 12 above, materially affecting health and safety that can be remedied by repair, replacement of a damaged item, or cleaning and the Tenant fails to comply as promptly as conditions require in case of emergency, or within fourteen (14) days after written notice by the Landlord specifying the breach and requesting that the Tenant remedy it within that period of time, the Landlord may enter the dwelling unit and cause the work to be done in a workmanlike manner and shall in addition have the remedies available under the Alabama Uniform Residential Landlord Tenant Act.

00106681

If there is noncompliance by the Tenant with Paragraph 12 above materially affecting health and safety other than as set forth in the preceding paragraph, and the Tenant fails to comply as promptly as conditions require in the case of emergency, or within (14) days after written notice by the Landlord if it is not an emergency, specifying the breach and requesting that the Tenant remedy within that period of time, the Landlord may terminate the rental agreement. If the rental agreement is terminated, the Landlord has a right to possession and for rent and a separate claim for actual damages for breach of the rental agreement. Any claim not satisfied by Tenant may be turned in to the credit bureau or collection agency.

Except as prohibited by applicable law, a Landlord may recover actual damages and obtain injunctive relief for noncompliance by the Tenant with rental agreement of the obligations of the Tenant under §35-9A-301 Code of Alabama.

23. REMEDY AFTER TERMINATION: If the rental agreement is terminated, the Landlord has a right to possession, for rent, and a separate claim for actual damages for breach of the rental agreement and court cost.

24. NOTICE: A Landlord receives notice when it is delivered at the place of business of the Landlord through which the rental agreement was made or at any place held out by Landlord as the place of receipt of the communication.

25. PROHIBITIVE EQUIPMENT/FURNITURE: Tenant agrees not to place antennas, satellite dishes, waterbeds, and auxiliary heaters without written permission form Landlord.

26. INVENTORY: Any furnishing and equipment to be furnished by Landlord shall be set out in a special inventory. The inventory shall be signed by both Tenant and Landlord concurrently with this Rental Agreement and shall be a part of this Agreement.

27. PETS: Tenant shall not keep domestic or other animals on or about the premises without the PRIOR WRITTEN CONSENT of the Landlord. Landlord, and Landlord's sole discretion, may consent if Tenant makes the following payments:

(a) a non-refundable fee of $_____ and

(b) a refundable deposit for the pet(s) in the total amount of $_____, for the term of this agreement. Tenant shall be responsible for the animal, its behavior, and any damage done by the animal. The Landlord shall have the right to withdraw consent and demand removal of any previously permitted animal upon the first complaint registered against such animal or upon evidence of injury or damage to person or property caused by the animal.

28. WAIVER: A Tenant is considered to have waived violation of a Landlord's duty to maintain the premises as set forth by the Rental Agreement or violation of the Landlord's duties under the Alabama Residential Landlord and Tenant Act, as defense in an action for possession based upon nonpayment of rent, or in an action for rent concerning a period where Landlord has no

00106681

notice of the violation of the duties, fourteen (14) days before rent is due for violations involving services other than essential services, or the Landlord has no notice before rent is due which provides a reasonable opportunity to make emergency repairs necessary for the provision of essential services. No modification, change, or cancellation hereof shall be valid unless in writing and executed by all parties hereto. No representation or promise has been made by either party hereto except as herein stated.

29. PEACEFUL ENJOYMENT: The Landlord covenants that the Tenant, on paying the rent and performing the covenants hereof, shall and may peaceably and quietly have, hold, and enjoy the rented premises for the term mentioned without hindrance or interruption by the Landlord.

30. PROVISIONS: The provisions of this Rental Agreement shall be binding upon and inure to the benefit of the Landlord and the Tenant, and their respective successors, legal representatives, and assigns.

31. SUBORDINATION: Tenant's rights are subject to any bona fide mortgage which now covers said premises and which may hereafter be placed on said premises by Landlord. Tenant shall upon request by Landlord execute a subordination of its rights under this Rental Agreement to any mortgage given by Landlord hereunder, whether to secure construction or permanent or other financing. Resident shall upon request by Landlord promptly execute a certification of good standing certifying the terms of amendments hereto, if any, and any other information reasonably requested.

32. RENTAL RATE ADJUSTMENT: On and after the expiration of the initial term of this lease, the Landlord, at Landlord's discretion, may alter the rental rate in effect provided only that written notice of such alteration is delivered at first class mail to the US Postal Service, postage prepaid at least fifteen (15) days prior to the effective date of alteration.

33. RULES AND REGULATIONS: The common area facilities, if any such as swimming pool, laundry room, recreational, and other common area facilities, when open and operating, are subject to applicable rules and regulations posted by the Landlord. The Tenant agrees to observe faithfully all rules and regulations that the Landlord has now or may hereafter adopt for the use of the premises.

34. JOINT RESPONSIBILITY: If this Rental Agreement is executed by more than one (1) Tenant, the responsibility and liabilities herein imposed shall be considered and construed to be joint and several, and the use of the singular shall include the plural.

35. LANDLORD'S ADDRESS FOR COMMUNICATIONS: All notices, request, and demands unless otherwise stated herein, shall be addressed and sent to:

Mail: 

Phone

00106681

Other:

36. CAPTIONS: Any heading preceding the text of any paragraph hereof is inserted solely for convenience of reference and shall not constitute a part of this Rental Agreement, nor shall they affect its meaning, construction or affect.

, 37. FACSIMILE AND OTHER ELECTRONIC MEANS: The parties agree that this Agreement may be communicated by use of a fax or other secure electronic means, including but not limited to electronic mail and the internet, and the signatures, initials and handwritten or typewritten modifications to any of the foregoing shall be deemed to be valid and binding upon the parties as if the original signatures, initials and handwritten or typewritten modifications were present on the documents in the handwriting of each party.

38. MEGAN'S LAW: The Tenant and Landlord agree that the Property Manager or Real Estate Broker representing Tenant or Landlord and all affiliated agents are not responsible for obtaining or disclosing any information contained in the Alabama Sex Offender Registry. The Tenant and Landlord agree that no course of action may be brought against the Property Manager or Real Estate Broker representing Tenant or Landlord and all affiliated agents for failure to obtain or disclose any information contained in the Alabama Sex Offender Registry. The Tenant agrees that the Tenant has the sole responsibility to obtain any such information. The Tenant understands that Sex Offender Registry information may be obtained from the local sheriff's department or other appropriate law enforcement officials.

39. ENTIRE AGREEMENT. This lease contains the entire agreement between the parties hereto and all previous negotiations leading thereto, and it may be modified only by a dated written agreement signed by both Landlord and Tenant. No surrender of the Premises or of the remainder of the term of this lease shall be valid unless accepted by Landlord in writing TIME IS OF THE ESSENCE WITH REGARD TO ALL TERMS AND CONDITIONS IN THIS AGREEMENT.

40. NON-RELIANCE CLAUSE: Both Tenant and Landlord hereby acknowledge that they have not received or relied nor could have relied upon any statement or representations or promises or agreements or inducements by either Broker or their agents which are not expressly stipulated herein. If not contained herein, such statements, representations, promises, or agreements shall be of no force or effect. This general non-reliance clause shall not prevent recovery in tort for fraud or negligent misrepresentation or intentional misrepresentation unless specific non-reliance language is included in this agreement. This is a non-reliance clause and is neither a merger clause nor and extension of a merger clause. The parties execute this agreement freely and voluntarily without reliance upon any statement or representations by parties or agents except as set forth herein. Parties have fully read and understand this Agreement and the meaning of its provisions. Parties are legally competent to enter into this agreement and to fully accept responsibility. Parties have been advised to consult with counsel before entering into this agreement and have had the opportunity to do so.

41. ADDITIONAL TERMS:  ① Deposit of $975 to be paid over 3 month in divided pmts of $325. 1st pmt includes:

00106681

August rent (5th–31st) – $850  } Total $1,175$^{20}$
Deposit pmt. $325

— over →

Initial: /JES

Late charge- #5/day if rent pd. after the 5th so retroactive to the 1st. For example, if rent pd. on 6th of the month, late fee would be $30. If rent pd. on ~~the~~ 1st - 5th of month, No late fee.

WHEREFORE, the parties have executed this Rental Agreement or caused the same to be executed by their authorized representative, the day and year first above written.

THIS RENTAL AGREEMENT supersedes all prior written or oral agreements and can be amended only through a written agreement signed by both parties. Provisions of this Rental respective heirs, successors, and assigns.

**THIS IS A LEGALLY BINDING CONTRACT. IF NOT UNDERSTOOD SEEK COMPETENT LEGAL ADVICE BEFORE SIGNING.**

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their seals in duplicate the day and year above written.

_____   _____
Witness Tenant

_____   _____
Witness Tenant

_____   _____
Witness Landlord

_____   _____
Witness Landlord's Agent

00106681

04/2011/THU 05:07 PM

P. 002

Tim, I need the following info.

Lease Agreement
8216
Ryan Ridge

Your place of employment: ▇▇▇▇▇▇▇▇▇

Work phone # ▇▇▇▇▇▇▇▇▇

Your home address: ▇▇▇▇▇▇▇▇

If your daughter is on the lease, I need the same info from her

Caroline is not presently employed

Will there be a pet in the house? NO

Name(s) of designated occupants of the house:

Caroline H. Torrence

▇▇▇▇▇▇

# EXHIBIT E

Page 1

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA

CIVIL ACTION NO. CV-2014-900103

MARRELL A. CRITTENDEN, JR., et al.,
    Plaintiff,

vs.

DIXIE ELECTRIC COOPERATIVE, et al.,
    Defendants.

DEPOSITION OF COURTNEY RENEE BYNUM
Means Gillis Law, LLC
60 Commerce Street, Suite 200
Montgomery, Alabama 36103
August 26, 2014

REPORTED BY:
    Gail B. Pritchett
    Certified Realtime Reporter,
    Registered Professional
    Reporter and Notary Public

Page 3

1          INDEX OF EXAMINATION
2               PAGE:
3  EXAMINATION BY MS. MINOR      6
4  EXAMINATION BY MR. GILLIS    97
5  REEXAMINATION BY MS. MINOR  103
6  REEXAMINATION BY MR. GILLIS  104
7
8
9          INDEX OF EXHIBITS
10             PAGE:
11  Defendant's Exhibit 1     22
12  Defendant's Exhibit 2     37
13  Defendant's Exhibit 3     85
14  Defendant's Exhibit 4     88
15  Defendant's Exhibit 5     89
16  Defendant's Exhibit 6     90
17  Defendant's Exhibit 7     90
18  Defendant's Exhibit 8     91
19  Defendant's Exhibit 9     92
20  Defendant's Exhibit 10    92
21  Defendant's Exhibit 11    94
22  Defendant's Exhibit 12    95
23  Defendant's Exhibit 13    96

Page 2

1        A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4      Mr. H. Lewis Gillis
5      Attorney at Law
6      Means Gillis Law, LLC
7      60 Commerce Street, Suite 200
8      Montgomery, Alabama 36103
9      334.270.1033
10     hlgillis@meansgillislaw.com
11
12  FOR THE DEFENDANT:
13     Ms. Teresa G. Minor
14     Attorney at Law
15     Balch & Bingham LLP
16     1901 6th Avenue North, Suite 1500
17     Birmingham, Alabama 35203
18     205.251.8100
19     tminor@balch.com
20
21  OTHERS PRESENT:
22     Ms. Courtney Alrea Crittenden
23

Page 4

1         S T I P U L A T I O N
2       IT IS STIPULATED AND AGREED,
3  by and between the parties, through their
4  respective counsel, that the deposition of
5  COURTNEY RENEE BYNUM may be taken before Gail
6  B. Pritchett, Commissioner, Certified Realtime
7  Reporter, Registered Professional Reporter and
8  Notary Public;
9       That it shall not be necessary for
10  any objections to be made by counsel to any
11  questions, except as to form or leading
12  questions, and that counsel for the parties may
13  make objections and assign grounds at the time
14  of trial, or at the time said deposition is
15  offered in evidence, or prior thereto.
16
17
18
19
20
21
22
23

Page 41

1    a calendar? And maybe I can pinpoint the exact
2    date.
3        Q.   Yes, ma'am. I brought -- I'm
4    going to show you -- this is my personal
5    calendar --
6        A.   Okay, that's fine.
7        Q.   -- but there is a 2013/14, and '15
8    in here. And there is 2013, if that will help
9    you. November the 25th is the day that your
10   sister indicated to me that y'all moved out.
11   No, no, I think you are on '14. Look at '13.
12       A.   '13?
13       Q.   Yes, ma'am. Lewis might can point
14   you in the right direction there.
15       A.   16th?
16       Q.   What day of the week was that?
17       A.   That was, according to this
18   calendar, Saturday. Saturday.
19       Q.   And were you there at the time?
20       A.   I was.
21       Q.   Why were you --
22            MR. GILLIS: Saturday or Sunday?
23       A.   Uh-oh, wait a minute. It was

Page 42

1    Saturday.
2        Q.   (BY MS. MINOR:) And why were you
3    there on a Saturday?
4        A.   I want to say for that 16th, I had
5    a family function.
6        Q.   Here in Montgomery?
7        A.   Yes, ma'am.
8        Q.   And tell me what you remember
9    happened.
10       A.   That it was sewage water coming up
11   in the tub.
12       Q.   Which tub?
13       A.   It was in both tubs.
14       Q.   On the 16th?
15       A.   Yes, ma'am. So it was sewage --
16   brown sewage water that would seep up in the
17   tub. It had brown BM pebbles to come up with
18   it in the tub as well as the stool. It was
19   basically overflooding. The sewage water from
20   the stool was emerging in the hallways, in my
21   bathroom. When I looked in the master
22   bathroom, she had the same issue, had sewage
23   water coming up in her tub. In the shower, her

Page 43

1    stool was also overflooding and water all over
2    the bathroom floor.
3        Q.   Now, was this the first time
4    anything happened, on the 16th?
5        A.   Yes, ma'am.
6        Q.   And it's your testimony that on
7    Saturday, November 16th, there was overflow of
8    sewage in both bathrooms, am I right?
9        A.   Yes, ma'am, that would be correct.
10       Q.   And that it got onto the carpet?
11       A.   Yes, ma'am.
12       Q.   Both in the hallway and the master
13   bedroom?
14       A.   Yes. Not only in the master
15   bedroom, but she have a closet right outside of
16   the shower, it also got on that floor as well.
17       Q.   What was the floor in the bathroom
18   and the master bedroom? Was it tile?
19       A.   In the bedroom?
20       Q.   No, in the master bathroom. I may
21   have misspoken.
22       A.   Tile, yes, ma'am.
23       Q.   Was it tile throughout --

Page 44

1        A.   No, ma'am.
2        Q.   -- throughout the bathroom?
3        A.   Yes. In her closet she had
4    carpet.
5        Q.   And what about the hall bath, what
6    was the floor in there?
7        A.   Tile.
8        Q.   And it's your testimony that on
9    November 16th, this sewage was coming up in the
10   tub in both baths?
11       A.   Yes.
12       Q.   What about the toilet, was there
13   any overflow of the toilet?
14       A.   Yes.
15       Q.   In both bathrooms?
16       A.   Yes, ma'am. That's how the water
17   got on the floor.
18       Q.   Was there water from the tub
19   sufficient to get on the floor from the tub?
20       A.   The tub did not overflow.
21       Q.   It was just the toilet that
22   overflowed?
23       A.   It was just the toilet.

# EXHIBIT F

```
 1        IN THE UNITED STATES DISTRICT COURT

 2           MIDDLE DISTRICT OF ALABAMA

 3                 EASTERN DIVISION

 4

 5

 6

 7   CIVIL ACTION NO.:  3:15-CV-506

 8

 9   ESSEX INSURANCE COMPANY,

10           Plaintiff,

11

12   v.

13

14   J&J CABLE CONSTRUCTION, et al.,

15           Defendants.

16

17

18           DEPOSITION TESTIMONY OF:

19           COURTNEY ALREA CRITTENDEN

20                January 7, 2016

21

22

23
```

1  house, did you have any problems with the

2  plumbing or the toilets or the sewage

3  system, so to speak, between April of

4  2013 and November of 2013?

5      A.   No.

6      Q.   So everything seemed to you to

7  be working fine?

8      A.   Yeah.

9      Q.   Okay.  What was the very first

10  problem you observed with the plumbing

11  system or the sewage system or the

12  toilets or tubs or showers?

13      A.   I remember November the 16th.

14  Basically because that's when my

15  daughters were taking a shower together.

16      Q.   Okay.

17      A.   ▉▉▉▉▉▉▉▉▉▉▉▉▉.  And ▉▉▉▉, she

18  saw the toilet rise, and she said that it

19  looked like stuff was coming over the

20  toilet.  And so she left ▉▉▉▉ in the

21  shower, and she ran and told me to come

22  in the bathroom.

23      Q.   Where were you when ▉▉▉▉ came

1       A.   I can't recall if -- on that

2   particular day.   I don't remember.

3       Q.   What about on November 17th,

4   were y'all able to use the hall bathroom?

5       A.   I don't recall day for day.

6       Q.   Well, the 16th was the first

7   incident you were aware of.   Is that

8   correct?

9       A.   Yes.

10       Q.   All right.   After that first

11   incident, when is the next time you were

12   aware that there was a problem with

13   either bathroom or the sewer backup?

14       A.   It just seems like they would

15   alternate.   And it was like ongoing.   I

16   mean, from that day forward.   Like you

17   used the rest room, depending on what

18   bathroom they would go in, it just seemed

19   to come back up.   So, and then

20   eventually, it started from the toilet to

21   the bathtub.   So, you know, it just got

22   to the point where it was just unbearable

23   by the end of that particular week.

1      Q.   Okay.  Was the problem recurring

2   in the hall bathroom every day after

3   November 16th, or were there some days

4   where you were able to use that bathroom

5   okay?

6      A.   Every day.

7      Q.   All right.  How about the master

8   bathroom, was it having a sewer backup

9   every day after November 16th?

10     A.   That I can recall, yes.

11     Q.   Was there any day, either

12  November 16th or any of the subsequent

13  days, when the backup, the amount of

14  overflow was worse than the other days,

15  or was it generally the same amount that

16  was overflowing each time?

17     A.   Well, I guess it was a big event

18  on the 16th because, I mean, it was like

19  devastating to see that for the first

20  time.  So when that happened, it kind of

21  -- the other incidents was like, okay, we

22  got to plunger to use it, plunger to use

23  it.  So it was kind of like, okay, well,