## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

Essex Insurance Company, )
    Plaintiff, )
     )
     )
v. )     Case No.:  3:15-cv-506-WHA
     )
J&J Cable Construction, LLC,  *et al.*  )     **OPPOSED**
    Defendants. )
     )
And Related Actions )

## ESSEX INSURANCE COMPANY'S OPPOSITION TO
## J&J CABLE CONSTRUCTION, LLC'S MOTION FOR
## PARTIAL SUMMARY JUDGMENT

Essex Insurance Company submits this opposition to Defendant/Counterclaim-Plaintiff J&J Cable Construction, LLC's Motion for Partial Summary Judgment (Doc. 80) on the following grounds:

1.    The insured, J&J Cable, failed to show why the Total Pollution Exclusion is not a complete bar to coverage.

2.    J&J Cable lacks substantial evidence that Marrell Crittenden's bodily injury and property damage claims occurred before the insurance policy expired at 12:01 a.m. on November 12, 2013.

3.    Courtney Crittenden's bodily injury and property damage claims occurred on November 16, 2013; clearly after the insurance policy expired at 12:01 a.m. on November 12, 2013.

4.    The bodily injury claims of M.C., a minor, occurred on November 16, 2013; clearly after the insurance policy expired at 12:01 a.m. on November 12, 2013.

1

5. The bodily injury claims of A.C., a minor, occurred on November 16, 2013; clearly after the insurance policy expired at 12:01 a.m. on November 12, 2013.

6. The insured lacks substantial evidence that Caroline Torrence's bodily injury and property damage claims occurred before the insurance policy expired at 12:01 a.m. on November 12, 2013.

7. There were no claims for damages that potentially fell within the policy period until Dixie Electric's counter-claim in the underlying Crittenden Action. Prior to November 5, 2014, no claimed damages occurred during the policy period.

8. Essex began providing J&J Cable Construction with a defense in November 2014.

9. J&J Cable offered no evidence or legal authority to support its Bad Faith claim.

J&J Cable's Motion for Partial Summary Judgment should be denied based on the pleadings and other documents before the Court and the Evidentiary Materials in Support of Essex's Motion for Summary Judgment, which are incorporated by reference. Doc. 81 and 82.

## 1. <u>Essex did not Breach its Duty to Defend J&J Cable</u>

J&J Cable's Motion for Partial Summary Judgment alleges that Essex breached its duty to defend by failing to defend J&J Cable from January 2014 to November 2014 against the claims alleged by Marrell Crittenden, Courtney Crittenden, their minor children, and the Cross-Claim by Dixie Electric. J&J Cable failed to show why, as it alleges, Essex had a duty to defend J&J Cable from January 2014 to November 2014. Essex provided J&J Cable with a defense

2

subject to a reservation of rights in November 2014, once there was a pleading filed that suggested the possibility any occurrence happened before the Essex policy expired.

J&J Cable concedes that Essex provided J&J Cable with a defense as of November 2014 to the present. Thus, J&J Cable does not allege that Essex failed to provide a defense related to the *Caroline Torrence v. Dixie Electric Cooperative, et al.*, Civil Action No. CV-2015-901757 (the "Torrence Action") lawsuit, which was not filed until November 2015.

Under Alabama law, the insured bears the burden of establishing coverage by demonstrating that a claim falls within the policy. *Universal Underwriters Ins. Co. v. Stokes Chevrolet, Inc.*, 990 F.2d 598 (11th Cir. 1993). J&J Cable fails to do so in its Motion for Partial Summary Judgment. J&J Cable only asserts seven "facts" in support of its Motion for Partial Summary Judgment. Doc. 80, p. 2.

The first two facts allege that Essex issued a commercial general liability policy that expired on November 12, 2013, and the policy requires payment of "those sums that the insured becomes legally liable to pay as damages because of … 'bodily injury' or 'property damage'….' While true, J&J Cable omits the crucial related facts that the policy expired at 12:01 a.m. on November 12, 2013, and the insuring agreement  applies "only if ... [t]he 'bodily injury' or 'property

3

damage' occurs during the policy period."  Form CG 00 01 1207, p. 1 (b), Exhibit V in Doc. 82.

J&J Cable's third fact alleges Essex acknowledges that J&J Cable ruptured a sewer line sometime between November 8 and November 11. That fact is not dispositive of the key issue which is when did that ruptured sewer line cause damage to the plaintiffs in the underlying actions, Torrence and each to each Crittenden individually.

As its fourth fact, J&J Cable alleges Essex received notice of the Crittendens' lawsuit claiming "that J&J Cable had caused property damage."  Doc. 80, p. 2.  That suit specifically alleged "[o]n or about November 15, 2013 until approximately November 24, 2013, raw sewage began to and continued to seep and invade their home through bathroom toilets, under various walls within their dwelling place, the family living room, and various closets with the household and in hallways."

J&J Cable's fifth fact states that on January 28, 2014, Essex denied coverage and refused to defend J&J Cable. (Exhibit "2").  Essex did so based, in part, on the specific allegations in the original complaint that the damages occurred between November 15, and 24, 2013.  Essex denied coverage and refused to defend the underlying state court.  However, in fact six, J&J Cable then promptly admits Essex agreed to defend J&J Cable under a reservation of rights in November 2014.

4

The seventh and final fact asserted by J&J Cable is that prior to November 2014, Essex was aware from evidence and documents cited by Dixie Electric and other parties that injuries and damages allegedly suffered by the Crittendens and the Andersons occurred within the policy period. (See Exhibit "3", Essex 35, 36, & 283).  However, the cited evidence does not support those so-called "facts."

With respect to the last fact, J&J Cable cites to an October 20, 2014 letter from Dixie Electric's counsel which omits any discussion of when the Crittendens' damages occurred.  In fact, the Crittendens' complaint and a review of discovery indicates the Crittendens' damages occurred on or about November 16, 2013. *See e.g.*, Doc. 80, Exhibit 5, Essex 0304.

As shown below, those seven facts do not support summary judgment in favor of J&J Cable on its counterclaim against Essex for breach of the duty to defend or its claim for bad faith refusal to provide a defense. Doc. 21, ¶¶ 11, 13-15.

A. <u>No Duty To Defend Initially</u>

The Alabama Supreme Court established a bright-line rule that "the time of an 'occurrence' of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time ***the complaining party was actually damaged***." *U.S. Fid. & Guar. Co. v. Warwick Dev. Co.,* 446 So. 2d 1021, 1024 (Ala. 1984), emphasis added.

The Crittendens filed a lawsuit in Montgomery County Circuit Court styled as *Marrell A. Crittenden, et al. v. Dixie Electric Cooperative and J&J Cable Construction, LLC*, Civil Action No. CV-2014-900103 (the "Crittenden Action") on January 15, 2014. ***There were no allegations that any bodily injury or property damage occurred during the policy period***:

> "***On or about November 15, 2013 until approximately November 24, 2013, raw sewage began to and continued to seep and invade [the Crittendens'] home*** through bathroom toilets, under various walls within their dwelling place, the family living room, and various closets within the household and in hallways. The seepage of raw sewage made the home uninhabitable causing them to move, destroyed their possessions within the household and caused mental anguish, mental distress and other illnesses for the household members." Compl., Exhibit A, ¶ 9; emphasis added.

There was no duty to defend J&J Cable in this lawsuit because there was no bodily injury or property damage alleged to have occurred during the policy period; which had expired at 12:01 a.m. on November 12, 2013. The policy language made this clear: "This insurance applies to 'bodily injury' and 'property damage' only if .... (2) ***the 'bodily injury' or 'property damage' occurs during the policy period....***" Form CG 00 01 1207, p. 1 (b), Exhibit V in the Essex Motion for Summary Judgment, Doc. 81.

6

The Crittendens' First Amended Complaint was filed on October 10, 2014, and alleged:

> "On or about November 3, 2013 until approximately November 11, 2013, the sewage line was breached and ***thereafter*** raw sewage began to and continued to seep and invade their home...." Exhibit A, First Am. Compl. at ¶ 9; *See also* Second Am. Compl. at ¶ 10; emphasis added.

Thus, the Crittendens continue to allege the sewage line was breached sometime between November 3 and November 11 and "***thereafter***" raw sewage seeped into the home.  Although the First Amended Complaint alleges that the sewer lateral was breached during the policy period, it does not allege that the raw sewage seeped into the home during the policy period.  Thus, there was no duty to defend.  Instead, the Amended Complaint merely alleges that the raw sewage seeped into the home ***after*** the November 3-11 timeframe.

## B.  Duty To Defend Was Timely Fulfilled

Importantly, the Crittendens were renters and not responsible for repairs, maintenance, or replacement of the sewer laterals, which were owned by the homeowners, Dr. Jack and Kem Anderson.  *See* the Residential Rent Agreement between the Crittendens and Andersons, ¶ 13, attached hereto as Exhibit A to the Opposition Brief.  Thus, even the First Amended Complaint failed to allege any

7

bodily injury or property damage to any Crittenden which occurred during the policy period.[1]

It was not until November 2014 that any allegations surfaced that suggest the possibility of alleged bodily injury or property damage occurring during the policy period.  On November 5, 2014, Dixie Electric filed a Cross-Claim against J&J Cable for the claims seeking reimbursement from J&J Cable for any damages owed to any of the Crittendens and for "the cost to repair the [Anderson's] broken and damaged sewer laterals."  Cross-Claim at ¶ 14.  Prior to this Cross-Claim, there were no claims for damages for repairs to the Andersons' sewer laterals.  As discussed above, the Crittendens' bodily injury and property damage alleged up to this point arose from the sewage backup, not the damage to the sewer laterals, which are two separate events.  As such, Essex owed no duty to defend J&J Cable from January 2014 to November 2014.

The Dixie Electric Cross-Claim was the first mention of the property owners' claim for damage to the sewer lateral itself. The property owner, Dr. Anderson, was paid for that damage on April 3, 2014. He signed a release that recited that the **accident occurred on November 19**. *See* Exhibit B to this Opposition Brief. He settled with Dixie Electric for damage to the sewer lateral leading to the house occupied by Caroline Torrence as well. That release also

---

[1] The Second Amended Complaint was filed on February 24, 2015, at which time Essex was providing J&J Cable with a defense subject to a reservation of rights.

recited the **date of the accident as November 19**. *See* Exhibit C to this Opposition Brief; *see also* Deposition of Jack Anderson, 37:11-38:19, 39:8-14, excerpts attached hereto as Exhibit D.

It is uncontested that Essex provided a defense under a reservation of rights starting in November 2014. As discussed above, there is no evidence that before November 2014 the Crittendens claimed "bodily injury" or "property damage" which occurred before the Essex policy expired. Therefore, Essex owed no duty to defend J&J Cable from January 2014 to November 2014 and, as such, J&J Cable's Motion for Partial Summary Judgment is due to be denied.

**2.**    **J&J Cable Did Not Brief Or Support It's Bad Faith Claim**

As shown in the prior section, Essex provided a defense to J&J Cable once the pleadings were amended to allege the possibility of a claim during the policy period. Thus, there was no bad faith and Essex is entitled to summary judgment on that claim.

**3.**    **J&J Cable's Supporting Evidence Should Not Be Considered as it Violates this Court's September 2, 2015 Order (Doc. 20)**

The Court should strike J&J Cable's fact number seven, Doc. 80, p. 3, for lack of evidentiary  support and failure to comply with this Court's September 2, 2015, Uniform Scheduling Order.  [Doc. 20].

J&J Cable states, in part, "injuries and damages allegedly suffered by the Crittendens … occurred within the policy period." J&J Cable cites to a letter from

Dixie Electric's attorney, which is not evidence and contains hearsay. Even so, that letter does not address when the Crittendens encountered the sewage and resulting damage. Further, J&J Cable offers as support a photo copy of a CD which is clearly not evidence of anything. If that CD was provided to the Court, it was not produced to Essex as part of the J&J Cable partial summary judgment submission. Additionally, the documents on that CD are chock-full of inadmissible evidence which Essex cannot fairly be expected to address here.

Secondarily, the Court should strike the depositions referenced by J&J Cable for failing to comply with this Court's Order (Doc. 20) which requires:

> A brief and all supporting evidence shall be filed with any such [dispositive] motion. In all briefs filed by any party relating to the motion, the discussion of the evidence in the brief must be accompanied by a specific reference, by page and line, to where the evidence can be found in a supporting deposition or document. Failure to make such specific reference will result in evidence not being considered by the court.

Doc. 20, Section 2.

The following deposition citations should not be considered for the additional reason they do not support J&J's allegations:

J&J Cable cites to 20 pages of Jerry Noblitt's deposition. He testified, among other things, that J&J Cable was not responsible for the damage. 48:16–21. He offered no first-hand testimony on when the boring took place, when, if or how the sewer lateral was struck, or when anyone was damaged by J&J Cable.

10

Marrell Crittenden testified at pages 45-46:

```
8    Q.   Your wife testified that she first
9         noticed something on Saturday that she believes
10        was the 16th and that you were at home at that
11        time. Do you remember that?
12   A.   I remember them-- I remember
13        that.
14   MR. MEANS:      Go ahead and listen to
15        her question.
16   A.   Okay.
11   Q.   (BY MS. MINOR:)       Were you home
18        that time when there was a problem in the hall
19        bath?
20   A.   I don't know if was at home. I
21        don't--
22   Q.   How did you hear about it?
23   A.   She told me about it, my wife.
1    Q.   Okay. You don't remember whether
2         you were at home when it was actually going on?
3    A.   Correct.
```

**4    *Q.   Okay. When's the first time you***
**5         *noticed any problems with either smell or***
**6         *something coming out of the toilets or the tub?***
**1    *A.   I don't know the exact date, but***
**8         *before that date, I remember having to clean***
**9         *our bathroom floor and toilet because of some***
**10        *issues with it over flooding and it also came***
**11        *up in the-- it would come up in the shower***
**12        *adjacent to that toilet.***
**13   *Q.   Was this the master bathroom?***
**14   *A.   Correct.***
**15   *Q.   Do you know how long in time it***
**16        *was before your wife had the problem on the***
**17        *16th?***
**18   *A.   No.***

2014 Deposition of M. Crittenden, 45:8-46:18, emphasis added.

11

Courtney Crittenden testified at pages 61-64 of her 2014 deposition:

| | | |
|---|---|---|
| 8 | Q. | When did you first believe there |
| 9 | | was a problem with the sewage getting into the |
| 10 | | house? |
| 11 | A. | It was a major issue on the 16th |
| 12 | | of November. My husband and I discussed that |
| 13 | | he noticed before then, but I had the -- I had |
| 14 | | a major issue to clean up on the 16th, I |
| 15 | | remember, because I had to go rent a Roto -- |
| 16 | | the -- the Rug Doctor. |
| 17 | Q. | What was the major issue? |
| 18 | A. | It overflooded from the hall bath |
| 19 | | to the carpet, all the way up to the hall; not |
| 20 | | only in the hall bath but, also, in the -- this |
| 21 | | bath, it came up. |
| 22 | Q. | When you're saying "this bath," |
| 23 | | you're pointing to the master bathroom? |
| 1 | A. | The master bath -- bathroom. |
| 2 | Q. | You said your husband had |
| 3 | | mentioned something before then? |
| 4 | A. | Prior, yes. |
| 5 | Q. | When was that? |
| 6 | A. | I would say like that Monday or |
| 7 | | Tuesday. I don't know the date, but it was |
| 8 | | prior to the 16th. |
| 9 | Q. | Do you remember what day of the |
| 10 | | week the 16th was? |
| 11 | A. | I can't remember. |

2014 Courtney Crittenden Deposition  63:8-64:11.

The Court is asked to strike lines 64:2-8 of her testimony as hearsay regarding what her husband said about when he observes sewage in the house and, similarly, strike her testimony at 64:12-21.

J&J Cable cites Essex's disclaimer letter to suggest the sewer line was breached after November 11 (Doc. 80, 7) but fails to inform the Court the disclaimer letter references the complaint and evidence reviewed which shows the Crittendens' damages occurred on or after November 16. Doc. 80, Exhibit 5, Essex0304.

## 4.   J&J Cable Implicitly Concedes Applicability Of Total Pollution Exclusion

J&J Cable fails to mention the Total Pollution Endorsement recited at paragraph 23 of the First Amended Complaint  (Doc. 61). *See also* Doc. 61, ¶ 24 and Count II, ¶ 33-36.

As stated in Essex's Motion For Summary Judgment, the Total Pollution Exclusion provides the insurance policy "does not apply to … '[b]odily injury' or 'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' [*i.e.*, 'any solid, liquid, [or] gaseous … irritant or contaminant, including … waste'] at any time."  The underlying claims all arise from the overflow of raw sewage (including human waste and feces) which each claimant encountered in November 2013. *See also* discussion that Doc. 81, 9, 11, 13, and 22-27.

## **Conclusion**

WHEREFORE, Essex respectfully requests that this Honorable Court deny J&J Cable's Motion for Partial Summary Judgment; and grant Essex any other relief that the Court deems just and equitable on the grounds that J&J Cable lacks substantial evidence that any plaintiff in the underlying state court actions (Marrell Crittenden, Courtney Crittenden, their minor children, and Caroline Torrence) suffered any property damage or bodily injury during the policy period; that Essex breached its duty to defend when Essex provided J&J Cable with a defense immediately following the first pleading that alleged any damage within the policy period; and J&J Cable failed to show why the Total Pollution Exclusion is not a complete bar to coverage.

RESPECTFULLY SUBMITTED,

DATED:  March 23, 2016          */s/  Lane Finch*_____
                                                 F. LANE FINCH, JR.
                                                 (ASB-0027-I58F)
                                                 BRIAN C. RICHARDSON
                                                 (ASB-5241-H14U)
                                                 Attorneys for Essex Insurance Co.

**OF COUNSEL:**
SWIFT, CURRIE, McGHEE & HIERS, LLP
2 North 20th Street, Suite 1405
Birmingham, AL 35203
(205) 314-2401
lane.finch@swiftcurrie.com
brian.richardson@swiftcurrie.com

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on March 23, 2016, I have served the foregoing by electronic filing through the Court's CM/ECF system the following attorneys of record:

John G. Smith
Louis M. Calligas
BALCH & BINGHAM, LLP
P. O. Box 78
Montgomery, AL 36101-0078

Tyrone C. Means
H. Lewis Gillis
MEANS GILLIS LAW, LLC
P. O. Box 5058
Montgomery, AL 36103

Robert Simms Thompson
Tiffany N. Johnson
THE LAW OFFICES OF ROBERT
SIMMS THOMPSON, PC
P. O. Box 830780
Tuskegee, AL 36083

David E. Allred
D. Craig Allred
ALLRED & ALLRED, PC
7030 Fain Park Drive, Suite 9
Montgomery, AL 36117


        */s/ Lane Finch*
        Of Counsel

# EXHIBIT A

**RESIDENTIAL RENTAL AGREEMENT**

State of ALABAMA
County of Montgomery
Property Address: *8212 Ryan Ridge Loop, Montg. AL 36117*
Tenant: *Courtney Bynum / Cosigned with mother: Marie Bynum*

    This rental agreement made within Montgomery, ALABAMA, on this *25th* day
of *April*, *2013*, by and between Tenant(s) (hereinafter called
"TENANT"), and Owner (hereinafter called "Landlord"), shall provide as follows:

**1. LOCATION:** The Landlord hereby rents to the Tenant and the Tenant hereby rents
from the Landlord a parcel of property located in the county of Montgomery, State
of ALABAMA which parcel of land with improvements will constitute the premises.
Said parcel of land is more particularly described as follows:

**2. TERMS:** This Rental Agreement shall commence on the *25th* day of
*April, 2013*, and end on the *25th* day of *April, 2014*. Tenant
covenants that upon the termination of this Rental Agreement, or any extension
thereof that Tenant will quietly and peaceably deliver up possession of the premises
in good order and condition, reasonable wear and tear expected, free of Tenant's
personal property, garbage and other waste, and return all keys to the Landlord.

**3. RENTAL APPLICATION:** The Tenant acknowledges that the Landlord has relied
upon the rental application, a copy of which is attached hereto, as an inducement for
entering into this agreement, and the Tenant warrants to the Landlord that the facts
stated in the application are true to the best of Tenant's knowledge. If any facts
stated in the rental application prove to be untrue, the Landlord shall have the right
to terminate the residency immediately and to collect from the Tenant any damages
resulting therefrom.

**4. RENT:** Tenant agrees to pay Landlord a rent of $ *975⁰⁰* per month, payable in
advance on or before the first day of every month during said term for a total rent of
$ *11,700⁰⁰*. The rent is payable to : *Jack (or Ken) Anderson*. Tenant agrees
that failure to pay rent pursuant to the terms hereof is a willful violation of this
Rental Agreement.
Tenant further agrees to pay a late fee of $ *10* per day if rent is paid after the
5th day of the month. This fee accrues daily and is retroactive to the 1st day of the
month. So, for example, if the rent is paid on the 6th of the month a minimum late
charge of $60 would be due. Where the term of the Rental Agreement commences or
terminates on a day of the month other than the first, the amount paid to Landlord
by Tenant for the portion of the month where rent is due shall be figured based on a
daily rate which is calculated based on the monthly rate.

**5. OCCUPANTS:** Only persons designated in the rental agreement or as further
modified or agreed to in writing by Landlord shall reside in the rented premises. For
purposes of this rental agreement, the designated occupants are:
*Nextrell,* ▮▮▮▮▮▮▮▮▮▮▮ )

**6. SUBLEASE:** Tenant shall not assign or sublet said premises, or any part thereof
without the written consent of the Landlord. Tenant must have written permission
from Landlord for guests to occupy the premises for more than 14 days.

* *There are some dark spots on carpet
and clorox in the front bedroom*

DEFENDANT'S EXHIBIT

7. RENEWAL TERMS: With thirty days written notice, either party may terminate this agreement at the end of the initial term, but if no notice is given, the agreement will be extended on a month to month basis on the same terms and conditions contained in this agreement. Thirty days written notice by either party is required prior to termination during such month to month term.

8. RETURNED CHECKS:  Tenant agrees to pay $50 for each dishonored check for bookkeeping costs and handling charges, plus late charges if the check is not made good before the sixth day after the due date. All future rent and charges, if more than one check is returned, shall be paid in the form of cash, cashier's check or money order. If any check for the security deposit or the first month's rent is returned for insufficient funds, Landlord may declare this rental agreement void and immediately terminated.

9. UTILITIES AND SERVICE:  Tenant agrees to pay for utilities and services. In the event of Tenant default on payment of utilities, Landlord may pay and charge Tenant as additional rent together with any penalties, charges and interest. Tenant shall be liable for any inspections required by local authorities/utility companies due to Tenant's failure to obtain service at time of occupancy or to maintain said service during the term of this agreement. Tenant shall pay all cost of hook-ups and connection fees and security deposits in connection with providing utilities to premises during the term of the Lease.

10. TENANT OBLIGATIONS: Tenant agrees to comply with the provisions of  35-9A-301, Code of Alabama 1975, and to keep the dwelling unit and all parts of the premises that he leases safe and clean. In the case of a single-family house or duplex, Tenant shall keep the yard mowed, watered and free of fire ants, keep the roof and gutters free of debris, the shrubs neatly trimmed, and landscaping maintained. Tenant agrees to comply with the lease and rules and regulations the Landlord may adopt concerning the Tenants' use and occupancy of the premises.
     Tenant or any member of Tenant's family, guest or other person under the Tenant's control, shall conduct themselves in a manner that will not disturb other Tenants' and neighbors' peaceful enjoyment of the premises. Tenant, or any member of Tenant's family, guest or other person under the Tenant's control, shall not engage in or facilitate criminal or drug related activities. Any such violation constitutes substantial violation of the Lease and a material noncompliance with the Lease and is grounds for termination of tenancy and eviction from the premises.
     It is specifically understood that Tenant will, at Tenant's expense keep sinks, lavatories, and commodes open reporting any initial problem within five (5) days of occupancy, repair any and all damages caused by tenancy and replace any burned out light bulbs. Tenant agrees to report to Landlord any malfunction of or damage to electrical, plumbing, HVAC systems, smoke detectors, and any occurrence that may cause damage to the property. Tenant also agrees to pay for the cost to all repairs made necessary by negligence or careless use of the premises and pay for repairs and loss resulting from theft, malicious mischief or vandalism by Tenant and their guests. Tenant agrees to provide copies to Landlord of any inspection report or repair estimates the Tenant may obtain.
     Tenant agrees to be responsible for and to make at Tenant's expense all routine maintenance including but not limited to stoppage of sewer because of misuse or broken water pipes/fixtures due to neglect or carelessness of Tenant. No repairs, alterations or changes in or to said premises or the fixtures or appliances contained therein, shall be made except after written consent of Landlord, and shall be the responsibility of the Tenant for the cost of restoring said premises to their

Essex01021

original condition if Tenant makes any such unauthorized modifications. NO REPAIR COSTS SHALL BE DEDUCTED FROM RENT BY TENANT. All improvements made by Tenant to the said premises shall become the property of the Landlord. Locks/deadbolts shall not be changed without the expressed permission of the Landlord.

Tenant is directly responsible for any damage caused by Tenant's appliances and/or furniture. Tenant is responsible for changing HVAC filters, reporting any water leaks, lighting pilot lights, checking for tripped breakers, changing smoke detector batteries and minor housekeeping repairs. Tenants will be held liable for damage to HVAC systems caused by dirty or missing filters and damages resulting from unreported problems. Tenant acknowledges that Tenant has inspected the premises and agrees that the premises and any common area are in safe and habitable condition. Tenant acknowledges receipt of instructions of smoke detector operation.

11. MAINTENANCE OF PREMISES: Landlord agree to make repairs and do what is necessary to keep the premises in a fit and habitable condition as specified in ht e Alabama Uniform Residential Landlord and Tenant Act. The Landlord further agrees to maintain in reasonably good and safe working condition, all electrical, gas, plumbing, sanitary, HVAC, smoke detectors and other facilities supplied by him. Landlord is not responsible for changing batteries in smoke detectors.

12. INSURANCE: Tenant shall be responsible for insuring his/her own possessions against fire and other catastrophes.

13. RIGHT TO ACCESS: The Tenant shall not unreasonably withhold consent to the Landlord to enter into the dwelling unit in order to inspect the premises; make necessary or agreed repairs, decorations, alterations, or improvements; supply necessary or agreed services; or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workmen, or contractors. The Landlord or Landlord's agent may enter the dwelling unit without consent of the Tenant in case of emergency.

The Landlord shall not abuse the right of access or use it to harass the Tenant. Except in cases of emergency or unless it is impracticable to do so, Landlord shall give Tenant at least 2 days notice of the Landlord's intent to enter and may enter only at reasonable times. Posting on the primary door of entry to the residence of the Tenant stating the intended time and purpose of the entry shall be a permitted method of notice for the purpose of the Landlord's right of access to the premises.

The Landlord has not other right of access except: pursuant to court order, as permitted by the Alabama Uniform Residential Landlord and Tenant Act when accompanied by a law enforcement officer at reasonable times for the purpose of service of precess in eviction proceedings, or unless the Tenant has abandoned or surrendered the premises, or as otherwise allowed by law.

14. DESTRUCTION OR DAMAGE TO PREMISES: If the dwelling unit or premises are damaged or destroyed by fire or casualty to the extent that normal use and occupancy of the dwelling unit is substantially impaired, the Tenant may:

(a) immediately vacate the premises and notify the Landlord in writing within fourteen days thereafter of Tenant's intention to terminate the rental agreement, in which case the rental agreement terminates as of the date of vacating; or
(b) if continued occupancy is lawful, vacate any part of the dwelling unit rendered unusable by the fire or casualty, in which case the Tenant's liability for rent is reduced in proportion to the diminution in the fair-marked rental value of the dwelling unit.

Essex01022

a damaged item, or cleaning and the Tenant fails to comply as promptly as conditions require in case of emergency, or within fourteen (14) days after written notice by the Landlord specifying the breach and requesting that the Tenant remedy it within that period of time, the Landlord may enter the dwelling unit and cause the work to be done in a workmanlike manner and shall in addition have the remedies available under the Alabama Uniform Residential Landlord Tenant Act.

If there is noncompliance by the Tenant with Paragraph 10 above materially affecting health and safety other than as set forth in the preceding paragraph, and the Tenant fails to comply as promptly as conditions require in the case of emergency, or within (14) days after written notice by the Landlord if it is not an emergency, specifying the breach and requesting that the Tenant remedy within that period of time, the Landlord may terminate the rental agreement. If the rental agreement is terminated, the Landlord has a right to possession and for rent and a separate claim for actual damages for breach of the rental agreement. Any claim not satisfied by Tenant may be turned in to the credit bureau or collection agency. Except as prohibited by applicable law, a Landlord may recover actual damages and obtain injunctive relief for noncompliance by the Tenant with rental agreement of the obligations of the Tenant under §35-9A-301 Code of Alabama.

18. REMEDY AFTER TERMINATION: If the rental agreement is terminated, the Landlord has a right to possession, for rent, and a separate claim for actual damages for breach of the rental agreement and court cost

19. NOTICE: A Landlord receives notice when it is delivered at the place of business of the Landlord through which the rental agreement was made (see paragraph 28) or at any place held out by Landlord as the place of receipt of the communication.

20. PROHIBITIVE EQUIPMENT/FURNITURE: Tenant agrees not to place antennas, satellite dishes, waterbeds, and auxiliary heaters without written permission form Landlord.

21. PETS: Tenant shall not keep domestic or other animals on or about the premises without the PRIOR WRITTEN CONSENT of the Landlord. Landlord, and Landlord's sole discretion, may consent if Tenant makes the following payments:
(a) a non-refundable fee of $__500__ and
(b) a refundable deposit for the pet(s) in the total amount of $_____ , for the term of
this agreement. Tenant shall be responsible for the animal, its behavior, and any damage done by the animal. The Landlord shall have the right to withdraw consent and demand removal of any previously permitted animal upon the first complaint registered against such animal or upon evidence of injury or damage to person or property caused by the animal.

22. WAIVER: A Tenant is considered to have waived violation of a Landlord's duty to maintain the premises as set forth by the Rental Agreement or violation of the Landlord's duties under the Alabama Residential Landlord and Tenant Act, as defense in an action for possession based upon nonpayment of rent, or in an action for rent concerning a period where Landlord has no notice of the violation of the duties, fourteen (14) days before rent is due for violations involving services other than essential services, or the Landlord has no notice before rent is due which provides a reasonable opportunity to make emergency repairs necessary for the provision of essential services. No modification, change, or cancellation hereof shall be valid unless in writing and executed by all parties hereto. No representation or promise has been made by either party hereto except as herein stated.

Essex01023

# EXHIBIT B

Claim Number 01GC104536

## RELEASE OF ALL CLAIMS

### KNOW ALL MEN BY THESE PRESENTS:

That the undersigned, being of lawful age and authority, for sole consideration of Eight Thousand Three Hundred Twenty Two Dollars 24/100 ($8,322.24) to be paid to Jack Anderson do/does hereby and for my/our its heirs, executors, administrators, successors and assigns release, acquit and forever discharge Dixie Electric Cooperative, Federated Rural Electric Insurance Exchange and his, her, their or its agents servants, successors, heirs, executors, administrators and all other persons, firms, corporations, associations or partnerships of and from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever, which the undersigned now has/have or which may hereafter accrue on account of or in any way growing out of any and all known and unknown foreseen and unforeseen bodily and personal injuries and property damage and the consequences thereof resulting or to result from the accident, casualty or event which occurred on or about the 19th day of November, 2013 at, or near 8212 Ryan Ridge Loop, Montgomery, AL,

It is understood and agreed that this settlement is the compromise of a doubtful and disputed claim, and the payment made is not to be construed as an admission of liability on the part of the party or parties hereby released, and that said releases deny liability therefore and intend merely to avoid litigation and buy their peace.
The undersigned hereby declares and represents that the injuries sustained are or may be permanent and progressive and that recovery therefore is uncertain and indefinite and in making this Release it is understood and agreed that the undersigned relies wholly upon the undersigned's judgment, belief and knowledge of the nature, extent, effect and duration of said injuries and liability therefore and is made without reliance upon any statement or representation of the party or parties hereby released or their representatives or by any physician or surgeon by them employed.
The undersigned further declares and represents that no promise, inducement or agreement not herein expressed has been made to the undersigned, and that this Release contains the entire agreement between the parties hereto, and that the terms of this Release are contractual and not a mere recital.

THE UNDERSIGNED HAS READ THE FOREGOING RELEASE AND FULLY UNDERSTANDS IT.

Signed, sealed and delivered this ___3rd___ day of ___April___ ,2014

CAUTION: READ BEFORE SIGNING BELOW

x _____
Claimant Jack Anderson

State of _Alabama_

County of _Montgomery_

On this _3rd_ day of _April_ , 2014, before me personally appeared

_Jack Anderson_ known to be the person (s) named herein and who executed the foregoing Release and he/she/they acknowledges to me that he/she/they voluntarily executed the same.

_____
Notary Public

My term expires ___05/27/2015___

PLAINTIFF'S EXHIBIT

Anderson 000003

# EXHIBIT C

Claim Number 01GC104536

## RELEASE OF ALL CLAIMS

### KNOW ALL MEN BY THESE PRESENTS:

That the undersigned, being of lawful age and authority, for sole consideration of Four Thousand Two Hundred Fifteen Dollars 74/100 ($4,215.74) to be paid to Jack Anderson do/does hereby and for my/our its heirs, executors, administrators, successors and assigns release, acquit and forever discharge Dixie Electric Cooperative, Federated Rural Electric Insurance Exchange and his, her, their or its agents servants, successors, heirs, executors, administrators and all other persons, firms, corporations, associations or partnerships of and from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever, which the undersigned now has/have or which may hereafter accrue on account of or in any way growing out of any and all known and unknown foreseen and unforeseen bodily and personal injuries and property damage and the consequences thereof resulting or to result from the accident, casualty or event which occurred on or about the 19th day of November, 2013 at, or near 3316 Ryan Ridge Loop, Montgomery, AL.

It is understood and agreed that this settlement is the compromise of a doubtful and disputed claim, and the payment made is not to be construed as an admission of liability on the part of the party or parties hereby released, and that said releases deny liability therefore and intend merely to avoid litigation and buy their peace.

The undersigned hereby declares and represents that the injuries sustained are or may be permanent and progressive and that recovery therefore is uncertain and indefinite and in making this Release it is understood and agreed that the undersigned relies wholly upon the undersigned's judgment, belief and knowledge of the nature, extent, effect and duration of said injuries and liability therefore and is made without reliance upon any statement or representation of the party or parties hereby released or their representatives or by any physician or surgeon by them employed.

The undersigned further declares and represents that no promise, inducement or agreement not herein expressed has been made to the undersigned, and that this Release contains the entire agreement between the parties hereto, and that the terms of this Release are contractual and not a mere recital.

THE UNDERSIGNED HAS READ THE FOREGOING RELEASE AND FULLY UNDERSTANDS IT.

Signed, sealed and delivered this 3ᵈ day of April , 2014

CAUTION: READ BEFORE SIGNING BELOW

x _____
            Claimant Jack Anderson

State of Alabama

County of Montgomery

On this 3ᵈ day of April 5 , 2014, before me personally appeared

Jack Anderson known to be the person (s) named herein and who executed the foregoing Release and he/she/they acknowledges to me that he/she/they voluntarily executed the same.

_____
Notary Public

My term expires 05/27/2015

PLAINTIFF'S
EXHIBIT
5

# EXHIBIT D

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE MIDDLE DISTRICT OF ALABAMA

 3                      EASTERN DIVISION

 4

 5    ESSEX INSURANCE COMPANY,

 6              PLAINTIFF,

 7    vs.              CIVIL ACTION NO. 3:15-CV-506

 8    J&J CABLE CONSTRUCTION,

 9    LLC, et al,

10              DEFENDANTS.

11

12

13              *  *  *  *  *  *  *  *  *  *  *

14

15         DEPOSITION OF JACK ANDERSON, M.D.,

16    taken pursuant to stipulation and agreement

17    before Haley Tunnell, Court Reporter and

18    Commissioner for the State of Alabama at Large,

19    at Montgomery Surgical Center, Taylor Road,

20    Montgomery, Alabama, on Tuesday, February 8,

21    2016, commencing at approximately 4:32 p.m.

22

23              *  *  *  *  *  *  *  *  *  *  *
```

```
1    Q.   Do you know why you wrote this or who you

2    sent it to?

3    A.   I don't know.  Let me see.

4         Yeah.  I was -- I think this is also -- I

5    remember Ms. Singleton.  Is that her name?

6    Q.   Yes.

7    A.   Yeah.  Singleton telling me that I needed

8    to submit in writing a request for loss of

9    rental income that was to -- I think, it was to

10   her at Dixie Electric.

11                  (Plaintiff's Exhibit No. 7 was

12                  marked for identification.)

13   Q.   Take a look at Exhibit 7, and please tell

14   us what that is?

15   A.   Without reading every bit of this -- and I

16   don't remember this letter in particular, but

17   this is, I'm thinking, the amount that they were

18   paying me back that I had paid out to fix my

19   properties, and this, I guess, was just

20   something that I signed, acknowledging that I

21   was in receipt of that payment.

22   Q.   Let me see make sure.  This one, which is

23   Exhibit 7, says "Release of all Claims" at the
```

1    top is a heading, and it relates to the 8216

2    Ryan Ridge Loop property.  Do you see that?

3    A.    I do.

4    Q.    And that's your signature on this?

5    A.    Right.

6    Q.    And in the last sentence of the first

7    paragraph, it talks about -- you see, right

8    here, it says, "As a result of the accident,

9    casualty or event which occurred on or about the

10   19th day of November 2013."  Do you see that?

11   A.    I do.

12   Q.    Do you know where that date came from?

13   A.    I don't.

14   Q.    Is that the date that you believe the sewer

15   backed up into the 8216 Ryan Ridge property?

16              MR. CALLIGAS:  Object.

17              MR. ALLRED:  Objection.

18   A.    I think it would be on or around that day,

19   but I don't know for sure.

20              MR. ALLRED:  What was the date?  I'm

21        sorry.

22              MR. FINCH:  November 19th.

23   Q.    And is that belief based on your

```
 1    conversation with Courtney or something else?
 2              MR. CALLIGAS:  Objection.
 3    A.    It's just based on the belief that that's
 4    the date they put here.  I know it's around the
 5    time -- I mean, we're saying late 2013.  I don't
 6    know the date that it happened.  I don't know.
 7    I don't remember.
 8    Q.    And then for the other property, there's a
 9    similar document, which I marked as Exhibit 8.
10         Is that a release for the 8212 property
11    that you signed?
12                   (Plaintiff's Exhibit No. 8 was
13                   marked for identification.)
14    A.    Yes.
15    Q.    And it also has the November 19, 2013,
16    date.
17         Do you have any basis for that date being
18    listed on the document?
19    A.    I don't.
20    Q.    Can you think of any information, Doctor,
21    or any documentation that you might have or
22    might be able to get that would enable us to
23    actually pin down either the date when Courtney
```