IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| ESSEX INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 3:15-cv-506-WHA-WC |
| J&J CABLE CONSTRUCTION, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT DIXIE ELECTRIC COOPERATIVE'S
RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT**

Defendant Dixie Electric Cooperative ("Dixie Electric") files this response in opposition to the Motion for Summary Judgment (Doc. 81) filed by Plaintiff Essex Insurance Company ("Essex"). As grounds for its opposition,[1] Dixie Electric states the following:

**INTRODUCTION**

Essex has failed to meet its burden of proving that the total pollution exclusion in its insurance policy ("the Policy") issued to J&J Cable Construction, LLC ("J&J") bars coverage for the claims in the underlying state court litigation.[2] First, Essex has failed to distinguish *U.S. Fidelity and Guaranty Co. v. Armstrong*, 479 So. 2d 1164 (Ala. 1985) ("*Armstrong*"), where the Supreme Court of Alabama held that an insurance policy's pollution exclusion did not bar coverage for damage caused by raw sewage flowing onto adjacent land during the construction

---

[1] In opposition to Essex's Motion for Summary Judgment, Dixie Electric also adopts and incorporates by reference its Motion for Summary Judgment (Doc. 83), Memorandum Brief (Docs. 84, 92), and Evidentiary Submission (Doc. 85). Dixie Electric also adopts and incorporates by reference its statement in footnote 1 of its Memorandum Brief (Doc. 84, 92) as if fully stated herein.

[2] *Marrell Crittenden, Jr. et al, v. Dixie Electric Cooperative, et al.*, in the Circuit Court of Montgomery County, Alabama, Case No. CV-2014-900103; and *Caroline Torrence v. Dixie Electric Cooperative, et al.*, in the Circuit Court of Montgomery County, Alabama, Case No. CV-2015-901757.

243742.4

of a sewer system.  Although the pollution exclusion in the Policy contains some differences from the one addressed in *Armstrong*, those differences are inconsequential. As the Supreme Court of Alabama made clear in *Porterfield v. Audubon Indemnity Co.*, 856 So. 2d 789 (Ala. 2002) ("*Porterfield*"), the total pollution exclusion in the Policy uses terms commonly associated with traditional environmental pollution that, when applied to facts such as residential sewage backup from a broken sewer pipe, are ambiguous and do not apply. *Id.* at 805-06.

Second, the Crittendens' and Caroline Torrence's damages allegedly began, and, in fact, began during the Policy period.  Essex has failed to offer substantial evidence that the damages and injuries began after the Policy's expiration to dispute the evidence presented by Dixie Electric. As discussed below, Essex ignores the Policy's language that any "continuation, change or resumption of that 'bodily injury' or 'property damage' after the end of the policy period" is covered. Essex also ignores Alabama cases making clear all of the damages here arise from an "occurrence" during the Policy period.

I.    **The Total Pollution Exclusion in the Policy Does Not Apply to Bar Coverage.**

The total pollution exclusion in the Policy (*see* Doc. 85-12, p. 41) does not bar coverage here for bodily injury and property damage caused by a residential sewage backup based on the Supreme Court of Alabama's holding in *Armstrong*. To begin, Essex bears the burden of proving the applicability of the pollution exclusion. Moreover, its exclusion "should be interpreted as narrowly as possible to provide the maximum coverage available." *Porterfield*, 856 So. 2d at 799-800. Stated another way, the exclusion should be construed "so as to limit the exclusion to the narrowest application reasonable under the wording."  *Id.* at 800 (quoting *Sullivan v. State Farm Mut. Auto Ins.*, 513 So. 2d 992, 994 (Ala. 1987)). When policy language is reasonably susceptible to two or more constructions or there is reasonable doubt or confusion as to the

meaning, the policy is ambiguous and is to be interpreted in favor of coverage.  *Porterfield*, 856 So. 2d at 799. As discussed below, this rule is particularly significant here, given that the Supreme Court of Alabama has found the same terms presented by the Policy's pollution exclusion to be ambiguous and, therefore, the exclusion did not apply.

In *Armstrong*, the Supreme Court of Alabama held that a pollution exclusion at issue did not bar coverage for damage caused by raw sewage flowing onto adjacent land during the construction of a sewer system. *Armstrong*, 479 So. 2d 1168. In so holding, the Supreme Court of Alabama found that the pollution exclusion was "not free of ambiguity" and was "intended to cover only industrial pollution and contamination." *Id.* The pollution exclusions at issue here and in *Armstron*g are more similar than they are different, and the few differences between them do not warrant a result different than in *Armstrong*, as explained below.

The pollution exclusion at issue in *Armstrong* provided:

> This insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalies, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

*Armstrong*, 479 So. 2d at 1168.

The total pollution exclusion in the Policy provides, in pertinent part, as follows:

> This insurance does not apply to: … '[b]odily injury' or 'property damage' which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of ["any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, soot, fumes, acids, alkalis, chemicals and waste"] at any time.

Doc. 85-12, p. 41 (with definition of "pollutants" from Doc. 85-12, p. 36, Definition No. 15).

As can be seen above, the language between the two exclusions is similar in all material respects. In its brief, Essex quotes only a portion of the pollution exclusion in *Armstrong*, and

omits all of the "environmental terms of art" ("discharge, **dispersal**, **release** or **escape**") *See* Doc. 81 at 24 (bold terms omitted); *See Porterfield*, 856 So. 2d at 806; *Armstrong*, 479 S. 2d at 1168.  Moreover, while the pollution exclusion in the Policy does not contain the language "into or upon land, the atmosphere or any water course or body of water," like the one in *Armstrong*, this language was not determinative in *Armstrong*.  Indeed, the Supreme Court of Alabama noted that the "raw sewage flowed **onto adjacent land** owned by Ms. Armstrong." *Armstrong*, 479 So. 2d at 1166 (emphasis added). In addition, while the pollution exclusion in *Armstrong* included the qualification that "this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental," the Supreme Court of Alabama did not rely on this language. In fact, there is nothing in *Armstrong* to suggest that the Supreme Court of Alabama characterized or viewed the raw sewage that flowed onto Ms. Armstrong's land as being "sudden and accidental;" in fact, it noted that raw sewage flowed "[d]uring the construction of the sewer system," which, given that the time necessarily required to construct a sewer system, would suggest that the flow was not "sudden." *See id*. at 1166, 1168.

Second, according to the pollution exclusion in *Armstrong*, a "pollutant" was "smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants." *Id*. at 1168. Implicit in the Supreme Court of Alabama's holding in *Armstrong* is that "raw sewage" from a city's sewer system was not a "pollutant" under the pollution exclusion at issue, notwithstanding its references to "waste materials," "irritants" and "contaminants." *See Armstrong*, 479 So. 2d at 1168. The Policy here uses practically the same definition for "pollutants": "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Doc. 85-

12, p. 36, Definition No. 15. [3] Accordingly, the definition of "pollutants" in the Policy warrants the same interpretation as in *Armstrong* -- that sewage from a residential sewer lateral is not a "pollutant" under the facts presented in this case.

At the very least, the definition of "pollutants" in the Policy is "not free of ambiguity" as applied to residential sewage, and thus should be construed against Essex. *See Armstrong*, 479 So. 2d at 1168 (noting that the pollution exclusion at issue had been found to be "not free of ambiguity" and construed against the insurer); *Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.*, 817 So. 2d 687, 695 (Ala. 2001) (interpreting an ambiguity in an insurance policy against the insurer). Moreover, because it is a term in a Policy exclusion, "it should be interpreted as narrowly as possible to provide the maximum coverage available." *Sullivan v. State Farm Mut. Auto. Ins.*, 513 So. 2d 992, 994 (Ala. 1987). Thus, as in *Armstrong*, this Court should find that the total pollution exclusion in the Policy does not bar coverage here for residential, non-industrial sewage related-damages, notwithstanding its references to "waste," "irritants," and "contaminants" in the definition of "pollutants."

Third, the pollution exclusion in *Armstrong* applied to "any discharge, dispersal, release or escape" of "pollutants." *Armstrong*, at 1168. The total pollution exclusion in the Policy uses almost identical language: "the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape." Doc. 85-12, p. 41. The terms "discharge" and "dispersal" have been characterized by the Supreme Court of Alabama in prior cases as "terms commonly associated with environmental law," and thus, Essex "can be presumed to have intended the same construction as used by the [Supreme Court of Alabama]." *See Porterfield*, 856 So. 2d at 806 (interpreting an "absolute pollution-exclusion clause"); *see also Nautilus Ins. Co. v. Jabar*,

---

[3] The removal of the terms "toxic" (before "chemicals") and "materials (after "waste") in the definition of "pollutants" in the Policy also does not warrant a different interpretation than in *Armstrong*.

188 F.3d 27, 30 (1st Cir. 1999) ("the terms used in the exclusion clause, such as 'discharge,' 'dispersal,' 'release' and 'escape,' are terms of art in environmental law and are generally used to refer to damage or injury resulting from environmental pollution."); *Saba v. Occidental Fire & Cas. Co. of North Carolina*, 2014 WL 7176776, at *2-3 (D. Ariz. Dec. 16, 2014) (same; interpreting the same total pollution exclusion that is in the Policy). Additional language in the total pollution exclusion in the Policy further supports the interpretation that the exclusion is directed to traditional environmental or industrial pollution, as found in *Armstrong*, and not residential sewage backup caused by a broken sewer pipe. In particular, the Policy's pollution exclusion goes onto exclude coverage for claims made by governmental authorities for damages because of "testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, 'pollutants'." Doc. 85-12, p. 41, clause f(2)(b); *see Saba*, 2014 WL 7176776, at *3 (noting that the same language supported the interpretation that the total pollution exclusion "appears to be directed at industrial insureds who must handle, store, and treat hazardous waste.") (citations and quotations omitted). A reasonable policyholder would interpret the exclusion in its totality to reach exactly the same conclusion as the Supreme Court of Alabama reached in *Armstrong*.

The few additional terms in that aforementioned clause of the total pollution exclusion in the Policy do not warrant a different interpretation. The addition of the term "threatened" also demonstrates an intent to include traditional environmental pollution, as opposed to residential sewage backup, because "[l]iability for a mere threat of injury is a concept that is fundamental in modern environmental statutes…, but is foreign to normal tort liability, … and incorporation of environmental liability terms and concepts into the absolute pollution exclusion illustrates that the exclusion was designed to be limited to injury for typical, industrial environmental damage."

*See Porterfield*, 856 So. 2d at 797 (quoting John N. Ellison et al., *Recent Developments in the Law Regarding the "Absolute" and "Total" Pollution Exclusion, the "Sudden and Accidental" Pollution Exclusion, and Treatment of the "Occurrence" Definition*, (ALI-ABA Course of Study Materials, Environmental Insurance: Past, Present, and Future, June 14-15, 2001)). Given their common meanings, the addition of the terms "seepage"[4] and "migration"[5] in the pollution exclusion does not warrant a different interpretation. In any event, these terms are inapplicable here given that there was a backup of sewage through residential plumbing, as opposed to a seepage through soil or another substance or a migration from one place to another.

Here, the backup of sewage into a residence from a broken sewer pipe does not constitute a "discharge, dispersal, seepage, migration, release or escape." It also does not constitute industrial or environmental pollution or contamination, and thus, should not fall within the total pollution exclusion in the Policy. *Armstrong*, 479 So. 2d at 1168. At the very least, the phrase "discharge, dispersal, seepage, migration, release or escape" in the pollution exclusion in the Policy is "not free of ambiguity" as applied to a residential sewage backup due to a broken sewer lateral, and thus should be construed against Essex. *See Armstrong*, 479 So. 2d at 1168 (noting that the pollution exclusion at issue had been found to be "not free of ambiguity" and construed against the insurer). The Supreme Court of Alabama found similar terms to be ambiguous in *Porterfield* and, construing them against the insurer as required by established rules of insurance policy construction, held the exclusion did not apply. *Porterfield*, 856 So. 2d at 806. Likewise, this Court should find that the terms are ambiguous (susceptible to two or more constructions

---

[4] "Seepage" is defined as "an occurrence in which a liquid or gas flows or passes slowly through small openings." *See* http://www.merriam-webster.com/dictionary/seepage (simple definition) (last accessed on March 14, 2016).

[5] "Migrate" is defined as "to move from one country, place, or locality to another" or to change position in an organism or substance." *See* http://www.merriam-webster.com/dictionary/migrate (last accessed on March 14, 2016).

when applied to the facts presented here), construe the terms against Essex, and find that the exclusion does not apply as a matter of law.

In sum, it is reasonable that J&J would interpret the exclusion <u>not</u> to apply to damage caused when it bored into a sewer lateral, particularly given the constructions given the exclusion by the Supreme Court of Alabama in *Armstrong* and *Porterfield*. For those reasons, as in *Armstrong*, this Court should find that the total pollution exclusion in the Policy was "intended to cover only industrial pollution and contamination" and thus, does not preclude coverage here for J&J. *See Armstrong*, 479 So. 2d at 1168.

Essex relies on *Shalimar Contrs. v. American States Ins. Co.*, 975 F. Supp. 1450 (M.D. 1997) ("*Shalimar*"), where this Court held that an insured's disposal of lead contaminated materials was barred by an absolute pollution exclusion. *Shalimar* is readily distinguishable for several reasons. First, the alleged "pollutant" in *Shalimar* was lead contaminated materials, whereas the instant case concerns residential sewage. *Id.* The only Alabama case addressing sewage in the context of an insurance policy's pollution exclusion is *Armstrong*, discussed above. Second, the "absolute pollution exclusion" in *Shalimar* is different than the "total pollution exclusion" in the Policy. *Compare Shalimar*, 975 F. Supp. at 1453 (quoting absolute pollution exclusion) *with* Doc. 85-12, p. 41 (total pollution exclusion in the Policy). As explained above, the pertinent language of the total pollution exclusion in the Policy is no different than the qualified pollution exclusion in *Armstrong*, which addressed sewage-related damages. Third, the insured in *Shalimar* was found to have handled, stored, and disposed of the alleged pollutants. *Shalimar*, 975 F. Supp. at 1455-1457 (noting that the insured did not dispute that "it did not handle, store, or dispose of the lead contaminated materials"). Here, it is undisputed that J&J does not handle, store, or dispose of raw sewage, or any environmental or industrial waste, in its

work -- J&J is in the business of underground boring for cable companies and other utilities. *See* Doc. 85-2, p. 2, ¶ 1. J&J assumed it was insured for its underground boring work. Deposition of Jerry Noblitt (2016), at 36:6-36:7 ("And when I go out and do work, I do work under the assumption that I'm insured.") (attached as Exhibit P).[6]

In addition, the analysis in *Shalimar* is limited and has been rejected by the Supreme Court of Alabama in *Porterfield*, where an absolute pollution exclusion was found to be ambiguous and ineffective to exclude personal injury claims arising from lead paint chips in a household. *Porterfield*, 856 So. 2d at 806. In *Porterfield*, the Supreme Court of Alabama recognized the limitations of *Shalimar*. Specifically, unlike here, the insured in *Shalimar* did not contend the specific terms of the pollution exclusion at issue were ambiguous. *Porterfield*, 856 So. 2d at 797-98 (citing *Shalimar*, 975 F. Supp. at 1455-1456). As noted in *Porterfield*, the *Shalimar* court concluded that absent evidence or argument that the language in the exclusion was ambiguous, the insured's argument that the exclusion should be limited to intentional pollution of the environment at large was without merit. *Id*. at 797 (citing *Shalimar*, 975 F. Supp. at 1456). As noted above, the *Porterfield* court also noted the insured in *Shalimar*, unlike J&J here, was found to be "'handling, storing and transporting pollutants in the form of waste contaminated with lead in connection with the lead abatement work being carried out at the Riverside Heights Housing Project.'" *Id*. at 798 (quoting *Shalimar*, 975 F. Supp. at 1458). Further, the issue and focus of the *Shalimar* court, according to the *Porterfield* court, was limited to whether lead was a pollutant. *Id*. ("The court in *Shalimar* assumed, without any specific analysis, that Shalimar's activities in depositing lead-bearing waste debris and clothing qualified

---

[6] J&J could not have reasonably expected that sewage-related damage caused by its underground boring work would be included in the total pollution exclusion in the Policy. J&J's liability coverage under the Policy should not be dependent on what type of underground pipe, line, or object that it happens hit or break while performing its underground boring work.

as a discharge dispersal, or release of those materials. **It thus focused its analysis mainly on the question whether lead was a pollutant**.") (emphasis added).

But most significantly, the Supreme Court of Alabama in *Porterfield* rejected the analysis in *Shalimar*. The *Shalimar* court declined to follow holdings of cases in other jurisdictions which found the terms "discharge," "dispersal," "release," and "escape" to be environmental terms of art aimed at traditional environmental liabilities. *See Porterfield*, 856 So. 2d at 798. As noted above, the *Porterfield* court, however, concluded that because the insurers chose to use the terms "discharge" and "dispersal" in its absolute pollution exclusion, which had been previously characterized by the Supreme Court of Alabama in addressing a qualified pollution exclusion as terms commonly associated with environmental law, the insurer can be presumed to have intended the same construction given to those terms by the Supreme Court of Alabama in its earlier decisions. *Id*. at 806 (citing *Essex Ins. Co. v. Avondale Mills*, 639 So. 2d 1339 (Ala. 1994)). Specifically, the Supreme Court of Alabama stated:

> Given this Court's characterization in *Essex v. Avondale Mills, supra*, of "discharge" and "dispersal" as terms commonly associated with environmental law, an insurer subsequently employing those terms can be presumed to have intended the same construction as used by the Court.

*Id*. Accordingly, as explained above, this Court should view the terms "discharge" and "dispersal," as well as the other similar and related terms, in the total pollution exclusion in the Policy as terms commonly associated with environmental law. *Id*.

The parties agree that this Court must apply Alabama law, as opposed to law from other jurisdictions. *See* Doc. 81, p. n. 1; Doc. 84, p. 15, n. 5. Indeed, as recognized by the Supreme Court of Alabama in addressing the absolute pollution exclusion in *Porterfield*, "[c]ases may be found for and against every issue any litigant has ever raised, and often the cases reaching the same conclusion as to a particular issue do so on the basis of differing, and sometimes

inconsistent, rationales." *Porterfield*, 856 So. 2d at 800. With respect to Alabama law, the Supreme Court of Alabama's decisions in *Armstrong* and *Porterfield* make clear that the total pollution exclusion in the Policy does not apply to the claimed injuries and damages here which were caused by a backup of residential sewage resulting from broken sewer laterals. For that reason, Essex's motion for summary judgment should be denied, and Dixie Electric's motion for summary judgment, as it relates to the inapplicability of the total pollution exclusion, should be granted.

Notwithstanding the foregoing arguments, the total pollution exclusion in the Policy does not apply to bar coverage for Dixie Electric's cross-claims against J&J in the underlying state court litigation for the cost to investigate and repair the damaged sewer laterals at 8212 Ryan Ridge Loop and 8216 Ryan Ridge Loop. *See* Doc. 50-1, pp. 31, 103. It also does not bar any claim in the underlying state court litigation for loss of use of the sewer laterals. *See* Doc. 50-1, pp. 20-22, 31, 93-95. The damage to the sewer laterals (*i.e.*, broken underground pipes), as well as the loss of use of the sewer laterals, qualifies as "property damage" under the Policy. Doc. 85-12, p. 36, Definition No. 17 (defining "property damage" as "[p]hysical damage to tangible property, including all resulting loss of use of that property."). Dixie Electric has filed cross-claims against J&J in the underlying state court litigation seeking to recover those costs. *See* Doc. 50-1, pp. 31, 103. The total pollution exclusion does not eliminate coverage for J&J for such property damage claims because the damage to the sewer laterals, as well as the loss of use of the sewer laterals, were caused by J&J's underground boring work (*see* Jerry Noblitt Depo. at 45:2-46:17, 207:16-22 (Doc. 85-3, pp. 13, 53)), and not by any alleged "pollutants." *See* Doc. 85-12, p. 41. As such, contrary to Essex's arguments (Doc. 81, p. 27), the total pollution exclusion does not bar "all coverage" here. Rather, Essex has an obligation to defend and

indemnify J&J against property damage claims in the underlying state court litigation. For that reason alone, Essex's motion for summary judgment should be denied.

## II.   Substantial Evidence Exists to Establish that Covered Damages Occurred During the Policy Period.

As explained in Dixie Electric's Motion for Summary Judgment (*see* Doc. 92), substantial evidence exists to establish that covered damages occurred during the Policy period. Rather than restating all of the facts and arguments contained in Dixie Electric's Motion for Summary Judgment, Dixie will address only certain factual issues and omissions in Essex's Motion for Summary Judgment (Doc. 81), as set out below. Further, Dixie Electric explains below why Essex's argument that the claimants' allegations of sewage backup amount to separate "occurrences" outside of the Policy is contrary to Alabama law.

### A.   Date of the Breach of the Sewer Laterals

In its motion, Essex stated that "[a]t **some time** during J&J Cable's work, it breached the sewer laterals… . The **actual date of the breach** of the sewer laterals **is still in question**… ." Doc. 81, p. 12 (emphasis added). Essex, however, ignores the clear, undisputed testimony in the record that the date of the breach of the sewer laterals was on November 8, 2013, within the Policy period. Jerry Weir, the employee of J&J handling the boring work, testified that all boring performed by J&J "was done on **Friday, November 8, 2013**." Weir Aff., ¶¶ 4-6 (Doc. 85-2, pp. 2-3) (emphasis added). From this testimony, it can be reasonably inferred that the sewer laterals were broken on November 8, 2013, within the Policy period. *Id*. Regardless, it is undisputed that all work performed by J&J was completed by **November 11, 2013**, within the Policy period. *Id*.;

Jerry Noblitt Depo. at 146:21-147:13 (Doc. 85-3, p. 38). In other words, there can be no dispute

that the sewer laterals were broken by November 11, 2013, within the Policy period. *Id.*[7]

### B.      First Sewage Incident at the Crittenden Residence

In its motion, Essex stated that "[Marrell Crittenden] does not know when he first noticed

or experienced sewage backup." Doc. 81, p. 13. Marrell Crittenden, however, testified that he

experienced sewage backup at his residence at 8212 Ryan Ridge Loop on Monday, November

11, 2013, while J&J was still working outside. *See* M. Crittenden 2016 Depo. at 25:6-27:8,

46:10-47:21, 51:3-16, 61:12-19 (Doc. 85-7).[8] While there may have been "no indication that

anyone knew the sewer laterals were breached until sometime after the work was completed," as

---

[7] Essex states that "Dixie Electric hired J&J Cable to perform the underground electrical portion of this work and informed J&J Cable how much conduit to use and where to run the conduit." Doc. 81, p. 11. To be clear, Dixie Electric's role with J&J's work was limited to telling J&J to run the conduits "from point A to B" in the easement, to providing acceptable conduit; and to confirming that the work had been performed satisfactorily after J&J finished. *See* Jerry Noblitt 2014 Depo. at 24:7-25:19, 34:12-35:13, 76:7-77:, 87:8-87:12, 163:22-167:16 (Doc. 85-3). As far as the depth of the boring and installation of conduit, that decision was in the sole discretion of J&J, subject to the minimum requirements of the National Electric Safety Code. *Id.* at 163:22-167:16, 172:14-173:14, 198:16-199:8. Finally, no Dixie Electric employee was even present at the location where J&J performed its work. Brad Arrington 2014 Depo. at 51:19-52:3 (Doc. 85-1). While Dixie Electric does not believe these facts are material to the issues on summary judgment, Dixie Electric did not want to viewed as having ignored these facts in later argument by Essex.

[8] In 2014, Marrell Crittenden testified that the first sewage backup incident occurred **prior to November 16, 2013**, but he did not know the exact date. *See* M. Crittenden 2014 Depo. at 46:4-47:2 (Doc. 85-10, p. 13) ("I don't know the exact date, but before [November 16, 2013]."). Marrell Crittenden's testimony in 2016 that the first sewage backup occurred on Monday, November 11, 2013, does not contradict his earlier testimony from 2014 (that he "did not know the exact date"). It can be explained as a clarification or that he simply could not recall the date in 2014 but could recall it in 2016. *See Kerns v. Sealy*, 2007 U.S. Dist. LEXIS 48918, at *43 (S.D. Ala. July 6, 2007) (recognizing that a party is not precluded from elaborating upon, explaining, or clarifying prior testimony). For that reason, Marrell Crittenden's testimony should be considered on summary judgment.

Even without that "specific date" testimony, there is sufficient evidence in the record to establish that the first sewage backup occurred on November 11, 2013 or earlier. Marrell Crittenden testified that J&J was outside working when the first sewage backup occurred, which does not contradict any earlier testimony from 2014. *See* M. Crittenden 2016 Depo. at 25:6-27:8 (Doc. 85-7, p. 8). Given the undisputed testimony from J&J that it completed its work on November 11, 2013 (*see* Doc. 85-2, pp. 2-3), a reasonable inference can be drawn that the first sewage backup described by Marrell Crittenden occurred on or before Monday, November 11, 2013, even without considering Marrell Crittenden's "specific date" testimony referenced above.

argued by Essex (*see* Doc. 81, p. 12), Marrell Crittenden's testimony establishes that sewage backed up in the Crittenden residence by November 11, 2013. *Id*. In addition, Marrell Crittenden testified that his daughter, M.C., was present at the house during that first sewage incident. *See* M. Crittenden 2016 Depo. at 25:13-25:20 (Doc. 85-7, p. 8); M. Crittenden 2014 Depo. at 47:16-22 (Doc. 85-10, p. 13).

Courtney Bynum testified to a sewage backup incident that occurred "maybe" or "approximately" two weeks before November 16, 2013. C. Bynum 2016 Depo. at 30:9-30:21, 34:1-40:6 (Doc. 85-9).[9] While Essex characterizes the testimony as "patently unbelievable," a sewage backup incident occurring on November 8, 2013 (day of the boring work) would still fit within her time frame given that it would be more than one week and less than two weeks prior to November 16, 2013. C. Bynum 2016 Depo. at 40:2-6 ("Q. Did the first incident occur more or less than fourteen days prior to November 16th? A. I don't recall, but it was in that time line.") (Doc. 85-9, p. 11).

C.      **First Sewage Incident at the Torrence Residence**

Essex states that "[Caroline] Torrence could not offer any testimony as to when the sewage backup into her home first occurred." Doc. 81, p. 19. Torrence, however, did testify that the first sewage backup occurred in "the beginning of November of 2013." Torrence Depo. at 40:15-41:11 (Doc. 85-6, pp. 11-12). From that testimony, a reasonable inference can be drawn that Torrence's sewage incident occurred before November 12, 2013, within the Policy period, particularly in light of the fact that the sewer lateral was broken on November 8, 2013 (or at least by November 11) and the Crittenden's sewage problem began by at least November 11, 2013.

---

[9] This testimony also contradicts Essex's statement that "Courtney Bynum[] repeatedly testified that the sewage overflow occurred on November 16, 2013…." Doc. 81, p. 14. While she did testify to a sewage incident on November 16, it was not the first sewage incident at the Crittenden residence.

### D.   Mischaracterization of the Allegations of the Underlying Complaints

The operative complaints in the underlying state court litigation both allege that "[o]n or about or between November 3, 2013 until approximately sometime after November 11, 2013, the sewage line at Plaintiff's home was breached and thereafter raw sewage began to and continued to seep and invade Plaintiff's home through bathroom toilets, under various walls within her dwelling place, the family living room, and various closets within the household and in hallways until approximately middle to late November 2013." Doc. 50-1, pp. 20-21, ¶ 10; p. 93, ¶ 7. Essex attempts to mischaracterize the word "thereafter" in the allegation above as meaning "after the November 3-11 timeframe." *See, e.g.*, Doc. 81, p. 19. The allegation, however, when read in full, unlike how it is quoted in broken parts by Essex (*see* Doc. 81, p. 19), reveals that the word "thereafter" is simply referring to the logical fact that the sewage backup occurred <u>after</u> the breach of the sewer lateral. Doc. 50-1, pp. 20-21, ¶ 10; p. 93, ¶ 7. In addition, the allegations of the complaints could be read to mean that the breach of the sewer lateral occurred sometime between November 3, 2013 and November 11, 2013, which is consistent with the allegations of Dixie Electric's cross-claims in the underlying state court litigation. *See* Doc. 50-1, p. 28, ¶  3; p. 100, ¶ 3.

Essex also attempts to rely on the original complaint filed by the Crittendens in the underlying state court litigation. *See* Doc. 81, p. 14. The original complaint, however, is irrelevant as it has been superseded by the Crittendens' second amended complaint (Doc. 50-1, pp. 18-26). *See Ex parte Puccio*, 923 So. 2d 1069, 1072 (Ala. 2005) ("An amended complaint supersedes the previously filed complaint and becomes the operative pleading, unless it subsequently is modified.").

E.     **The Policy and Applicable Alabama Law Demonstrate Essex Owes Coverage for all of the "Bodily Injury" and "Property Damage" Claims.**

As set forth above and as explained in Dixie Electric's Motion for Summary Judgment (*see* Doc. 92), there is substantial, undisputed evidence of an "occurrence" of "bodily injury" and "property damage" during the Policy period. Essex relies on two cases to support its argument that the applicable "occurrence" took place outside the Policy. In addition to the evidentiary shortcomings of its arguments, the case law on which Essex relies does not support its position. Further, as explained below, Essex simply ignores Policy language demonstrating all of the injury is treated as having arisen during its Policy, as well as Alabama case law demonstrating that the "occurrence" for purposes of Essex's coverage obligations[10]—the accidental breaking of sewer laterals, the event that proximate caused loss of use of entire sewer systems, the sewage backup, and all of the damages claimed in the underlying state court litigation.

First, Essex relies on *Cincinnati Ins. Co. v. Amerisure Ins. Co.*, 2012 WL 4033724 (S.D. Ala. Sept. 12, 2012), which involved a faulty workmanship claim (an insured allegedly defectively constructing condominiums where work deficiencies resulted in later damage) in contrast to a specific, accidental damage event (an insured accidentally breaking sewer laterals pipe – (*i.e.*, "property damage") that led to the loss of use of sewer systems and to sewage backups). In *Cinncinati,* problems with cracked stucco were experienced in 2003. *Id.* at *1*. Repairs were performed in 2004 "to the full satisfaction of all concerned." *Id.* For the period 2004 through 2007,

> [t]here [was] no evidence of any ongoing issues, problems, defects, claims, or disputes that [condo owner] presented to [general contractor] during that time period; rather, by all appearances, the repairs were deemed satisfactory by [condo

---

[10] The question of whether the breaking of two different sewer laterals constitutes one or two "occurrences" under the Policy is not at issue here.  For purposes of this response, the import here is that the accidental breaking of the sewer lateral is the occurrence that triggers coverage under the Policy.

owner,] the balconies appeared to be functioning properly, and the observed water intrusion issues appeared to have been corrected to the satisfaction of all concerned. [Condo owner] sustained no damages, expended no resources on balcony-related repairs, and endured no curtailment of its members use and enjoyment of their balconies during this interval.

*Id.* at 2. The three-year silence "abruptly ended" on May 25, 2007, when the condominium owner's attorney wrote a letter identifying sagging damage to the balconies. Importantly, the Court noted the letter "made no mention of the 2003-2004 water intrusion issues on the [condominium] balconies, nor insinuated that [condo owner] viewed the present problems as a continuation or outgrowth of those issues, as opposed to a newly discovered defect." *Id.* According to the court, the complaint in the underlying dispute "could not have been more clear as to timeframe, alleging that '[i]n Spring of 2007, the balconies began to sag.'" *Id.* at 3.

The court in *Cincinnati*, therefore, addressed the timing of an "occurrence" of "property damage" in the context of faulty construction claims, and relied on the general rule that "the relevant inquiry is when the property damage took place, not when the underlying work was performed." *Id.* at 9. All of the evidence was unequivocal that the damage on which the claims were based first occurred in 2007. In contrast, here the damage on which the underlying claims are based first occurred on November 8, 2013 (or at least by November 11, 2013), when J&J accidentally broke two sewer laterals. This alone is sufficient to trigger the Policy's coverage, but in addition to the damage to the two sewer laterals, the damaged pipes immediately began the process of sewage backup. While not necessary to defeat Essex's motion for summary judgment, Marrell Crittenden's testimony puts sewage backup in his home before expiration of the Policy. *See* Section II.B., *supra*.

In sum, this is not a construction defect claim where faulty workmanship led to a damage event years later, or separate and independent damages years apart,—this is a claim where an

insured broke sewer laterals (an immediate damage event) that stopped them from working and led to additional damage up to and beyond expiration of the Policy. The "occurrence" of damage took place the moment J&J broke the sewer laterals.  Noticeably absent from Essex's motion for summary judgment is the provision in the Policy that "'**[b]odily injury' or 'property damage' which occurs during the policy period** and was not, prior to the policy period, known to have occurred by an insured …, **includes any continuation, change or resumption of that 'bodily injury' or 'property damage' after the end of the policy period**." Doc. 85-12, p. 22 (Section I, Coverage A, 1.c) (emphasis added). As explained in Dixie Electric's Motion for Summary Judgment, because the damage here began during the Policy period, Essex owes coverage for any continuation, change, or resumption of that injury or damage after the end of the Policy (*i.e.*, after 12:01 a.m. on November 12, 2013). *See* Doc. 92, pp. 23-26.

Further, the facts here are easily distinguishable from those presented in *Liberty Mut. Ins. Co. v. Wheelwright Trucking Co., Inc.*, 851 So. 2d 466 (Ala. 2002), also cited by Essex, where the trailers associated with the loss of use claim did not fail until three years after cracking began. The court found the "occurrence" was not the cracking beginning in 1995, but the failure of the trailers when carrying the heavy loads in 1998.  *Id.* at 483. The Court specifically noted in reaching its determination that "the duration of the cracking and its effect on the performance of the trailers for hauling other loads was uncertain." *Id.*  at 481. In stark contrast, the sewer laterals here were broken, immediately stopped working, and sewage began backing up when the Policy was still in effect. This is not a case of J&J's product failing or its workmanship later proving faulty and causing subsequent damage years later. This is a case where J&J accidentally broke two sewer laterals and almost immediately sewage backed up into the residences.

All of the injuries and damages here proximately resulting from J&J breaking sewer laterals, and, therefore, arise from "occurrences" (the breaking of the lines) within the Policy. Alabama cases addressing the issue of number of "occurrences" when there are multiple damages and injury claims are instructive. In *USF&G v. Safeco Ins. Co.,* 444 So. 2d 844 (Ala. 1983), the Supreme Court of Alabama adopted the cause test for purposes of determining whether multiple claims of injuries having "multiple and disparate impacts on individuals and ... over a period of time" arise from one or multiple "occurrences." "As long as the injuries stem from one proximate cause there is a single occurrence." *Id.* at 846 (quotation omitted).  In *Home Indemnity Co. v. City of Mobile*, 749 F.2d 659 (11 Cir. 1984), the court described the cause test as follows:

> Thus, a single occurrence may result in multiple injuries to multiple parties over a period of time; but if one cause is interrupted and replaced by another intervening cause, the chain of causation is broken and more than one occurrence has taken place."

*Id.* at 662; *Certain Underwriteers at Lloyd's, London v. Southern Nat. Gas Co.*, 142 So. 3d 436, 457 (Ala. 2013) ("Sonat had cleanup areas at each site where Pydraul . . . had contaminated the groundwater; that contamination was caused by the use of Pydraul through a unitary pipeline; and the manner of operating each compressor station was the same. . . we cannot say that [Liberty Mutual] has shown that the trial court erred in finding that there had been one 'occurrence'"); *St Paul Fire & Marine Ins. Co. v. Christianson Marine, Inc.*, 893 So. 2d 1124 (Ala. 2004) ("The fact that all seven barges were involved in the incident giving rise to Christiansen Marine's damage does not establish that there were seven 'occurrences,' for purposes of calculating the deductible due under the policy. . . . Moreover, St. Paul has not offered any evidence to establish that Christiansen Marine's damage resulted from more than one proximate cause. . . .").

Here, the proximate cause for all of the damage was two broken sewer laterals an "occurrence" undisputedly during the Policy period. *See* Doc. 50-1, pp. 20-21, ¶ 10 ("the sewage line was breached and thereafter raw sewage began to and continued to seep and invade their home. . . ."); Doc. 50-1, p. 28, ¶ 3 ("The damage to the underground sewer laterals which occurred on November 8, 2013 and/or November 11, 2013 caused and continued to cause property damage, including, but not limited to, a sewage back up in the house"). J&J reasonably expected all of these damages to be covered, based on this well settled Alabama law and the Policy's language. The Policy includes an Each Occurrence Limit that limits the damages Essex must pay "because of "all 'bodily injury' and 'property damage' arising out of any one "occurrence." Doc. 10-8, p. 23. "Occurrence" is defined in the Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Doc. 10-8, p. 27. "Property damage" and "bodily injury" under the Policy include any continuation, change or resumption of that 'bodily injury' or 'property damage' after the end of the policy period." A reasonable construction of the Policy is that it is intended to cover all damage and claims stemming from a single "occurrence" during the Policy. Essex interpretation that the Policy does not so apply finds no basis in Alabama law.

### III. Essex is Obligated to Defend and Indemnify J&J against Dixie Electric's Cross-Claims in the Underlying State Court Litigation.

While Dixie Electric admits that it is not a named insured under the Policy, the allegations of Dixie Electric's cross-claims against J&J in the underlying state court litigation clearly invokes coverage under the Policy and an obligation of Essex to defend the cross-claims. *See* Doc. 50-1, pp. 28-31, 100-103. The cross-claims against J&J seeking "[a] money judgment for all monies paid on any claim(s) against Dixie for the cost to investigate the broken sewer laterals, the cost to repair the broken and damaged sewer laterals, the loss of use of property

resulting from the broken and damaged sewer laterals and continuing damage, and the cost to clean up the houses at 8212 Ryan Ridge Loop and 8216 Ryan Ridge Loop" constitute a claim for "property damage" under the Policy. *See* Doc. 50-1, pp. 31, 103; Doc. 92, pp. 19-20. The cross-claims clearly state a claim for "property damage" during the Policy period because the cross-claim alleges that the sewer laterals were breached prior to November 12, 2013. *See* Doc. 50-1, p. 28, ¶ 3; p. 100, ¶ 3. As for "bodily injury," the cross-claims against J&J seek a money judgment for all sums that may be adjudged against Dixie in favor of Torrence and the Crittendens, which includes their respective claims for "bodily injury," as well as "property damage." *See* Doc. 50-1, p. 29, ¶ 7, p. 31, p. 101, ¶ 7, p. 103. As explained in Dixie Electric's Motion for Summary Judgment (*see* Doc. 92), and above, the Crittendens and Torrence have made claims for "bodily injury" and "property damage" covered by the Policy.

## **CONCLUSION**

In conclusion, Essex has not met its burden of establishing that the total pollution exclusion in the Policy applies to bar coverage, and substantial evidence has been presented to establish that covered damages occurred during the Policy period. Further, Essex is obligated under the Policy to defend J&J against Dixie Electric's cross-claims in the underlying state court litigation. For those reasons, Essex's Motion for Summary Judgment should be denied.

Respectfully submitted this the 23rd day of March, 2016.

/s/Louis M. Calligas
One of the Attorneys for Defendant
Dixie Electric Cooperative

**OF COUNSEL:**
John G. Smith (ASB-8146-T68J)
jgsmith@balch.com
Louis M. Calligas (ASB-4907-O73C)
lcalligas@balch.com
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and service will be perfected upon any CM/ECF participants electronically on this the 23rd day of March, 2016:

F. Lane Finch, Jr.
Lane.Finch@swiftcurrie.com
Brian C. Richardson
brian.richardson@swiftcurrie.com
Swift Currie McGhee and Hiers, LLP
2 North 20th Street, Suite 1405
Birmingham, AL 35203
*Attorneys for Essex Insurance Company*

Robert Simms Thompson
rstpc@aol.com
Tiffany Nichelle Johnson-Cole
tnijohnson@aol.com
Robert Simms Thompson, PC
P.O. Box 830780
Tuskegee, AL 36083
*Attorneys for the Crittendens and Caroline Torrence*

Tyrone C. Means
tcmeans@meansgillislaw.com
H. Lewis Gillis
hlgillis@meansgillislaw.com
Kristen J. Gillis
kjgillis@meansgillislaw.com
Means Gillis Law, LLC
P.O. Box 5058
Montgomery, AL 36103
*Attorneys for the Crittendens and Caroline Torrence*

David E. Allred
dallred@allredpclaw.com
D. Craig Allred
callred@allredpclaw.com
Allred & Allred, P.C.
7030 Fain Park Drive, Suite 9
Montgomery, Alabama 36117
*Attorneys for J&J Cable Construction, LLC*

/s/Louis M. Calligas
Of Counsel