IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| Essex Insurance Company,   )<br>    Plaintiff,   )<br>   )<br>v.   )<br>   )<br>J&J Cable Construction, LLC, *et al.*   )<br>    Defendants.   )<br>   )<br>And Related Actions   ) | Case No.:  3:15-cv-506-WHA<br><br>**OPPOSED** |

### ESSEX INSURANCE COMPANY'S REPLY TO DIXIE ELECTRIC COOPERATIVE'S OPPOSITION TO ESSEX INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

Essex Insurance Company replies to Dixie Electric Cooperative's Response in Opposition to Essex's Motion for Summary Judgment (Doc. 98) and, in summary, shows:

1. The Essex Total Pollution Exclusion Bars Coverage for Damages Caused by Exposure to Raw Sewage.

2. The "Property Damage" and "Bodily Injury" Did Not Occur Until After the CGL Policy Expired.

3. Dixie Electric has no Standing to Raise Coverage Issues.

### I.    INTRODUCTION

Essex has thoroughly briefed the issues in this case in its Motion for Summary Judgment (Doc. 81), its Opposition to Dixie Electric's Motion for Summary Judgment (Doc. 95), and its Opposition to J&J Cable Construction's

1

Motion for Summary Judgment (Doc. 96), which are incorporated by reference herein. The purpose of this Reply Brief is to target new and/or restructured arguments and positions taken by Dixie Electric in its Opposition to Essex's Motion for Summary Judgment (Doc. 98). Essex does not waive any arguments or positions made in its Motion for Summary Judgment or Oppositions to Summary Judgment, which have sufficiently addressed Dixie Electric's arguments and positions in its Motion for Summary Judgment and Opposition to Essex's Motion for Summary Judgment.

## II.     ARGUMENT

**A.     The Essex Total Pollution Exclusion Bars Coverage for Damages Caused by Exposure to Raw Sewage.**

Essex has provided substantial evidence, and supporting case law, showing that the subject Total Pollution Exclusion bars coverage for the damages here since all damages were allegedly caused by exposure to raw sewage containing human waste. There is no doubt the claims by each Crittenden and by Torrence all arose from their individual exposure to human waste that backed up in to their rental houses on or about November 16, 2013.

Dixie Electric's position that the Essex Total Pollution Exclusion is limited to industrial waste is based on the 1985 *Armstrong* decision interpreting a qualified pollution exclusion. Here, as in *Shalimar Contractors, Inc. v. Am. States Ins.*, 975 F. Supp. 1450 (M.D. Ala. 1997).

> [T]he present exclusion bars coverage for the "actual ... discharge, dispersal, seepage, migration, release, or escape of pollutants," and makes no reference to whether the release was into or upon land, the atmosphere, or water, or whether the release was sudden, accidental, or gradual in nature. In short, the court finds that the present exclusion is far more specific and covers a far broader range of activities than the pollution exclusion at issue in the cases cited by the Plaintiff. The court concludes that, absent any evidence or argument that the language in this particular exclusion is ambiguous, the Plaintiffs argument that the present exclusion should be limited to intentional pollution of the environment at large is without merit.

*Shalimar Contractors, Inc.*, 975 F. Supp. at 1457. Likewise, the Essex Total Pollution Exclusion covers a far broader range of activities than the qualified pollution exclusion at issue in *Armstrong*. Furthermore, as in *Shalimar Contractors*, the Essex Total Pollution Exclusion makes no reference to whether the release was onto or upon land, the atmosphere, or water, or whether the release was sudden, accidental or gradual in nature. In short, Dixie Electric's argument that the Essex Total Pollution Exclusion should be limited to intentional pollution of the environment at large is clearly without merit.

Dixie Electric relies heavily on the *Armstrong* decision, citing it almost three dozen times. However, that decision does not broadly support Dixie Electric's position, as it suggests. The *Armstrong* case arose from a sewer system project, during which raw sewage flowed onto adjacent land owned by Ms. Armstrong. One of the defenses raised by USF&G was a qualified pollution exclusion. As the

3

court noted in that 1985 decision, the pollution exclusion was, in the early 1980s, "relatively new to the insurance industry." 479 So. 2d at 1168.

Important to deciding the instant case, the Alabama Supreme Court said in Armstrong:

> We should not be understood to hold that raw sewage could never be such a "pollutant," or that the insurance company could not write an exclusion clause which would cover the activity involved here. We hold only that this policy clause, under the facts of this case, does not eliminate coverage.

*Id*.

That quotation refutes Dixie's claim that "[I]mplicit in … *Armstrong* is that 'raw sewage' from a city's sewer system was not a 'pollutant' …." Dixie's Opp. Br., 4. That quote also contradicts J&J Cable's assertion that *Armstrong* holds human waste is not a pollutant. Doc. 97, 2. The argument the defined term "pollutant" does not include "human waste" is also contradicted by the definition itself which states "'Pollutants' mean any solid [or] liquid … irritant or contaminant, including … waste." Doc. 97, 3; *compare* policy at Doc. 82-4, p. 13 of 14.

The differences between the pollution exclusion in *Armstrong* and the Essex Total Pollution Exclusion are not, as Dixie Electric characterizes them, "inconsequential." Dixie's Opp. Br., 2. Importantly, the qualified pollution exclusion in *Armstrong* states "this exclusion does not apply if such discharge,

dispersal, release or escape is sudden and accidental." 479 So. 2d at 1168. The exception for accidental discharge of pollutants is consistent with the court's understanding that that exclusionary clause "was 'intended to cover only industrial pollution and contamination.'" 479 So. 2d at 1168, *citing Molton, Allen & Williams, Inc. v. St. Paul Fire & Marine Ins. Co.*, 347 So. 2d 95, 99 (Ala. 1977), other citation omitted.

Here, the Essex Total Pollution Exclusion expressly excludes coverage for ALL pollution: "This insurance does not apply to … '[b]odily injury' or 'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." There is NO exception for accidental discharge of pollutants as there was in the old qualified pollution exclusion.

The distinction between Essex's total pollution exclusion and the old qualified pollution exclusion is further illustrated in *Molton, Allen and Williams,* where the court considered evidence that the early "pollution exclusions" "contemplate only the discharge of foreign matter or industrial refuse into the environment …" and "the exclusions are directed solely to intentional discharges by an industrial operation of foreign matter or industrial refuse into the environment." *Molton, Allen & Williams, Inc. v. St. Paul Fire & Marine Ins. Co.*, 347 So. 2d 95, 98 (Ala. 1977). Under the early pollution exclusions "Coverage is

5

afforded for damages caused by pollution or contamination if the discharge, dispersal, release, or escape is sudden and accidental." *Id*. That "eliminate[d] coverage for damages arising out of pollution or contamination, expected or intended on the part of the insured. *Id*.

As shown above, Essex's Total Pollution Exclusion does not allow coverage for damage caused by pollution if the discharge, etc. is accidental. Quite to the contrary. The total pollution exclusion totally excludes coverage for damages caused by pollution "at any time."

This brings us full circle to the prophetic statement by the Alabama Supreme Court in *Armstrong*: "We should not be understood to hold that raw sewage could never be such a 'pollutant,' or that the insurance company could not write an exclusion clause which would cover [the discharge of raw sewage] …." 479 So. 2d 1168.  Therefore the Court should find that the Essex Total Pollution Exclusion is, just that. A total exclusion of all bodily injury or property damage caused, in whole or in part, by exposure to pollution.

It is equally clear there raw sewage is pollution.  Any contention to the contrary defies common sense. Further, contention raw sewage is not a pollutant is out of step with the state's environmental laws. The Alabama Department of Environmental Management, Water Division (hereinafter "ADEM") defines sewage as:

6

> Water carried human wastes from residences, buildings, industrial establishments or other places, together with such ground surface, storm or other waters as may be present.

ADEM Admin. Code r. 335-6-5-.02 (nn).  ADEM's definition of "Pollutant" includes "sewage".

> "<u>Pollutant</u>" includes but is not limited to dredged spoil, solid waste, incinerator residue, ***sewage***, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked, or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

ADEM Admin. Code r. 335-6-5-.02 (gg) (emphasis added).

Therefore, the Court will find the Essex Total Pollution Exclusion is not limited to environmental disasters or industrial pollution and it bars coverage for the "bodily injury" and "property damages" asserted by each of the Crittendens and by Torrence. As such, Essex is entitled to summary judgment in this case.

**B.    The "Property Damage" and "Bodily Injury" Did Not Occur Until After the CGL Policy Expired.**

Essex has provided substantial evidence that the Crittenden separate bodily injury and property damage claims asserted by each and by Torrence did not arise until after the expiration of the policy at 12:00 a.m. on November 12, 2013.  Dixie Electric relies on Marrell Crittenden's contradictory testimony to argue that the backup occurred during the policy period.  As demonstrated in Essex's Motion for Summary Judgment and Opposition to Dixie Electric's Motion for Summary

Judgment, Marrell Crittenden's contradictory testimony cannot be used by Dixie Electric in support of its Motion for Summary Judgment. Doc. 81, 18-19; Doc. 95, 10 and 14.

Dixie Electric attempts to tie together all of the individual claims into one bundle and assert they all occurred when the property owner, the Andersons, suffered property damage in the form of damage to the sewer laterals. The primary ties Dixie Electric used to bind this bundle are *Home Indemnity Co. v. City of Mobile*, 749 F.2d 659 (11 Cir. 1984) and *Certain Underwriters at Lloyd's, London v. Southern Nat. Gas Co.*, 142 So. 3d 436 (Ala. 2013) ("*Sonat*"). However, those cases do not involve bodily injury or property damage that first occurred to a claimant *after* expiration of the policy at issue.

The *Sonat* case arose from PCB and Mercury leaks from a series of compressor stations along Sonat's natural gas pipeline. The claimants sought damages for past and future, response costs for a legend property damage which was continuous and progressive, beginning in 1949 and extending up until 1996. 142 So. 3d at 442. The insurer alleged the PCB contaminations occurred at different compressor stations at different times and by different means and were, thus, separate occurrences.

The main policies at issue defined "occurrence" as

"An accident or a happening, event or a continuous or repeated exposure to conditions which results unexpectedly and unintentionally

8

>as applied to the Assured seeking indemnity hereunder, in ... property damage ... during the policy period. ***All such exposures to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence***."

142 So. 3d at 441, 453; emphasis added.

Other applicable policies defined occurrence as: "[O]ne happening or series of happenings arising out of or caused by one event taking place during the term of this contract." 142 So. 3d at 453.

In contrast, the Essex definition of "occurrence" does not include language deeming multiple exposures to be one occurrence: "'Occurrence' means ***an accident***, including continuous or repeated exposure to substantially the same general harmful conditions." CITE; emphasis added.

*Home Indem. Co. v. City of Mobile*, 749 F. 2d 659 (11th Cir. 1984), is also distinguishable. The policy language at issue in that case provided that: "for the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of the continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of *one occurrence*." 749 F. 2d at 661; emphasis in original. There is no such language in the Essex policy. Moreover, this case is not followed in Alabama and has only been cited to twice in Alabama since the opinion. *See Home Indem. Co. of New York v. City of Mobile*, 477 So. 2d 312 (1985) (cited to for procedural reference only); *see also Worthington Fed. Bank v. Everest Nat. Ins. Co.*, 110 F. Supp. 3d 1211 (N.D. Ala.

9

2015). As Essex pointed out in its Motion for Summary Judgment and oppositions to defendants motions for summary judgment, the "timing of an 'occurrence' for insurance purposes ... is when the property damage took place, not when the underlying work was performed." *Cincinnati Ins. Co. v. Amerisure Ins. Co.,* 2012 WL 4033724, *9 (S.D. Ala. 2012), *citing U.S. Fid. & Guar. Co. v. Warwick Dev. Co.*, 446 So. 2d 1021, 1024 (Ala. 1984) (finding that Alabama courts have never construed the manifestation trigger to include accumulative, imperceptible deterioration). The relevant inquiry is not the time the wrongful act was committed, but the time the complaining party was actually damaged. *Cincinnati Ins. Co.*, 2012 WL 4033724 at *9.

What is overlooked by Dixie Electric, and should not be overlooked by the Court, is the Essex policy requires that the occurrence first happen during the policy period: "This insurance applies to 'bodily injury' and 'property damage' ***only if***: … [t]he 'bodily injury' or 'property damage' occurs during the policy period …." CITE; emphasis added. The decisive question is when was the first occurrence? The standard for answering that question is not addressed in *Sonat*. The *City of Mobile* decision does not answer that question either.

The standard is enunciated in *U.S. Fid. & Guar. Co. v. Warwick Dev. Co.*, 446 So. 2d 1021, 1024 (Ala. 1984): "[A]s a general rule the time of an 'occurrence' of an accident within the meaning of an indemnity policy is not the

10

time the wrongful act was committed but the time the complaining party was actually damaged.'" More than a dozen decisions under Alabama law state the same standard, including, most recently, *Essex Ins. Co. v. J & J Masonry LLC*, 2015 WL 1499120, (N.D. Ala. Apr. 1, 2015):

> Alabama courts apply a manifestation of damages rule for determining when an insurance policy's defense and coverage obligations are triggered. In … *Warwick Development Co*., … the Alabama Supreme Court adopted "as a general rule the time of an 'occurrence' of an accident within the meaning of an indemnity policy is not the time the wrongful act is committed but the time the complaining party was actually damaged." ***As a practical matter, this general rule means "the insurance that is in force at the time of the property damage ... is applicable rather than insurance that was in force when the work was performed*.**"

2015 WL 1499120, at *2, citations omitted; emphasis added.

### C. Dixie Electric has no Standing to Raise Coverage Issues.

As discussed in previous motions, Dixie Electric admits it is not an insured under the Essex policy and, as such, is not due reimbursement of attorney fees, expenses, and costs in defending the underlying Crittenden Litigation and the Torrence Litigation. Doc. 95, 3-4. Dixie Electric does not have standing to assert claims on behalf of the insured, yet it attempts to do so. Therefore, based on the previous motions and the arguments made herein, the Court should deny Dixie Electric's motion and dismiss its claims against Essex.

### III. <u>CONCLUSION</u>

WHEREFORE, Essex respectfully requests that this Honorable Court declare and adjudge Essex does not owe a duty to defend J&J Cable with respect to the Underlying Actions and declare that there is no coverage under the CGL Policy for the Crittendens' or Torrence's claims or Dixie Electric's cross-claims against J&J Cable; and grant any other relief that the Court deems just and equitable under the circumstances.

RESPECTFULLY SUBMITTED,

DATED:  March 30, 2016              */s/  Lane Finch*
                                    F. LANE FINCH, JR.
                                    (ASB-0027-I58F)
                                    BRIAN C. RICHARDSON
                                    (ASB-5241-H14U)
                                    Attorneys for Essex Insurance Co.

**OF COUNSEL:**
SWIFT, CURRIE, McGHEE & HIERS, LLP
2 North 20th Street, Suite 1405
Birmingham, AL 35203
(205) 314-2401
lane.finch@swiftcurrie.com
brian.richardson@swiftcurrie.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that on March 30, 2016, I have served the foregoing by electronic filing through the Court's CM/ECF system the following attorneys of record:

John G. Smith
Louis M. Calligas
BALCH & BINGHAM, LLP
P. O. Box 78
Montgomery, AL 36101-0078

Tyrone C. Means
H. Lewis Gillis
MEANS GILLIS LAW, LLC
P. O. Box 5058
Montgomery, AL 36103

Robert Simms Thompson
Tiffany N. Johnson
THE LAW OFFICES OF ROBERT SIMMS THOMPSON, PC
P. O. Box 830780
Tuskegee, AL 36083

David E. Allred
D. Craig Allred
ALLRED & ALLRED, PC
7030 Fain Park Drive, Suite 9
Montgomery, AL 36117

*/s/ Lane Finch*
Of Counsel